Loan No. 52-9330000

## EXHIBIT "A"

### LEGAL DESCRIPTION OF LAND

Tract "A", Tract "B" and Lot 1, GRANDE LAKES APARTMENTS, according to the Plat thereof, as recorded in Plat Book 59, Page 46, of the Public Records of Orange County, Florida.

Loan No. 52-9330000

## EXHIBIT "B"

## DISBURSEMENT SCHEDULE

All Disbursements, Set Aside Letters and Letters of Credit shall be made or issued in accordance with the following terms, conditions and procedures:

(a)    _Disbursement Account._  The following demand deposit account (the "Disbursement Account") has been opened at the HINSDALE branch of BANK OF AMERICA (the "Bank") in the name of the Borrower, subject to a security interest in favor of the Lender, which has been acknowledged in writing by the Bank: Account no._____, ABA Number 000991. 0029104072 67

(b)    _Method of Disbursement._  Subject to fulfillment of all applicable conditions and the terms and procedures set forth in the Agreement and this Disbursement Schedule: (i) each Disbursement shall be made on the basis of a Disbursement Request submitted (in duplicate) by the Borrower to the Lender, pursuant to which Borrower shall certify that the Project Costs covered by the Disbursement Request have been paid or incurred by the Borrower, and (ii) upon the Lender's approval of the Disbursement Request, the proceeds of the Disbursement shall be deposited into the Disbursement Account or, in the case of Disbursements for any Line Item for "Land," into an escrow designated by the Borrower and approved by the Lender, except that (A) the proceeds of any Disbursement to pay interest or other amounts owing to the Lender shall be made by book entry, and (B) at the Lender's option, Disbursements may otherwise be made by the Lender directly to the Borrower, to the Contractor, if any, or to any other Lien Claimant, or jointly to one or more of such Persons or to other Persons designated by the Borrower, or in such other manner as the Lender may approve or require, including, without limitation, through the title company.

(c)    _Set Aside Letters and Letters of Credit._  Subject to fulfillment of all applicable conditions and the terms and procedures set forth in the Agreement and this Disbursement Schedule, the Lender shall issue Set Aside Letters from time to time and cause the LC Bank to issue Letters of Credit from time to time upon written request of the Borrower, provided that (i) the obligation of the Lender to issue any Set Aside Letter and the agreement of the Lender to cause the LC Bank to issue any Letter of Credit shall be subject to receipt by the Lender of the applicable Set Aside Letter Fee or Letter of Credit Fee and to the Lender's approval, in its sole discretion, of the form and substance of the Set Aside Letter or Letter of Credit and, except insofar as the purpose and maximum amount of the Set Aside Letter or Letter of Credit are set forth in Part C of Exhibit "C", the purpose and maximum amount of the Set Aside Letter or Letter of Credit, (ii) the issuance of any Letter of Credit shall be further subject to the consent and approval of the LC Bank in its sole discretion and to the approval by the Lender in its sole discretion of the terms and conditions of issuance, and the provisions for the issuance of Letters of Credit set forth herein shall in any event be subject to § 7.05(e) of the Agreement, and (iii) unless the Lender otherwise consents, (A) no Set Aside Letter shall obligate the Lender to advance funds after the Maturity Date, (B) no Letter of Credit shall have an expiration date after the Maturity Date, and (C) no Set Aside Letter or

Letter of Credit shall be issued if the Lender has reasonably determined that any Project Costs intended to be covered or secured by such Set Aside Letter or Letter of Credit are not likely to be incurred prior to the Maturity Date. The maximum amount that the Lender may be obligated to fund under any Set Aside Letter at any time plus any amounts actually funded by the Lender under any such Set Aside shall reduce, to that extent, the amount otherwise available to be disbursed or set aside for other Project Costs covered by the same Line Item, and any amount funded by the Lender under any Set Aside Letter shall be deemed to be a Disbursement of the proceeds of the Loan or Borrower's Funds (as the case may be) for purposes of the Agreement, the Note and the other Loan Documents (in each case regardless of whether the amount thereof plus all other Disbursements shall exceed the Loan Amount), except that the funding of any such amount shall not be subject to any conditions or requirements other than those set forth in the Set Aside Letter or Letter of Credit. Without limitation on the foregoing provisions of this paragraph (c), the Borrower acknowledges and agrees that (1) any disbursement by the LC Bank under any Letter of Credit represents an advance of the proceeds of the Loan to or for the account of the Borrower on behalf of the Lender, and (2) in consideration of the issuance of any such Letter of Credit and the obligation of the Lender to reimburse the LC Bank for any such disbursement thereunder, each such disbursement shall be deemed to be a Disbursement of the Loan (as described above) and the Borrower agrees to pay to the Lender the amount of each such disbursement, with interest thereon, on the terms set forth in the Note with respect to all Disbursements of the Loan (in each case regardless of whether the amount thereof plus all other Disbursements shall exceed the Loan Amount).

(d)    Line Item Budgets; Use of Proceeds. The Borrower shall deliver to the Lender, prior to the earlier of the first Disbursement or the first Set Aside Letter or Letter of Credit, if any, requested by the Borrower (or prior to such later date as the Lender may approve in writing), a Line Item Budget for the Project. Unless the Lender otherwise consents: (i) each Disbursement shall be made and used solely to pay or reimburse the Borrower for payment of, and each Set Aside Letter or Letter of Credit shall be issued solely with respect to, Project Costs associated with specific Line Items set forth in the Project Budget and any applicable Line Item Budget as specified in the Disbursement Request, and (ii) the total amount disbursed for Project Costs associated with any Line Item shall not exceed the corresponding amount set forth in the Project Budget and any applicable Line Item Budget (plus any amounts disbursed by the Lender for such purpose from "Contingency" in accordance with clause (B) below), and the amount of any Set Aside Letter or Letter of Credit issued in respect of any Line Item shall not exceed the corresponding amount set forth in the Project Budget and any applicable Line Item Budget less the total of all amounts previously disbursed or set aside (or secured by any Letter of Credit) for such Line Item. For purposes of this paragraph: (A) Disbursements with respect to any Line Item for "Land" shall be made for the purchase price of the Land and any existing improvements (if not previously purchased by the Borrower) and payment of existing Liens affecting the Collateral (other than Permitted Exceptions), with any balance to be disbursed as directed by the Borrower, (B) Disbursements with respect to any Line Item for "Contingency" shall be available for cost overruns on specific Line Items or for Project Costs for matters not covered by specific Line Items shall not exceed the percent of hard costs complete as determined by Lender's most current inspection, subject in each case to the prior approval of the Lender, and (C) Disbursements with respect to any Line Item for "Developer Overhead" and "Project Indirects" shall not exceed the percent of hard costs complete as determined by Lender's most current inspection.

2

If the Borrower effects any cost savings with respect to any Line Item, the Borrower shall give notice to the Lender of such cost savings promptly upon the discovery of the same, whereupon the amount of such cost savings shall be transferred from the Line Item(s) in question to the "Contingency" Line Item, and shall thereafter be available for disbursement as stated in clause (B) above.

Unless the Lender otherwise consents, no modifications shall be made to the Project Budget or any Line Item Budget at any time, except that (i) the Project Budget shall be supplemented from time to time by any Line Item Budget approved by the Lender, and (ii) the Project Budget and any applicable Line Item Budget shall be appropriately modified by the Lender from time to time to reflect any increase in Project Costs for which additional Borrower's Funds have been deposited by the Borrower with the Lender in accordance with paragraph (f) below. Notwithstanding, no disbursements allocated in the Line Item Project for actual constructions costs shall be disbursed for any other line item or purpose until, Borrower, or Lender if made without Borrower's consent, has, given written notice of said decision (including the amount of the loan proceeds to be so disbursed) to the Contractor and any other lienor who has given a notice to owner, all pursuant to Section 713.3471, (2), Florida Statutes, and to the extent permitted by law, Borrower will hold Lender harmless from and indemnify Lender from any such liability to such Persons.

(e)    <u>Disbursement, Set Aside Letter and Letter of Credit Procedures.</u> Each Disbursement (other than Disbursements to pay interest or other amounts owing to the Lender) and each Set Aside Letter or Letter of Credit shall be subject to prior receipt by the Lender, in form and substance satisfactory to the Lender, of each of the following items: (i) a Disbursement Request or Set Aside Letter Request or Letter of Credit Request, as the case may be, submitted (in duplicate) by the Borrower, certifying the status of construction of the Improvements and the amount requested (and the total of all amounts previously requested) with respect to each Line Item, and also certifying that no Event of Default has occurred and is continuing and that all Representations made by the Borrower in any of the Loan Documents are correct in all material respects as of the date of the Disbursement Request or Set Aside Letter Request or Letter of Credit Request, (ii) if requested by the Lender, a certificate or statement from the Contractor, if any, and/or the Architect with respect to the status of construction or the amount requested, (iii) originals or copies of such bills, invoices, receipts, lien releases or waivers or other evidence of payment or information as the Lender may reasonably require with respect to any Lien Claims or potential Lien Claims or the status of construction or amounts paid or payable for any Project Costs, (iv) to the extent that any Disbursement relates to costs for building materials, equipment or other Personal Property, evidence that such building materials, equipment or other Personal Property have been incorporated into the Improvements or have been delivered to the Borrower and stored and insured in a manner satisfactory to the Lender, (v) evidence of any insurance required by § 4.08 (if not previously furnished to the Lender) and, if requested by the Lender, evidence that any required Financing Commitment is in full force and effect, (vi) such endorsements to the Title Policy  and such other Documents and information relating to the Collateral or the Project as the Lender may reasonably request, (vii) in the case of the first Disbursement or Set Aside Letter or Letter of Credit only, the "Required Items" described in Exhibit "C", and (viii) to the extent provided in paragraph (d) above, any Line Item Budget required to be delivered to the Lender prior to the Disbursement or Set Aside Letter or Letter of Credit, and (ix) in the case of any

3

portion of the Loan which is subject to any "Retention Requirements" or other "Holdback Requirements" specified in Exhibit "C", such evidence as the Lender may require that all applicable conditions have been fulfilled.

Unless the Lender otherwise consents, not more than two Disbursements (other than Disbursements to pay interest or other amounts owing to the Lender) shall be made during any month. Unless otherwise paid by the Borrower, and notwithstanding paragraph (b) above, Disbursements for interest and other amounts owing to the Lender may be made by the Lender without further authorization from the Borrower.

Unless the Lender otherwise consents, the Lender shall not be obligated to make any Disbursement or issue any Set Aside Letter or cause any Letter of Credit to be issued if (A) the Lender has determined that an Event of Default has occurred or that an event which, with notice of the passage of time or both, would be an Event of Default has occurred or that any Representation made by the Borrower in any of the Loan Documents would not be correct in all material respects if made on and as of the date of the Disbursement or Set Aside Letter or Letter of Credit, or (B) the Lender has determined, based on inspections by or on behalf of the Lender or such other information as the Lender deems appropriate, that the construction of the Improvements is not substantially as represented by the Borrower or is not in compliance with the requirements of the Agreement, or (C) the Borrower has failed to deposit with the Lender any Borrower's Funds required by paragraph (f) below, or (D) the Lender is required under applicable Laws to withhold the Disbursement or Set Aside Letter or Letter of Credit or a stop notice has been asserted against the Lender and has not been fully released, or (E) the Lender has determined that any Liens or Rights of Others, other than Permitted Prior Exceptions, may have priority over the Mortgage with respect to the Disbursement or amounts that may be funded under the Set Aside Letter or Letter of Credit. Any liability of Lender to Contractor or other lienor giving notice to owner under Section 713.3471(1), Florida Statutes, resulting from Lender's failure to, within five (5) business days after such determination, give them written notice of any final determination of Lender, that Lender will cease further disbursements, shall not be asserted by Borrower.

(f)     Deposit of Borrower's Funds. Prior to the first Disbursement or Set Aside Letter or Letter of Credit (or prior to such later date as the Lender may approve in writing), the Borrower shall deposit with the Lender Borrower's Funds in an amount equal to all "Additional Costs To Be Paid By Borrower" set forth in the original Project Budget, and the Borrower may from time to time deposit additional Borrower's Funds with the Lender as the Borrower deems appropriate to cover any increase in Project Costs. In addition, if the Lender at any time determines that any actual or estimated Project Costs have exceeded or can reasonably be expected to exceed the corresponding amount set forth in the Project Budget or any applicable Line Item Budget (whether as a result of Change Orders or otherwise), or that Project Costs for any matters not covered by specific Line Items have been or may be incurred by the Borrower, or that the undisbursed portion of the Loan [together with the undisbursed portion of all Borrower's Funds deposited with the Lender under this paragraph (f)] is or may be insufficient to pay all Project Costs that may be payable under the Loan Documents or otherwise required in connection with the Project (including a reasonable reserve for contingency, interest and other costs and expenses), then the Borrower shall deposit with the Lender, on demand, additional Borrower's Funds in an amount deemed reasonably necessary by the Lender to pay such Project Costs or to cover such

4

Insufficiency. Any Borrower's Funds deposited with the Lender under this paragraph (f) shall be held in a Cash Collateral Account and shall be disbursed by the Lender prior to further Disbursements of the Loan.

(g)     Disbursement Controls.  Notwithstanding anything in this Exhibit "B" to the contrary, the disbursement controls shall be as follows:

| Disbursement Processing Description: | |
|---|---|
| • Loan Admin Due Diligence Review | Prior to Disbursement |
| • Backup Invoices for Hard Costs | Not Required |
| • Backup Invoices for Soft Costs | Required Over $5,000,000.00 |
| • Conditional/Unconditional Lien Waivers | Not Required |
| • Retention | Consistent with Building Contract |
| • Inspection of Hard Cost Items | Prior to Disbursement |
| • Title Endorsement | At disbursement |
| • Borrower's Draw Request (HBD –CL Form) | Required |
| • Frequency of Disbursement | 1-2 a month |
| Sales Verification | Monthly Sales Report |

5

Loan No. 52-9330000

## EXHIBIT "C"

## LOAN REQUIREMENTS

Borrower:     HAWTHORNE GRANDE LIMITED PARTNERSHIP, a Florida limited partnership

Project:     Hawthorne Grande

Loan Amount: $46,295,000.00

Loan Fee:     $694,425.00 (.75% per annum of Loan Amount), payable contemporaneously with the execution of this Agreement

A.     Required Items (to be furnished by the Borrower prior to the first Disbursement or Set Aside Letter):

    1.     Promissory Note in the face amount of $46,295,000.00 executed by the Borrower in favor of the Lender to evidence the Loan.

    2.     Construction Mortgage with Assignment of Rents, Security Agreement and Fixture Filing executed by the Borrower in favor of the Lender to secure the Loan and other Obligations of the Borrower, which shall cover the Real Property, certain Personal Property, the Project Agreements, the Improvement Plans and such other rights, properties and interests relating to the Project or any other Collateral as the Lender may require.

    3.     Financing statement executed by the Borrower in favor of the Lender with respect to such Collateral as the Lender may require.

    4.     Secured Environmental Indemnity executed by the Borrower.

    5.     General Guaranty of all Obligations of the Borrower executed by Ganesan Visvabharathy and the General Partner.

    6.     Environmental Guaranty executed by Ganesan Visvabharathy and the General Partner.

    7.     Cash Collateral Agreement executed by Borrower and consented to by the bank where the Cash Collateral Account is maintained.

    8.     Cash Collateral Agreement relating to net operating income executed by Borrower.

    9.     Cash Collateral Agreement – LC executed by Borrower and consented to by the bank where the LC account is maintained.

10. Collateral Assignment of Contracts for Purchase and Sale of Condominium Units.

11. Borrower's Affidavit.

12. Business Purpose Affidavit.

13. Notice of Special Flood Hazards.

14. Statement Under Rule 4 – 124.013.

15. Compliance Agreement.

16. Statement Regarding Legal Services.

17. Subordination Agreement – None.

18. Authorizing Resolutions for each Loan Party.

19. Charter Documents for each Loan Party.

20. Opinion of counsel for the Loan Parties from Gray/Robinson, Attorneys at Law (covering the due authorization, execution and delivery of the Loan Documents, the enforceability of the Loan Documents and such other matters as the Lender may reasonably require).

21. Current Financial Statements for Ganesan Visvabharathy.

22. Evidence of insurance required by § 4.08.

23. Assignment of Project Documents executed by the Borrower.

24. Copy of preliminary title report and recorded exceptions.

25. Evidence of compliance with zoning/zoning endorsement and other land use restrictions.

26. Environmental investigative report prepared by Universal Engineering Services.

27. Appraisal(s) prepared by the Lender or an appraiser approved by the Lender confirming the prospective market value of (A) the Project, assuming completion of the Construction of the Improvements to be not less than $57,400,000.00.

28. Evidence of Utility Services.

29. Copy of any proposed CC&R's or easements, when available.

30. Copy of budget for condominium association, when available.

31. Statement of conditions for transfer of common areas to homeowners association, if applicable and when available.

32. Copy of preliminary Condominium Declaration, when available.

33. List of bonds, security deposits, Set Aside Letters or Letters of Credit required in connection with the Project.

34. Borrower's Funds in the form of cash deposits for all "Additional Costs To Be Paid By Borrower" set forth in the Project Budget.

35. Evidence of recording/filing of Mortgage/financing statement.

36. Confirmation that Title Policy has been or will be issued at or prior to first Disbursement or Set Aside Letter.

37. Insured Closing Protection Letter from the title company addressed to Lender concerning the title agent, if applicable.

38. UCC searches showing financing statement executed by the Borrower to be a first priority filing.

39. Evidence that the Loan Fee and all closing costs payable by the Borrower under § 4.12 have been or will be paid at or prior to the recordation of the Mortgage.

40. Evidence that Borrower has contributed cash equity of at least $9,215,000.00 at the time of closing.

41. 2005 Tax Return Certification – Ganesan Visvabharathy.

42. Mezzanine Lender Loan Documents - None.

43. Firm Commitment from Marshall & Ilsley Bank for purchase of a participation in the amount of fifty (50%) percent of the Loan.

44. Confirmation (i) that Ganesan Visvabharathy owns all of the issued and outstanding shares of stock of the General Partner and (ii) that Ganesan Visvabharathy owns 100% of the membership interests of Hawthorne Grande, LLC, a Florida limited liability company.

B.   <u>Additional Matters</u> (including disclosure of finder's or broker's fees, Special Taxes, flood conditions, development conditions or impediments, pending or unissued consents and approvals, delayed delivery of Line Item Budgets and delayed deposit of Borrower's Funds): none.

C.   <u>Set Aside Letters and Letters of Credit</u>. The Borrower anticipates that the following Set Aside Letter(s) and Letter(s) of Credit may be necessary or desirable in connection with the Project: not known at this time.

3

As a condition to the issuance of each Set Aside Letter and Letter of Credit, the Borrower shall pay to the Lender a nonrefundable Set Aside Letter Fee in an amount to be determined by Lender by or a nonrefundable Letter of Credit Fee in an amount to be determined by Lender. Each such Set Aside Letter Fee or Letter of Credit Fee shall be fully earned when paid and shall not be refundable, in whole or in part, under any circumstances.

D.  Presale Requirements: No sales of Units in any Building shall be closed and no common areas shall be transferred to any homeowners association until at least 50% of the Units in such Building have become "sold" Units.

E.  Holdback Requirements (other than any "Retention Requirements" specified below):

NONE

F.  Retention Requirements: Retention shall be consistent with the Construction Contract, on a trade by trade basis in accordance with commercially reasonable custom in the area in which the Project is located.

G.  Financial Covenants:

1.  Borrower shall provide or cause to provide to Lender until the Loan is paid in full:

a.  Financial Statement for Ganesan Visvabharathy after the end of each fiscal year end within 120 days prepared in accordance with generally accepted accounting principles consistently applied;

b.  Financial Statement for Ganesan Visvabharathy after the end of each quarter setting forth a calculation of his liquid assets in accordance with the definition of liquid assets set forth in paragraph G.2.b. below.;

c.  Federal Tax Returns with all schedules including K-1, if applicable, for Ganesan Visvabharathy within 30 days of filing;

2.  Borrower acknowledges that net worth is a significant consideration to Lender in connection with the making of the Loan. Accordingly, Borrower agrees that the failure by Ganesan Visvabharathy to maintain the following financial capabilities shall constitute an Event of Default.

a.  Tangible Net Worth of Ganesan Visvabharathy as of the end of each calendar year in an amount not less than Fifty-Two Million Five Hundred Thousand and No/100 Dollars ($52,500,000.00). Tangible Net Worth shall mean the excess of Assets over Liabilities, excluding, however from the determination of Assets: (i) all assets that would be classified as intangible assets under GAAP, including without limitation, goodwill (whether representing the excess of cost over book value of assets acquired or otherwise), negative goodwill, patents, trademarks, trade names, copyrights, franchises and deferred charges (including without limitation, unamortized debt discount and expense, organization costs and research and development costs); and (ii) subordinated debt.

4

b. As of the date hereof and until August 10, 2006, liquid assets of Ganesan Visvabharathy of not less than One Million Five Hundred Thousand and No/100 Dollars ($1,500,000.00). Effective August 10, 2006 and as of the end of each calendar quarter thereafter during the term of the Loan, liquid assets of Ganesan Visvabharathy not less than Five Million and No/100 Dollars.

c. A Maximum Debt to Net Worth ratio for Ganesan Visvabharathy not exceeding 2.00 to 1.00 as of the end of each calendar year. Debt shall mean all debts and monetary obligations of Ganesan Visvabharathy, including contingent obligations.

H.   Other Requirements:

1.   Condominium Declaration.   Prior to the closing of the first Unit, the Borrower shall record the Condominium Declaration for the Project which Condominium Declaration shall be subject to Lender's approval, which approval shall not be unreasonably withheld.

2.   Absorption Rate.   Commencing in July of 2006, the Borrower shall cause not less than 13 Units per month to be sold during each three-month period, calculated on a rolling three-month basis.   Commencing in September of 2006, the Borrower shall cause the sale of not less than 10 Units to be closed each month.

As used in this Exhibit:  (a) a "closed" Unit means a Unit as to which title has been conveyed to the purchaser, and (b) a "sold" Unit means a Unit as to which a purchaser (other than the Borrower or an Affiliate of the Borrower) has entered into a binding agreement to purchase the Unit for an amount not less than the "Minimum Sales Price" set forth on Exhibit "E" and has paid a nonrefundable deposit to the Borrower, and escrow instructions have been executed by the Borrower and the purchaser.

3.   Sales Start Date.  The Borrower shall cause the first Unit to be available for sale no later than 90 days after the date of the Mortgage is recorded.

4.   Speculative Units.  N/A.

5.   Standing Inventory.  N/A.

6.   Maximum Number of Units Under Construction.  N/A.

7.   Letter of Credit.  N/A.

8.   Remargining.  As a condition of the Loan, Lender may obtain, prior to August of 2006, a new appraisal to be paid in full by the Borrower.  The appraisal to be conducted in accordance with the standards regarding real estate — secured lending as set forth in Title 11 of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") regulations promulgated thereunder and Lender's current appraisal policies and reporting guidelines, and may include an in-house appraisal reviewed by Lender (collectively the "Appraisal").

If, taking the Appraisal into consideration, Lender determines that the Appraised Loan-to-Value Ratio of the Property exceeds 80% (the "Adjusted Percentage"), Lender shall have the right to demand immediate payment from Borrower, and Borrower agrees to pay to Lender on demand, such sum for application against the outstanding commitment of the Note as Lender may determine as necessary to cause the Appraised Loan-to-Value Ratio of the Property to be no greater than 80%.

"Appraised Loan-to-Value Ratio" shall mean the ratio of the then existing loan budget to the Prospective Market Value upon Completion of Construction ("PMVCC") of the Property as improved by the Improvements. PMVCC shall be the value of the Units upon completion as determined by Lender at the origination of this Loan. Subject to the foregoing, PMVCC shall be deemed to have the meaning assigned to it under FIRREA.

9.    Monthly Operating Statements.    Borrower shall provide a monthly operating statement for each month during the term of the Loan, with each such statement to be delivered within fifteen (15) days after the end of the subject month, which shall set forth the Net Cash Flow of the Borrower for the subject month, and each of which statements shall be certified by the chief financial officer of the Borrower. The term Net Cash Flow, as used herein, shall have the meaning set forth in the Cash Collateral Agreement (NOI) of even date herewith given by Borrower to Lender.

10.    Recording of Condominium Declaration. The Borrower shall cause, within 180 days from the date that the Mortgage is recorded, a Declaration of Condominium covering all of the Units and the entire Project, to be filed for record in Orange County, Florida. The Declaration of Condominium must be consistent with the Improvement Plans for the Project approved by the Lender, in full compliance with all Laws and requirements of Governmental Agencies (including, without limitation, Chapter 718, Florida Statutes, and all local ordinances).

11.    Change in Management Positions in Borrower and General Partner. Ganesan Visvabharathy presently serves as the senior manager of the General Partner and the Borrower. If the Borrower or the General Partner or both contemplate a change in such management, Borrower shall provide Lender with written notice of such proposed change, together with all information as may be requested by Lender for review. No such change in management shall be made by the Borrower or the General Partner or both without the Lender's prior written approval.

Loan No. 52-9330000

## LOAN BUDGET SUMMARY    EXHIBIT "D"

### Hawthorne Grande Limited
### Orlando, Florida

| Cost Category | Total Project Cost | Total Loan Funds | Cash Equity | Deferred / and Apprec. Equity |
|---|---|---|---|---|
| Land (1000) | $49,698,259 | $40,683,259 | $9,215,000 | $0 |
| Land Cost | $49,304,863 | $40,089,863 | $9,215,000 | $0 |
| Land Cost Other | $593,396 | $593,396 | $0 | $0 |
| Site Costs (2000) | $0 | $0 | $0 | $0 |
| Overex Sitework | $0 | $0 | $0 | $0 |
| Site Costs Other | $0 | $0 | $0 | $0 |
| Direct Construction Costs (3000) | $172,400 | $172,400 | $0 | $0 |
| Direct Construction Costs | $172,400 | $172,400 | $0 | $0 |
| Indirect Construction Costs (4000) | $2,745,135 | $2,745,135 | $0 | Cash Flow |
| Developer O/H (3% of sales max) | $443,744 | $443,744 | $0 | $0 |
| Arch/Engineering | $25,000 | $25,000 | $0 | $0 |
| Contractor Fee | $162,500 | $162,500 | $0 | $0 |
| Funds advanced to collateralize L/C | $1,000,000 | $1,000,000 | $0 | $0 |
| Project Indirects (3% of costs max) | $323,500 | $323,500 | $0 | $0 |
| Taxes/Ins. Bonds/Misc | $580,391 | $580,391 | $0 | $0 |
| Legal Acctg/ Misc | $130,000 | $130,000 | $0 | $0 |
| Sales / Marketing Costs (5000) | $1,606,134 | $1,606,134 | $0 | $0 |
| On-going Marketing/Advertising | $1,511,134 | $1,511,134 | $0 | $0 |
| Start-Up Marketing | $0 | $0 | $0 | $0 |
| Model Landscape/ Furnishing | $95,000 | $95,000 | $0 | $0 |
| Financing Costs (6000) | $3,292,856 | $1,039,211 | $0 | $2,253,445 |
| Interest Reserve | $2,598,231 | $344,786 | $0 | $2,253,445 |
| Loan Fee - HBD | $694,425 | $694,425 | $0 | $0 |
| Loan Fee - Broker | $0 | $0 | $0 | $0 |
| General Contingency (7000) | | | | |
| Contingency | $48,661 | $48,661 | $0 | $0 |
| Total | $57,763,445 | $46,295,000 | $9,215,000 | $2,253,445 |

Loan No. 52-9330000

### EXHIBIT "E"

### MINIMUM SALES AND RELEASE PRICES

| Plan | Approximate Unit Size | No. of Units | Minimum Release Prices |
|------|----------------------|--------------|------------------------|
| A | 801 sq. ft. | 42 | $147,082.00 |
| B | 843 sq. ft. | 42 | 168,646.00 |
| C | 877 sq. ft. | 42 | 183,020.00 |
| D | 996 sq. ft. | 24 | 198,448.00 |
| E | 1,018 sq. ft. | 24 | 209,228.00 |
| F | 1,215 sq. ft. | 42 | 223,725.00 |
| G | 1,245 sq. ft. | 42 | 245,007.00 |
| H | 1,515 sq. ft. | 24 | 285,177.00 |
| I | 1,551 sq. ft. | 24 | 314,598.00 |
| | Garage | 45 | 13,475.00 |

Total No. of Residential Units:   306

The "Release Price" for each Unit shall be the greater of the amount shown in this Exhibit "E" for that type of Unit or 100% of the net sales price (which shall mean the total sales price less (A) the lesser of (i) reasonable and customary closing costs paid by the Borrower including sales commissions, escrow fees, title insurance premiums, transfer taxes, prorations for real property taxes and other similar charges, or (ii) 6% of the total sales price.

Loan No. 52-9330000

## EXHIBIT "F"

## DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

"Acceptable Sales Contract" means a firm and binding sale contract for a Unit, in form and substance previously approved by Lender, subject to changes thereto requested by the purchaser and agreed to by Borrower exercising prudent business judgment, and, in addition to complying therewith and with any other applicable provision of this Agreement, such sale contract shall (a) be entered into with a financially responsible purchaser, (b) provide that the purchase price for such Unit be not less than the Minimum Sales Price applicable to such Unit, (c) require purchaser to make a non-refundable earnest money deposit of not less than 5% of the amount of the Sales Contract, (d) provide for closing of such Unit upon substantial completion of the Unit or, if said Unit is substantially completed on the date Borrower and the purchaser enter into such purchase contract, within six (6) months from the date of said purchase contract and (e) not contain any conditions precedent to the purchaser's obligations thereunder which have not been satisfied or waived by such purchaser.

"Additional Collateral Agreements" means the "Additional Collateral Agreements" (if any) specified in Exhibit "C" and any other mortgages, assignments or other agreements (other than the Mortgage) now or in the future securing the Loan or any Guaranty.

"Affiliate" means, as to any Person, any other Person that directly or indirectly controls or is controlled by or under common control with the Person specified.

"Agreement" means this Building Loan Agreement, including all exhibits.

"Alternate Rate" means the "Alternate Rate" set forth in the Note.

"Architect" means any Person engaged by the Borrower from time to time as an architect or to perform similar functions in connection with the Project.

"Architect Agreement" means, as to any Architect, the agreement between the Borrower and the Architect relating to services to be provided by the Architect in connection with the Project.

"Authorization" means any authorization, consent, approval, order, license, permit, exemption or other action by or from, or any filing, registration or qualification with, any Governmental Agency or other Person.

"Authorizing Resolutions" means (a) in the case of a corporation, a certified copy of resolutions adopted by its board of directors, (b) in the case of a partnership (whether general or limited), a certificate signed by all of its general partners, and (c) in the case of a trust or any other entity, evidence of such other action as the Lender may require, in each case authorizing the execution, delivery and performance of all Loan Documents to which it is a party or by which it is bound.

"Banking Day" means any day (excluding Saturdays and Sundays) on which banks located in Florida are not authorized or required by law to close.

"Borrower's Funds" means any funds of the Borrower deposited with the Lender pursuant to the Disbursement Schedule.

"Building" means individually, and "Buildings" mean collectively, each building presently on the Land as part of the Project within which the Units will be located.

"Cash Collateral Account" means a cash collateral account maintained by the Lender for the account of the Borrower for purposes of this Agreement or any of the other Loan Documents which shall be subject to a security interest in favor of the Lender for the purpose of securing the Borrower's Obligations and over which the Lender shall have sole and exclusive control and right of withdrawal.

"Change Order" means a change in, or supplement to, the Improvement Plans.

"Charter Documents" means (a) in the case of a corporation, its articles of incorporation and bylaws, (b) in the case of a limited liability company, its articles of organization and operating and/or management agreement, (c) in the case of a partnership, its partnership agreement and any certificate or statement of partnership, and (d) in the case of a trust or any other entity, its formation documents, in each case as amended from time to time.

"Closed Unit" means a Unit as to which title has been conveyed, pursuant to an Acceptable Sales Contract, to a bona fide purchaser.

"Collateral" means all property in which the Lender is granted or purportedly granted a Lien pursuant to the Mortgage.

"Competing Project" means any residential housing improvements or units which are located within a radius of five (5) miles of the Project.

"Condominium Declaration" shall mean the document by which the Project will be submitted to the condominium form of ownership pursuant to the Florida Condominium Act (the "Act"), prepared in accordance with the Act and which establishes the rights and easements in connection with the Project for the benefit of all future owners of the Units.

"Construction" means the performance of the work necessary, as set forth in the Improvement Plans, to make the Land and the Improvements ready for conversion to the condominium form of ownership and to allow the sale of the Units.

"Construction Contract" means, as to any Contractor, the agreement between the Borrower and the Contractor relating to services to be provided by the Contractor in connection with the Project.

"Contractor" means any Person engaged by the Borrower from time to time as a general contractor in connection with the Project.

3

"Cost Savings" means the excess, if any, of any Line Item over the actual Project Costs incurred in connection with the work associated with such Line Item, as determined by the Lender after such work has been completed and all such Project Costs have been paid in full and all Lien Claims and potential Lien Claims relating to such work have been released or otherwise discharged to the satisfaction of the Lender.

"Declaration" means the Condominium Declaration and those declarations (and supplemental declarations) of covenants, conditions and restrictions described in the Title Policy (or subsequently recorded by or on behalf of the Borrower, with the Lender's prior written consent) and governing the development of the Project.

"Disbursement" means each disbursement of the proceeds of the Loan and each disbursement of any Borrower's Funds in accordance with the Disbursement Schedule or any Set Aside Letter or Letter of Credit. Without limitation on the foregoing, any amount funded by the Lender under any Set Aside Letter or disbursed by the LC Bank under any Letter of Credit shall be deemed to be a disbursement of the proceeds of the Loan (or, in the case of any Set Aside Letter, a disbursement of Borrower's Funds, if applicable).

"Disbursement Account" has the meaning set forth in paragraph (a) of the Disbursement Schedule.

"Disbursement Request" means a written request for a Disbursement in a form approved by the Lender.

"Disbursement Schedule" means the "Disbursement Schedule" attached as Exhibit "B".

"Documents" means written documents and materials, including agreements, approvals, certificates, consents, instruments, financing statements, reports, budgets, forecasts and opinions.

"Environmental Indemnity" means the Environmental Indemnity executed by the Borrower in favor of the Lender and described in Exhibit "C".

"Events of Default" means the events set forth in § 6.01.

"Financial Statements" means balance sheets and income statements.

"Flood Hazard Area" means an area which has been designated as a special flood hazard area or subject to comparable risks by the Federal Emergency Management Agency or any successor to such Agency.

"Governmental Agency" means (a) any government or municipality or political subdivision of any government or municipality, (b) any assessment, improvement, community facilities or other special taxing district, (c) any governmental or quasi-governmental agency, authority, board, bureau, commission, corporation, department, instrumentality or public body, (d) any court, administrative tribunal, arbitrator, public utility or regulatory body, or (e) any central Lender or comparable authority.

4

"Guarantor" means any Person who has executed or is required to execute a Guaranty, and such Person's successors and assigns.

"Guaranty" means any Guaranty executed in favor of the Lender and described in Exhibit "C".

"Improvement Plans" means the improvement plans and specifications described in Exhibit "C", as modified by any Change Orders approved by the Lender.

"Improvements" means all buildings and other improvements presently located upon the Land, including the 11 buildings in which 306 residential apartment units are located and the Construction to be performed upon same.

"Land" means the land described in Exhibit "A".

"Laws" means all federal, state and local laws, rules, regulations, ordinances and codes.

"LC Bank " means a bank designated by the Lender as the LC Bank in connection with any Letter of Credit to be issued under this Agreement.

"Letter of Credit" means a standby letter of credit issued by an LC Bank for the account of the Lender, or for the account of the Borrower and the Lender, in favor of a surety, Governmental Agency or other Person approved by the Lender, to secure the payment of Project Costs by the Borrower or the payment or performance of other obligations of the Borrower in connection with the Project, in each case as approved by the Lender in its sole discretion.

"Letter of Credit Fee" means a nonrefundable fee to be paid by the Borrower to the Lender as a condition to the issuance of any Letter of Credit, in each case in the amount set forth in Exhibit "C".

"Letter of Credit Request" means a written request for a Letter of Credit in a form approved by the Lender.

"Lien" means any lien, mortgage, pledge, security interest or other charge or encumbrance.

"Lien Claim" means (a) any mechanics lien affecting any of the Collateral, (b) any stop notice affecting the undisbursed portion of the Loan or any Borrower's Funds, (c) any right of any Person to assert or maintain any such mechanics lien or stop notice, and (d) any other claim to payment by any Lien Claimant.

"Lien Claimant" means the Contractor, if any, and any other Person who has furnished labor, service, equipment or material in connection with the Project or who is otherwise entitled to payment for any Project Costs.

"Line Item" means each of the separate items set forth in the Project Budget and in any Line Item Budget.

5

"Line Item Budget" means a budget for the Project in form and substance satisfactory to the Lender and setting forth in such detail as the Lender may require the nature and amount of all Project Costs anticipated in connection with the Project as such budget may be modified from time to time in accordance with the Disbursement Schedule.

"Loan" means the loan to be made by the Lender to the Borrower pursuant to this Agreement in an amount not to exceed the Loan Amount.

"Loan Amount" means the amount of the Loan set forth in § 1.00.

"Loan Documents" means this Agreement, the Note, the Mortgage, the Environmental Indemnity, the Guaranties, and any Additional Collateral Agreements, as the same may be amended, renewed or extended from time to time.

"Loan Fee" means a nonrefundable loan fee to be paid by the Borrower to the Lender at or prior to the time of recordation of the Mortgage in the amount set forth in Exhibit "C".

"Loan Party" means (a) the Borrower, (b) any Guarantor which at the time has or may have any obligation or liability (whether fixed, contingent or otherwise) under the Guaranty executed or to be executed by it, (c) any Person executing any Additional Collateral Agreements, and (d) in the case of any Loan Party which is a partnership, any general partner of such Loan Party.

"Loan to Value Ratio" means eighty percent (80%).

"Maturity Date" means the maturity date of the Note; as such maturity date may be extended pursuant to this Agreement.

"Mezzanine Lender" – None.

"Mortgage" means the Construction Mortgage with Assignment of Rents, Security Agreement and Fixture Filing executed by the Borrower to secure the Loan.

"Note" means the Promissory Note executed by the Borrower in favor of the Lender to evidence the Loan.

"Obligations" means all obligations of the Borrower of every nature under the Loan Documents.

"Other Requirements" means (a) the terms, conditions and requirements of all Project Agreements, Authorizations and Rights of Others relating to the Collateral or the Project and all other Documents, agreements and restrictions relating to, binding on or affecting the Collateral or the Project, including the Declaration and other covenants, conditions and restrictions, leases, easements, reservations, rights and rights-of-way, (b) requirements relating to the sale or transfer of individual Units or common areas or portions of common areas or the supply of Utility Services to the Real Property, (c) requirements and recommendations of the soils report and any environmental impact report or negative declaration, (d) all building, zoning, land use, planning and subdivision

6

requirements, and (e) requirements relating to construction of any offsite improvements or any construction contemplated by any Set Aside Letter or Letter of Credit.

"Parking Spaces" shall mean a parking space in the Project which may either be a Unit or a limited common element.

"Permitted Exceptions" means (a) Liens in favor of the Lender, (b) Permitted Prior Exceptions, and (c) other matters expressly approved by the Lender in writing which are subject and subordinate to the Lien of the Mortgage.

"Permitted Prior Exceptions" means (a) general ad valorem real property taxes which are not delinquent, (b) Special Taxes described in Part B of Exhibit "C" or otherwise approved in writing by the Lender which in each case are not delinquent, (c) such other matters as the Lender shall expressly approve in writing as "Permitted Prior Exceptions" for purposes of this Agreement.

"Permitted Transfer" means (a) any sale or other transfer of Units and common areas (or undivided interests in common areas) and the disposition of any excess proceeds of sale, in each case to the extent permitted by § 4.05, and (b) any transfer or other disposition of Personal Property permitted by § 4.06.

"Person" means any person or entity, whether an individual, trustee, corporation, partnership, limited liability company, joint stock company, trust, unincorporated organization, bank, business association or firm, joint venture, Governmental Agency or otherwise.

"Personal Property" means tangible personal property and fixtures, including building materials and supplies, appliances, furnishings, equipment and other "Goods" (as defined in the Mortgage), but excluding construction equipment of a type intended for use in connection with other projects.

"Project" means the project for the acquisition of the Land and the improvements thereon, the Construction of the Improvements, the acquisition and installation of certain Personal Property, the development of the Land and the Improvements in accordance with the Improvement Plans, and the marketing and sale of Units.

"Project Agreements" means (a) the Architect Agreement, if any, the Construction Contract, if any, any Financing Commitment and any other takeout, refinancing or permanent loan commitment issued or assigned to the Borrower with respect to the Real Property, and (b) all leases, rental agreements, service and maintenance agreements, purchase and sale agreements, purchase options and other agreements of any nature relating to the Collateral or the Project, including agreements with contractors, subcontractors, suppliers, project managers and supervisors, designers, architects, engineers, sales agents and consultants, and (c) the Condominium Declaration.

"Project Budget" means the budget for the Project attached as Exhibit "D", as supplemented by each Line Item Budget approved by the Lender from time to time, in each case as modified from time to time in accordance with the Disbursement Schedule.

"Project Costs" means all costs and expenses of any nature relating to the Project or the financing of the Project.

"Real Property" means the Land and the Improvements and all other buildings, structures and improvements now or in the future located on the Land.

"Remedy" means any right, power or remedy.

"Representations" means the representations and warranties of the Borrower set forth in § 5.00 and all other representations, warranties and certifications to the Lender in the Loan Documents or in any other Document delivered under or in connection with the Loan Documents.

"Right of Others" means, as to any property in which a Person has an interest, any legal or equitable claim or other interest (other than a Lien but including a leasehold interest, a right of first refusal or a right of repossession or removal) in or with respect to such property held by any other Person, and any option or right held by any other Person to acquire any such claim or other interest or any Lien in or with respect to such property.

"Set Aside Letter" means (a) a letter from the Lender to a surety setting forth the Lender's undertaking to fund Project Costs for construction of Improvements to be bonded by the surety in connection with the Borrower's development of the Project, or (b) a letter from the Lender to a Governmental Agency setting forth the Lender's undertaking to fund Project Costs for construction of Improvements in connection with the Borrower's development of the Project.

"Set Aside Letter Fee" means a nonrefundable fee to be paid by the Borrower to the Lender as a condition to the issuance of any Set Aside Letter, in each case in the amount set forth in Exhibit "C".

"Set Aside Letter Request" means a written request for a Set Aside Letter in a form approved by the Lender.

"Sold Unit" means a Unit subject to a binding contract between Borrower and a contract purchaser which is an Acceptable Sales Contract.

"Special Tax" means, as to any property, (a) any special assessment or other Tax which is or may become a Lien affecting such property, other than general ad valorem real property taxes, and (b) any assessment, improvement, community facilities or other special taxing district in or into which such property is or may be located or incorporated or under which any special assessment or other Tax which is or may become a Lien affecting such property is or may be imposed.

"Taxes" means all taxes, assessments, charges, fees and levies (including interest and penalties) imposed, assessed or collected by any Governmental Agency.

"Title Policy" means an ALTA 1970 form (amended 1984) lender's policy of title insurance in form and substance satisfactory to the Lender, issued by an insurer selected by the Borrower and satisfactory to the Lender, together with such endorsements and policies of coinsurance and/or reinsurance as may be required by the

Lender, in a policy amount equal to the Loan Amount, insuring the Mortgage to be a valid first priority Lien on the Land and showing the Land to be subject only to Permitted Prior Exceptions.

"Unit" shall mean each residential condominium unit to be located on the Land (and, in the event the Condominium Declaration establishes parking spaces as units, each Parking Space) within the Project. "Units" means all of the Units collectively.

"Utility Services" means all utility services, including water, gas, if any, electricity, telephone, garbage removal and sewer services.

9

EXHIBIT A
CONT.

PLAINTIFF'S
EXHIBIT

05-06-2006

Loan No. 52-9930000

**GENERAL GUARANTY**

(Real Estate Secured Loan)

TO:   INDYMAC BANK, F.S.B.

THIS GENERAL GUARANTY ("Guaranty"), dated May 06th, 2006, is made by GANESAN VISVABHARATHY AND HAWTHORNE ORLANDO CORPORATION, a Florida corporation (individually and collectively, the "Guarantor"), in favor of INDYMAC BANK, F.S.B. (the "Lender"), and is executed pursuant to the Building Loan Agreement dated as of the date of this Guaranty between the Lender and HAWTHORNE GRANDE LIMITED PARTNERSHIP, a Florida limited partnership (the "Borrower") (such Building Loan Agreement, as it may from time to time be supplemented, modified and amended, being referred to in this Guaranty as the "Agreement"), the provisions of which are incorporated in this Guaranty by reference.  The Agreement provides, among other things, for rules of construction which apply to this Guaranty.  Capitalized terms used in this Guaranty and not otherwise defined are used with the meanings set forth in the Agreement.

Subject to the terms and conditions set forth in the Agreement, the Lender has agreed to make a loan to the Borrower in the amount of $46,295,000.00 (the "Loan") to finance the real estate project of the Borrower known as Hawthorne Grande (the "Project").  The Loan will be secured by a Mortgage executed by the Borrower with respect to the Project.  As a condition of the obligation of the Lender to make the Loan, the Guarantor is required to execute and deliver to the Lender this Guaranty.

To induce the Lender to make the Loan and for other valuable consideration, the Guarantor agrees as follows:

1.     Guaranteed Obligations.  The Guarantor absolutely and unconditionally guarantees the punctual and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the following (the "Guaranteed Obligations"):  (a) all present and future indebtedness evidenced by the Note dated the date of this Guaranty in the face principal amount of $46,295,000.00 executed by the Borrower to the order of the Lender, including principal, interest and all other amounts payable under the terms of the Note; and (b) all other present and future obligations of the Borrower to the Lender under the Loan Documents (including any Environmental Indemnity executed by the Borrower in favor of the Lender and obligations in respect of Letters of Credit and Set Aside letters); in each case as such indebtedness and other obligations may from time to time be supplemented, modified, amended, renewed and extended, whether evidenced by new or additional Documents or resulting in a change in the interest rate on any indebtedness or otherwise.  Upon the occurrence of any Event of Default, all Guaranteed Obligations shall, at the option of the Lender, immediately become due and payable by the Guarantor without protest, presentment, notice of dishonor, demand or further notice of any kind, all of which are expressly waived by the Guarantor, and irrespective of whether any Guaranteed Obligations have then become due and payable by the Borrower or any other Loan Party (each of the Borrower and any other Loan Party other than the Guarantor being referred to in this Guaranty as an "other Loan Party").

2.    Nature of Guaranty.   This Guaranty is a guaranty of payment and performance and not of collection and applies to all Guaranteed Obligations, whether existing now or in the future, including (a) interest and other Guaranteed Obligations arising or accruing after bankruptcy of any Loan Party or any sale or other disposition of any Security for this Guaranty or for the obligations of any other Loan Party (any such security being referred to in this Guaranty as the "Security"), and (b) any Guaranteed Obligations that survive repayment of the Loan. This Guaranty and any Security for this Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment or performance of any Guaranteed Obligations is rescinded or must otherwise be returned by the Lender or any other Person upon the bankruptcy, insolvency or reorganization of any Loan Party or otherwise, all as though such payment or performance had not occurred. The Guarantor shall have no authority, and hereby waives any right to revoke this Guaranty, but if any purported revocation shall be deemed to have occurred by operation of law or otherwise, the provisions of this Guaranty shall continue to apply notwithstanding such revocation.

3.    Obligations Independent.   The obligations of the Guarantor under this Guaranty are independent of the obligations of any other Loan Party under the Loan Documents (such obligations of any other Loan Party, including the Borrower's obligations in respect of the Guaranteed Obligations, being referred to in this Guaranty as the "Other Obligations") and any Security, and the enforceability of any Security for this Guaranty is likewise independent of any such Other Obligations and any other Security. The Lender may bring action against the Guarantor and otherwise enforce this Guaranty or any Security for this Guaranty without bringing action against any other Loan Party or joining any other Loan Party in any action against the Guarantor, and otherwise independently of any other Remedy that may be available to the Lender at any time with respect to any Other Obligations or Security. The Guarantor waives any right to require the Lender at any time to proceed against any other Loan Party, apply any Security or otherwise enforce, proceed against or exhaust any Other Obligations or Security or pursue any other Remedy in the Lender's power.

4.    Action with Respect to Other Obligations or Security.   The Guarantor authorizes the Lender, without notice or demand and without affecting its liability under or the enforceability of this Guaranty or any Security for this Guaranty, from time to time to: (a) supplement, modify, amend, renew, extend, accept partial payments or performance on, or otherwise change the time, manner or place of payment or performance or the interest rate or other terms or the amount of, or release, reconvey, terminate, waive, abandon, subordinate, exchange, substitute, transfer or consent to the transfer of or enter into or give any other agreement, approval, waiver or consent with respect to or in exchange for any Other Obligations or Security or any of the Loan Documents; (b) receive and hold additional Security or guaranties; (c) release any other Loan Party from any personal liability with respect to any Other Obligations and participate in any bankruptcy or reorganization of any other Loan Party in such manner as the Lender may determine; and (d) accelerate, settle, compromise, compound, sue for, collect or otherwise liquidate, enforce or deal with any Other Obligations or Security (including judicial or nonjudicial sale or other disposition of any Security), bid and purchase at any sale or other disposition of any Security and apply any Security and any proceeds or other payments received by the Lender, in each case in such order and manner as the Lender may determine.

5.    Waiver of Defenses.   The Guarantor waives any defense to the enforcement of this Guaranty or any Security for this Guaranty arising by reason of:

2

(a) any present or future Laws or orders affecting the terms of, or the Lender's Remedies with respect to, any Other Obligations or Security; (b) the absence or cessation of personal liability of any other Loan Party with respect to any Other Obligations; (c) the failure of any other Person to execute this Guaranty or any other guaranty or agreement; (d) the failure of any Loan Party to properly execute any Loan Document or otherwise comply with applicable legal formalities; (e) the unenforceability or invalidity of any Other Obligations or Security or the lack of perfection or failure of priority or any other loss or impairment of any Security; (f) any discharge or release of any other Loan Party or any Other Obligations or Security or any impairment or suspension of any Remedies of the Lender, whether resulting from any act or omission of the Lender or any other Person or by operation of law or otherwise; (g) any bankruptcy, insolvency or reorganization of any Loan Party or any disability or other defense of any other Loan Party with respect to any Other Obligations or Security; (h) any failure of the Lender to disclose to the Guarantor any information relating to the financial condition, operations, properties or prospects of any other Loan Party now or in the future known to the Lender (the Guarantor waiving any duty on the part of the Lender to disclose such information); (i) any failure of the Lender to monitor proper application of loan funds or compliance with the Loan Documents, or to preserve, insure or protect any Security or any subrogation, contribution or reimbursement rights of the Guarantor; (j) any application of proceeds or payments received by the Lender to obligations other than the Guaranteed Obligations; (k) any other action by the Lender, whether authorized by § 4 or otherwise, or any omission by the Lender or other failure of the Lender to pursue, or any delay in pursuing, any other Remedy in the Lender's power; or (l) any defense arising from a claim that the obligations of the Guarantor are greater than those of the Borrower or any other Loan Party. Guarantor waives all rights and defenses arising out of any election of remedies by the Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the Guarantor's rights of subrogation and reimbursement against the principal by the operation of principles of subrogation, contribution, indemnification or otherwise.

The Guarantor waives all rights and defenses that the Guarantor may have because the Borrower's debt is secured by real property. This means, among other things:

1. The Lender may collect from the Guarantor without first foreclosing on any real or personal property collateral pledged by the Borrower.

2. If the Lender forecloses on any real property collateral pledged by the Borrower:

(A) The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

(B) The Lender may collect from the Guarantor even if the Lender, by foreclosing on the real property collateral, has destroyed any right the Guarantor may have to collect from the Borrower.

This is an unconditional and irrevocable waiver of any rights and defenses the Guarantor may have because the Borrower's debt is secured by real property.

The Guarantor further waives: (i) any defense to the recovery by the Lender against the Guarantor of any deficiency or otherwise to the enforcement of this Guaranty or any Security for this Guaranty after a nonjudicial sale or other disposition of any Security for any Other Obligations that is determined, for any reason, to not have been conducted in a commercially reasonable manner, even though, in the case of any such Security subject to the Uniform Commercial Code, such failure may prevent the Guarantor from exercising Reimbursement Rights against any other Loan Party; (ii) any rights, defenses or benefits that are or may be available to the Guarantor by reason of suretyship principles, or comparable provisions of the Laws of any other jurisdiction and all other suretyship defenses it would otherwise have under the Laws of Florida or any other jurisdiction; (iii) all benefits of any statute of limitations affecting the Guarantor's liability under or the enforcement of this Guaranty or any Other Obligations or Security; (iv) all setoffs and counterclaims; (v) promptness, diligence, presentment, demand for performance and protest; (vi) notice of nonperformance, default, acceleration, protest or dishonor; (vii) except for any notice otherwise required by applicable Laws that may not be effectively waived by the Guarantor, notice of sale or other disposition of any Security; and (viii) notice of acceptance of this Guaranty and of the existence, creation or incurring of new or additional Guaranteed Obligations, and all other notices of any kind with respect to any Other Obligations.

6.    Waiver of Reimbursement Rights.    Until all Other Obligations have been paid and performed in full, the Guarantor shall not exercise any rights of subrogation, reimbursement, contribution or indemnification or any similar rights or remedies (collectively, "Reimbursement Rights") against any other Loan Party, and waives any right to enforce any Remedy which the Lender now has or may in the future have against any other Loan Party and any benefit of, and any right to participate in, any Security or Other Obligations now or in the future held by the Lender. If the Guarantor nevertheless receives payment of any amount on account of any such Reimbursement Rights or otherwise in respect of any payment or performance by the Guarantor of any Guaranteed Obligations prior to payment and performance in full of all Other Obligations, such amount shall be held in trust for the benefit of the Lender and immediately paid to the Lender for application to the Other Obligations in such order and manner as the Lender may determine.

7.    Representations of the Guarantor.    The Guarantor represents and warrants to the Lender that:  (a) this Guaranty is executed at the request of the Borrower; (b) the Guarantor has established adequate means of obtaining from any other Loan Parties on a continuing basis information pertaining to, and is now and on a continuing basis will be completely familiar with, the financial condition, operations, properties and prospects of such other Loan Parties; (c) the Guarantor has received and approved copies of all of the other Loan Documents; and (d) no oral promises, assurances, representations or warranties have been made by or on behalf of the Lender to induce the Guarantor to execute and deliver this Guaranty.

8.    Financial Statements and Tax Returns.    Ganesan Visvabharathy hereby agrees to deliver to the Lender, the following: (a) within one hundred twenty (120) days after the end of each fiscal year of Ganesan Visvabharathy for so long as any portion of the Loan is outstanding, Financial Statements for Ganesan Visvabharathy, in form and detail satisfactory to Lender, for and as at the end of each fiscal year, (b) after the end of each quarter for Ganesan Visvabharathy, Financial Statements for and as at the end of such quarter verifying cash liquidity amounts of Ganesan Visvabharathy in form and detail satisfactory to Lender, (c) tax returns including K-1's for Ganesan Visvabharathy

4

within thirty (30) days of filing, and (d) upon request by the Lender from time to time, copies of Financial Statements prepared on behalf of Ganesan Visvabharathy, in each case certified in a manner acceptable to the Lender.

9.    Indemnification by the Guarantor.    Without limitation on any other obligations of the Guarantor or Remedies of the Lender under this Guaranty, the Guarantor shall indemnify, defend and save and hold harmless the Lender from and against, and shall pay on demand, any and all losses, liabilities, damages, costs, expenses and charges (including the reasonable fees and disbursements of the Lender's legal counsel) suffered or incurred by the Lender as a result of (a) any failure of any Guaranteed Obligations to be the legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their terms, except as enforcement may be limited by bankruptcy, insolvency or other similar Laws affecting the rights of creditors generally, or (b) any failure of the Borrower to pay and perform any Guaranteed Obligations in accordance with the terms of such Guaranteed Obligations.

10.    Rights of Setoff.    Upon the occurrence and during the continuance of any Event of Default, the Lender is authorized at any time and from time to time to the fullest extent permitted by applicable Laws, and without notice or demand, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender to or for the credit or account of the Guarantor against any and all obligations of the Guarantor under this Guaranty.

11.    Waivers and Amendments.    No supplement to, modification or amendment of, or waiver, consent or approval under, any provision of this Guaranty shall be effective unless in writing and signed by the Lender, and any waiver, consent or approval shall be effective only in the specific instance and for the specific purpose for which given.

12.    Remedies.    Each of the Remedies provided in this Guaranty is cumulative and not exclusive of, and shall not prejudice, any other Remedy provided in this Guaranty or by applicable Laws or under any other Loan Document. Each Remedy may be exercised from time to time as often as deemed necessary by the Lender, and in such order and manner as the Lender may determine. No failure or delay on the part of the Lender in exercising any Remedy shall operate as a waiver of such Remedy; nor shall any single or partial exercise of any Remedy preclude any other or further exercise of such Remedy or of any other Remedy.

13.    Costs and Expenses.    The Guarantor shall pay to the Lender on demand all costs, expenses and charges of the Lender in connection with the enforcement of, or the exercise of any Remedy or any other action taken by the Lender under or in connection with, this Guaranty or any Guaranteed Obligations, including the reasonable fees and disbursements of the Lender's legal counsel and other out-of-pocket expenses.

14.    Notices.    All notices and other communications provided under this Guaranty shall be in writing and mailed or delivered to the Guarantor at the address set forth on the signature page of this Guaranty or at any other address in the State of Florida as may be designated by the Guarantor in a written notice sent to the Lender in accordance with § 7.03 of the Agreement. Any notice or other communication will be effective (a) if given by mail, on the earlier of receipt or the third day after deposit in the

United States mails with first-class postage prepaid, or (b) if given by personal delivery, when delivered.

15.    Binding Agreement. This Guaranty shall be binding on and inure to the benefit of the Guarantor and the Lender and their respective successors and assigns, except that the Guarantor shall have no right to assign any interest under this Guaranty without the prior written consent of the Lender. The Lender may from time to time assign its interest under this Guaranty in whole or in part without notice to or the consent of the Guarantor.

16.    Multiple Guarantors. If more than one Person signs this Guaranty as Guarantor, (a) the term "Guarantor" shall mean each such Person, (b) the obligations of each Guarantor shall be joint, several and independent, and (c) this Guaranty shall be construed and enforced as though each Guarantor executed a separate guaranty on the terms set forth in this Guaranty.

17.    Governing Law. This Guaranty has been delivered in Florida and shall be governed by, construed and enforced in accordance with the laws of Florida.

18.    Time of Essence. Time is of the essence of each and every provision of this Guaranty.

19.    Nature of Waivers. THE GUARANTOR HEREBY ACKNOWLEDGES THAT (A) THE GUARANTOR HAS CONSULTED WITH LEGAL COUNSEL TO UNDERSTAND THE FULL IMPACT OF THE WAIVERS MADE BY THE GUARANTOR PURSUANT TO THIS GUARANTY, INCLUDING THOSE SET FORTH IN SS 2, 3, 4, 5, 6 AND 20 HEREOF, (B) THE GUARANTOR UNDERSTANDS THE FULL IMPACT OF SUCH WAIVERS, AND (C) SUCH WAIVERS HAVE BEEN KNOWINGLY AND WILLINGLY MADE BY THE GUARANTOR.

20.    Waiver of Jury Trial. EACH OF THE LENDER AND THE GUARANTOR WAIVE TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING (INCLUDING COUNTERCLAIMS), WHETHER AT LAW OR EQUITY, BROUGHT BY THE LENDER OR THE GUARANTOR AGAINST THE OTHER ON MATTERS ARISING OUT OF OR IN ANY WAY RELATED TO OR CONNECTED WITH THIS GUARANTY, THE OTHER LOAN DOCUMENTS, THE LOAN OR ANY TRANSACTION CONTEMPLATED BY, OR THE RELATIONSHIP BETWEEN THE LENDER AND THE GUARANTOR OR ANY OTHER LOAN PARTY OR ANY ACTION OR INACTION BY ANY PARTY UNDER, ANY OF THE LOAN DOCUMENTS.

21.    Financial Covenants.    Guarantor acknowledges that Ganesan Visvabharathy's net worth is a significant consideration to Lender in connection with the making of the Loan.    Accordingly, so long as any portion of the Loan remains outstanding, Ganesan Visvabharathy covenants and agrees to maintain the following financial capabilities. Any failure by Ganesan Visvabharathy to maintain such financial capabilities shall constitute an Event of Default.

(a)    Tangible net worth of not less than $52,500,000.00 measured annually. Tangible net worth shall mean the excess of Assets over Liabilities, excluding however, from the determination of Assets: (i) all assets that would be classified as intangible assets under GAAP, or such other accounting principles as Lender may find acceptable from time to time, including, without limitation, goodwill (whether representing

6

the excess of cost over book value of assets acquired or otherwise) negative goodwill, patents, trademarks, trade names, copyrights, franchises and deferred charges (including, without limitation, unamortized debt discount and expense, organization costs and research and development costs); and (ii) subordinated debt.

(b)    As of the date hereof and until August 10, 2006, liquid assets of not less than $1,500,000.00.  Effective August 10, 2006 and as of the end of each calendar quarter thereafter, liquid assets of not less than $5,000,000.00.  Liquid assets shall mean cash or readily marketable public traded securities with an investment grade rating by a nationally recognized rating agency.

(c)    A maximum debt to worth ratio not exceeding 2.0 to 1.0, measured annually.  Debt shall mean all debts and monetary obligations of Ganesan Visvabharathy, including contingent obligations, and worth shall be determined as set forth in this section.

"GUARANTOR":

_____
Ganesan Visvabharathy

Hawthorne Orlando Corporation, a Florida corporation

By:_____
    Ganesan Visvabharathy, President

(Corporate Seal)

Address of Guarantor:
101 Burr Ridge Parkway, Suite 306
Burr Ridge, Illinois 60527

87981_2.DOC

7

PLAINTIFF'S
EXHIBIT

4



July 23, 2007

Hawthorne Grande Limited Partnership                    **VIA UPS OVERNIGHT DELIVERY**
101 Burr Ridge Parkway, Suite 306
Burr Ridge, IL 60527

Attn: Dr. Ganesan Visvabharathy

|        | Re:    | Lender:   | IndyMac Bank, F.S.B. |
|--------|--------|-----------|---------------------|
|        |        | Borrower: | Hawthorne Grande Limited Partnership, a Florida limited partnership |
|        |        | Loan No.: | 52-9930001 |
|        |        | Loan Balance: | $46,069,227.57 |
|        |        | Guarantors: | Hawthorne Orlando Corporation, a Florida corporation, and Dr. Ganesan Visvabharathy |

Dear Dr. Visvabharathy:

Please be advised that Hawthorne Grande Limited Partnership (the "Borrower") is in default under the Note, the Mortgage, the Building Loan Agreement and the other documents which evidence and secure the above Loan (collectively the "Loan Documents") by reason of numerous Events of Default, including, without limitation, the following Events of Default:

(a)    Failure by the Borrower to pay the installments of interest due as follows:

May 1, 2007 in the amount of $326,041.96; June 1, 2007 $339,201.26; and July 1, 2007 in the amount of $328,519.01.

By reason of the continuing Events of Default under the Loan, as described above, Lender hereby declares the entire unpaid principal balance of the Note and all accrued and unpaid interests thereon to be due and payable in full. The following amounts are now due and payable under the Note:

| (i)   | Principal balance | $45,069,227.57 |
|-------|-------------------|----------------|
| (ii)  | Interest due (from 4/1/07 to 7/24/07) | 1,245,711.73 |
| (iii) | Late Fees | 188,714.26 |
| (iv)  | Inspection Fees | 200.00 |
| (v)   | Past Due Legal Fees | 8,557.84 |

www.indymacbank.com

{O1172121;1}

Homebuilder Division
233 South Wacker Drive, Suite 4620, Chicago, IL 60606

Tel: 312.332.5405
Fax: 312.332.5427

Hawthorne Grande Limited Partnership
Attn: Dr. Ganesan Visvabharathy
July 23, 2007
Page 2

| | | |
|---|---|---|
| (vi) | Endorsement Fee | 600.00 |
| (vii) | Reconveyance Fee | 45.00 |
| (viii) | UCC-Filing Fee | 20.00 |
| (ix) | Demand Fee | 25.00 |
| Total | | $46,513,101.40 |

In addition, commencing on July 24, 2007, per diem interest of $14,710.09 (at the Alternate Rate (currently base rate plus 3% per annum or 11 ¾%) as reported in the *Wall Street Journal* on July 23, 2007, but not to exceed 24% per annum) shall accrue on the outstanding principal balance of the Loan.

Funds should be wire transferred to:

IndyMac Bank, F.S.B.

888 E. Walnut Avenue

Pasadena, CA 91101

Account Name: HBD Payoff Account

Routing Number: 322270288

Account Number: 85-27122-200000

Reference: Code X25QPC1

Loan Number 52-9930001

Borrower Name: Hawthorne Grande, LP

Capitalized terms used in this letter, but not defined herein, shall have the respective meanings set forth in the Loan Documents.

To the maximum extent provided for under the Loan Documents and under the guarantees executed by the guarantors (the "Guarantors") listed above in favor of Lender, Lender will seek to hold Borrower and the Guarantors liable for payments of the amounts due and owing

Hawthorne Grande Limited Partnership
Attn: Dr. Ganesan Visvabharathy
July 23, 2007
Page 3

to the Lender including, without limitation, the amounts set forth above and attorneys' fees and costs.

Please be advised that the description of the Loan Documents contained in this letter shall not be deemed to limit, amend or modify the terms of or otherwise affect the Loan Documents or any other documents evidencing or securing the Loan. Additionally, any description herein of the specific rights or remedies of the Lender shall not be deemed to limit or exclude any other rights or remedies to which Lender may be or become entitled to under the Loan or the Loan Documents at law, in equity, or otherwise.

This Notice is being sent to you as a courtesy only and shall in no way be deemed to obligate Lender to give you or anyone else any notice of any kind in connection with the Loan Documents or otherwise. Any and all non-waiver provisions in favor of Lender contained in the Loan Documents remain in full force and effect and shall not be deemed to have been waived, in whole or in part, by Lender as a result of the delivery of this letter.

If the Lender does not receive payment in full of the above sums in clear funds within five (5) business days from the date hereof, Lender may, at its option, proceed with any and all rights and remedies that Lender may have, both at law or in equity, against the Borrower, the Guarantors, and the security for the Loan pledged by the Borrower.

Please govern yourself accordingly.

Very truly yours,

IndyMac Bank, F.S.B.

By: _Todd Camp_____
Name:  Todd Camp
Title:   First Vice President_____