# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

INDYMAC BANK, F.S.B., a )
Federal Saving Bank, )
                     )
        Plaintiff, )
                     )  No. 07 C 6224
    vs. )
                     )
GANESAN VISVABHARATHY, an )
individual and HAWTHORNE )
ORLANDO CORPORATION, a )
Florida corporation, )
                     )
        Defendants. )

        The telephonic evidence deposition of

GANESAN VISVABHARATHY called for examination

pursuant to Notice and the Rules of Civil Procedure

for the United States District Courts pertaining to

the taking of depositions, taken before Anna Maria

Castle, a Notary Public within and for the County

of Will and State of Illinois, at 55 West Monroe,

Suite 3200, Chicago, Illinois, on the 19th day of

April, 2008, at the hour of 10:00 o'clock a.m.

REPORTED BY:  ANNA MARIA CASTLE, CSR

LICENSE NO.:  084-004148

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 2

```
1   APPEARANCES:
2       LEVENFELD PEARLSTEIN, LLC,
3       BY: MR. GARY I. BLACKMAN and
4       MR. JIM MARTIGNON
5       Two North LaSalle Street, Suite 1300
6       Chicago, Illinois 60602
7       (312) 476-7536
8           Representing the Plaintiff;
9
10      SPERLING & SLATER,
11      BY: MR. DANIEL A. SHMIKLER
12      55 W. Monroe Street, Suite 3200
13      Chicago, Illinois 60603
14      (312) 641-3200
15          Representing the Defendants.
16
17
18
19
20
21
22
23
24
```

Page 3

```
1              I N D E X
2
3   WITNESS                          PAGE
4   GANESAN VISVABHARATHY
5       Direct Examination by Mr. Shmikler    4
6       Cross Examination by Mr. Blackman    29
7
8
9
10
11             E X H I B I T S
12  NUMBER                   MARKED FOR ID
13  Deposition Exhibit
14
15      Nos. 1 and 2              13
16      No. 3                     16
17      No. 4                     19
18      No. 5                     106
19      No. 6                     130
20
21
22
23
24
```

Page 4

```
1              (Witness sworn.)
2           GANESAN VISVABHARATHY,
3   called as a witness herein, having been first duly
4   sworn, was examined and testified as follows:
5            DIRECT EXAMINATION
6   BY MR. SHMIKLER:
7       Q.  Good morning, or maybe I should say good
8   evening to you.
9           Where are you calling from?
10      A.  India.
11      Q.  And could you state and spell your name
12  for the record, please.
13      A.  Ganesan Visvabharathy, G-a-n-e-s-a-n
14  V-i-s-v-a-b-h-a-r-a-t-h-y.
15      Q.  And where do you currently reside?
16      A.  In India.
17      Q.  What is your address there?
18      A.  It is 196/8 Asiad Colony, Anna Nagar West,
19  Chennai 600101.
20      Q.  How long have you lived there?
21      A.  Since about November of '07.
22      Q.  Are you married?
23      A.  Yes.
24      Q.  What is your wife's name?
```

Page 5

```
1       A.  Suriya Sastri, S-a-s-t-r-i.
2       Q.  Does your wife reside with you?
3       A.  No, sir, we are separated.
4       Q.  Is there a divorce proceeding that's
5   pending?
6       A.  Yes.
7       Q.  How long has that been pending since?
8       A.  Since February of '06.
9       Q.  Who filed for divorce, you or your wife?
10      A.  She did.
11      Q.  Are you contesting her right to a divorce?
12      A.  No, we are only in dispute about division
13  of property.
14      Q.  And where does your wife live?
15      A.  7529 Ridgewood Lane, Burr Ridge, Illinois.
16      Q.  Did you formally live at that address?
17      A.  Yes.
18      Q.  When did you begin living at that address?
19      A.  When did I begin living?
20      Q.  At that address, yes.
21      A.  That address, I think we bought the home
22  in December of '04.  So since December of '04 I was
23  living there.
24      Q.  And when did you move out?
```

2 (Pages 2 to 5)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 6

1    A.  About the summer of '06.
2    Q.  When you left, did you move out
3  temporarily and permanently?
4    A.  Permanently.
5    Q.  And what do you mean when you say you
6  moved out permanently?
7    A.  Well, because, you know, we were
8  separating. I'm going through a divorce, so there
9  was no point in living in that house, so I moved
10  out.
11    Q.  When you moved out, did you intend to move
12  back at any point?
13    A.  No.
14    Q.  When you moved out, did you complete a
15  forwarding address request for the post office?
16    A.  Yes.  I instructed one of my employees to
17  do that.
18    Q.  What's his name?
19    A.  Viswamatham, V-i-s-w-a-m-a-t-h-a-m.
20    Q.  Is that his first name or last name?
21    A.  That's his last name.
22    Q.  Do you know his first name?
23    A.  I don't know his first name.
24    Q.  Do you know whether he did that, that is,

Page 7

1  put in the address change request?
2    A.  Yes, I know he did that because I talked
3  to him and he said he had made that, change of
4  address form.  And also subsequently, I received a
5  lot of mail forwarded from Burr Ridge to my new
6  home in LaGrange.
7    Q.  Despite that, do you know if any of your
8  mail has gone to the Ridgewood Lane or Burr Ridge
9  address since you left?
10    A.  Some mail could have gone there since I
11  left, yes.
12    Q.  Okay.  Have you ever picked up mail to you
13  that was sent to the Burr Ridge after you moved
14  out?
15    A.  I'm not able to hear you.
16    Q.  Sorry.
17       Have you ever picked up any mail that was
18  sent to Burr Ridge after you moved out?
19    A.  Yes, yes.  When I go to get the children,
20  my wife would sometimes give me mail that would
21  come for me and sometimes she would forward it to
22  my office.
23    Q.  Now, after you moved out, did you ever
24  tell anyone that Burr Ridge was your address and

Page 8

1  that they should send you mail there?
2    A.  When I moved out?
3    Q.  After you moved out.
4    A.  No.
5    Q.  Now, when you would get mail from your
6  wife, either at your office or directly, that had
7  been sent to you at Burr Ridge, what would you do
8  with it?
9    A.  Oh, you mean when I get the mail from
10  Burr Ridge?
11    Q.  Right.  You said that sometimes you would
12  get mail from your wife and then she would send it
13  to your office; that it would be sent to
14  Burr Ridge.  When that would happen, what would you
15  do?
16    A.  If it was not junk mail, I would have my
17  secretary inform the sender of my current address
18  in LaGrange.
19    Q.  You mean your then current address?
20    A.  Yes, that's what I mean, then current
21  address.
22    Q.  Do you still own any financial interest in
23  that Burr Ridge house?
24    A.  Yes.  And I expect I will until it's

Page 9

1  resolved in my divorce proceeding.
2    Q.  It's your understanding it's part of the
3  marital estate that's being divided?
4    A.  That's my understanding.
5    Q.  Do you have any possessions of yours still
6  at the Burr Ridge address?
7    A.  I have left some old clothes and books and
8  things like that but nothing of any value.
9    Q.  Have you ever gone back to Burr Ridge for
10  the purpose of retrieving any of that stuff?
11    A.  No, not for the purpose of retrieving any
12  of that stuff, no.
13    Q.  Do you have any intent of going back to
14  get it at any point?
15    A.  No.
16    Q.  Would you care if your wife just threw
17  that stuff out?
18    A.  I don't care.
19    Q.  All right.  When you left Burr Ridge, did
20  you go live somewhere else?
21    A.  Yes.
22    Q.  Where did you go to live?
23    A.  400 South Catherine Avenue in LaGrange.
24    Q.  That's in Illinois?

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 10

1  A. Yes, Illinois.
2  Q. Now, after you moved out of Burr Ridge to
3  go live in LaGrange, did you ever go back to live
4  at the Burr Ridge house?
5  A. No, not to live at the Burr Ridge house.
6  I did stay there temporarily to take care of my
7  children for about a month, I don't know, between
8  the end of '06 and the beginning of '07 when my
9  wife went to India, but I was only house sitting
10 and watching the children. But I did not intend to
11 establish a residence there. And I maintained my
12 residence in LaGrange during that time. My
13 belongings remained in LaGrange, and I was still
14 paying the utilities in LaGrange.
15 Q. Was that the only time that you even
16 stayed at the Burr Ridge house after you moved out?
17 A. Was that the only time what?
18 Q. That you stayed at the Burr Ridge house
19 after you had moved out?
20 A. Yes, yes, to baby-sit my children.
21 Q. Now, how long did you live at that address
22 in LaGrange?
23 A. Oh, until -- LaGrange, until October of
24 '07.

Page 11

1  Q. Okay. Now, you've got some documents over
2  there I think were forwarded on to you for use in
3  this examination.
4      If you would, I'd like you to get ahold of
5  your affidavit that's dated March 13th of 2008.
6  A. You mean March 13th?
7  Q. March 13th, 2008.
8      Let me know when you've got that in front
9  of you.
10 A. Okay.
11 Q. Are you still looking for it?
12 A. Yeah. Hold on. Hold on. I'll be able to
13 get it.
14     March 13th?
15 Q. Right. The date you'll find at the bottom
16 of it next to your signature.
17 A. Hold on.
18 Q. Are you still looking?
19 A. Yes, I have my affidavit dated February
20 14.
21 Q. Right. There should be another one.
22 There should be the March 13th one that has the two
23 bills attached to it.
24 A. That has what attached to it?

Page 12

1  Q. Two bills.
2  A. Oh, two bills attached to it. Yeah, I got
3  that. I got the bills. Yes, I got that.
4  Q. Do you have the affidavit or just the
5  bills?
6  A. I have the bills.
7  Q. All right. We don't need the affidavit.
8  Let's mark the bills as Exhibits 1 and 2.
9  A. I think I can get the affidavit.
10 Q. The other side might want to ask you about
11 the affidavit. I'm only going to ask you about the
12 bills anyway.
13     MR. BLACKMAN: It's pretty short. Why don't
14 you just read it into the record.
15     MR. SHMIKLER: That's fine.
16 BY MR. SHMIKLER:
17 Q. So you do or you don't have the affidavit
18 on you?
19 A. I can pull up the affidavit. It's going
20 to take a little bit.
21 Q. Let's focus on the bills right now. We'll
22 mark those as Exhibits 1 and 2. Exhibit 1 will be
23 the ComEd bill.
24     (Whereupon, Deposition Exhibits

Page 13

1          Nos. 1 and 2 was marked for
2          identification.)
3  THE WITNESS: Okay.
4  BY MR. SHMIKLER:
5  Q. You have those two in front of you?
6  A. Yes.
7  Q. If you take a look at the ComEd bill.
8  A. Yes.
9  Q. Let's see. Direct your attention towards
10 the top here, that's your name, and that's the
11 address in LaGrange where you described you were
12 living at the time?
13 A. That's correct.
14 Q. That has an issue date of September 14th
15 of 2007, so you were living at that address at that
16 time?
17 A. Correct.
18 Q. So the electric service -- is this
19 something you received?
20 A. Yes.
21 Q. All right. So I take it the electric was
22 in your name at that location at that time?
23 A. Right.
24 Q. Now, if you'll flip over to the next page

4 (Pages 10 to 13)

Page 14

1  or to the other bill which looks like it's a Direct
2  TV bill dated October 5th of 2007; do you see that?
3      A.  Yes, I see that.
4      Q.  Is this also a bill that you received and
5  paid to that address?
6      A.  Yes.
7      Q.  I think you said you lived in LaGrange
8  until October of 2007?
9      A.  Correct.
10     Q.  Where did you go to live after that?
11     A.  I moved to India to live with my cousin in
12 Chennai.
13     Q.  When you left LaGrange, was it your
14 intention to at some point go back to living in
15 LaGrange at some point in the future?
16     MR. BLACKMAN:  Objection as to leading.
17     THE WITNESS:  When I left LaGrange, was it my
18 intention to come back to LaGrange you mean?
19 BY MR. SHMIKLER:
20     Q.  Right.
21     MR. BLACKMAN:  Same objection.
22     THE WITNESS:  No.
23 BY MR. SHMIKLER:
24     Q.  Did you mean to move out temporarily or

Page 15

1  permanently?
2      A.  Permanently.
3      Q.  Why did you move to India?
4      A.  For business, you know, real estate market
5  is cold there considerably and, you know, there
6  were still many opportunities in India.
7      Q.  When you moved to India, was it your
8  intent to establish a permanent residence there?
9      MR. BLACKMAN:  Objection, asked and answered.
10     THE WITNESS:  Yes.
11 BY MR. SHMIKLER:
12     Q.  When you did that, did you have to
13 register with Indian immigration or any other
14 Indian government immigration agency?
15     A.  Usually only the arrival registration, and
16 beyond that I don't have to register yet at this
17 time.
18     Q.  Are you a citizen of India?
19     A.  No, I'm not a citizen of India.  I had to
20 give up my Indian citizenship when I became a U.S.
21 citizen.  But as a former citizen of India, I'm
22 entitled to OCI status overseas in India.  I don't
23 have to register for that yet, but when the time
24 comes, I intend to do so.

Page 16

1      Q.  You said you're entitled to the OCI status
2  is that what you said, Dr. Vish?
3      A.  Yes.
4      Q.  What does OCI stand for?
5      A.  OCI stands for Overseas Citizen of India.
6      Q.  Now, you said you had the February 14th
7  affidavit on hand.  Why don't you take a look at
8  that, please.  We'll mark it as Exhibit 3.
9          (Whereupon, Deposition Exhibit
10             No. 3 was marked for
11             identification.)
12     THE WITNESS:  Yes, I have it.
13 BY MR. SHMIKLER:
14     Q.  All right.  I want to direct your
15 attention -- first of all, is that your signature
16 at the bottom?
17     A.  Yeah, I see the date at the bottom.
18     Q.  And is that your signature?
19     A.  Yes.
20     Q.  Did you execute this on or about the date
21 February 14th?
22     A.  That is correct.
23     Q.  I want to direct your attention to
24 paragraph 4 of that affidavit where you had said,

Page 17

1  "I have been travelling abroad for the past several
2  months beginning in about October of 2007"; do you
3  see that?
4      A.  Yeah, I have the affidavit.
5      Q.  Do you see that paragraph I just referred
6  to?
7      A.  Hello?
8      Q.  Can you hear me?
9      A.  Hello?
10     Q.  Can you hear me?
11     A.  Hello?
12     Q.  Yes, hello?
13     A.  Hello?
14     Q.  Hello, can you hear me?
15     MR. SHMIKLER:  Off the record for a second.
16         (Discussion off the record.)
17 BY MR. SHMIKLER:
18     Q.  Before we were disconnected I was
19 directing you to paragraph 4 of your February 14th
20 affidavit; do you see that?
21     A.  Yes.
22     Q.  Do you recall that paragraph you wrote, "I
23 have been travelling abroad for the past several
24 months beginning in about October 2007"; do you see

5 (Pages 14 to 17)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 18

1  that?
2      A.  Yes.
3      Q.  In light of your testimony that around
4  that time you moved to India, what did you mean by
5  this in this affidavit?
6      A.  Well, right after I moved to India I did a
7  lot of travelling on business to many different
8  places but my residence was Chennai.
9      Q.  Where were you travelling?
10     A.  Different cities in India, Bombay, Delhi,
11 Bangalore, Chennai.  And I also went to Sri Lanka.
12 I was in Austria, France, other places.
13     Q.  What kind of places were you looking at
14 while you were travelling?
15     A.  Well, I was just looking at potential real
16 estate projects.
17     Q.  Where were you living on December 1st,
18 2007?
19     A.  In Chennai.
20     Q.  Again, among the documents you should have
21 for use of this deposition are a series of -- I
22 think it's six pages of bills from Chennai; do you
23 have that?
24     A.  Yes.

Page 19

1      MR. SHMIKLER:  Let's mark this as Group Exhibit
2  4.
3          (Whereupon, Group Deposition
4          Exhibit No. 4 was marked for
5          identification.)
6  BY MR. SHMIKLER:
7      Q.  I'm going to start with the order I happen
8  to have them here.  The first one looks like it's a
9  bill from Vasanth & Company, V-a-s-a-n-t-h.  And it
10 looks like it's dated December 12 of '07, assuming
11 it's the date they use over there.  Do you see that
12 one; it's for a washing machine?
13     A.  Yeah, washing machine, yes.
14     Q.  In India, that date that it says there,
15 6.12.2007, what does that mean?
16     A.  In India they always put the day first.
17 Month is second.  Day, month, and year.
18     Q.  That was December 6 of 2007?
19     A.  That is December 6 of 2007, yes.
20     Q.  And what does this reflect, what
21 transaction does this reflect?
22     A.  This is purchase of a washing machine.
23     Q.  You bought it?
24     A.  Yes.

Page 20

1      Q.  And what was it for?
2      MR. BLACKMAN:  To wash clothes.
3      THE WITNESS:  For use in the residence.
4  BY MR. SHMIKLER:
5      Q.  And the next page, it looks like another
6  bill from the same company, what's the date on this
7  one?
8      A.  What date are you referring to?
9      Q.  I'm sorry, I forgot you don't have them in
10 the order I do.  I have one for Whirlpool High
11 Cool?
12     A.  Yeah, Whirlpool High Cool, that has
13 December 1, yes.
14     Q.  And again, was this something that you
15 bought?
16     A.  Yes.
17     Q.  And for what use?
18     A.  That's for use in the residence.
19     Q.  And the next one I have, again, the same
20 company.  It looks like for a television set?
21     A.  Yes.
22     Q.  What's the date on that one?
23     A.  That is November 30th.
24     Q.  And this television was for what use?

Page 21

1      A.  This is a TV, again, for use in the
2  residence.
3      Q.  The next one I have is a bill from a Megha
4  Systems, M-e-g-h-a?
5      A.  Yeah.
6      Q.  What's the date on this one?
7      A.  That's November 28.
8      Q.  Okay.  What was this for?
9      A.  This is -- they came to fix the computer.
10     Q.  And it has the -- on the "to" line there,
11 was that your name and your address at the time?
12     A.  Yes.
13     Q.  All right.  The next page I got is from
14 Udison Technologies, U-d-i-s-o-n?
15     A.  Right.
16     Q.  What's the date on this one?
17     A.  That is November 19th.
18     Q.  And what was this for?
19     A.  This is the purchase of the computer.
20     Q.  Is that your name and address at the time
21 that's listed on the invoice?
22     A.  That's correct.
23     Q.  And then the last one I got is Amma Air
24 Cons?

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 22

1    A. Right.
2    Q. What's the date on this?
3    A. That's December 28.
4    Q. What was this for?
5    A. This is the air-conditioner.
6    Q. Is it the same air-conditioner that we saw
7  before or different air-conditioner?
8    A. No, no, we had washing machine,
9  refrigerator.
10    Q. Right.
11    A. High Cool is a refrigerator. It's not an
12  air-conditioner. Then TV, and this is the
13  air-conditioner.
14    Q. My mistake. Is that your name and address
15  up on the invoice as of this date?
16    A. That's correct.
17    Q. And these bills that we looked at in these
18  last six bills, these are true and correct copies
19  of, you know, invoices that you received as they
20  appear?
21    A. Yes.
22    Q. Is it your intention to live permanently
23  in India?
24    MR. BLACKMAN: Objection, asked and answered

Page 23

1  twice.
2  BY MR. SHMIKLER:
3    Q. You can answer.
4    A. Yes, it is my intention to live in India
5  permanently.
6    Q. Do you have any present intention of
7  moving back to Chicago or anywhere else in the
8  United States?
9    A. I do not have present intention of moving
10  back to Chicago or any other place in the U.S.
11    Q. What about your remaining business
12  interest in the United States?
13    A. Well, I have my staff there who can take
14  care of it, and I'm always available by phone,
15  e-mail, fax, and occasional visits, if needed, and,
16  you know, I'm always available to my people. So
17  it's not a problem these days. You know, you can
18  run a business from anywhere.
19    Q. You have children though here in the U.S.,
20  correct?
21    A. That's correct.
22    Q. What about them, if you live in India?
23    MR. BLACKMAN: Objection as to form.
24    THE WITNESS: Two of my children are over 18

Page 24

1  and so they're grown and they are in college. My
2  second one is actually starting college in a few
3  months -- a few weeks actually. And my youngest
4  one and I, we speak on the own. And I do plan to
5  visit her and, you know, have her visit me.
6  Actually, I talked to her about having her spend a
7  couple of months with me in the summertime here in
8  India.
9  BY MR. SHMIKLER:
10    Q. Have you discussed those plans with your
11  wife?
12    A. Yes, I have.
13    Q. Now, this change in your residence to
14  India, is that consistent -- well, let me back up
15  for a second and lay a foundation for this.
16    In your divorce do you recall you have a
17  joint parenting agreement in effect?
18    A. Yes.
19    Q. And this change in your residence to
20  India, is that consistent with your joint parenting
21  agreement?
22    MR. BLACKMAN: Objection as to form. I don't
23  know what that means "consistent." Are you asking
24  whether that it's something he can legally do?

Page 25

1    MR. SHMIKLER: I'll rephrase it.
2  BY MR. SHMIKLER:
3    Q. Is it consistent with your obligations and
4  understandings with your wife pursuant to that
5  agreement?
6    MR. BLACKMAN: Same objection.
7    When you say "consistent with," are you
8  asking his legal opinion as to whether he has the
9  right to permanently move?
10    MR. SHMIKLER: No, I'm asking his understanding
11  whether he can do this whether it causes any
12  problems under the joint parenting agreement.
13    MR. BLACKMAN: Objection as to form. You're
14  asking him whether or not he has the right to do
15  this legally because that's what problems means?
16    MR. SHMIKLER: I'll rephrase it.
17  BY MR. SHMIKLER:
18    Q. Is it your understanding that your joint
19  parenting agreement prevents you from moving to
20  India?
21    MR. BLACKMAN: Objection to calling for a legal
22  conclusion and foundation as to his knowledge and
23  understanding of it to begin with.
24  BY MR. SHMIKLER:

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 26

1    Q.  You can go ahead and answer.
2    A.  I do not think so because the agreement is
3  old and outdated in several places.  It claims that
4  two of my children are minor and that's not the
5  case today.  And as long as me and my wife agree,
6  there should not be any problems.
7    Q.  Are you working with your wife to get
8  agreement on how you'll interact with the children
9  basically with your new residence?
10   A.  Yes, I'm working on that agreement, yes.
11 I think we should be able to work that out no
12 problem.
13   Q.  Has your wife ever told you that your new
14 residence in India creates a problem with your
15 joint parenting agreement?
16   MR. BLACKMAN:  Objection as to form.
17 BY MR. SHMIKLER:
18   Q.  You can answer it.
19   A.  Has my wife ever told me that my moving to
20 India will cause any problems with the joint
21 parenting agreement?
22   Q.  Right.
23   A.  No, she has not.
24   Q.  Now, have you received any legal papers

Page 27

1  that relate to Indymac from your wife?
2    A.  No.
3    Q.  You're aware that Indymac takes the
4  position in this case that they served you by
5  delivering legal papers to your wife, right?
6    A.  They served some papers to my wife.
7    Q.  That you're aware that that's their
8  position?
9    A.  Sorry?
10   Q.  You're aware, generally speaking, that's
11 their position?
12   MR. BLACKMAN:  Objection as to form and that's
13 their position.  Are you asking him what Indymac's
14 legal position is?
15   MR. SHMIKLER:  I'm asking what his
16 understanding is.
17   MR. BLACKMAN:  You're asking him what his
18 understanding of Indymac's legal position is?
19   MR. SHMIKLER:  Right.  That he was served by
20 dropping papers off with his wife.
21   MR. BLACKMAN:  All right.
22 BY MR. SHMIKLER:
23   Q.  Do you understand generally speaking that
24 that's what they're saying in this case?

Page 28

1    A.  Repeat that, please.  What are they saying
2  in this case?
3    Q.  All right.  Much to do about nothing.
4  Let's move on a little bit.
5      You're aware that Indymac had a process
6  server deliver some legal papers for you with your
7  wife, right?
8    A.  Some papers were delivered, yes, to my
9  wife.
10   Q.  Do you have any knowledge of your wife
11 giving any of those papers to your lawyer,
12 Michael Collins?
13   A.  I have no knowledge.
14   Q.  Has Michael Collins at any time been
15 authorized to accept service for you in this
16 matter?
17   A.  No.
18   Q.  Now, you have authorized us, your lawyers,
19 to accept service in this matter under certain
20 conditions, right?
21   A.  Correct.
22   Q.  And what were those conditions?
23   A.  Well, as long as Indymac agrees to
24 vacating all the defaults and gives us some time to

Page 29

1  answer the Complaint, I have -- that's fine.  Then
2  you're authorized to accept service on my behalf.
3    MR. BLACKMAN:  Objection as to relevance.
4  BY MR. SHMIKLER:
5    Q.  Do you have any understanding why that
6  agreement hasn't been reached?
7    MR. BLACKMAN:  Objection as to relevance as to
8  whatever settlement discussions we had.
9    THE WITNESS:  Well, my understanding is Indymac
10 would only agree if I agree to freeze my assets
11 which I don't believe is reasonable.
12   MR. SHMIKLER:  All right.  I don't have
13 anything further.
14       CROSS EXAMINATION
15 BY MR. BLACKMAN:
16   Q.  All right, Doctor, my name is Gary
17 Blackman, and I represent Indymac.  And I'm going
18 to be asking you some questions.
19     I want to start with, prior to today's
20 deposition did you speak with your wife about her
21 testimony yesterday?
22   A.  No.
23   Q.  Were you aware that she gave a deposition
24 on Tuesday of this week?

8 (Pages 26 to 29)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 30

1      A.  I was aware that she was giving a
2  deposition, yeah, I think so, yeah.
3      Q.  Did you -- I don't want to know what you
4  said, but did you discuss your wife's deposition
5  with your lawyer?
6      MR. SHMIKLER:  I'm going to object on the
7  grounds of attorney-client privilege.  I think even
8  the subject matter raises issues of privilege.
9      MR. BLACKMAN:  I disagree.  I think it goes to
10 his credibility and your specific answers coming
11 off of her deposition -- or questions to him.
12 BY MR. BLACKMAN:
13     Q.  Are you not instructing, sir, based upon
14 your advice of counsel?
15     MR. SHMIKLER:  You mean he's answering?
16 BY MR. BLACKMAN:
17     Q.  You're not answering, sir, that question
18 as to whether --
19     A.  Yeah, I'm not answering, no.
20     Q.  Just to be clear, that question is whether
21 you had any conversations with your lawyer about
22 the deposition testimony of your wife on Tuesday;
23 that's the question that you're not answering?
24     MR. SHMIKLER:  Again, that's the question we

Page 31

1  are objecting to and advising him not to answer.
2      THE WITNESS:  Right.  I'm not answering.
3  BY MR. BLACKMAN:
4      Q.  Okay.  Now, did you read your wife's
5  deposition transcript?
6      A.  Did I read my wife's deposition
7  transcript?  My wife's deposition transcript?
8  Yeah, I read some of it.
9      Q.  When was that sent to you, yesterday when
10 we got the transcripts?
11     MR. SHMIKLER:  Couldn't have been sent before.
12     THE WITNESS:  I don't recall when.
13 BY MR. BLACKMAN:
14     Q.  Well, her deposition was Tuesday and today
15 is Thursday.  So sometime between Tuesday and
16 Thursday you read her deposition transcript?
17     A.  Yeah, sometime during that time.
18     Q.  And that was sent to you by Mr. Shmikler?
19     A.  Yeah, that was sent by Mr. Shmikler.
20     Q.  Were you advised as to why this was being
21 sent to you?
22     MR. SHMIKLER:  Objection, attorney-client
23 privilege and instruct the witness not to answer.
24 BY MR. BLACKMAN:

Page 32

1      Q.  You're not answering, sir, based on advice
2  of counsel?
3      A.  No, no.
4      Q.  Now, when you read the deposition, was
5  there anything in there you disagreed with?
6      A.  I -- you know, I didn't really read in any
7  great detail or anything.
8      Q.  That's not my question.  My question
9  wasn't whether you read it in great detail.  My
10 question was whether you read it, was there
11 anything in there you disagreed with?
12     MR. SHMIKLER:  Object to form.
13     THE WITNESS:  Well, there are areas I disagreed
14 with, yeah.
15 BY MR. BLACKMAN:
16     Q.  Can you tell me what those areas are?
17     A.  Well, you know, I definitely I have moved
18 here to India and she thinks I'm coming back.  You
19 know, that's clearly a difference.
20     Q.  You're referring to your wife's testimony
21 that she believes you told her you were coming
22 back?
23     A.  I don't know.
24     Q.  You don't know what?

Page 33

1      MR. SHMIKLER:  I object.  Mischaracterizes her
2  testimony.
3  BY MR. BLACKMAN:
4      Q.  Go on, sir.
5      A.  That's her -- you know, that's her
6  testimony.  I don't know what you're really
7  referring to.
8      Q.  Well, is it your understanding that your
9  wife testified in her deposition that you had told
10 her you were coming back?
11     MR. SHMIKLER:  Again, same objection.
12     THE WITNESS:  I don't think I have told her I
13 was coming back.
14 BY MR. BLACKMAN:
15     Q.  Listen to my question, sir.  That's not
16 what I'm asking.
17         Do you recall seeing in your wife's
18 deposition her testimony that you were coming back?
19     MR. SHMIKLER:  Same objection.  You guys don't
20 have another copy of that, do you?
21     THE WITNESS:  I don't recall that.
22 BY MR. BLACKMAN:
23     Q.  Do you have the deposition in front of
24 you?

9 (Pages 30 to 33)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 34

1    MR. SHMIKLER: Do you have it there, Dr. Vish,
2  with you or no?
3    THE WITNESS: I have to see if I can get it.
4  No, I don't have it in front of me.
5  BY MR. BLACKMAN:
6    Q.  Where did it go between yesterday and
7  today?
8    MR. SHMIKLER: Objection, form.
9    THE WITNESS: Sorry?
10  BY MR. BLACKMAN:
11    Q.  What happened to it?
12    A.  Some other place, I don't know.  I must
13  have kept it somewhere else or something.
14    Q.  Was it sent to your residence or was it
15  sent to your business?
16        When you were sent the deposition
17  yesterday by Mr. Shmikler, was it sent to your
18  residence or your business?
19    A.  It was sent to the business.
20    Q.  Okay.  And is that where you read it at?
21    A.  Yeah, I only -- I didn't have much time at
22  all.  I only glanced through it really.  I mean, it
23  was too long.  And really, I don't -- you know, I
24  just -- who has the time to read this.  I mean, you

Page 35

1  guys are lawyers.  I don't have time for all of
2  this.
3    Q.  You don't have time for all this?
4    A.  Sorry?
5    MR. SHMIKLER: Objection.
6  BY MR. BLACKMAN:
7    Q.  This is not important enough to you?
8    MR. SHMIKLER: Objection, compound to form and
9  harassing the witness.  He told you he didn't have
10  time to read the transcript.
11    MR. BLACKMAN: He said who has time for all of
12  this.
13    MR. SHMIKLER: He's talking about reading the
14  transcript clearly.  Let's not harass and get the
15  testimony.
16  BY MR. BLACKMAN:
17    Q.  Go on, sir.
18        Well, let me ask you this, what's the
19  business address that Mr. Shmikler sent the
20  transcript to?
21    A.  Sorry?
22    Q.  You said that Mr. Shmikler sent you the
23  transcript to your business address.  What's --
24    A.  What's your question?

Page 36

1    Q.  My question is, you just testified that
2  Mr. Shmikler sent your transcript to your business
3  address.  I asked you if it was sent to your
4  residence or your business and you said your
5  business address, and I'm asking what the address
6  is of your business?
7    MR. SHMIKLER: Objection, mischaracterizes his
8  prior testimony.
9    MR. BLACKMAN: He can clarify.  That's why I'm
10  asking.
11    MR. SHMIKLER: I understand.
12    THE WITNESS: No, it's just a computer version.
13  BY MR. BLACKMAN:
14    Q.  So when you said business address, what
15  were you referring to when you testified --
16    A.  Business address in India.
17    Q.  Okay.  What is your business address in
18  India?
19    A.  Well, I can get you all of that no
20  problem.
21    Q.  I'm confused, sir.
22        A few minutes ago you stated that
23  Mr. Shmikler sent your transcript to your business
24  address.

Page 37

1        Now, my question is, what are you
2  referring to when you say your business address?
3    A.  It's 36 Vidyaraman Street, in Chennai.
4    Q.  36 what?
5    A.  Vidyaraman Street.
6    Q.  Can you spell that please?
7    A.  V-i-d-y-a-r-a-m-a-n Street.
8    Q.  Okay.  Was that where the transcript was
9  sent?
10    A.  Yeah.
11    Q.  Okay.  And then is that -- is that an
12  office?
13    A.  Yes.
14    Q.  Do you still have the letterhead?  Is it
15  addressed to that address?
16    A.  No, no.  It's sent teletronically.
17    Q.  So it was sent by e-mail?
18    A.  Yeah.
19    Q.  And it was sent by e-mail -- do you have a
20  personal e-mail address or just a business e-mail
21  address?
22    A.  Well, just business address.
23    Q.  Okay --
24    MR. SHMIKLER: Object to the relevance.

10 (Pages 34 to 37)

Page 38

1   BY MR. BLACKMAN:
2       Q.  So -- I'm just trying to understand, sir.
3   When you say you got a business address, have you
4   set up a business in India?
5       MR. SHMIKLER:  Object to relevance.  Actually,
6   I'll withdraw that objection.
7       MR. BLACKMAN:  It's all relevant.
8       MR. SHMIKLER:  I'll withdraw that objection.
9   BY MR. BLACKMAN:
10      Q.  Sir?
11      A.  Yes.
12      Q.  When you refer to your business address
13  that you said you received an e-mail from
14  Mr. Shmikler.
15      A.  Yeah.
16      Q.  Is that a different e-mail address than
17  your personal e-mail address?
18      MR. SHMIKLER:  Object to relevance.
19      THE WITNESS:  Is that -- your question is, is
20  that a different e-mail address?
21  BY MR. BLACKMAN:
22      Q.  Yes.
23      A.  From personal?
24      Q.  Yes.

Page 39

1       A.  Yeah.
2       Q.  Okay.  What's your business e-mail
3   address?
4       MR. SHMIKLER:  Object to relevance.
5       THE WITNESS:  I mean, is this something --
6   BY MR. BLACKMAN:
7       Q.  Yes, it is.
8       MR. SHMIKLER:  Dr. Vish, I object on the
9   grounds of relevance.  It's not relevant, but you
10  can go ahead and answer it.  Hopefully, he will not
11  sign you up for any spam lists.
12  BY MR. BLACKMAN:
13      Q.  What's your business e-mail address?
14      THE WITNESS:  Is that something I can answer,
15  Dan?
16      MR. SHMIKLER:  Yeah, go ahead and answer it.
17      THE WITNESS:  It's vish, v-i-s-h,
18  @hawthorne-corp.com.
19  BY MR. BLACKMAN:
20      Q.  Is that an old business address or is that
21  a new business e-mail address?
22      MR. SHMIKLER:  Object to relevance.
23      MR. BLACKMAN:  Just for the record -- hang on a
24  second.  This is all relevant to whether or not he

Page 40

1   has established his -- a permanent residence out
2   there and to judge his credibility.  You've put
3   these issues into relevance so --
4       MR. SHMIKLER:  People change their e-mail
5   address --
6       MR. BLACKMAN:  I'm not debating you.  I'm just
7   responding.
8       MR. SHMIKLER:  You responded, so I'm going to
9   reply.
10      MR. BLACKMAN:  Go ahead.
11      MR. SHMIKLER:  A person's e-mail address is
12  good worldwide, whether they have the same or
13  different e-mail has absolutely no bearing on where
14  their residence --
15      MR. BLACKMAN:  In this case --
16      MR. SHMIKLER:  In no case is that true.
17  BY MR. BLACKMAN:
18      Q.  Sir, the e-mail address
19  vish@hawthorne-corp.com, is that a new e-mail
20  address or is that one you had while you were
21  living in the United States?
22      MR. SHMIKLER:  Object to relevance.
23      THE WITNESS:  It's the same, same e-mail
24  address, nothing new.

Page 41

1   BY MR. BLACKMAN:
2       Q.  What's your personal e-mail address?
3       MR. SHMIKLER:  Object to relevance.
4       THE WITNESS:  I don't have to --
5   BY MR. BLACKMAN:
6       Q.  Yes, you do, yes, you do.
7       MR. SHMIKLER:  Dr. Vish, it's totally
8   irrelevant.  We've objected on that basis.  Don't
9   worry.  I'm sure the judge will throw this out, but
10  go ahead and give that answer.
11      THE WITNESS:  You want my personal e-mail
12  address?
13      MR. SHMIKLER:  That's what he's asking for.
14      THE WITNESS:  Hello?
15  BY MR. BLACKMAN:
16      Q.  Sir, I've asked that three times.  Do
17  you not --
18      A.  Hello?
19      Q.  Do you not --
20      A.  Hello?
21      Q.  Yes.
22      MR. SHMIKLER:  Hello, can you hear us?
23      THE WITNESS:  Hello?
24      MR. BLACKMAN:  That's convenient.

11 (Pages 38 to 41)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 42

```
 1    THE WITNESS: Hello?
 2    MR. SHMIKLER: Can you hear us, Dr. Vish?
 3    THE WITNESS: Hello?
 4    MR. SHMIKLER: Let's go off.
 5         (Discussion off the record.)
 6    MR. SHMIKLER: We can hear us now. We're
 7 going to go back on the record.
 8 BY MR. BLACKMAN:
 9    Q. Dr. Vish, what is your personal e-mail
10 address?
11    A. It's vishg81@yahoo.com.
12    Q. Is that a new e-mail --
13    A. No.
14    Q. -- let me finish my question.
15      Is that a new e-mail or is that the one
16 you were using when you were living in the United
17 States?
18    MR. SHMIKLER: Object to relevance.
19    THE WITNESS: It's not a new one.
20 BY MR. BLACKMAN:
21    Q. Okay. Do you have any other e-mail
22 addresses that you're using?
23    A. No.
24    MR. SHMIKLER: Object to relevance.
```

Page 43

```
 1 BY MR. BLACKMAN:
 2    Q. Now, you gave a business address of 36
 3 Vidyaraman?
 4    A. Yeah.
 5    Q. Is that an office?
 6    A. Yes.
 7    Q. And is there a name that you use when you
 8 work out of that office?
 9    A. Is there a name here?
10    Q. Is there a company name that you're using
11 when you're working out of that office?
12    A. It's Real Estate Consultants Private
13 Limited.
14    Q. What's it called, Real Estate Consultants
15 Private Limited?
16    A. Right.
17    Q. When was that formed?
18    A. I don't know, maybe a year and a half ago.
19    Q. Okay. So was this a business that you had
20 in India before you say you moved there?
21    A. Yeah.
22    Q. What does that business do?
23    A. Sorry?
24    Q. And what does that business do?
```

Page 44

```
 1    A. Hello?
 2    MR. SHMIKLER: Can you hear us?
 3    THE WITNESS: Yeah, I can hear you now.
 4 BY MR. BLACKMAN:
 5    Q. What does that business do?
 6    A. Well, we just -- it's basically supporting
 7 the U.S. -- sale of U.S. real estate, you know,
 8 whatever projects I have in the U.S. This is more
 9 like a call center operation and they make calls to
10 customers in the U.S. and then transfer it live to
11 your salesman arranging site visits and helping the
12 U.S. sale.
13    Q. So that company, if I understand what
14 you're saying, is that helps you make the sales for
15 the developments that you're doing in Chicago?
16    A. Hello?
17    MR. SHMIKLER: Can you hear us?
18    THE WITNESS: Hello?
19    MR. SHMIKLER: Can you hear us okay? Dr. Vish?
20 Hello?
21    THE WITNESS: Hello?
22         (Discussion off the record.)
23 BY MR. BLACKMAN:
24    Q. Sir, are you staying in one place while
```

Page 45

```
 1 we're asking these questions or are you walking
 2 around?
 3    A. No, no, no, the phone has a problem.
 4    MR. SHMIKLER: Do you have another phone?
 5    THE WITNESS: Let me see if I can substitute it
 6 with a different phone or something. Hold on.
 7         (Discussion off the record.)
 8         (Whereupon the record was read
 9         as requested.)
10         (Discussion off the record.)
11 BY MR. BLACKMAN:
12    Q. Dr. Vish, the entity that you just
13 mentioned, the Real Estate Private Limited which
14 you stated, if I understand you correctly, handles
15 the sales calls for the developments that you're
16 doing in Chicago?
17    A. Yes, Chicago, and they did try to do the
18 Florida sales also but obviously Florida is going
19 nowhere. And it was set up to help all U.S. sales,
20 Chicago and Florida. There is no more Florida.
21    Q. Does it have employees?
22    A. Do I have employees?
23    Q. Does it have employees?
24    A. Yeah, I have a couple of employees.
```

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 46

```
 1    Q.   Are they still doing sales now for the 222
 2  Pearson?
 3    A.   Yes.
 4    Q.   Is there any other properties that they
 5  are handling sales for other than 222 Pearson?
 6    A.   No.
 7    Q.   And how many units are left to be sold?
 8    MR. SHMIKLER:  Object to relevance.  This
 9  doesn't have anything to do with the service issue.
10    THE WITNESS:  I think about 50 or so.
11  BY MR. BLACKMAN:
12    Q.   And then you have people that are working
13  for you in Chicago to finish that project?
14    MR. SHMIKLER:  Object to relevance.
15    MR. BLACKMAN:  I think it's very relevant to
16  whether or not he is going to India for this whole
17  purpose of avoiding debts and obligations while at
18  the same time running businesses in Chicago from
19  which he's getting funds.
20    MR. SHMIKLER:  He's acknowledged that he's
21  running businesses in Chicago.  The details of the
22  businesses are not relevant.
23    MR. BLACKMAN:  It's absolutely relevant to what
24  extent he has actually permanently moved to India
```

Page 47

```
 1  or whether he's saying that to avoid service and to
 2  avoid this Complaint.
 3    MR. SHMIKLER:  He's offered to accept service,
 4  so --
 5    MR. BLACKMAN:  I'm not debating you.  I'm just
 6  responding to your relevancy objection.
 7    MR. SHMIKLER:  You don't have to respond.  If
 8  you do, I'm going to reply.
 9  BY MR. BLACKMAN:
10    Q.   Sir, you have --
11    A.   Yes.
12    Q.   You have employees that are working for
13  you here?
14    MR. SHMIKLER:  Same objection, relevance.
15    THE WITNESS:  Working for me where?
16  BY MR. BLACKMAN:
17    Q.   You have employees that are working for
18  you in Chicago to sell the remaining units at 222
19  Pearson?
20    A.   Right.
21    Q.   What are their names?
22    MR. SHMIKLER:  Object to relevance.
23  BY MR. BLACKMAN:
24    Q.   Sir?
```

Page 48

```
 1    A.   Yeah.
 2    Q.   What are their names?
 3    A.   Oh, the names?
 4    Q.   What are the names of the people working
 5  for you in Chicago to sell your condominium units?
 6    A.   Arjun Ramdarajan, Pria then --
 7    Q.   Sir, I'm going to need you to spell each
 8  of these.
 9    A.   Arjun -- why is this any relevance?  Why
10  is this relevant to what we have --
11    MR. SHMIKLER:  Sir, the answer is that it's not
12  relevant --
13    MR. BLACKMAN:  Are you having a conversation
14  with your client?
15    MR. SHMIKLER:  I'm trying to get your answer.
16  So I think it will be helpful to let me advise the
17  client.
18    MR. BLACKMAN:  I think it will be helpful if we
19  follow the procedures.
20  BY MR. BLACKMAN:
21    Q.   Sir, your lawyer is the one that makes the
22  objections, not you.  So we cannot have a dialogue
23  in the middle of a deposition between you and him
24  as to whether people like my questions or not.
```

Page 49

```
 1    So when I ask you the questions, your
 2  lawyer will make the objections.  Unless he
 3  instructs you not to answer, you have to answer.
 4    So that's the way this process works.  So
 5  I don't want to debate with you why I'm asking
 6  questions every time I'm asking that; do you
 7  understand that?
 8    THE WITNESS:  Yeah, but I need to know --
 9    MR. BLACKMAN:  No, sir, you don't need to know
10  anything.  All you need to know is you've got a
11  lawyer who is representing you who will make
12  objections.  And if he instructs you not to answer
13  a question, then you don't have to answer.  But
14  until he does that you have to answer.
15    So what are the names of the people and
16  spell them who are working for you selling your
17  units at 222 Pearson?
18    MR. SHMIKLER:  I object that it's completely
19  irrelevant to the service question.  What's going
20  on here is an improper attempt to conduct a
21  citation type proceeding to aid them in a different
22  matter which is entirely improper.
23  BY MR. BLACKMAN:
24    Q.   Go ahead, sir.
```

13 (Pages 46 to 49)

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 50

1    MR. SHMIKLER: You can answer it.
2    THE WITNESS: Arjun.
3  BY MR. BLACKMAN:
4    Q. You're going to have to spell each of
5  these.
6    A. A-r-j-u-n. Pria.
7    Q. Is this one person or two different
8  people? Is that his last name?
9    A. No, two different -- two different people.
10    Q. Okay. What's Arjun's full name?
11    A. Ramdarajan.
12    Q. Arjun is his first name?
13    A. Yeah.
14    Q. How do you spell his last name?
15    A. Ramdarajan.
16    Q. How do you spell his last name?
17    A. Hello?
18    MR. SHMIKLER: Can you hear us, Dr. Vish? Do
19  you hear us?
20    THE WITNESS: Ramdarajan.
21  BY MR. BLACKMAN:
22    Q. How do you spell his last name?
23    A. Hello?
24    MR. SHMIKLER: Can you spell Arjun's last name,

Page 51

1  Dr. Vish?
2    THE WITNESS: Hello?
3    MR. SHMIKLER: If I had any control --
4    MR. BLACKMAN: I think you do. If we can't do
5  his deposition, he's going to have to come in.
6        (Discussion off the record.)
7    THE WITNESS: I can hear you now.
8    MR. SHMIKLER: He wants you to spell Arjun's
9  last name, Dr. Vish.
10    THE WITNESS: Hello?
11    MR. SHMIKLER: Dr. Vish, he wants you to spell
12  Arjun's last name, please.
13    THE WITNESS: R-a-m-d-a-r-a-j-a-n.
14  BY MR. BLACKMAN:
15    Q. Okay. And who are the other primary
16  individuals who are overseeing the sale of the
17  units at 222?
18    A. Well, there is Thiru, T-h-i-r-u, Thiru,
19  and then there is Brian and Gerry and Griselda.
20    Q. What's Thiru's last name?
21    MR. SHMIKLER: Object to relevance on each of
22  these names.
23    MR. BLACKMAN: You've made your point.
24  BY MR. BLACKMAN:

Page 52

1    Q. What's Thiru's last name?
2    A. It's Thiru Narayanan, N-a-r-a-y-a-n-a-n.
3    Q. Okay. And what's Brian's last name?
4    A. I don't know his last name.
5    Q. What's Gerry's last name?
6    A. I don't remember.
7    Q. Now, sir, I want to go back to -- it seems
8  like a long time ago -- the question that began
9  with my asking you about the deposition of your
10  wife. And I will read this into the -- I will read
11  this into the record.
12    On page 98 of your wife's deposition --
13    MR. SHMIKLER: Can I go get a copy of this?
14  Otherwise we're going to have an objection whether
15  you've read it completely, so on and so forth.
16    MR. BLACKMAN: Hold on, Doctor.
17        (A short break was taken.)
18    MR. BLACKMAN: Ready?
19    MR. SHMIKLER: Yeah. What page did you say you
20  were on?
21    MR. BLACKMAN: I'll say it again.
22  BY MR. BLACKMAN:
23    Q. Doctor, I'm going to read a question and
24  answer from your wife's deposition on Tuesday.

Page 53

1    A. Okay.
2    Q. And I'm going to start with page 97 --
3  actually, I'm going to start, sir, I'm sorry, with
4  page 94. And this is on line 12 and the question
5  is:
6      "Okay, period, and is it your belief or
7  understanding that he has moved to India
8  permanently?"
9      And your wife's answer was, "No."
10      And then there was some objections. And
11  then the question on line 18 is:
12      "So you don't know whether he has moved
13  permanently or not?"
14      "Answer: I don't think he's moved
15  permanently."
16      And then I'm going to go to page 97, line
17  23, the question:
18      "How do you know he was going back and
19  forth? You said he was going back and forth. How
20  do you know that?"
21      "Answer: He would come back -- he says
22  he's coming back, so I'm thinking that he will be
23  coming back."
24      "Question: So he's told you that he's

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 54

1   coming back?"
2       "Answer: Yes."
3       Now, sir, I want to ask you, is it your
4   testimony that your wife is not telling the truth?
5       A.  No, no, I cannot interpret for that.  It's
6   her interpretation, so that's all.  No, I can't say
7   that.
8       Q.  But are you denying that you ever told her
9   that you were not moving there permanently?
10      MR. SHMIKLER:  Objection, mischaracterizes her
11  testimony.
12      THE WITNESS:  I don't think we ever had an
13  opportunity to talk about this.  We don't talk
14  much.  Why you guys -- we're going through a
15  divorce.  Don't you understand we're going through
16  a divorce.
17  BY MR. BLACKMAN:
18      Q.  Sir, are you denying that you ever advised
19  your wife that you were coming back?
20      MR. SHMIKLER:  Objection, asked and answered.
21  No, withdraw the objection.  You fixed the
22  question.  Sorry.
23  BY MR. BLACKMAN:
24      Q.  Are you denying that you ever advised your

Page 55

1   wife that you were coming back?
2       A.  I don't recall any such conversation, sir.
3   That's all.
4       Q.  Is it possible that you did?
5       A.  No, I don't recall any such conversation.
6       Q.  Okay.  So if she recalls that
7   conversation, she would be wrong?
8       A.  I'm not going to conclude anything about
9   what she said.  I do not recall any such
10  conversation, period.
11      Q.  Okay.  Now, I want to go through the
12  timetable of when you moved because I'm kind of
13  confused about it.
14      You state that you moved out of the
15  Ridgewood residence in the summer of 2006?
16      A.  Correct.
17      Q.  And do you recall when that was exactly?
18      MR. SHMIKLER:  I object.  It mischaracterizes
19  his testimony.  You said December?
20      MR. BLACKMAN:  The summer.
21      MR. SHMIKLER:  Sorry.  I'll withdraw.  I
22  misheard you.
23  BY MR. BLACKMAN:
24      Q.  Is that your testimony that you moved out

Page 56

1   of the Ridgewood residence the summer of 2006?
2       A.  Yes.
3       Q.  Do you recall when?
4       A.  I don't recall exactly when.
5       Q.  Do you recall approximately when?
6       A.  It's -- I don't know.  To the best of my
7   recollection, it was probably somewhere around
8   either June or August.
9       Q.  Okay.  And then where did you go from
10  there?
11      A.  To LaGrange.
12      Q.  Okay.  Now, is that a rental or a condo?
13      A.  It's a rental.
14      Q.  Who owns it?
15      A.  I don't know the name of the owner.  They
16  were in Singapore.
17      Q.  Who did you pay your rent to?
18      A.  It was paid to a fellow by the name Mark
19  Shure.
20      Q.  Mark -- what's the --
21      A.  S-h-u-r-e.  He's an attorney.  You can go
22  through the Sullivan's and get his name and verify
23  all my rent payments --
24      Q.  Sir, sir, sir, just listen to my question

Page 57

1   and answer it.  If there's any other questions,
2   I'll ask you those later.
3       A.  Yes.
4       Q.  Now, Mr. Shure, was he the landlord or was
5   he the landlord's attorney?
6       A.  He was the representative for the landlord
7   and he is an attorney, so...
8       Q.  And when did your -- did you have a lease?
9       A.  Yes, I did have a lease.
10      Q.  You had a written lease?
11      A.  Sorry?
12      Q.  You had a written lease?
13      A.  Yes, I did.
14      Q.  Well, when did it end?
15      A.  I do not recall when it ended.  I don't
16  have an exact recollection of when it ended.
17      Q.  Well, approximately when did it end?  Did
18  it end in 2007?
19      A.  I don't recall.  It was 2007 sometime.
20      Q.  When did you move out?
21      A.  I moved out, you know, late October, maybe
22  early November, during that period.
23      Q.  Okay.  And then you didn't move back in,
24  right?

15 (Pages 54 to 57)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 58

1    A.  No.
2    Q.  And then did you take your belongings and
3  send them -- what did you do with your belongings
4  when you moved out?
5    A.  I took them with me.
6    Q.  Okay.  Did you take -- did you send
7  anything over to the house on Ridgewood?
8    A.  Did I put anything over to the house on
9  Ridgewood?
10    Q.  Right.
11    A.  No, no.
12    Q.  What did you do with your car?
13    A.  Well, the car is parked in Pearson.
14    Q.  That's the Lexus?
15    A.  Yeah.
16    Q.  Okay.  And that's parked at Pearson.  Why
17  is it parked at Pearson?
18    A.  Well, you know, that's my project.
19    Q.  Okay.  But you've moved to India.  Why
20  would you have your car in Chicago?
21    A.  Well, I have not had, you know, time to
22  really decide what to do with the car and this and
23  that.
24    Q.  What would you need to decide?

Page 59

1    A.  Hello?
2    Q.  What would you need to decide?  I mean, if
3  you moved --
4    A.  Hello?
5    MR. SHMIKLER:  Can you hear us now?
6    THE WITNESS:  Hello?
7    MR. SHMIKLER:  Hello, Dr. Vish?
8        (Discussion off the record.)
9    MR. BLACKMAN:  For the record this deposition
10  has been repeatedly interrupted by the inability of
11  the witness for whatever reason to stay on the
12  phone in the middle of the questioning.  And it
13  appears that the only time Dr. Vish has a problem
14  staying on the phone is when I'm asking him a
15  question that he doesn't want to answer.  We didn't
16  seem to have these technical difficulties when his
17  counsel was asking him questions.  So every five
18  minutes we have to stop and reconnect.  And so at
19  this point we're going to keep trying to go
20  forward, but we have an inability to take this
21  man's deposition in a normal and rational way prior
22  to Tuesday's hearing.
23    MR. SHMIKLER:  I just point out that I think
24  there's some inaccuracies in there.  We had the

Page 60

1  exact same problem during my examination.  I don't
2  think there's any correlation between the technical
3  difficulties we're having and the questions that
4  counsel is asking.  Questions as spelling last
5  names, we had a problem, so -- hi, Dr. Vish?
6    THE WITNESS:  Yes.
7    MR. SHMIKLER:  Hang on one second.
8        We agree there's a technical problem.
9  We're doing what we can to address it.  We'll take
10  further measures if it gets worse and it's
11  something that we're all dealing with.
12  BY MR. BLACKMAN:
13    Q.  Dr. Vish, I was asking about your car.  If
14  you moved from the United States to India
15  permanently, as is your testimony, why would you
16  still have your car in Chicago at your place of
17  business here?
18    A.  Well, I may visit and still have my
19  children there, I may visit, and I may occasionally
20  come to take care of business so...
21    Q.  Okay.  So who is charged with taking care
22  of your car while you're gone?
23    A.  Sorry?
24    Q.  Who's in charge of taking care of your car

Page 61

1  while you're gone?
2    A.  Really the car doesn't need much.  It's a
3  Lexus and really the people, the fellows there that
4  park the car, and they take care of it.
5    Q.  Okay.  Is the car in your name?
6    A.  I do not recall if it is in my name or in
7  one of the company's name.  I do not recall that,
8  sir.
9    Q.  Okay.  So you -- I don't recall whether
10  you told me when you moved out of LaGrange.
11    MR. SHMIKLER:  I think he did.  It was
12  answered.
13  BY MR. BLACKMAN:
14    Q.  Late October, early November?
15    A.  Right.
16    Q.  Now, was your lease up at that time?
17    A.  Sorry?
18    Q.  Was your lease up at that time?
19    A.  Was there a lease at that time?
20    Q.  Was that the end of your lease in October
21  or early November?
22    A.  My -- my best recollection is that was the
23  end of the lease.
24    Q.  Well, do you have any documents other than

16 (Pages 58 to 61)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 62

1   what you have given us to support which is a couple
2   of bills from September and October that support
3   that you were at LaGrange from 2006 through the
4   fall of 2007, do you have any other documents other
5   than these two bills?
6       A.   Well, I have a lease agreement, signed a
7   lease agreement.  I don't know where it is.  I got
8   to track it down, but I know the realtor who set up
9   the house and I also know the lawyer that is the
10  caretaker for the house, Mark Shure.  He will have
11  a copy and somewhere in my office may have a copy
12  and I can also go to the realtor and, you know,
13  and --
14      Q.   Sir --
15      A.   -- ask her.
16      Q.   The only documents that you have provided
17  to your counsel with respect to that LaGrange
18  address, are these two bills, one is a ComEd bill
19  and one is a direct TV bill, right?  Those are the
20  only two bills, only two documents you provided
21  them with respect to LaGrange; is that correct?
22      A.   That may be so.
23      Q.   Okay --
24      A.   But I do have -- I am saying under oath I

Page 63

1   do have a lease agreement.  I did sign a lease
2   agreement.  And in all probability Mark Shure, the
3   attorney, whom you can find in the Sullivan's will
4   have a copy, and I will make an attempt to get it.
5       Q.   That's too late, sir, because this
6   deposition today is in lieu of you coming in for
7   your trial testimony on Tuesday.  So whatever
8   documents there were supposed to be given to your
9   lawyer so we could ask you questions at your
10  deposition.
11           We're doing this now so you do not have to
12  testify at trial.  So there is no further date.  So
13  I just want to confirm that the only things that
14  you have -- and I think you've confirmed this --
15  that you've given us are these two bills.
16           Now, when you moved out in late October,
17  early November, where did you go?
18      A.   Well, I travelled a little bit in the U.S.
19  and then I moved to India.
20      Q.   Well, I want to know specifically when you
21  left in early November did you first travel in the
22  U.S.?
23      A.   Yes.
24      Q.   Okay.  And then for how long were you

Page 64

1   travelling in the U.S.?
2       A.   Oh, about three days, three, four days.
3       Q.   Okay.  Where would you stay when you would
4   travel in the U.S.?
5       A.   Well, I was in Cleveland.
6       Q.   Okay.  Is that for business?
7       A.   No, I was visiting some relatives.
8       Q.   Okay.  And then where did you go from
9   Cleveland?
10      A.   Then I went to India.
11      Q.   When did you go to India?
12      A.   Somewhere around the early part of
13  November.
14      Q.   Can you be --
15      A.   Maybe the 7th, 10th, something like that.
16  I don't remember the exact date.
17      Q.   Now, when you went to India on the 7th or
18  the 10th -- how did you get there; was it Air
19  India?
20      A.   No.
21      Q.   What did you fly on?
22      A.   My best recollection it was Air France.
23      Q.   Okay.  So then when you went to India on
24  or about the 7th or the 10th of December --

Page 65

1       A.   No, not December, November.
2       Q.   Sorry.  November.  You're right.
3            Were you aware at the time that you owed
4   money to Indymac?
5            MR. SHMIKLER:  Objection to the extent it calls
6   for a conclusion, a legal conclusion.
7            MR. BLACKMAN:  I don't think it's a legal
8   conclusion to know whether you owe money to
9   someone.
10           MR. SHMIKLER:  It is because it depends on the
11  appraisals of the properties.
12  BY MR. BLACKMAN:
13      Q.   Sir?
14      A.   Yes.
15      Q.   When you went to India, were you in
16  default to Indymac under its loans?
17           MR. SHMIKLER:  Same objection.
18           THE WITNESS:  I do not know.
19  BY MR. BLACKMAN:
20      Q.   Well --
21      A.   I do not recall.
22      Q.   You don't recall whether or not you were
23  in default to Indymac under the loans when you went
24  to India; is that your recollection?

17 (Pages 62 to 65)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 66

1    A.  There were -- there were just too many
2  papers.  Maybe there was -- maybe some loans were
3  in default.  I don't quite recall that.  I know
4  there was some default.
5    Q.  Well, do you recall that on May 1st, 2007,
6  Hawthorne Grand defaulted on its loans to Indymac?
7    MR. SHMIKLER:  Again, object to legal
8  conclusion.
9    THE WITNESS:  I'm -- they may have sent some
10  notices, you know, stating default.
11  BY MR. BLACKMAN:
12    Q.  Well, sir, do you recall being in my
13  office at a meeting before the lawsuit was filed
14  speaking with the -- hang on -- speaking with the
15  representatives at Indymac about how you were going
16  to repay what was owed?
17    A.  Yes, there was a meeting at your office.
18  I recall that.
19    Q.  And when you were meeting at my office
20  with the representatives of Indymac and myself --
21    A.  Hello?
22    MR. SHMIKLER:  Can you hear us?
23    THE WITNESS:  Hello?
24    MR. SHMIKLER:  Can you hear us?

Page 67

1    THE WITNESS:  Yeah, I can hear you now.
2  BY MR. BLACKMAN:
3    Q.  When you were meeting in our office, that
4  was before you moved to India, wasn't it?
5    A.  Yeah.
6    Q.  And the purpose of the meeting was to
7  discuss -- the purpose of the meeting was to
8  discuss with you --
9    A.  Hello?
10    MR. SHMIKLER:  Can you hear us now?  Dr. Vish?
11  Dr. Vish?
12    THE WITNESS:  Hello?
13    MR. SHMIKLER:  Can you hear us?  Are you there?
14    THE WITNESS:  Hello?
15        (Discussion off the record.)
16    MR. SHMIKLER:  I think we heard you say you
17  wanted to try your cell phone?
18    THE WITNESS:  Yes, I want to see -- you know, I
19  will talk as much as I can.  And if I lose you
20  again, I'm going to try it from my cell phone.  I'm
21  just hooking it up.  Hang on one second.
22    MR. SHMIKLER:  Can you hear us?
23    THE WITNESS:  Yeah, I can hear you, yeah, go
24  ahead.

Page 68

1    MR. SHMIKLER:  If you lose us again, call us
2  back on the cell.  In the meantime we're setting up
3  a conference call and number which may help.
4    THE WITNESS:  Okay.
5  BY MR. BLACKMAN:
6    Q.  Sir, when you were in my office with my
7  clients to discuss the loans that were made to you
8  and your companies, you were in default at that
9  time; were you not?
10    MR. SHMIKLER:  Object to the extent it calls
11  for a legal conclusion.  If you want to ask if he
12  knew it was their position.
13    MR. BLACKMAN:  I'm asking him that.
14    MR. SHMIKLER:  Fine.  That's our objection.
15  BY MR. BLACKMAN:
16    Q.  Go ahead.
17    A.  I'm not going to draw a legal conclusion
18  it was in default.  It's a claim made by Indymac
19  and, you know --
20    Q.  Are you current?
21    A.  Sorry?
22    Q.  Are your companies current in their
23  obligations to Indymac; is that what you're saying?
24    A.  No, they may not be current.

Page 69

1    Q.  When you were in our office, is it your
2  testimony that the loans were in good standing at
3  that point?
4    MR. SHMIKLER:  Objection, calls for a legal
5  conclusion.
6    THE WITNESS:  I don't know what you mean by
7  good standing.  I mean, everybody knows the
8  problems that we have in Florida, so the property
9  sale could not take place as per planned, so there
10  were difficulties.
11  BY MR. BLACKMAN:
12    Q.  Sir, when you say there were difficulties,
13  I want to be clear and I want to be honest here,
14  when you were in our office, you were not in our
15  office because everything was fine; you were in our
16  office because you were in default to Indymac and
17  you owed it money.
18    MR. SHMIKLER:  Objection.  It calls for a legal
19  conclusion.  I think to the extent you go beyond
20  what his understanding was as to their claims, I
21  don't think it's relevant.
22  BY MR. BLACKMAN:
23    Q.  Go ahead.
24    A.  Yeah, I'm not going to -- I'm not going to

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 70

1  say it was in default --
2  Q. Sir, you do not have a choice, sir.
3  MR. SHMIKLER: What he's trying to tell you is
4  that he's not -- he doesn't have an opinion on the
5  legalities of it. If you want to ask about the
6  facts --
7  BY MR. BLACKMAN:
8  Q. What was the purpose of our meeting? Why
9  did you come to our office?
10  A. Well, the purpose of our meeting was to
11  see if we can come to some agreement with regard to
12  the property and the loan.
13  Q. Okay. And why did we need to do that?
14  A. Hello?
15  Q. Why did we need to do that?
16  A. Hello?
17  MR. SHMIKLER: Hello? All right.
18  THE WITNESS: Yeah.
19  BY MR. BLACKMAN:
20  Q. Why did we need to do that?
21  A. Why did we need to --
22  Q. Why did we need to come to an agreement
23  about the property and the loan if everything was
24  fine?

Page 71

1  MR. SHMIKLER: Objection, form.
2  THE WITNESS: I'm not saying everything was
3  fine. There were some issues, problems with regard
4  to sale and number of sales we can make and all of
5  that, so there were problems.
6  BY MR. BLACKMAN:
7  Q. When you were in our office before you say
8  you moved to India, were you current on the loans;
9  were you current in your obligations? I'm not
10  saying whether you were in default or not. I'm
11  saying were you current in your obligations to
12  Indymac?
13  MR. SHMIKLER: You're asking him personally or
14  the company?
15  MR. BLACKMAN: Either.
16  MR. SHMIKLER: I object to form.
17  MR. BLACKMAN: Because he was there in both
18  capacities.
19  MR. SHMIKLER: Just to be clear who we're
20  talking about.
21  BY MR. BLACKMAN:
22  Q. Go ahead.
23  A. You were talking about the company --
24  yeah, I mean.

Page 72

1  Q. Was your company current to Indymac when
2  you were at our office?
3  A. No, it was not.
4  Q. And now you've signed a personal
5  guarantee?
6  A. Yes.
7  Q. Can you pay Indymac under that personal
8  guarantee today?
9  MR. SHMIKLER: I object. It's not relevant to
10  the issue of service.
11  MR. BLACKMAN: I think it is.
12  MR. SHMIKLER: I think it's beyond the scope of
13  these proceedings.
14  MR. BLACKMAN: I think it is very relevant as
15  to why somebody three days after a lawsuit is filed
16  after being in our office trying to discuss a
17  workout all the sudden says he's moving to India
18  and is avoiding service, I think it's very
19  relevant.
20  MR. SHMIKLER: He's not avoiding service. He's
21  offered to accept service.
22  MR. BLACKMAN: He doesn't need my permission to
23  accept service. You can accept service and you can
24  go into the court and you can ask them to vacate

Page 73

1  defaults and you can ask them for whatever relief
2  you want. You don't need my permission for that.
3  You keep suggesting that this is something that I
4  have some control over. You had that right and
5  that ability since November. So that is -- I'm not
6  sure what the relevance of that is.
7  BY MR. BLACKMAN:
8  Q. But sir?
9  MR. SHMIKLER: The issue --
10  MR. BLACKMAN: Do you have an objection?
11  MR. SHMIKLER: My objection is that it's not
12  relevant.
13  BY MR. BLACKMAN:
14  Q. Okay. Sir, can you pay your personal
15  guarantee right now? Can you pay Indymac all the
16  money that your companies owe Indymac?
17  MR. SHMIKLER: Objection.
18  THE WITNESS: I wish to correct some statement
19  you made that three days after walking into your
20  office. That is incorrect.
21  BY MR. BLACKMAN:
22  Q. Sir, I'm not asking -- that wasn't a
23  question to you.
24  A. Yes.

19 (Pages 70 to 73)

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 74

1      Q.  Listen to my question because I want to go
2  through this and be done with this.
3      Can you pay Indymac now on your personal
4  guarantee for the monies owed to Indymac under the
5  various loans; can you do that?
6      MR. SHMIKLER:  Object to foundation.
7      THE WITNESS:  You know, I do not think I need
8  to answer that question.
9      MR. SHMIKLER:  You do need to answer it.  Dr.
10  Vish, this is Dan.  You do need to answer it.
11      THE WITNESS:  Is that Dan?
12      MR. SHMIKLER:  Yeah, this is Dan.  I made my
13  objections.  You can go ahead and answer the
14  questions.
15      THE WITNESS:  Dan?
16      MR. SHMIKLER:  Yes.  I made my objections,
17  Dr. Vish.  Go ahead and answer the question, if you
18  know.
19      THE WITNESS:  Dan?
20      MR. SHMIKLER:  Yes.  Can you hear me?
21  Dr. Vish?
22      THE WITNESS:  Hello?
23      MR. SHMIKLER:  Dr. Vish?
24      MR. BLACKMAN:  You don't see a pattern here?

Page 75

1      MR. SHMIKLER:  I don't see a pattern here.
2      THE WITNESS:  Hello?
3      (Discussion off the record.)
4      MR. SHMIKLER:  We don't want these
5  interruptions anymore.  Let's switch to the cell
6  phone now, okay?
7      THE WITNESS:  Cell phone?
8      MR. SHMIKLER:  Yeah, we don't want these
9  interruptions anymore.  Switch to the cell phone.
10      THE WITNESS:  Okay.
11      MR. SHMIKLER:  Call us right back.
12      (A short break was taken.)
13      MR. SHMIKLER:  Hello, Dr. Vish?
14      THE WITNESS:  Yes.
15      MR. SHMIKLER:  Can you hear us okay?
16      THE WITNESS:  Yeah, I can hear you.
17      MR. SHMIKLER:  We'll see if this works.  If we
18  have any problems, we'll switch over to the AT&T
19  conference.
20      THE WITNESS:  Okay.
21      MR. SHMIKLER:  I don't know if you heard what I
22  was telling you.  I said we made our objections to
23  it and you can go ahead and answer it.  Do you
24  recall what it was?

Page 76

1      THE WITNESS:  Okay.  The question is.
2      MR. BLACKMAN:  Could you please read it back.
3      (Whereupon the record was read
4      as requested.)
5      THE WITNESS:  Pay Indymac under the various
6  loans, I do not know because I -- it is possible
7  that I may be able to pay because I still believe
8  the property has considerable value.  So I think
9  there is enough in the properties to take care of
10  the loan.
11  BY MR. BLACKMAN:
12      Q.  Sir, that's not my question.  I want you
13  to listen my question --
14      MR. SHMIKLER:  I object.  I think it is the
15  question.
16      MR. BLACKMAN:  Let me finish and you'll
17  understand why it's not my question.
18      MR. SHMIKLER:  All right.
19  BY MR. BLACKMAN:
20      Q.  My question is not whether there's enough
21  money if collateral is liquidated to pay down the
22  loan so that you won't have to pay monies under
23  your personal guarantee.  My question is -- because
24  there's no requirement that collateral be

Page 77

1  liquidated first.
2      My question is, if Indymac comes to you
3  today and says, can you pay everything that's owed
4  pursuant to your personal guarantee, can you do
5  that?
6      MR. SHMIKLER:  Object to foundation and to the
7  extent it calls for a legal conclusion.
8      Go ahead and answer it.
9      THE WITNESS:  I can't -- you know, I cannot be
10  answering any hypothetical questions.  I think my
11  understanding is that the first charge -- this is
12  my understanding.  The first charge has got to be
13  the property.  And if there is any deficiency left
14  after the property's value, then I'm responsible
15  for it.
16  BY MR. BLACKMAN:
17      Q.  Okay.  Well, sir, sir, it's not a
18  hypothetical and I want you to answer the question
19  because I'm not asking --
20      A.  I have answered the best I can.  That is
21  my --
22      Q.  Sir --
23      A.  -- that is my understanding.
24      Q.  Sir --

Page 78

1    A.  That is my understanding.
2    Q.  Sir, when I am speaking you are not
3  allowed to speak; do you understand that?
4    MR. SHMIKLER: Unless he's still answering the
5  question which has been the case a number of times
6  or if he needs clarification.
7    MR. BLACKMAN: That's your job.
8    MR. SHMIKLER: If he doesn't understand --
9    MR. BLACKMAN: Stop.
10    MR. SHMIKLER: Let's not make these blanket
11  statements.
12    MR. BLACKMAN: You know, control your witness,
13  all right.
14    MR. SHMIKLER: No, you don't want me to shut
15  up. I try to help you and --
16  BY MR. BLACKMAN:
17    Q.  Dr. Vish, I want to ask you again because
18  you haven't answered the question. I'm not asking
19  you whether there is sufficient collateral in your
20  opinion to be liquidated. I'm asking you if
21  Indymac came to you today and asked you to pay all
22  amounts owed under all these loans pursuant to your
23  personal guarantees, would you personally have
24  sufficient financial assets to do that?

Page 79

1    MR. SHMIKLER: I have the same objections as
2  the previous question.
3    THE WITNESS: I'm not sure they have a right to
4  do that. That's why I am saying it is a
5  hypothetical question. You claim they have the
6  right. I claim they don't. So it is a
7  hypothetical question, as far as I'm concerned.
8  BY MR. BLACKMAN:
9    Q.  Sir, your lawyer is the one to make an
10  objection as to whether this is hypothetical. You
11  are required to answer the question. You don't
12  have that right; do you understand that?
13    MR. SHMIKLER: Wait a minute. First, I have an
14  objection. In fact, included in your question was
15  your argument that it was not a hypothetical, he's
16  responding to that. I think that's fine and he can
17  do that. I think that he can.
18  BY MR. BLACKMAN:
19    Q.  Sir, how much is Indymac owed under the
20  loans? Sir?
21    MR. SHMIKLER: Object to foundation to the
22  extent it calls for a legal conclusion.
23  BY MR. BLACKMAN:
24    Q.  How much is Indymac owed by your companies

Page 80

1  under the loans?
2    MR. SHMIKLER: Same objections.
3    THE WITNESS: I don't have that data in front
4  of me.
5  BY MR. BLACKMAN:
6    Q.  Is it more than $50 million?
7    A.  You are talking about one loan or two
8  loans?
9    Q.  I'm talking about all three loans. Is it
10  more than $50 million?
11    A.  I think so.
12    Q.  Is it more than 75 million?
13    A.  I don't exactly recall.
14    Q.  Okay. Well, let's say it's more than 50
15  million. Do you have $50 million in personal
16  assets to repay pursuant to your personal
17  guarantee?
18    MR. SHMIKLER: Object to relevance.
19    THE WITNESS: Do I have --
20  BY MR. BLACKMAN:
21    Q.  Do you have in excess of $50 million to
22  repay the loans if demand was made on you pursuant
23  to your personal guarantee? Do you have those
24  financial assets?

Page 81

1    MR. SHMIKLER: Same objection.
2    THE WITNESS: I'm not sure they can make that
3  demand.
4  BY MR. BLACKMAN:
5    Q.  I understand your position, but I'm asking
6  you a different question.
7    I'm asking you whether or not you have the
8  financial ability to make a payment to a bank in
9  excess of $50 million?
10    MR. SHMIKLER: Again, object to relevance.
11    THE WITNESS: I am not sure that it is, you
12  know -- I do not see why this is not a hypothetical
13  question.
14    MR. SHMIKLER: I got an idea.
15    MR. BLACKMAN: I don't want an idea.
16    MR. SHMIKLER: You just want to control my
17  witness. I'm trying to help.
18    MR. BLACKMAN: I don't want your help.
19    MR. SHMIKLER: If you let me talk to him.
20    MR. BLACKMAN: No, I'm not going to do it like
21  that. It's not a difficult question. I understand
22  you got an objection as to relevance. We're
23  playing games here.
24  BY MR. BLACKMAN:

21 (Pages 78 to 81)

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

Page 82

```
 1    Q.  Dr. Vish, I'm going to ask you again, do
 2  you have in excess of $50 million in your personal
 3  assets to pay a demand in that amount if made by
 4  Indymac?
 5    A.  No, sir.
 6    Q.  Okay.  Now, when you left the country in
 7  October or November of 2007, did you take any
 8  personal assets with you?
 9    A.  What personal assets?
10    Q.  I mean, what are you living on in India?
11    A.  I have my clothes.
12    Q.  What are you living on in terms of monies
13  and dollars; how are you paying for anything?
14    MR. SHMIKLER:  Object to relevance.  I think
15  we're again moving to the area of a citation
16  proceeding.
17    MR. BLACKMAN:  I think it's relevant to whether
18  he's established a permanent residence in India.
19  BY MR. BLACKMAN:
20    Q.  Sir, how are you paying for living in
21  India?
22    A.  How does it matter?  Everything just looks
23  like a discovery.  This is not --
24    Q.  Sir, you've hired a very good attorney to
```

Page 83

```
 1  represent you.  You are paying this lawyer to
 2  represent you.  He will make an objection and the
 3  judge will rule on it.  Until he tells you not to
 4  answer, you have to answer.  So how are you living
 5  in India from where -- strike that.
 6        How is it that you are financially living
 7  in India if your businesses are all here?
 8    A.  No.  Business -- I have an operation here
 9  to help support the U.S. sales.
10    Q.  Okay.  But the operation --
11    A.  And --
12    MR. SHMIKLER:  He's still answering the
13  question.  Please let him finish.
14  BY MR. BLACKMAN:
15    Q.  That operation --
16    MR. SHMIKLER:  I object.
17    THE WITNESS:  Wait a minute.  You don't want me
18  to interrupt nor can you interrupt me.
19    MR. SHMIKLER:  That's absolutely right.  Please
20  finish your answer.
21  BY MR. BLACKMAN:
22    Q.  Go ahead.  You're right, Doctor.
23    A.  Repeat the question, please.
24    Q.  How is it you are financially supporting
```

Page 84

```
 1  yourself if you moved to India permanently if all
 2  your businesses are in Chicago?
 3    A.  Well, like I said, there is -- the
 4  operation here is really helping the American
 5  Sales, No. 1.  No. 2, it doesn't cost much to live
 6  in India.  It costs very little to live in India.
 7  My whole food expenses for a month is like, I don't
 8  know, maybe $300 or something that.  I mean, it
 9  doesn't --
10    Q.  Sir, it doesn't matter to me how much it
11  costs.
12        My question is how is it that you are
13  living in India, financially supporting yourself if
14  your businesses are in the United States?
15    MR. SHMIKLER:  Object to form.
16  BY MR. BLACKMAN:
17    Q.  Do your businesses send money from the
18  United States to you to support you in India?
19    MR. SHMIKLER:  Are you --
20    THE WITNESS:  No, I have my savings.
21  BY MR. BLACKMAN:
22    Q.  I'm sorry?
23    A.  I have my savings and -- you know, and I
24  told you it costs very little to live in India.
```

Page 85

```
 1    Q.  So do any of your businesses ever send you
 2  money to live on when you're in India?
 3    MR. SHMIKLER:  I object to relevance.
 4    MR. BLACKMAN:  I think it's very relevant --
 5    MR. SHMIKLER:  It doesn't matter where it comes
 6  from.  If you want to ask him does he have a bank
 7  account in India, I mean, that would tell you where
 8  he lives, but where he gets money sent from,
 9  nothing to do with it.
10  BY MR. BLACKMAN:
11    Q.  Go ahead, sir, you can answer the
12  question.
13        Do you get money from the operations in
14  the United States?
15    A.  Do I get money from operations in the
16  United States?
17    Q.  Right.
18    A.  For what?
19    Q.  For anything.  For yourself personally,
20  for your living expenses, for anything that you're
21  doing.
22        Do you get money from your operations in
23  the United States that's sent to you in India?
24    A.  Look, even to support this operation here
```

22 (Pages 82 to 85)

Page 86

1    just to help the U.S. sales, I am funding it here.
2        Q.   That's not my question.
3        A.   There is no cash there that can be used.
4    I wish there was.  There is no cash.  You know the
5    status of the real estate market.
6        Q.   Sir, sir.  I just want you to listen to my
7    questions.  I don't need an explanation.  I just
8    need you to listen and answer my questions.
9            My question is, is it your testimony since
10   you have allegedly moved to India in October or
11   November of 2007 that no monies have been
12   transferred to you from the United States to you or
13   for your use in India; is that your testimony?
14       MR. SHMIKLER:  Object to relevance.
15       THE WITNESS:  I don't recall that.
16   BY MR. BLACKMAN:
17       Q.   Is that true or is that not true?
18       MR. SHMIKLER:  Object to form and to relevance.
19       THE WITNESS:  I said I don't recall that.
20   BY MR. BLACKMAN:
21       Q.   You don't recall what?
22       A.   I don't recall any transfer of funds.
23       Q.   Okay.  Do you have access to your bank
24   accounts in the United States?

Page 87

1        A.   Do I have access to my bank accounts?
2    Yeah, I have access, yeah.
3        Q.   And are those the ones that are at
4    Private Bank and MB Financial?
5        A.   The MB Financial has got nothing to do
6    with me.
7        Q.   You've got your personal bank accounts at
8    Private Bank?
9        MR. SHMIKLER:  I object on the grounds for
10   relevance.
11   BY MR. BLACKMAN:
12       Q.   Sorry?
13       MR. SHMIKLER:  First, I'll object to the
14   grounds of relevance.
15       MR. BLACKMAN:  Look, you opened the door to all
16   of this when he says he permanently lives out
17   there.  We're entitled to explore his connections
18   to whatever assets he is maintaining here.  He's
19   not saying he's got two residences.  He's saying
20   that he's moving there and he's not coming back.
21   So you opened the door.  Whether or not that
22   benefits us in some other way, has nothing to do
23   with these proceedings.
24       MR. SHMIKLER:  It does because it's not

Page 88

1    relevant the fact he has an account here.
2        MR. BLACKMAN:  It all --
3        MR. SHMIKLER:  Where it is and so forth is not
4    relevant.
5        MR. BLACKMAN:  Okay.
6    BY MR. BLACKMAN:
7        Q.   Sir, do you maintain personal checking or
8    savings accounts in the United States?
9        MR. SHMIKLER:  Again, object on the grounds of
10   relevance.
11       THE WITNESS:  Yes.
12   BY MR. BLACKMAN:
13       Q.   Those are in Chicago?
14       A.   Yes.
15       Q.   And those are at Private Bank?
16       MR. SHMIKLER:  Same objections.
17       THE WITNESS:  Yes.
18   BY MR. BLACKMAN:
19       Q.   And are they at any other banks?
20       MR. SHMIKLER:  Same objections.
21       THE WITNESS:  None that I recall, no.
22   BY MR. BLACKMAN:
23       Q.   Okay.  Now, were those bank accounts in
24   existence when you left the country in October or

Page 89

1    November of 2007?
2        A.   Yes.
3        Q.   Okay.  Why did you not close your personal
4    bank accounts, if you were moving to India
5    permanently?
6        A.   Well, I do -- like I said, I do -- I do
7    have business interest in America still and I have
8    my children.  I mean, it's not like -- I can't cut
9    off my ties.  What are you talking about?
10       Q.   I assume you have business accounts that
11   are in Illinois and Chicago, correct?
12       A.   Yeah.
13       Q.   Okay.  I'm not speaking about those.
14       A.   No, no, you were talking about even
15   personal accounts.  I have my children.  I can't
16   cut off my ties to U.S.  I don't know what you are
17   implying.
18       Q.   Sir, I just want you to listen to my
19   questions --
20       A.   I am listening.  You just keep on --
21       MR. SHMIKLER:  Dr. Vish --
22       THE WITNESS:  I have no idea what are you
23   trying to do.
24       MR. SHMIKLER:  Dr. Vish, this is Dan.  I know

                              23 (Pages 86 to 89)

Page 90

1  that you're frustrated. We're all frustrated with
2  the fact that the examination has veered well off
3  what's relevant. But let's just answer the
4  questions and then we can be done with it. So
5  don't -- try not to argue or get upset. That's
6  better.
7      THE WITNESS: Okay.
8  BY MR. BLACKMAN:
9      Q. Okay. Just to be clear, the personal
10  accounts that were in existence when you left the
11  country in October or November of 2007 are still in
12  existence; those have not been closed?
13      MR. SHMIKLER: Objection, asked and answered
14  and to relevance.
15  BY MR. BLACKMAN:
16      Q. Is that correct?
17      A. That is correct.
18      Q. Okay. Thank you.
19      Now, you stated that when you left
20  Cleveland you went to India around the 7th or the
21  10th of November, correct?
22      A. Yes.
23      Q. Now when you went there --
24      A. Yes.

Page 91

1      Q. When you went there, where did you stay?
2      MR. SHMIKLER: To Cleveland or India?
3  BY MR. BLACKMAN:
4      Q. When you went to India, you mentioned
5  something about staying at a cousin's house?
6      A. Right.
7      Q. Is that where you stayed when you first
8  got there?
9      A. Right.
10      Q. And what's his name?
11      A. Krishna Murthi.
12      Q. Can you spell that, please?
13      A. K-r-i-s-h-n-a M-u-r-t-h-i.
14      Q. For how long did you stay there?
15      A. Well, I've been staying there.
16      Q. Okay. So is that where you're calling
17  from now?
18      A. No, I'm calling from a different place.
19      Q. Where are you calling from now?
20      A. I'm calling from the office.
21      Q. Is that the office, the Real Estate
22  Private Limited office?
23      A. Yeah, right.
24      Q. Where does your cousin live?

Page 92

1      A. Anna Nagar.
2      Q. I'm sorry?
3      A. Anna Nagar.
4      Q. When you said the address that you put
5  into your affidavit, the 196/8 Asiad Colony, Anna
6  Nagar West, Chennai, that's your cousin's home,
7  right?
8      A. Right.
9      Q. And does he own that or does he rent that?
10      A. He rents that.
11      Q. He rents it. Okay.
12      Have you ever stayed there before 2007
13  when you went out there?
14      A. Yeah, I have stayed there before.
15      Q. How many times have you stayed there over
16  the past let's say three years?
17      A. I don't know. Maybe one or two times.
18      Q. So when you go out to India, is that where
19  you -- is that where you usually stay; is that your
20  family out there?
21      MR. SHMIKLER: Object to form.
22      THE WITNESS: No, not really. I travel and
23  maybe, you know, different places. And really it's
24  not like one place.

Page 93

1  BY MR. BLACKMAN:
2      Q. Okay. But do you have other family that
3  you stay with when you go to India besides your
4  cousin?
5      MR. SHMIKLER: Before he moved is what you're
6  asking about, right?
7      MR. BLACKMAN: I guess at any point.
8  BY MR. BLACKMAN:
9      Q. Are there different family members that
10  you've stayed with over time?
11      A. Yeah, there are different family members,
12  yeah.
13      Q. And is it your -- strike that.
14      Are you paying your cousin to stay at his
15  house?
16      A. No. Practice in India is really not to --
17  not to pay relatives, but I help out in other ways.
18  I help out with maybe children's school or things
19  like that. We don't really have a habit of paying
20  our relatives.
21      Q. So these various bills that your lawyer
22  went through with you, there was a washing machine,
23  there was a refrigerator, there was a TV, is that
24  for you or is that for you and your cousin?

24 (Pages 90 to 93)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 94

1    A.  It's for the common use, for me and my
2  cousin.
3    Q.  Are there other people living there
4  besides the two of you?  Does he have a wife or
5  children?
6    A.  Yes.
7    Q.  How many other people are living there?
8    A.  No, just the wife and the one daughter.
9  That's it.
10    Q.  So there's the four of you?
11    A.  Right.
12    Q.  How many rooms are in this apartment?
13    A.  There are like three, four rooms.
14    Q.  So do you have your own room?
15    A.  Yeah.
16    Q.  And the stuff that you bought, the washing
17  machine, the refrigerator, the TV, is that for
18  everybody's use or is that just for you?
19    MR. SHMIKLER:  Objection, asked and answered.
20    THE WITNESS:  No, it's for everybody's use.
21  BY MR. BLACKMAN:
22    Q.  Is that a gift to them or do you own that?
23    A.  I don't know.  We don't look at it like
24  this.  It's a different concept in India.  We don't

Page 95

1  say I own this.  We just -- I mean, it's -- you
2  will never understand.
3    Q.  I might understand but that's okay.
4      Well, let me ask you a different question.
5      If you choose to move back to the United
6  States, will you be bringing back the refrigerator
7  and the TV and the washing machine or will you
8  leave that for your cousin?
9    MR. SHMIKLER:  I object to form.  I object to
10  hypothetical and to relevance.
11  BY MR. BLACKMAN:
12    Q.  Go ahead, sir.
13    A.  You know, it's a hypothetical question.
14    Q.  You still have to answer it.
15    THE WITNESS:  Dan, do I have to answer
16  hypothetical questions?
17    MR. SHMIKLER:  Answer to the best of your
18  ability, Dr. Vish, and that's what you can do.
19    THE WITNESS:  I can't imagine this question
20  coming from a lawyer.  You know the answer.
21  BY MR. BLACKMAN:
22    Q.  I'd like to hear it, sir.
23    A.  I don't know.
24    MR. SHMIKLER:  You can answer it, if you know,

Page 96

1  Dr. Vish.
2    THE WITNESS:  I don't know.
3  BY MR. BLACKMAN:
4    Q.  So now you just said I wouldn't understand
5  about why somebody would buy appliances or gifts
6  and let everybody use them.
7      Is it your testimony that if you came back
8  to the United States that you might bring all that
9  with you?
10    MR. SHMIKLER:  I object to the preamble as it
11  mischaracterizes his testimony.  I object to the
12  remainder of the question as asked and answered,
13  hypothetical, additional objections to form and
14  relevance.
15  BY MR. BLACKMAN:
16    Q.  Is it your testimony, sir, that you don't
17  know whether or not you would bring that stuff back
18  or leave it with him?
19    A.  It's patently absurd that somebody would
20  think of bringing this.  What kind of question is
21  this?  How much does it cost to ship all of this?
22  What are you talking about?  Why you ask this
23  question?  I don't understand.
24    MR. SHMIKLER:  It's all right.  Even the

Page 97

1  ridiculous questions we're going to answer.  That's
2  okay.  Everyone knows they're ridiculous.
3    MR. BLACKMAN:  Dan, if you have an objection,
4  make an objection.  Please do not be rude and do
5  not be unprofessional by having a dialogue with
6  your client in the middle of an evidence deposition
7  saying my questions are ridiculous.  Please don't
8  do that.  It only makes it difficult for me to ask
9  him questions.  He's put in an affidavit that this
10  is a permanent residence of his.  Now, these
11  questions may seem silly, but they're very
12  important because that's the position he's taking
13  please don't perpetuate the difficulty I am having
14  with asking him questions by having a dialogue with
15  him while I'm doing this saying how ridiculous this
16  is.  We're only here because he will not accept
17  service and is challenging this.  That's why we're
18  here, not because of anything I've done.  I would
19  just ask you make your objections and try to avoid
20  those kind of side comments.
21    MR. SHMIKLER:  Gary, I'm trying to help you
22  here.  I didn't interrupt you --
23    MR. BLACKMAN:  You're not helping me by --
24    MR. SHMIKLER:  Please let me finish.

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 98

```
 1      MR. BLACKMAN: You're not helping --
 2      MR. SHMIKLER: You're still doing it. Please
 3   allow me to finish.
 4      MR. BLACKMAN: Go ahead.
 5      MR. SHMIKLER: My response to this is, I'm
 6   trying to help you here. The witness is
 7   understandably upset because the notion that
 8   whether he owns it or they own it or whoever owns
 9   it, no one is going to take a refrigerator back
10   with them from India and everybody knows that. So
11   it's a ridiculous question. He's upset by that.
12   And I'm assuaging him to get him to answer the
13   questions even though he's upset and acknowledging
14   his feelings and that they're valid. Ultimately
15   this is to your benefit. If you want to continue
16   your examination, please do so.
17      MR. BLACKMAN: Just for the record, this is an
18   evidence deposition in lieu of trial testimony.
19   You would not be able to do this if we were
20   standing up before Judge Guzman and your client was
21   on the stand. So it does not matter to me whether
22   you think this helps or not. This is a formal
23   federal evidence deposition. This is not a
24   discovery deposition and this is just not an
```

Page 99

```
 1   informal dialogue. You would not be able to do
 2   that if he was on the stand and that's the purpose
 3   he is here.
 4      So again, limit your objections. Tell
 5   him, if you want to assuage him, to answer the
 6   questions. But do not agree with him about how
 7   ridiculous they are.
 8      MR. SHMIKLER: I will point out that also,
 9   similarly, if you were on the stand you will not be
10   able to put in these preambles to your questions;
11   you would not be able to make these arguments to
12   the witness; you wouldn't be able to do any of
13   those.
14      MR. BLACKMAN: That's why you make objections.
15      MR. SHMIKLER: If you'd like to cut down on
16   those, then I can cut down on what I'm doing. It's
17   a two-way street. And I agree, let's both cut down
18   and keep this going, but don't put me in a position
19   where I have to respond.
20   BY MR. BLACKMAN:
21      Q. Okay. Sir, have you discussed with your
22   cousin for how long you will be living with him and
23   his family?
24      A. Well, we really, you know, do not have to
```

Page 100

```
 1   discuss that. We know I'm living there
 2   permanently. So he's aware of that. And, you
 3   know, it's not our custom to say I'm going to be
 4   here for two months or three months. I mean, it's
 5   a very different culture, very, very different
 6   culture.
 7      Q. Sir, please listen to my question. I'm
 8   not asking for an explanation. You're making this
 9   far longer than it needs to.
10      My only question was whether you ever
11   discussed with your cousin for how long you would
12   be staying there? That's all my question is.
13      MR. SHMIKLER: I object because he answered
14   that question.
15   BY MR. BLACKMAN:
16      Q. Is the answer no?
17      A. No, I did not discuss that.
18      Q. Now, when you went to India to live with
19   your cousin, what did you take with you?
20      A. Just my clothes and some books.
21      Q. Do you own anything other than your
22   clothes and your books?
23      A. There isn't any -- I mean, my needs are
24   very few and really any other than clothes and books
```

Page 101

```
 1   there isn't anything you can take. It doesn't make
 2   sense.
 3      Q. Sir, sir, again, I want you to listen to
 4   my question. I'm not asking you what your needs
 5   are. I'm asking whether you own anything other
 6   than the clothes and the books that you brought to
 7   your cousin's?
 8      MR. SHMIKLER: Object to form.
 9      THE WITNESS: I have the car. You know that.
10   BY MR. BLACKMAN:
11      Q. All right. Besides the car, do you own
12   anything else?
13      THE WITNESS: I can't recall.
14      MR. SHMIKLER: Are you talking about personal
15   possessions or marital estate stuff?
16      MR. BLACKMAN: Well, that's personal
17   possessions, too.
18   BY MR. BLACKMAN:
19      Q. Did you read in your wife's deposition
20   that there are things of yours that are still at
21   the house on Ridgewood?
22      A. Yeah.
23      Q. Okay. And she testified that there were
24   some clothes of yours there?
```

26 (Pages 98 to 101)

Page 102

1      A.  I don't recall what she testified, but I
2  know I have some old clothes and maybe some books
3  and things like that, pretty much of no value to
4  me.
5      Q.  And do you also own with your wife some of
6  the furniture in the house, in the Ridgewood house?
7      A.  I don't know that, sir, I don't know.  We
8  don't get -- it's not -- I don't know.  I won't
9  claim --
10     MR. SHMIKLER:  Dr. Vish, just answer his
11  question.  It's okay, all right?
12     THE WITNESS:  I don't know, I don't know.
13  That's my answer, I don't know.
14  BY MR. BLACKMAN:
15     Q.  Okay.  Now, since you went out to India,
16  November 7th or 10th, have you been back?
17     A.  Back where?
18     Q.  To the United States.
19     A.  Yes, I have been.
20     Q.  And how many times?
21     A.  Just once.
22     Q.  And was that when you came in for your
23  wife's mother's funeral?
24     A.  Yes.

Page 103

1      Q.  And when you came in, how long were you in
2  for?
3      A.  Just a few days.
4      Q.  And where did you stay?
5      A.  I stayed at the hotel.
6      Q.  Now, is it your testimony that your only
7  home right now is in India?
8      A.  You mean home by what?  I mean, if you're
9  talking about home, you mean by way of what?
10     Q.  I don't know.  I'm asking you.
11     A.  I don't know what you mean by your only
12  home because home means -- you know, I still
13  technically I have ownership interest in the house
14  in Burr Ridge.  So I don't know what you mean by --
15  you know, this is my residence here, permanent
16  residence here, and so I don't know what you mean
17  by --
18     Q.  Do you have any other residences -- strike
19  that.
20         Is it your testimony that you do not have
21  any other residences in the United States?
22     MR. SHMIKLER:  Object to form.
23     THE WITNESS:  Like I said, I do have some
24  ownership interest, but I do not have residence,

Page 104

1  you know, per se by way of staying permanently in
2  the United States, no, I don't.
3  BY MR. BLACKMAN:
4      Q.  So after you left LaGrange, you didn't
5  move into any place else or create any other
6  residence in Chicago or the United States?
7      A.  No, sir.
8      Q.  So on December 1st, which was the date
9  that your wife was served with the papers, the only
10  residence in your opinion was where you were
11  staying at your cousin's?
12     A.  Yes.
13     Q.  Okay.  Now, do you pay the utilities at
14  your cousin's?
15     A.  Do I pay the utilities?  No, I don't.
16     Q.  Do you pay the -- any of the bills?
17     A.  No, I buy some groceries, you know, I buy
18  foods, I buy groceries, I bring them.  So that's
19  how I help out and I buy some of these things.
20     Q.  When you were living in Illinois, would
21  you from time to time pick up the mail that was
22  addressed to you that was sent to the home on
23  Ridgewood?
24     MR. SHMIKLER:  Object to form.  You mean in

Page 105

1  LaGrange when he was living there?  Because
2  Illinois would include both houses.
3  BY MR. BLACKMAN:
4      Q.  Okay.  When you were living in LaGrange,
5  did you occasionally pick up your mail from the
6  Ridgewood property?
7      A.  Yes.
8      Q.  Okay.  And sometimes your office would
9  pick up mail for you from your wife at Ridgewood?
10     A.  Yes.
11     Q.  Now, did you ever put in a change of
12  address with the post office telling them that all
13  your mail should go to LaGrange?
14     A.  Yes, I instructed Viswamatham in my office
15  to do that and he did it.
16     Q.  Do you have before you one of the
17  documents that we asked your lawyer to send you
18  which was a notice from the post office with
19  respect to any change of address information?  Do
20  you have that in front of you?
21     A.  I can get that.  Hold on.
22     Q.  Okay.
23     A.  Yes, I have that.
24     MR. BLACKMAN: I'm going to mark that as

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 106

1  Exhibit 5.
2        (Whereupon, Deposition Exhibit
3        No. 5 was marked for
4        identification.)
5  BY MR. BLACKMAN:
6    Q.  Now, this document which has a file stamp
7  circle from the post office dated March 10th, 2008,
8  at the bottom; do you see that?
9    A.  Yes.
10   Q.  And what this states is this is a notice
11 from the post office that says that, according to
12 the post office records, you are still located --
13 your address for purposes of the post office is
14 still at the Ridgewood Lane home?
15       MR. SHMIKLER:  I object to foundation.
16 BY MR. BLACKMAN:
17   Q.  Do you see that?
18   A.  I see that.
19   Q.  Okay.  Do you know why the post office
20 still shows your current address at 7529 Ridgewood
21 Lane in Burr Ridge?
22   A.  I have no idea.  It is absolutely
23 incorrect because I have received several mails to
24 LaGrange.  And Viswamatham told me he made it, the

Page 107

1  change of address.
2    Q.  Did you ever see or sign yourself a change
3  of address?
4    A.  No.  Whatever it was in that form.  I
5  don't recall what I had to do.  If there was a
6  signature needed, I'm sure he would have gotten my
7  signature.  Absolutely, yes.  He does things
8  correctly.
9    Q.  But you don't have a copy of that, do you?
10   A.  No.
11   Q.  Now, your wife testified in her deposition
12 that after she was served with the court papers she
13 spoke with you on the phone.
14       Do you recall having a conversation with
15 your wife about what she was served with after she
16 was given the court papers?
17       MR. SHMIKLER:  Object to mischaracterization of
18 her testimony.
19       MR. BLACKMAN:  You want to do it the slow way.
20 We can go through and read it.
21       MR. SHMIKLER:  Just ask the question.  You
22 don't need the preamble.
23       MR. BLACKMAN:  That wasn't your basis.
24       MR. SHMIKLER:  I'm objecting to the preamble.

Page 108

1  BY MR. BLACKMAN:
2    Q.  Sir?
3    A.  Yes.
4    Q.  Do you recall having a conversation with
5  your wife about the papers that she was served
6  with?
7    A.  I do not recall that.
8    Q.  Okay.
9    A.  I know there was -- so many papers came,
10 so I don't know which one it is.  I don't know.
11 There may be, but I have no specific recollection
12 of any one thing in particular.
13   Q.  Okay.  Now, if your wife testified at her
14 deposition on Tuesday that she spoke with you about
15 the Indymac court papers after she was served,
16 would you have any reason to dispute that?
17       MR. SHMIKLER:  Object to the extent it
18 mischaracterizes her testimony.
19       THE WITNESS:  I only said I do not recall.  I
20 mean, there is -- you know, it is entirely possible
21 I may have had that discussion.
22 BY MR. BLACKMAN:
23   Q.  Okay.  Now, your wife also testified that
24 you told her to send the papers to your lawyer,

Page 109

1  Mr. Collins; do you recall doing that?
2        MR. SHMIKLER:  Object to the extent it
3  mischaracterizes his testimony.
4        THE WITNESS:  Yeah, normally if there are any
5  legal papers that come, I do tell her to send it to
6  Michael Collins, yes.
7  BY MR. BLACKMAN:
8    Q.  Do you recall in this case telling your
9  wife to send the papers to Mr. Collins?
10   A.  I -- I think so.
11   Q.  Okay.  And the reason that you did that
12 was because he is your personal lawyer?
13   A.  No, he's not my personal lawyer.  Usually
14 anything that comes -- you know, to get some idea
15 what it is, I have no idea what it is --
16   Q.  Sir, sir, my question is why did you send
17 it to Mr. Collins?  Isn't he your lawyer?
18   A.  Well, yes, he has been doing some work in
19 different areas.  And I can't specifically say he's
20 my lawyer.
21   Q.  Okay.  Well, he is the lawyer for a number
22 of your businesses; is he not?
23   A.  Yes.
24   Q.  Okay.  And your wife testified that he and

Page 110

1  his firm helped you and your wife establish family
2  trusts and partnerships with respect to your
3  children and your personal assets?
4      A.  Yes.
5      Q.  Okay.  And so he has represented you both
6  personally and in your business?
7      MR. SHMIKLER:  I object.  It mischaracterizes
8  his testimony.  You're talking about Michael
9  Collins?
10  BY MR. BLACKMAN:
11     Q.  Has Michael Collins represented you both
12  personally and in your business?
13     A.  Sir, I don't recall that.
14     Q.  Well, has Michael Collins -- your wife
15  testified that Michael Collins -- strike that.
16         Did Mr. Collins' firm represent your
17  family in helping it create partnerships and family
18  trusts?
19     A.  Did they help in what?
20     Q.  Did Mr. Collins' firm, and this was your
21  wife's testimony, assist your family in creating
22  family trusts and partnerships?
23     A.  They're mostly involved in some company
24  things and it is possible they may have done some,

Page 111

1  you know, partnership work.
2      Q.  Do you recall your wife telling you that
3  the papers that she was served with related to
4  Indymac?
5      A.  No, sir, I don't recall that.
6      Q.  Now, after the papers were sent to
7  Mr. Collins, did he ever call you about this
8  lawsuit?
9      MR. SHMIKLER:  Wait.  I object on the grounds
10  of attorney-client communication.  Direct the
11  witness not to answer.
12     MR. BLACKMAN:  For the record whether or not a
13  phone call was made is not an attorney-client
14  communication.
15     MR. SHMIKLER:  You can ask him whether or not
16  there was a phone call, but you can't ask him the
17  subject matter.  You asked him about this lawsuit
18  which is the subject matter.
19  BY MR. BLACKMAN:
20     Q.  Go ahead, sir.
21     MR. SHMIKLER:  No, no, I'm instructing him not
22  to answer based on attorney-client privilege.
23  BY MR. BLACKMAN:
24     Q.  Sir, are you not answering the question of

Page 112

1  whether after the papers were sent to Mr. Collins
2  you and he spoke about the lawsuit; are you not
3  answering that question?
4      A.  I am not answering that.
5      Q.  Okay.  Now, is there a reason after your
6  wife was served with these papers that you have not
7  come into this case to defend yourself?
8      MR. SHMIKLER:  Object to the extent it calls
9  for a legal conclusion.
10     MR. BLACKMAN:  I'm not asking him a legal
11  opinion.  I'm asking him why he has moved to India
12  and not remained in the United States to defend
13  himself in this case.
14     MR. SHMIKLER:  Well, that's two different
15  questions.
16     MR. BLACKMAN:  Okay.
17     MR. SHMIKLER:  Why he moved to India which I
18  think he's already answered.  You're free to ask
19  that, but I think it's compound.  If this is a new
20  question you're asking, the objection is it's
21  compound and that it -- I object to form.
22  BY MR. BLACKMAN:
23     Q.  Go ahead, sir.
24     MR. SHMIKLER:  If you're able to.

Page 113

1      THE WITNESS:  What's your question?
2  BY MR. BLACKMAN:
3      Q.  Is there a reason why you have not, up
4  until now, have not chosen to come back to the
5  United States to defend yourself in this lawsuit?
6      MR. SHMIKLER:  Object to form.
7  BY MR. BLACKMAN:
8      Q.  Go ahead, sir.
9      A.  It's not chosen.  It's really -- I have an
10  attorney representing me.  That's what it is.  I
11  got an attorney representing me, so, you know, I
12  mean, I'm coward.
13     Q.  Right.  Now, do you understand that you
14  are and have been since December you have taken the
15  position that you are not a party to this lawsuit
16  yet because service of process was not valid; do
17  you understand that that's the position that you've
18  taken?
19     MR. SHMIKLER:  Object to the
20  mischaracterization to the extent it calls for a
21  legal conclusion.
22  BY MR. BLACKMAN:
23     Q.  Go ahead, sir.
24     A.  Sir, I am not going to draw any legal

29 (Pages 110 to 113)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 114

1   conclusions. I cannot answer that. I don't know,
2   okay? I cannot answer.
3       Q.  I'm not asking you a legal conclusion.
4       A.  You are, you are.
5       MR. SHMIKLER:  Don't argue with him, Dr. Vish.
6   BY MR. BLACKMAN:
7       Q.  Those responses are objections to be made
8   by your lawyer, not you.
9       So my question is -- I'll ask a different
10  question.
11      Why is it, sir, that you have not agreed
12  to come into this lawsuit and defend yourself in
13  the claims made by Indymac?
14      MR. SHMIKLER:  I object to the extent that it
15  mischaracterizes the facts.  We have made that
16  offer.  And caution the witness to the extent that
17  any of this calls for disclosure discussions you
18  had with your attorneys that you shouldn't answer.
19      But if you're able to respond without
20  doing so, you should do so to the best of your
21  ability.
22  BY MR. BLACKMAN:
23      Q.  Go ahead.
24      A.  What's your question?

Page 115

1       Q.  Why have you not come into this case as a
2   defendant to defend it on its merits?
3       MR. SHMIKLER:  Same objections.
4       THE WITNESS:  I have an attorney representing
5   me, sir.  That's all.  That's my answer.  That is
6   my answer.
7   BY MR. BLACKMAN:
8       Q.  I hear you.
9       A.  That's it.
10      MR. SHMIKLER:  Can I request a bathroom break
11  at this point?
12      MR. BLACKMAN:  We're going to take a break,
13  sir.  You should stay on the phone.  Don't go
14  anywhere.
15      THE WITNESS:  All right.
16      (A short break was taken.)
17  BY MR. BLACKMAN:
18      Q.  Doctor, do you know for how long your
19  cousin has owned or rented the place where you're
20  living?
21      A.  What is that?
22      Q.  Do you know for how long your cousin has
23  been renting the place where you are living?
24      A.  Oh, like seven or eight years.

Page 116

1       Q.  Okay.  And you stated that you've stayed
2   there in the past, correct?
3       A.  Yes.
4       Q.  When you would stay there, would you stay
5   in the same bedroom that you're staying in now?
6       A.  Yes.
7       Q.  Okay.  And do you have any personal
8   belongings that are in storage anywhere?
9       A.  Here in Chennai?
10      Q.  Either there or here.  You know what a
11  storage locker is, right?
12      A.  Yeah.
13      Q.  Do you have any personal belongings that
14  are in any storage facilities?
15      A.  No, I don't have anything in storage
16  facility.
17      Q.  I want to ask you about something I don't
18  really understand.
19      You said you moved to India, correct me if
20  I'm wrong, because there were business
21  opportunities out there; is that right?
22      A.  Yeah.
23      Q.  But you're still finishing a project as a
24  developer in Chicago at 222 Pearson, correct?

Page 117

1       A.  Yes.
2       Q.  And you are still in the middle of a
3   divorce that has not yet been completed, correct?
4       A.  Yes.
5       Q.  And there's still a parenting agreement
6   that gives you the right to visit with the children
7   every week or every month, correct?
8       A.  Correct.
9       Q.  And you have other businesses here besides
10  222 Pearson, correct?
11      A.  I don't know what you mean "other
12  businesses."
13      Q.  I mean besides the Pearson project, you
14  have other development companies?
15      A.  Do I have a development company?
16      Q.  Is Pearson the only project that you are
17  doing at this point in the United States?
18      A.  Yeah, Pearson is the only one.  Florida is
19  underwater.
20      Q.  So why would you move to India now, in
21  particular the beginning of November, when you are
22  still in the middle of a divorce and in the middle
23  of a development that hasn't been completed?  Why
24  would you choose now to move to India?

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 118

1    MR. SHMIKLER: Objection, asked and answered.
2    MR. BLACKMAN: I don't think it was.
3    THE WITNESS: I already answered it, sir.
4    BY MR. BLACKMAN:
5    Q.  Go ahead and answer it again.
6    A.  I said the opportunities here are better
7    and the American real estate market is not all that
8    great, and so I'm just exploring things here.
9    Q.  Well, you're doing more than exploring
10   things.  You've stated that you've permanently
11   moved there, correct?
12   A.  Yes.
13   Q.  Without any intention of moving back to
14   the United States?
15   A.  Yes.
16   Q.  So my question is, why would you
17   permanently move to India at that particular time
18   while you were still in the middle of a divorce and
19   still in the middle of a development that you are a
20   principal in?
21   A.  Well, life always keeps moving.  And you
22   know, what can you say?  There's always going to be
23   -- there's -- you're always going to be in the
24   middle of something, so that never changes.

Page 119

1    Q.  That's right.  You are always in the
2    middle of something, but you're not always in the
3    middle of a divorce and in the middle of a
4    development and in the middle of a lawsuit that's
5    been filed against you for in excess of $50
6    million.
7    MR. SHMIKLER: Object to the form.
8    MR. BLACKMAN: I'm going to withdraw that.
9    BY MR. BLACKMAN:
10   Q.  Why not move after the development is
11   done?
12   A.  It's not any -- I mean, I don't know, sir.
13   I don't have an answer.
14   Q.  And why not move after the divorce is
15   done?
16   A.  I don't know.  I don't have an answer.
17   Q.  And why not move after the lawsuit is
18   done?
19   A.  I don't know.
20   Q.  Describe for me what the specific business
21   opportunities that caused you to move to India in
22   the beginning of November?  What specifically made
23   you want to go right then?
24   A.  I mean, if you've been reading the papers

Page 120

1    the growth story, only India and China are going to
2    be carrying the war, so this is the rights of the
3    east.  I think their time has come, so...
4    Q.  But what --
5    MR. SHMIKLER: He's still answering.
6    BY MR. BLACKMAN:
7    Q.  Go ahead.  Are you done yet?  Are you
8    still answering?
9    A.  I mean, yes, you keep interrupting my
10   thoughts.  I don't know what I can do.  You are a
11   lawyer so nobody can question you, but I'm
12   interrupted constantly, so I don't know what I can
13   do about that.
14   Q.  All right.  Well, I'm going to try not to
15   do that, sir.  Do you want to add anything else to
16   your last answer?
17   A.  No, I've already said there are
18   opportunities here.
19   Q.  Okay.  And can you tell me of any specific
20   opportunity that prompted you to go to India in the
21   beginning of November of '07?
22   A.  It's not, you know, anything specific.
23   Overall, there are opportunities here, plenty of
24   opportunities.  I've been coming here every year.

Page 121

1    It's not like it happened all of a sudden.  I've
2    been coming here every year.  I have been watching
3    what has been going on.  I have been, you know,
4    watching the growth story over three, four years.
5    Q.  My question was, I think you answered it,
6    there was nothing specific that brought you to
7    India, a specific business opportunity, in the
8    beginning of November of '07?
9    A.  Well, specific in the sense I have been
10   watching over time.  I have been -- I don't want to
11   really -- if you've been watching what has been
12   going on, it's like what is the best time and there
13   is no best time.
14   Q.  Sir, I'm not asking you what the best time
15   is.  You're not listening to my question.  I'm not
16   asking you what the best time is.  I'm asking you
17   whether there was a specific business opportunity
18   that made you go to India in the beginning of
19   November, like a specific project that you were
20   working on or anything like that?
21   A.  No, I don't recall anything specific.
22   Q.  Now, in addition to the Indymac loans, are
23   there any other loans that are outstanding on which
24   you have personal liability?

31 (Pages 118 to 121)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 122

1    MR. SHMIKLER:  Object to relevance.  Object to
2  the extent it calls for legal conclusions.
3    MR. BLACKMAN:  Go ahead, sir.
4  BY MR. BLACKMAN:
5    Q.  Do you owe anybody else besides Indymac
6  any money?
7    MR. SHMIKLER:  Same objections.
8    THE WITNESS:  Yes, I do.
9  BY MR. BLACKMAN:
10    Q.  Who is it?
11    MR. SHMIKLER:  Same objections.
12    THE WITNESS:  I owe Private Bank; I owe Fifth
13  Third Bank; I owe AmeriMark Bank.
14  BY MR. BLACKMAN:
15    Q.  What's the last one?
16    A.  AmeriMark.
17    Q.  Merimark?
18    A.  AmeriMark.
19    Q.  AmeriMark?
20    A.  Yes.
21    Q.  Anybody else?
22    A.  That's all I could recall.
23    Q.  Are you involved in any other litigation
24  besides the Indymac claim?

Page 123

1    MR. SHMIKLER:  Object to form.
2    THE WITNESS:  Any other litigation --
3  BY MR. BLACKMAN:
4    Q.  Are you involved in any other litigation?
5    A.  I don't recall any.
6    Q.  What about your companies?
7    A.  I don't recall any.
8    Q.  What about Lisle Technology and the
9  judgment they got against you?
10    MR. SHMIKLER:  Object to relevance.
11    THE WITNESS:  Yeah, Lisle Technology, yes, I
12  do.  Yes, what about that?  I remember that now,
13  yeah.
14  BY MR. BLACKMAN:
15    Q.  Is it accurate that you owe
16  Lisle Technology at least $75,000 under a
17  settlement agreement that has not been paid?
18    MR. SHMIKLER:  Object to form to the extent it
19  calls for a legal conclusion.
20    THE WITNESS:  It is what it is.  I don't know,
21  you know, what it is.  I cannot be drawing
22  conclusions.
23  BY MR. BLACKMAN:
24    Q.  Sir, I'm not asking you to draw a

Page 124

1  conclusion.  All I'm asking you is, are you aware
2  that there is a court order that required you to
3  pay Lisle Technology $75,000 and that that money
4  has not been paid; are you aware of that?
5    MR. SHMIKLER:  Same objections.
6    THE WITNESS:  Yes, I am aware, yes.
7  BY MR. BLACKMAN:
8    Q.  And why has not Lisle Technology been
9  paid?
10    MR. SHMIKLER:  Object to relevance.
11  BY MR. BLACKMAN:
12    Q.  I'm sorry?
13    A.  What's your question?
14    Q.  My question is why have they not been
15  paid?
16    MR. SHMIKLER:  Again, I object to relevance.
17    THE WITNESS:  There is no money to pay.
18  BY MR. BLACKMAN:
19    Q.  So you don't have $75,000 to pay them?
20    A.  Yes.
21    Q.  Yes, that's true?
22    A.  I don't have $75,000 to pay them.
23    Q.  Okay.  Now, how much do you owe
24  Private Bank?

Page 125

1    MR. SHMIKLER:  Same objection, relevance.
2    THE WITNESS:  I don't recall the number, sir, I
3  don't know.
4  BY MR. BLACKMAN:
5    Q.  Well, approximately.
6    A.  I don't know, maybe 16, $18 million,
7  somewhere around that range.
8    Q.  How much do you owe Fifth Third?
9    A.  I think a million dollars.
10    Q.  How much do you owe AmeriMark?
11    A.  I think about 3 million.
12    Q.  Now, do all your lenders know that you
13  have moved out of the country permanently?
14    MR. SHMIKLER:  Object to foundation and to
15  relevance.
16    MR. BLACKMAN:  It goes to his credibility.
17    THE WITNESS:  I don't know that.  I don't know.
18  BY MR. BLACKMAN:
19    Q.  Well, did you advise any of your lenders
20  that you were leaving the country and not
21  returning?
22    MR. SHMIKLER:  Again, object to relevance.
23    MR. BLACKMAN:  Well, it's very relevant to the
24  credibility on whether or not what he says he has

32 (Pages 122 to 125)

Page 126

1  left the country permanently, given the state of
2  his financial affairs, whether that is to be
3  believed. So it's very much relevant to his
4  affidavit and his credibility.
5      MR. SHMIKLER: It's not relevant to whether he
6  informed them or not. It's an issue between him
7  and them.
8      MR. BLACKMAN: I'm not debating.
9      MR. SHMIKLER: You are debating it. You
10 started a debate. You didn't have to. It has
11 nothing to do with whether or not he lived at his
12 wife's house on December 1st, 2007, which is the
13 only issue that's in question in this proceedings.
14     MR. BLACKMAN: Just for the record, if he
15 doesn't have a permanent residence someplace else
16 and he doesn't have a residence anyplace else in
17 the United States, that's his home. That's why
18 it's relevant.
19     MR. SHMIKLER: I understand that's your
20 position, but these are not relevant to that
21 question.
22 BY MR. BLACKMAN:
23     Q. Sir, did you ever advise any of your
24 lenders that you were moving out of the country

Page 127

1  permanently in early November 2007?
2      MR. SHMIKLER: Again, object to relevance.
3      THE WITNESS: I don't recall that.
4  BY MR. BLACKMAN:
5      Q. Okay. At any point in time between
6  November and today, have you ever advised any bank
7  or any lender or any financial institution that you
8  have moved out of the country, in your words,
9  permanently?
10     MR. SHMIKLER: Same objection.
11     THE WITNESS: I don't recall.
12 BY MR. BLACKMAN:
13     Q. Okay. Do you think that's something they
14 would care about?
15     MR. SHMIKLER: Object to foundation and to
16 relevance.
17 BY MR. BLACKMAN:
18     Q. Go ahead.
19     A. I don't know what they care about or not
20 or what. How can I answer that? I don't know.
21     Q. Can you give me the name of any person or
22 any institution that you have had a conversation
23 with where you advised them that you had moved
24 permanently out of the United States in early

Page 128

1  November '07 and did not have the intention of
2  returning; can you tell me anybody that you've told
3  that to?
4      A. Why is it relevant? Why I should tell
5  them -- if the loans are being paid --
6      MR. SHMIKLER: Dr. Vish --
7      THE WITNESS: If the project is running, if the
8  things are happening, project is running, and
9  that's all that matters. How does it matter?
10     MR. SHMIKLER: Dr. Vish, Dr. Vish, this is Dan.
11     THE WITNESS: Yeah.
12     MR. SHMIKLER: Just answer the question. He
13 wants to know is there anybody or any person or
14 institution that you've told that you moved
15 permanently to India?
16     THE WITNESS: I don't recall that.
17 BY MR. BLACKMAN:
18     Q. Okay. Do you know whether your lawyer in
19 the divorce case ever advised the court that you
20 had moved out of the country and had no intention
21 of returning?
22     A. I don't recall that.
23     Q. Now, sir, is it your understanding that
24 restraining orders have been entered in the divorce

Page 129

1  proceeding that prevents you from transferring or
2  dissipating various assets; is that your
3  understanding?
4      MR. SHMIKLER: Object to relevance.
5      THE WITNESS: Yeah, there is an order.
6  BY MR. BLACKMAN:
7      Q. There's more than one order, isn't there?
8      A. Yes.
9      MR. SHMIKLER: Again, object to relevance.
10 BY MR. BLACKMAN:
11     Q. And is it your testimony that you have
12 never violated that order?
13     MR. SHMIKLER: Object to relevance and to the
14 extent it calls for legal conclusions.
15     THE WITNESS: I cannot -- I cannot answer that,
16 sir. It's a legal conclusion. I cannot answer
17 that.
18 BY MR. BLACKMAN:
19     Q. So you're unable to answer whether or not
20 you have transferred assets in violation of a court
21 order?
22     MR. SHMIKLER: Same objections.
23     THE WITNESS: I cannot answer that. I don't --
24 you know, this is a legal conclusion, so I cannot

33 (Pages 126 to 129)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 130

1  draw that. No, I cannot answer that.
2  BY MR. BLACKMAN:
3  Q. Let me ask you a different way.
4  Are you aware of what assets the court
5  requires you to -- strike that.
6  Are you aware of the assets that the
7  divorce court has precluded you from transferring?
8  A. I don't recall the exact ones. I mean, I
9  have some -- I have the order here and --
10  Q. Which order is that, sir?
11  A. This is entered March 7, '07, temporary
12  restraining order.
13  Q. Okay.
14  A. And preliminary injunction.
15  Q. And that was entered -- let's mark that as
16  Exhibit 6.
17          (Whereupon, Deposition Exhibit
18          No. 6 was marked for
19          identification.)
20  BY MR. BLACKMAN:
21  Q. And that's an order entered restraining
22  you from transferring assets with respect to South
23  Country Line Road, the Ridgewood Lane, the VCM
24  trust, and the Sastri trust, correct?

Page 131

1  A. Yes.
2  Q. Okay. Do you know why the order was
3  entered against you?
4  MR. SHMIKLER: I object to the characterization
5  just based on the fact that it's an agreed order.
6  BY MR. BLACKMAN:
7  Q. Do you know why the order was entered?
8  A. I don't know why the order was entered.
9  Q. What is the VCM trust?
10  MR. SHMIKLER: Object to relevance.
11  THE WITNESS: It's a children's trust.
12  BY MR. BLACKMAN:
13  Q. Okay. Who's the beneficiary of that? Is
14  it you or your wife?
15  MR. SHMIKLER: Object to relevance.
16  THE WITNESS: No, no, the children are the
17  beneficiary.
18  BY MR. BLACKMAN:
19  Q. Sorry.
20  Who is the trustee of that trust, you or
21  your wife?
22  MR. SHMIKLER: Object to relevance.
23  MR. BLACKMAN: It's relevant to his claim that
24  he has permanently moved from the State of

Page 132

1  Illinois.
2  MR. SHMIKLER: I don't see how that addresses
3  the objection.
4  BY MR. BLACKMAN:
5  Q. Go ahead, sir, who's the trustee, you or
6  your wife?
7  A. My wife is the trustee.
8  Q. Okay. So you have no investment or
9  interest in that trust?
10  MR. SHMIKLER: Object to relevance.
11  THE WITNESS: No, sir.
12  BY MR. BLACKMAN:
13  Q. And then South County Line Road, is that a
14  property that's owned by you in the State of
15  Illinois?
16  MR. SHMIKLER: Object to relevance.
17  THE WITNESS: I don't quite recall. I think it
18  may be in my wife's name. I don't quite recall
19  whether I have any ownership interest in it.
20  BY MR. BLACKMAN:
21  Q. Do you have any ownership interest in the
22  Sastri trust?
23  MR. SHMIKLER: Object to relevance.
24  THE WITNESS: No.

Page 133

1  BY MR. BLACKMAN:
2  Q. Did you continue -- strike that.
3  At the point in time that you left the
4  United States in November of 2007, were you current
5  in your child support payments to your wife?
6  MR. SHMIKLER: Object to relevance.
7  THE WITNESS: No.
8  BY MR. BLACKMAN:
9  Q. How much do you owe her?
10  MR. SHMIKLER: Object to relevance.
11  THE WITNESS: I don't recall but probably --
12  I'm just taking a guess but --
13  MR. SHMIKLER: Dr. Vish, don't guess. If you
14  have a solid estimate based on knowledge, you can
15  give it, but don't speculate or guess.
16  BY MR. BLACKMAN:
17  Q. Go ahead.
18  MR. SHMIKLER: Answer it, if you can.
19  THE WITNESS: I don't know. It's probably in
20  excess of a quarter million dollars.
21  BY MR. BLACKMAN:
22  Q. Are you in default -- strike that.
23  Other than your wife and -- strike that.
24  Do you know whether you are in default on

34 (Pages 130 to 133)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 134

1  any other agreements to any other creditors?
2      MR. SHMIKLER: Object to form and object to the
3  extent it calls for a legal conclusion and also
4  object to relevance.
5      THE WITNESS: I don't recall.
6  BY MR. BLACKMAN:
7      Q.  Well, do you know whether any lender other
8  than Indymac has told you that you are in default
9  under a loan agreement with them?
10     THE WITNESS: I don't recall.
11     MR. SHMIKLER: Object to relevance.
12 BY MR. BLACKMAN:
13     Q.  You don't recall?
14     A.  No.
15     Q.  Now, there's an office that you maintain
16 in Burr Ridge still; is there not?
17     A.  What is that?
18     Q.  There's an office -- your business office
19 is in Burr Ridge?
20     A.  No longer there.
21     Q.  Okay.  It was there in December of 2007?
22     A.  I don't think so.  I think they moved
23 right around maybe November or December, sometime
24 around that time they moved, so...

Page 135

1      Q.  What was the old address?
2      A.  It was 101 Burr Ridge Parkway.
3      Q.  Was that Unit 306?
4      A.  Yeah.
5      Q.  What's the new address?
6      A.  It's 222 East Pearson.
7      Q.  That's the building that you're
8  developing?
9      A.  Yes.
10     Q.  Who paid the rent on the office at
11 Burr Ridge?
12     A.  Who paid the rent?  The company paid the
13 rent.
14     Q.  The company is which company?
15     MR. SHMIKLER: Object to relevance.
16     THE WITNESS: It's probably -- I don't recall
17 which company.
18 BY MR. BLACKMAN:
19     Q.  What's the name of the company that's
20 developing the property?
21     MR. SHMIKLER: Object to relevance.
22     THE WITNESS: Developing Pearson?
23 BY MR. BLACKMAN:
24     Q.  Yes.

Page 136

1      A.  It's Hawthorne Development Corporation.
2      Q.  And other than Hawthorne Development
3  Corporation, are there any other entities, business
4  entities, that you are currently doing business
5  through in the United States?
6      A.  No, I mean --
7      Q.  No?
8      A.  I mean, each project it's got its own LLC.
9  So the Florida, for instance, it was Hawthorne LP
10 and so it's LLC in Florida, so...
11     Q.  Are those still active entities?
12     A.  Well, they are -- I don't know what you
13 would call active or inactive.  Maybe they're
14 active even though they are underwater.
15     Q.  What about Hawthorne Orlando Corporation,
16 is that an entity that you are still utilizing in
17 the United States?
18     MR. SHMIKLER: Object to form.
19     THE WITNESS: No, I mean it's got -- there's
20 nothing there.
21 BY MR. BLACKMAN:
22     Q.  What was that -- what was the purpose of
23 that entity?
24     MR. SHMIKLER: Object to relevance.

Page 137

1      THE WITNESS: That was the Orlando project.
2  BY MR. BLACKMAN:
3      Q.  Now, you mentioned that your business
4  office has been moved over to 222 Pearson?
5      A.  Yes.
6      MR. SHMIKLER: Object to relevance.
7  BY MR. BLACKMAN:
8      Q.  Do you personally own any units at 222
9  Pearson?
10     A.  No.
11     Q.  Does your wife?
12     MR. SHMIKLER: Object to relevance.
13     THE WITNESS: No, no.
14 BY MR. BLACKMAN:
15     Q.  What about the trusts?
16     MR. SHMIKLER: Object to relevance.
17     THE WITNESS: No.
18 BY MR. BLACKMAN:
19     Q.  Now, according --
20     A.  You got to give me a minute.  It's now
21 1:00 o'clock at night.  I got to eat something, so
22 I'm going to take a break.  I got to eat.  I'm so
23 hungry.  Please excuse me.
24     MR. SHMIKLER: How long do you need, Dr. Vish?

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 138

```
1       THE WITNESS:  Go ahead and talk.  I still have
2   the phone on.
3   BY MR. BLACKMAN:
4       Q.  You can hear me and answer the questions
5   while you're doing whatever you're doing?
6       A.  I think so.
7       MR. SHMIKLER:  You want to continue while
8   you're eating?
9       THE WITNESS:  Yeah.
10      MR. SHMIKLER:  That's fine.
11  BY MR. BLACKMAN:
12      Q.  Now, according to your divorce file, there
13  are a number of units at 525 Hawthorne Place
14  Condominium that are part of the trust of your
15  children; are you familiar with that?
16      MR. SHMIKLER:  Object to relevance.
17  BY MR. BLACKMAN:
18      Q.  Sir?
19      A.  What is the question?
20      Q.  Are you familiar with a number of units
21  that are owned by your family trusts at 525
22  Hawthorne Place Condominium?
23      MR. SHMIKLER:  I got to object to relevance.
24      THE WITNESS:  Yes.
```

Page 139

```
1   BY MR. BLACKMAN:
2       Q.  Are those in the names of the trust or you
3   and your wife?
4       MR. SHMIKLER:  Object to form.
5       MR. BLACKMAN:  The units we just --
6       MR. SHMIKLER:  I don't think I understood the
7   question.
8           Could you read back the question.
9           (Whereupon the record was read
10              as requested.)
11  BY MR. BLACKMAN:
12      Q.  Sir, do you know who owns those units?
13      MR. SHMIKLER:  Object to relevance.
14      THE WITNESS:  The one in Hawthorne?
15  BY MR. BLACKMAN:
16      Q.  Right.
17      A.  Which trust are you referring to?
18      Q.  There's the Sastri trust and then there's
19  the children's minor trust.
20      A.  Yeah.
21      Q.  Okay.  Are those units -- do you have any
22  interest in any of those units?
23      A.  No, sir.
24      Q.  But they are still currently owned by your
```

Page 140

```
1   family?
2       MR. SHMIKLER:  Object to relevance.
3       THE WITNESS:  They're owned by both trust in
4   which I have no interest.
5   BY MR. BLACKMAN:
6       Q.  What about the parking spaces at Raintree
7   Court in Glen Ellyn, do you own those?
8       MR. SHMIKLER:  Object to relevance.
9       THE WITNESS:  No.
10  BY MR. BLACKMAN:
11      Q.  Who owns those?
12      MR. SHMIKLER:  Object to relevance.
13      THE WITNESS:  The children's trust.
14  BY MR. BLACKMAN:
15      Q.  What about the parcel of land in
16  Mount Vernon?
17      MR. SHMIKLER:  Object to relevance.
18      THE WITNESS:  I have no ownership interest.
19  BY MR. BLACKMAN:
20      Q.  Now, is there -- do you have an interest
21  in any tax refunds?
22      MR. SHMIKLER:  Wait.  I want to hear why this
23  is relevant.
24      MR. BLACKMAN:  I'm going to withdraw that.
```

Page 141

```
1   BY MR. BLACKMAN:
2       Q.  Sir, explain to me -- strike that.
3           Other than the Lexus, do you have any
4   other cars that are titled in the United States?
5       MR. SHMIKLER:  Object to relevance.
6   BY MR. BLACKMAN:
7       Q.  That are owned by you?
8       A.  No.
9       Q.  And when the units are sold at Pearson, do
10  you get any money from that?
11      MR. SHMIKLER:  Object to relevance.
12      THE WITNESS:  No.
13  BY MR. BLACKMAN:
14      Q.  Does your company?
15      MR. SHMIKLER:  Same objection.
16      THE WITNESS:  No.
17  BY MR. BLACKMAN:
18      Q.  Okay.  It all goes to Private Bank?
19      MR. SHMIKLER:  Object to relevance.
20      THE WITNESS:  Yes.
21  BY MR. BLACKMAN:
22      Q.  Are you in default to Private Bank?
23      MR. SHMIKLER:  Objection to relevance to the
24  extent it calls for a legal conclusion.
```

36 (Pages 138 to 141)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 142

1    THE WITNESS: No.
2    BY MR. BLACKMAN:
3    Q. Sir?
4    A. Yeah.
5    Q. Are you familiar with what's called a UCC
6    filing?
7    MR. SHMIKLER: Object to relevance.
8    THE WITNESS: Yeah.
9    BY MR. BLACKMAN:
10    Q. And if I told you there was a UCC filing
11    dated February 14th, 2008, made by Private Bank
12    with you personally as the debtor, do you know why
13    that would be?
14    MR. SHMIKLER: Object to relevance.
15    THE WITNESS: No, I don't know anything about
16    it.
17    BY MR. BLACKMAN:
18    Q. So you're not aware of any financial
19    transactions between you and Private Bank in
20    February of 2008?
21    MR. SHMIKLER: Object to relevance.
22    THE WITNESS: No, I'm not aware of any.
23    BY MR. BLACKMAN:
24    Q. Now, sir, have you taken out any loans

Page 143

1    where you filled out any financial applications
2    between the summer of 2006 and today?
3    MR. SHMIKLER: Object to relevance.
4    MR. BLACKMAN: It's relevant to see what he put
5    down as his residence.
6    BY MR. BLACKMAN:
7    Q. Sir?
8    A. Yeah.
9    Q. Have you filled out any financial
10    applications, applications for credit between the
11    summer of 2006 and today?
12    A. I don't recall any.
13    Q. So Private Bank has not asked you to fill
14    out anything?
15    A. I don't recall any.
16    Q. Well, you had to fill out something when
17    you got a refinance of the Ridgewood property; did
18    you not?
19    A. I did not -- I had no part in that
20    refinancing. I know nothing about it.
21    Q. Well, did you have to sign any documents?
22    A. None that I could recall. I don't
23    remember signing anything for that.
24    MR. SHMIKLER: I object to form. He answered

Page 144

1    the question. Whether he had to sign it, I don't
2    think he could answer.
3    MR. BLACKMAN: Whatever.
4    BY MR. BLACKMAN:
5    Q. Sir, when do you plan on coming to Chicago
6    again?
7    MR. SHMIKLER: Object to relevance.
8    THE WITNESS: I don't have -- I don't have any
9    specific plan. Just, you know, when needed I
10    certainly will come.
11    BY MR. BLACKMAN:
12    Q. How are you planning on seeing your
13    children under the parenting agreement if you have
14    no plans to come to Chicago?
15    MR. SHMIKLER: Object to the extent it
16    mischaracterizes his testimony.
17    THE WITNESS: No, I did not say I didn't have
18    plans to come. Why you are distorting my words, I
19    don't know.
20    BY MR. BLACKMAN:
21    Q. So do you have any plans to come to
22    Chicago?
23    A. Well, that's what I said. I think you --
24    I think as when needed I will come.

Page 145

1    Q. I'm not asking when needed.
2        You're under a parenting agreement that
3    gives you the right to see your children on certain
4    dates and --
5    A. I think it's already asked and answered.
6    I did say the agreement is in incorrect in places
7    because some of the things are inaccurate until
8    finally an agreement between me and my wife. So if
9    we agree that, you know, certain ways like my
10    children can come here and spend the summer or
11    anything like that, you know, then that's our
12    agreement.
13    Q. That's not my question.
14        Do you have any plans to come to Chicago
15    to visit your children pursuant to the parenting
16    agreement?
17    MR. SHMIKLER: Object to relevance.
18    THE WITNESS: You know, it's an agreement
19    between me and my wife. And you know, we can, you
20    know, adjust our schedules, whatever, and can be in
21    the places that is suitable for everybody. So
22    that's how it will be with it.
23    BY MR. BLACKMAN:
24    Q. I'm almost done, sir.

37 (Pages 142 to 145)

Page 146

1    The bills that your lawyer was showing you
2 for the things that you ordered for your cousin's
3 house.
4    A.  Yes.
5    Q.  Now, these bills are dated -- well,
6 there's various dates.  One is December 6, one is
7 December 1st, one is November 30th.
8    When you ordered these items, did you
9 order them while you were in India or did you order
10 them here for delivery in India?
11    A.  No, I ordered them while I was in India.
12    Q.  And do you remember the date that you
13 moved into your cousin's house?
14    MR. SHMIKLER:  Objection, asked and answered.
15    THE WITNESS:  I think, to the best of my
16 recollection, it was like early November, you know,
17 early November.
18 BY MR. BLACKMAN:
19    Q.  Okay.  Did you go anyplace else after you
20 got to India or did you go right to your cousin's
21 house?
22    A.  I went right to my cousin's house.
23    Q.  When did you tell him that you would be
24 moving in with him?

Page 147

1    A.  When did I tell him?  I don't recall when
2 I told him.  I don't quite recall when.
3    Q.  I assume that you would have called him
4 from the United States and told him that you were
5 moving there and letting him know that you wanted
6 to move in with him, right?
7    A.  Like I said, I don't recall, but, you
8 know, that is -- that is quite possible.
9    Q.  Well, can you give me an estimate as to
10 when you first told him that -- or asked him, one
11 of the two, that you were going to go live with
12 him?
13    A.  No, I don't recall exactly when.
14    Q.  Okay.  Was it within a month of when you
15 went out there?
16    A.  Yeah, like I said, I don't quite recall.
17    Q.  I know you don't recall the exact date.
18    I'm asking you to try to estimate.  Was it
19 within a month when you went out there that you
20 talked to your cousin?
21    A.  It's quite possible it was within that
22 period, yes.
23    Q.  Was it within a couple weeks?
24    A.  No, maybe -- maybe within a month.

Page 148

1    Q.  Okay.
2    A.  Maybe three weeks.  I don't quite recall.
3    Q.  So you left LaGrange at the end of October
4 and the beginning of November; is that right?
5    A.  Yes.
6    Q.  Okay.  Is that when you made the decision
7 to move to India?
8    A.  Late October, yeah, around that time.
9    Q.  So you would have -- you would have called
10 your cousin sometime between late October and
11 November 7th or 10th when you say that you arrived
12 in India?
13    A.  Like I said, I don't quite recall.
14    Q.  I understand that.
15    But if you made the decision in late
16 October to move to India and you went to India
17 around the 6th or the 10th, then sometime between
18 late November -- I mean, late October 2007 and when
19 you arrived, that's when you would have told your
20 cousin, right?
21    A.  Sometime around that time.  Again, I don't
22 recall the dates and things.
23    Q.  I understand that.
24    Okay.  So would it be fair to say that it

Page 149

1 was within ten days or two weeks that you gave
2 your --
3    A.  I don't know.  I have answered enough.  I
4 don't think I can recall with any more accuracy.  I
5 have said that, and you know, I don't recall it
6 with any more accuracy just because you ask
7 questions again and again.  I said I don't recall
8 and you keep asking me, so...
9    Q.  When you moved to India, did you tell your
10 wife that you were moving there permanently?
11    A.  I don't recall that.
12    Q.  Okay.  And when you went to India, did you
13 tell your wife where you would be living?
14    A.  I -- to the best of my recollection, no.
15    Q.  Why not?
16    A.  Look, we are in a divorce court.
17    Q.  All right.  You still have children and
18 you still have a parenting agreement and you still
19 have a wife.
20    Is there any reason why you didn't tell
21 her where you were moving when you made the
22 decision to go out there?
23    A.  There is no reason, sir.
24    Q.  Are you still in litigation with Mr. Khan?

38 (Pages 146 to 149)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 150

1    MR. SHMIKLER: Object to relevance.
2    THE WITNESS: To the best of my knowledge, no.
3    BY MR. BLACKMAN:
4    Q.  Sir, have you filed your taxes?
5    A.  No.
6    Q.  When was the last time you filed your
7    personal taxes?
8    A.  I think '06.
9    Q.  '06?
10   A.  Yeah.
11   Q.  When you filed, would you file jointly
12   with your wife?
13   A.  I don't recall that.
14   Q.  Do you have an accountant in Chicago or
15   Illinois?
16   A.  Yes.
17   Q.  Who is that?
18   MR. SHMIKLER: Object to relevance.
19   MR. BLACKMAN: It's relevant, again, as to his
20   continued contacts here and whether or not it is
21   believable that he has moved permanently to India.
22   MR. SHMIKLER: The fact he has an accountant
23   here and who it is --
24   MR. BLACKMAN: It seems he's got everything.

Page 151

1    THE WITNESS: Listen, this is in my opinion --
2    just because I have moved doesn't mean I have to
3    cut off all connections with the U.S., with my
4    accountant --
5    MR. SHMIKLER: Dr. Vish --
6    THE WITNESS: -- with my lawyers and
7    everything.
8    MR. SHMIKLER: Dr. Vish, there's not a question
9    pending. Just wait for a question.
10   THE WITNESS: Yeah, but he keeps on -- it
11   doesn't matter. He keeps on asking.
12   MR. SHMIKLER: I know.
13   THE WITNESS: He's going absolutely --
14   MR. SHMIKLER: I know, Dr. Vish. We're making
15   our objections. Just answer the question. That's
16   fine.
17   BY MR. BLACKMAN:
18   Q.  What is the name of your accountant here?
19   MR. SHMIKLER: Again, object to relevance.
20   THE WITNESS: Hold on one second, please.
21   MR. BLACKMAN: I have to eat something. Hold
22   on.
23   (A short break was taken.)
24   BY MR. BLACKMAN:

Page 152

1    Q.  Hi, Doctor, I think the last question was
2    do you still have an accountant in Illinois?
3    A.  Do I still have an accountant in Illinois?
4    Q.  That's right.
5    A.  Yes.
6    Q.  What's his name or her name?
7    A.  Shepard, Schwartz & Harris.
8    Q.  Other than Mr. Collins and Mr. Shmikler,
9    do you have any other lawyers that represent you or
10   your companies?
11   MR. SHMIKLER: Object to relevance.
12   THE WITNESS: From time to time we have had
13   different lawyers.
14   BY MR. BLACKMAN:
15   Q.  As you sit here today, is there anyone
16   that you can think of besides Mr. Collins and
17   Mr. Shmikler who are your counsel?
18   MR. SHMIKLER: You're talking about the present
19   tense, not former counsel, right?
20   MR. BLACKMAN: Yeah, as of now or let's say
21   between October of 2007 and today.
22   MR. SHMIKLER: You mean firms, he doesn't have
23   to list anybody?
24   MR. BLACKMAN: Firms.

Page 153

1    THE WITNESS: Well, we have a Florida lawyer.
2    MR. SHMIKLER: You said Florida lawyer?
3    THE WITNESS: Yes.
4    BY MR. BLACKMAN:
5    Q.  Who is that?
6    A.  John Stump.
7    Q.  Anybody else, any other Chicago firms that
8    are doing legal work for you now besides
9    Mr. Collins and Mr. Shmikler?
10   A.  I don't recall any.
11   MR. SHMIKLER: I don't have anything else.
12   MR. BLACKMAN: I don't have anything else.
13   MR. SHMIKLER: Dr. Vish, we're all done.
14   THE WITNESS: Thank you. Bye-bye.
15   (Off the record at 1:16 p.m.)
16   FURTHER DEPONENT SAITH NAUGHT
17
18
19
20
21
22
23
24

39 (Pages 150 to 153)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 154

```
 1   STATE OF ILLINOIS )
           ) SS:
 2   COUNTY OF C O O K )
 3      I, ANNA MARIA CASTLE, C.S.R., and Notary Public
 4   within and for the County of Will and State of
 5   Illinois, do hereby certify that heretofore,
 6   to-wit, on the 10th day of April, 2008, personally
 7   appeared before me, at 55 West Monroe, Suite 3200,
 8   Chicago, Illinois, GANESAN VISVABHARATHY, in a
 9   cause now pending and undetermined in the Circuit
10   Court of Cook County, Illinois, wherein INDYMAC
11   BANK, F.S.B., a Federal Saving Bank, is the
12   Plaintiff, and GANESAN VISVABHARATHY, an individual
13   and HAWTHORNE ORLANDO CORPORATION, a Florida
14   corporation, are the Defendants.
15      I further certify that the said witness was
16   first duly sworn to testify the truth, the whole
17   truth and nothing but the truth in the cause
18   aforesaid; that the testimony then given by said
19   witness was reported stenographically by me in the
20   presence of the said witness, and afterwards
21   reduced to typewriting by Computer-Aided
22   Transcription, and the foregoing is a true and
23   correct transcript of the testimony so given by
24   said witness as aforesaid.
```

Page 155

```
 1      I further certify that the taking of this
 2   deposition was pursuant to Notice, and that there
 3   were present at the deposition the attorneys
 4   hereinbefore mentioned.
 5      I further certify that I am not counsel for nor
 6   in any way related to the parties to this suit, nor
 7   am I in any way interested in the outcome thereof.
 8      IN TESTIMONY WHEREOF:  I have hereunto set my
 9   hand and affixed my notarial seal this 11th day of
10   April, 2008.
11
12
13
14   _____
15      CSR, NOTARY PUBLIC, WILL COUNTY, ILLINOIS
16
17
18
19
20
21
22
23
24
```

40 (Pages 154 to 155)

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

# EXHIBIT 1

ComEd
An Exelon Company

USEFUL TELEPHONE NUMBERS
Hearing/Speech Impaired: 1-800-572-5789 (TTY)
Customer Service: 1-800-Edison-1 (1-800-334-7661)

Page 1 of 1

Name            GANESAN VISVABHARATHY
Service Location  400 S CATHERINE AVE LA GRANGE
Phone Number    630-986-2434
**Account Number**  9524788037

Issue Date      September 14, 2007

Meter Information

| Read Date | Meter Number | Load Type | Reading Type | Meter Reading Previous | Present | Diff | Mult x | |
|-----------|-------------|-----------|--------------|------------------------|---------|------|--------|--|
| 09/14 | 997001047 | General Service | Tot kWh | 89325 ACT | 90899 ACT | 1574 | 1 | .74 |

Current Period

Residential – Blended Single    Service from 08/16/2007 to 09/14/2007 – 29 Days

| | | |
|---|---|---|
| Customer Charge | | $7.26 |
| Standard Metering Charge | | 2.21 |
| Distribution Facilities Charge | 1,574 kWh X 0.01965 | 30.93 |
| Transmission Services Charge | 1,574 kWh X 0.00415 | 6.53 |
| Supply Administration Charge | | 0.03 |
| Energy Supply Charge | 1,574 kWh X 0.07320 | 115.22 |
| Purchased Electricity Adjustment | | 7.87 |
| Environmental Cost Recovery Adj | 1,574 kWh X 0.00010 | 0.16 |
| Instrument Funding Charge Credit | 1,574 kWh X -0.00415 | -6.53 |
| Instrument Funding Charge Debit | 1,574 kWh X 0.00415 | 6.53 |
| Franchise Cost | $39.81 X 5.72900% | 2.28 |
| State Tax | | 5.19 |
| Municipal Tax | | 5.56 |
| **Total current charges** | | **$183.24** |

Other Charges

Thank you for your payment of $222.97

**Total amount due**                              $183.24

Your Usage Profile

13-Month Usage (Total kWh)



| Month Billed | Total Demand | Avg Daily kWh | Avg Daily Temp |
|--------------|-------------|---------------|----------------|
| Current Month | 0.0 | 54.3 | 69 |
| Last Month | 0.0 | 64.5 | 73 |
| Last Year | 0.0 | 91.6 | 67 |

Past due balances are subject to late charges. If you have a past due balance on your ComEd bill, you may be at risk for disconnection. For help with paying your electric bill, see this month's Energy@Home bill insert.

EXHIBIT

RRP #1 for Id
4-10-08       AMC

# EXHIBIT 2



**FOLLOW YOUR HOMETOWN TEAM,
WHEREVER YOU CALL HOME.**

DIRECTV

To order, visit directv.com/nfl

| ACCOUNT NUMBER | DATE DUE | AMOUNT DUE |
|---|---|---|
| 44382203 | 10/05/07 | $109.58 |

## Summary

Statement Date: 09/16/07
Page 1 of 1 for:
GANESAN VISVABHARATHY
For Service at:
400 S CATHERINE AVE
LA GRANGE, IL 60525-6312

| | |
|---|---|
| Previous Balance | 109.58 |
| Payments | -109.58 |
| Current Charges & Fees | 109.98 |
| Adjustments & Credits | 0.00 |
| Taxes | -0.40 |
| **Amount Due** | **$109.58** |

## Activity

| Start | End | Description | Amount |
|---|---|---|---|
| | | Previous Balance | 109.58 |
| 08/28 | | Payment - Thank You | -109.58 |
| | | **Current Charges for Service Period 09/15/07 - 10/14/07** | |
| 09/15 | 10/14 | PREMIER Monthly | 99.99 |
| 09/15 | 10/14 | HD Access Monthly | 9.99 |
| | | Sales Tax | -0.40 |
| | | **AMOUNT DUE** | **$109.58** |

**To contact us call 1-800-531-5000**

**Moving?** Call 1-866-WAY-U-MOVE or visit directv.com/moving.

**IMPORTANT NOTICE**
For your convenience, we will automatically charge your credit or debit card on file for this bill amount, if unpaid, plus any new fees posted to your account, and any applicable cancellation and equipment non-return fees if you cancel your DIRECTV service.

**COLLEGE FOOTBALL IS COMING**
See the most college action with ESPN Game Plan. Up to 12 games every Saturday only 2 payments of $64.50 each. Offer ends 9/29. Call 1-800-GET-SPORTS.

**GET $50 OFF YOUR BILL** for each person you refer who activates **DIRECTV®** service. Give them your DIRECTV account number and tell them to call **1-866-GIFT-TO-YOU**. For details go to directv.com/refer.

U872-0003       1236



EXHIBIT
Dep #2 6/19
4/15/08 AmC

# EXHIBIT 3

## AFFIDAVIT OF GANESAN VISVABHARATHY

1.      I am over the age of 21. I make this affidavit based on my personal knowledge.

2.      I have not lived at 7529 Ridgewood Lane, Burr Ridge, Illinois since at least the summer of 2006. Prior to the summer of 2006, I did reside at that house with my wife, Dr. Suriya Sastri, but permanently moved out as part of our separation. Divorce proceedings are pending.

3.      When I left Dr. Sastri's residence, I established my own separate abode.

4.      I have been traveling abroad for the past several months, beginning in about October 2007.

5.      Dr. Sastri has not provided me with any complaint or other legal pleading related to any lawsuit by Indymac against me.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on:  February 14, 2008

                                                    _____
                                                    Ganesan Visvabharathy



EXHIBIT

Dep #3 8x-10
4-10-08    AMC

# EXHIBIT 4

  

# VASANTH & CO.,

4800709
4849620

New No.33, (Old No.20) Arcot Road,
Kodambakkam, Chennai - 600 024.

WITH THE LARGEST
SHOWROOM NETWORK
IN INDIA

BRANCHES:

CASH BILL No.14129
Date: 6.12.2007

S. SWEERPATHY NO.185, 5, METHA COLONY, ANNANAGAR WEST,
CHENNAI - 101

| S.No | Product Details | Rate | Tax | Qty | Amount |
|---|---|---|---|---|---|
| 1 | WHIRLPOOL WASHING MACHINE | 23530.00 | 12.50% | 1 | 26460.00 |

Cash - 26460.00

Recvd. 26460.00  Balance: 0.00

| | TOTAL | |

Goods cannot be taken back
Goods NOT in sealed condition

For VASANTH & CO.,

  

Signature of Customer

EXHIBIT

Case 1:07-cv-06224 Document 35-2 Filed 04/15/2008 Page 50 of 59



 4800700
4849620

# VASANTH & CO.,

New No 33, Old No 20, Arcot Road,
Kodambakkam, Chennai - 600 024.



WITH THE LARGEST
SHOWROOM NETWORK
IN INDIA

BRANCHES:

T. Nagar, Kodambakkam

Tambaram, Anna
Nagar

Ashok Nagar, Vellore,
Arani, Kanchipuram

CASH BILL    NO : 14657                          Date : 1.12.2007

To    G. VISVANATHY NO 188/9, ASTRL COLONY, AMBATHUR WEST,
CHENNAI-101

| S.No. | Product Details | Rate | Tax | Qty. | Amount |
|-------|-----------------|------|-----|------|--------|
| 1 | WHIRPOOL WHCH COOL | 17550.00 | 12.50 | 1 | 19744.00 |
| | | | | | |
| | Cash - 19744.00 | | | | |
| | Recd 19744.00  Balance 0.00 | | | | |
| | | | | TOTAL | |

Goods cannot be taken back
Goods Received in good condition.

Tirunelveli, Madurai, Coimbatore, Tanjore, Vellore, Hosur, Trichy,
Pondicherry, Salem, Erode, Palayamkottai, Chengalpattu, Bangalore,
Karoor, Tuticorin, Nagercoil, Ranipett

  

VASANTH CEILING FAN    VASANTH MIXY FAST    VASANTH STABILIZER

For **VASANTH & CO.,** 

Signature of Customer





© 4800709
© 4849620

# VASANTH & CO.,

No. 20, Arcot Road, Kodambakkam
Chennai - 600 024
TNGST No. 1540817/93-94 CST No. 818004 d.4.9.95

WITH THE LARGEST SHOWROOM NETWORK IN INDIA

**BRANCHES**
T. Nagar, Kodambakkam, Purasawalkam, Tambaram,
Washermenpet, Royapuram, Adyar, Mylapore, Padi, Thiruvallur,
Madurai, Coimbatore, Tanjore, Vellore, Hosur, Trichy,
Pondicherry, Salem, Erode, Parakamkottai, Chengalpattu,
Bangalore, Tirupur, Tirunelveli.

CASH BILL  No : 245                              Date : 30.11.2007
To MR. RAVIBHARATHY, NO130/6, SASTRI COLONY, ANNA NAGAR WEST,
CHENNAI-600101.

| S.No. | Details | Rate | Tax | Qty | Amount |
|-------|---------|------|-----|-----|--------|
| 1 | SAMSUNG 39" TV | 19990.00 | 12.50% | 1 | 22489.00 |
| | Cash = 22489.00 | | | | |
| | | | | **TOTAL** | 22489.00 |

★ Goods once Sold cannot be taken back
★ Goods Received in good condition

★ All service complaints have to be
reported direct to manufacturers only

For **VASANTH & CO** (P)

Signature of Customer

TIN No : 33321245229
CST No. : 8412009/2005-2006                                    Cell : 98410 24393

SUBJECT TO CHENNAI JURISDICTION

CASH BILL

# MEGHA SYSTEMS

2/PC - 4C, 1st Floor, Mugappair West (Opp. Amutha Matric School),
Chennai - 600 037. E-Mail : meghasystems@gmail.com

To  G. VISVABHARATHY                    No. : **095**
    196/8, ASIAD COLONY
    ANNA NAGAR WEST              Date : 28/11/2007
    CHENNAI - 600101

| S.No | PARTICULARS | QTY. | RATE | Amount Rs. | P. |
|------|-------------|------|------|------------|-----|
| 1. | Service Charge for the computer | 1 No | — | 750 | |
| | | | Total | 750 | |

Rupees Seven hundred fifty only

Terms & Conditions :
1. Goods once sold will not be taken back or exchanged.
2. Any complaint should be lodged with us within 24Hrs or receipt of the goods.
3. Material sold as spare not in assemble conditions.

For **MEGHA SYSTEMS**

Authorised Signatory

# Udison Technologies

10, Prakash Flats, # 6, Rangarajapuram Main Road, Kodambakkam, Chennai - 600 024. Mobile: 98400-82510

<u>✛ Software Resellers ✛ Laptops ✛ Desktops ✛ Networking ✛ Troubleshooting</u>

TNGST No. 1403026
I 160404 CST No.
798120 I 160404 Area
Code : 0 7 1

## INVOICE

| To | | | | Pur No. | | Date: | |
|---|---|---|---|---|---|---|---|
| | | | | DC No. | | Date: | |
| Mr.G.Visvabharathy | | | | Invoice No. 258 | | Date: 19-11-2007 | |
| 196/8, Asiad Colony | | | | | | | |
| Anna Nagar West | | | | Your Ref No. Oral | | Date: | |
| Chennai -600 101. | | | | | | | |

| Sl. No. | Description | Qty. | Amount Per Unit | Total Amount (Rs.) |
|---|---|---|---|---|
| 1. | AMD Desktops | 1 Nos. | 24,800.00 | 24,800.00 |
| | AMD Semtron 2800 Processor | | | |
| | Asus K8VM Mother Board | | | |
| | Memory Plus 512MB DDR Ram | | | |
| | Segate 80GB IDE Hard Disk | | | |
| | LG Combo Drive | | | |
| | Samsung Optical Mouse | | | |
| | Samsung Keyboard | | | |
| | Intex IT 1703 17" TFT Monitor | | | |
| | Zebtronix PruthviATX Cabinet | | | |
| 2. | With LG DVD Writer | 1 No. | 6,450.00 | 6,450.00 |
| | **Total Amount** | | | 31,250.00 |

Amount In words :-Thirty One Thousand Two Hundred And Fifty Only.

for **Udison Technologies**

*any dispute subject to Chennai jurisdiction only

Authorised Signatory

**INVOICE**

293 0403
Cell : 98404 50795

# AMMA AIR CONS

**Authorised Sales & Service Dealer**

Show Room : No.15/5,
K.B.Dasan Road, Teynampet,
Chennai - 600 018.

M/s. Mr. G. Visvanadhacthy
196/2, Akiad Colony
Annanagar West
Chennai - 600 101

Incoice No : 102

Date : 28-12-07

| S.No. | DESCRIPTION | QTY. | RATE PER UNIT | TOTAL VALUE Rs. | P. |
|---|---|---|---|---|---|
| 1. | 2.0 Ton Voltas Split Air Conditioner | 1 No | 30,140/- | 30,140 | 00 |
| 2 | Installation Charges | 1 No | 1000/- | 1,000 | 00 |
| 3. | Condensing Stand | 1 No | 750/- | 750 | 00 |
| | | | TOTAL | 31,890 | - |

E. & O.E.

Note : The Company is not responsible for any damage, breakage after delivery to carries

Subject to Chennai Jurisdiction

For **AMMA AIR CONS**

Good's received in good condition.

   

# EXHIBIT 5

MAR-13-2008 12:46 MSJ PROCESS 312 353 4841 P.02
Case 1:07-cv-06224 Document 35-2 Filed 04/15/2008 Page 56 of 59
Case 1:07-cv-06226 Document 30-4 Filed 03/25/2008 Page 2 of 2

TO: Postmaster  Client/Case ID: STEVE JAMES

Law Firm ID: LEVENFEL

3/5/2008

### REQUEST FOR CHANGE OF ADDRESS AND BOX INFORMATION NEED FOR SERVICE OF LEGAL

Please furnish the new address or the name and street address(if a boxholder) for the following:

Name (if known)  GANESAN VISVABHRATHY

7529  RIDGEWOOD LANE

BURR RIDGE, IL, 60527

The following information is provided in accordance with 39CFR 265.6(d)(6)(ii). There is no fee for providing boxholder information. The fee for providing change of address information is waived in accordance with 39CFR 265.6(d)(1) and (2) and corresponding Administrative Support Manual 352.44a and b.

1. Requesting Party Capacity    **Special Process Server**

2. Statute or regulation that empowers the presenter to serve process (not required when presenter is an attorney or a party acting pro se except a corporation acting pro se must site statute): *735-5-2-202*

3. Name of All Known Parties to

Plaintiff:    INDYMAC BANK FSB

vs

Defendant:    GANESAN VISVABHRATHY

4. Court Where Case Has Been or Will be Heard    **UNITED STATES DISTRICT COURT**

5. The Docket Number or Other Identifying Number of Case(if assigned)    07CV6226

6. The Capacity in Which the Individual is to be Served ___✓___ Defendant _____ Witness

### WARNING

THE SUBMISSION OF FALSE INFORMATION EITHER (1) TO OBTAIN AND USE CHANGE OF ADDRESS INFORMATION OR BOXHOLDER INFORMATION FOR ANY PURPOSE OTHER THAN THE SERVICE OF LEGAL PROCESS IN CONNECTION WITH ACTUAL OR PROSPECTIVE LITIGATION OR (2) TO AVOID THE FEE FOR CHANGE OF ADDRESS INFORMATION COULD RESULT IN CRIMINAL PENALTIES INCLUDING A FINE UP TO $10,000.00 OR IMPRISONMENT OF NOT MORE THAN 5 YEARS, OR BOTH (TITLE 18 U.S.C. SECTION 1001).

I certify that the above information is true and correct and that the address information is needed and will be used solely for service of legal process in connection with actual or prospective litigation

### REQUESTING PARTY

STERN PROCESS & INVESTIGATION, LLC    Tax ID  04-3801615

205 W. RANDOLPH ST 1210

CHICAGO, IL, 60606    Phone  (312)-863-2150    Fax  (312)-853-3119

Signature _____    TODD M. MARTINSON

### FOR POST OFFICE USE ONLY

NEW ADDRESS or BOXHOLDER'S NAME.

[X] Still at Address

___ Not Known Address Given

Name:_____

___ No Change of Address Order on File

Address:_____

___ Moved, Left No Forwarding Address

City, State, Zipcode:_____

___ No Such Address

TOTAL P.01

TOTAL P.02



**EXHIBIT**

# EXHIBIT 6

#42030

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, DOMESTIC RELATIONS DIVISION

IN RE: THE MARRIAGE OF            )
                                  )
SURIYA V. SASTRI,                 )
                                  )
            Petitioner,           )
                                  )       No.  06 D 530086
      - and -                     )
                                  )       Calendar:  A
GANESAN VISVABHARATHY,            )
                                  )
            Respondent.           )

ENTERED
JUDGE EDWARD R. JORDAN -1631

MAR 0 7 2007

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

### AGREED ORDER

This cause coming to be heard on SURIYA V. SASTRI's ("Suriya") Emergency Petition
for Temporary Restraining Order and Preliminary Injunction and by agreement of the parties, the
Court being advised in the premises;

It is Ordered:

1.      Pending further Order of Court or written agreement of the parties, Vish
VISVABHARATHY ("Vish") shall not pledge the following real property as collateral or cause
any additional lien or encumbrance to be recorded against the property subsequent to the entry of
this Order:

    a.   8999 South County Line Road, Burr Ridge, Illinois, subject to an existing
         lien of approximately, $1,000,000;

    b.   7529 Ridgewood Lane, Burr Ridge, Illinois;

    c.   The property held in the VCM Trust; and

    d.   The property held in the Suriya Sastri Trust.

2.      The parties acknowledge that the properties listed in paragraph 1 above may have
previously been pledged as collateral in connection with Vish's real estate developments, which
shall not be considered a violation of this Order.

3.      Vish shall provide Suriya with the sum of $10,000 per month for temporary child
support, from which Vish shall pay all of the children's expenses.  Vish shall direct deposit the
temporary child support into Suriya's MB Financial checking account on the 1st day of each
month. This Order shall supersede and replace all prior Orders regarding temporary support and
is entered without prejudice to both parties' right to an evidentiary hearing on the issue.

EXHIBIT

4.    This Order shall revoke the Power of Attorney executed by Suriya authorizing Vish to sign documents on behalf of Suriya, the children's trust and/or Suriya's trust.

5.    Vish shall provide Suriya with 14 days advance notice of his intent to invest in any new developments.

6.    Vish shall pay the monthly interest in connection with the line of credit against the County Line Road, Burr Ridge, Illinois, property.

7.    The issue of whether the Mt. Vernon property (50 acres of vacant land) should be pledged as collateral to the Indymac Bank in connection with the Venue development in Orlando Florida, shall be set for hearing on April 25, 2007, at 2:00 p.m.  Vish shall be granted 21 days to file a Motion on the issue and Suriya shall be granted 14 days to respond.   Neither party shall transact with the Mt. Vernon property without written agreement or until the Court has ruled on the issue.

AGREED: _____
One of the attorneys for Suriya Sastri

ENTER:

_____
JUDGE

DATED: _____

BERGER | SCHATZ
Attorneys for Respondent.
161 North Clark #2800
Chicago, IL 60601
312/782-3456
Attorney No. 42030

#351014