# EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

INDYMAC BANK, F.S.B.,          )
a Federal Savings Bank,        )
            Plaintiff,         )
    vs.                        )  No. 07 C 6224
GANESAN VISVABHARATHY,         )
an individual,                 )
            Defendant.         )

The deposition of SURIYA SASTRI called for

examination pursuant to Notice and the Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken before

Jennifer A. Buckley, a notary public within and for the

County of Cook and State of Illinois, at 55 West Monroe

Street, Suite 3200, Chicago, Illinois, on the 8th day of

April 2008, at the hour of 10:20 a.m.

Reported By:  Jennifer A. Buckley, CSR
License No. 084-003632

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 2

APPEARANCES:

1
2   LEVENFELD PEARLSTEIN, LLC, by
3   MR. GARY I. BLACKMAN and
4   MR. JAMES G. MARTIGNON,
5   2 North LaSalle Street, Suite 1300
6   Chicago, Illinois 60602
7   (312) 476-7536
8       Representing the Plaintiff,
9
10  SPERLING & SLATER, by
11  MR. DANIEL A. SHMIKLER,
12  55 West Monroe Street, Suite 3200
13  Chicago, Illinois 60603
14  (312) 641-3200
15      Representing the Defendant,
16
17  BOLLINGER, RUBERRY & GARVEY, by
18  MR. MITCHELL D. ROSE,
19  500 West Madison Street, Suite 2300
20  Chicago, Illinois 60661
21  (312) 466-8000
22      Representing the deponent, Suriya Sastri.
23
24

Page 3

1                I N D E X
2   WITNESS                  EXAMINATION
3   SURIYA SASTRI
4   By Mr. Shmikler                    9
5
6           E X H I B I T S
7   NUMBER                  MARKED FOR ID
8       Sastri Deposition Exhibit
9   Exhibit 1                22
10  Exhibit 2                39
11  Exhibit 3                113
12  Exhibit 4                115
13  Exhibit 5                120
14  Exhibit 6                122
15  Exhibit 7                128
16
17
18
19
20
21
22
23
24

Page 4

1       MR. ROSE: Mitchell Rose appearing for Dr. Sastri.
2       MR. SHMIKLER: Dan Shmikler for the
3   defendant -- I'm sorry -- for defendant Visvabharathy,
4   Dr. Visvabharathy.
5       MR. BLACKMAN: Gary Blackman for the plaintiff.
6       MR. MARTIGNON: And Jim Martignon here for the
7   plaintiff.
8       MR. BLACKMAN: For the record, we want to raise an
9   objection to the way in which these depositions in
10  particular counsel's what he calls Rule 32 deposition
11  has proceeded.  There is an evidentiary hearing next
12  week.  We did not obtain prior to Sunday any date on
13  which the doctor would be produced for deposition.  We
14  served her with a subpoena.  Counsel for the defendant
15  acknowledged in an e-mail to me yesterday that he was
16  not representing her but thought that the subpoena was
17  invalid.  Nobody had come in to quash the subpoena or
18  seek a protective order.
19      At 4:39 we received an e-mail from counsel
20  advising that the deponent would not be appearing at our
21  office, 4:39 yesterday, would not be appearing in our
22  office because he thought the subpoena was invalid but I
23  was welcome to come to a deposition at 10:00 a.m. today,
24  which happens to be the same time as the subpoenaed

Page 5

1   deposition to participate in his deposition.
2       The first notice of deposition from counsel
3   for today was received last night, though there was an
4   e-mail about it yesterday.  I spoke with the doctor on
5   the telephone yesterday who confirmed, whether she does
6   now or not I don't know, but confirmed that when she was
7   speaking with counsel last week, it was not scheduled
8   for downtown.  So what it appears is that -- and
9   everybody's refused to come to our office for the
10  subpoena.  So what it appears is that a subpoena was
11  issued.  And then subsequent to that, a decision was
12  made to more or less hijack this witness and take over
13  these proceedings and take counsel's own deposition at
14  the same time at the same date as the subpoena.
15      So the witness has retained a lawyer last
16  night who's here, and we're happy to see that.  We are
17  objecting to counsel beginning with his Rule 32
18  deposition.  But we have no control over the order that
19  the witness's lawyer wishes to present the witness.  And
20  after counsel's done with his questioning, by agreement
21  of the parties, by agreement of counsel without waiving
22  whatever objections he might have, we're going to begin
23  with our subpoenaed deposition of the witness.
24      MR. SHMIKLER: I'd like to -- we'll put a

2 (Pages 2 to 5)

Page 6

1  more -- at the time that they begin their purported
2  subpoena examination, we'll make our objection in full.
3  But I'd note that, first of all, by agreement of the
4  parties is not correct if he means the defendant. We
5  absolutely do not agree that their subpoena is valid.
6  It's clearly barred by federal rule. They have not
7  sought -- it appears to be in the nature of a discovery
8  deposition which makes sense because they've never
9  identified Dr. Sastri as a witness in this matter they
10 wish to call. There's been no discovery authorized in
11 this matter at this point which would be required by
12 federal rule. They were advised months ago that if they
13 wish to have discovery in this case, they needed to seek
14 Court leave and they never did so. And, in fact, the
15 description of how this deposition came to be scheduled
16 is inaccurate. In truth they were notified last week
17 that we were seeking to take Dr. Sastri's deposition.
18 We were working with her schedule in order to determine
19 when she would be available. She and I spoke last
20 Friday afternoon at which point she thought that she
21 would be available this morning but was confirming that.
22 While we waited confirmation, they served a subpoena
23 that is not valid.
24       Monday morning contrary to his representation

Page 7

1  we informed them that their subpoena was not valid but
2  that the witness was, in fact, available and was now
3  willing to come downtown and so that we would proceed
4  with our deposition to preserve her testimony for the
5  hearing this morning. In subsequent e-mails they
6  refused to agree to that and insisted that their
7  subpoena was valid and then claimed that because they
8  had not received a, quote unquote, formal notice, that
9  somehow it impaired our ability to take her deposition
10 at which point we sent them the notice that they had
11 requested. I note that specifically the proceeding that
12 we're going forward today with to preserve testimony was
13 expressly approved by Court, and once again they have
14 not received any Court permission to proceed with their
15 subpoena. So with that said, I think we would like to
16 go ahead and proceed. Swear the witness.
17       MR. BLACKMAN: I'd like to make a very brief
18 response, and I don't want to spend a lot more time on
19 this. We don't agree that we don't have the right to
20 seek a subpoena on an F find that you submit as part of
21 your motion to quash. Rule 26 does not apply to these
22 proceedings. We haven't even begun the case because
23 you're challenging jurisdiction. These are your
24 witnesses for your motion. So we don't agree that Rule

Page 8

1  26 requires us to seek permission to take the deposition
2  of a witness that you will be producing whether in
3  person or in a deposition to support your motion.
4        And, second, and this is just an observation,
5  if counsel had, in fact, been speaking with the witness
6  about producing her this morning and those discussions
7  happened before Monday, we surely were not advised of
8  that and no one asked our availability for a deposition
9  on Tuesday morning. So it is I think a little
10 disingenuous to say that this was a date that you were
11 looking toward when you hadn't even checked with our
12 office as to whether we were available to meet with the
13 doctor this morning here or somewhere else. So we're
14 ready to start.
15       MR. SHMIKLER: Do you have anything?
16       MR. ROSE: At this point I don't have anything else
17 to add to that discussion.
18       MR. SHMIKLER: Will you swear the witness, please.
19       (Witness sworn.)
20            SURIYA SASTRI,
21 called as a witness herein, having been first duly
22 sworn, was examined and testified as follows:
23
24

Page 9

1            EXAMINATION
2  BY MR. SHMIKLER:
3     Q   Good morning. Could you state your name for
4  the record, please.
5     A   Suriya V. Sastri, M.D.
6     Q   You're a medical doctor I take it?
7     A   Yes.
8     Q   What kind of doctor are you?
9     A   I'm a gastroenterologist.
10    Q   Are you currently employed?
11    A   Yes.
12    Q   Where do you work?
13    A   I work with Well Group Health Partners,
14 Chicago Heights, Illinois.
15       MR. MARTIGNON: I'm sorry. Can you speak up just a
16 little bit? I'm having a little trouble hearing you.
17       THE WITNESS: Well Group.
18 BY MR. SHMIKLER:
19    Q   Okay. What's your current home address?
20    A   7529 Ridgewood Lane, Burr Ridge, Illinois
21 60527.
22    Q   Okay. How long have you lived there?
23    A   Since end of December 2004.
24    Q   Dr. Sastri, are you married?

3 (Pages 6 to 9)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 10

1    A    I guess but I'm separated.
2    Q    Okay.  And what's your husband's name?
3    A    Ganesan Visvabharathy.
4    Q    And does your husband live with you?
5    A    No.
6    Q    I take it you're legally separated?
7    A    I don't know what legally means.  I know I'm
8    separated.
9    Q    You're physically separated for sure?
10   A    Yes.
11   Q    I take it do you have divorce proceedings
12   pending?
13   A    Yes.
14   Q    And how long have those been pending?
15   A    I filed it in February 2006.
16   Q    Okay.  When did your husband move out of the
17   house?
18   A    Probably summer 2006.  And for a brief period
19   of time when I happened to go to India for a service
20   project, he was there between like the end of December
21   to January until I came back.  He was watching the
22   children.  That was 2007, January 2007 or the first week
23   February of 2007 he moved out.  He left.
24   Q    So he came in in December of '06 and out in

Page 11

1    about February of '07?
2    MR. BLACKMAN:  Objection as to form and leading.
3    This is your witness.  You have to ask direct questions.
4    BY MR. SHMIKLER:
5    Q    Dr. Sastri, just to clarify what you just
6    said, what year was it?  You said he moved in in
7    December.  What year did you say it was?
8    MR. BLACKMAN:  Same objection.
9    BY MR. SHMIKLER:
10   Q    What year did you say that was?
11   MR. ROSE:  You can go ahead and answer the
12   question.  Do you understand the question?
13   THE WITNESS:  What is the question?
14   BY MR. SHMIKLER:
15   Q    The question is, I just want to clarify the
16   dates that you just gave us when your husband was living
17   back in the house while you were away.  That was you
18   said it was from December through February, correct?
19   A    Not through February.  It was just the end of
20   January he left.
21   Q    And was that December 2006 through January --
22   A    Through the end of January 2007.
23   Q    So, yes, that's right, December 2006?
24   MR. BLACKMAN:  Objection, asked and answered.

Page 12

1    MR. SHMIKLER:  I just want to be clear.  I'm not
2    sure the record was clear with your answer.
3    MR. BLACKMAN:  Regardless of why you want to be
4    clear or not, the objection is it's asked and answered.
5    MR. ROSE:  You can answer.
6    THE WITNESS:  I'm really confused about this
7    objection thing.  So anyway --
8    MR. ROSE:  Just hold on one second.  If there's an
9    objection that's raised, then I'll take care of the
10   objection.  I'll deal with the objection.  And if I tell
11   you to go ahead and answer the question, just go ahead
12   and answer the question.  You don't need to pay
13   attention to the objections themselves.  Okay?
14   BY MR. SHMIKLER:
15   Q    Do you remember the question?
16   A    Yes.  I mentioned that he was there for about
17   a three- to four-week period when I happened to go to
18   India.  So he watched the children when I was not there.
19   So that was approximately between the end of December to
20   the end of January.
21   Q    I just want to make sure the years are clear.
22   A    And once I came back he left.
23   Q    I just want to make sure the years are clear.
24   Which years was that?

Page 13

1    A    December 2006 until January of 2007.
2    Q    Thank you.
3    When your husband moved out, did he move out
4    to live somewhere else?
5    A    I guess.
6    Q    Do you know where he went to live?
7    A    No.  At that time, no.
8    Q    You learned some time later?
9    MR. BLACKMAN:  Objection, leading and objection as
10   to form and foundation.
11   BY MR. SHMIKLER:
12   Q    Did you learn some time later where your
13   husband went to live?
14   A    Later on I learned that he probably was
15   staying somewhere one of the buildings he owned.  I
16   didn't know exactly where he was.  But then later we
17   learned that there was an apartment that he had in
18   LaGrange, and our children could go there and visit with
19   him.  That was 400 South Catherine.  So exactly like
20   when that happened, I'm not exactly sure.  Only I
21   learned later on.
22   Q    Did you ever go to that apartment in
23   connection with the children?
24   A    No.  They just went -- he would come pick

4 (Pages 10 to 13)

Page 14

1  them up and they would go meet with him a couple times a
2  week or on weekends, stuff like that.
3      Q    Other than the one instance that you already
4  described, did your husband ever come back to live with
5  you again in your house?
6      A    No.
7      MR. BLACKMAN:  At what point in time?
8  BY MR. SHMIKLER:
9      Q    Now, has anyone ever come --
10     MR. BLACKMAN:  Excuse me, Counsel.  At what point
11 in time?
12     MR. SHMIKLER:  Do you have an objection or what?
13     MR. BLACKMAN:  Yeah.  Objection.  What point in
14 time?
15     MR. SHMIKLER:  That's not an objection.
16     MR. BLACKMAN:  Counsel, are you refusing to clarify
17 that?
18     MR. SHMIKLER:  The witness understood the question.
19 If you want to follow-up on cross, follow-up on cross.
20     MR. BLACKMAN:  Just answer my question.  Are you
21 refusing to clarify what the witness at what point in
22 time that answer responded to?  Just say yes or no.
23     MR. SHMIKLER:  I think the answer was clear, and
24 I'm not following up on that.  If you want to follow-up,

Page 15

1  that's why you're here for.
2  BY MR. SHMIKLER:
3      Q    Has anyone ever come to your home looking for
4  your husband to serve him with legal papers?
5      A    Yes.
6      Q    Okay.  When did that happen?
7      A    Approximately November 2007.
8      Q    Okay.  What happened?
9      A    One evening I was coming back from where I
10 was in the evening around dusk time and this car was on
11 my driveway and this man approached me and he said that
12 he was serving some papers for my husband.  And I said
13 he doesn't live here.  He said where he would be, and I
14 said I don't know.  And he was kind of threatening and
15 menacing with different questions, and then I actually
16 didn't want to chat with him on the driveway so I asked
17 him to come into the garage.  And then I was talking
18 with him there, and he said then I will have the sheriff
19 come and knock at your door at midnight.  And I said
20 feel free to do anything.  He will not be there and I
21 don't mind being disturbed at any time of the day.  I'm
22 a doctor after all is what I said.
23     Q    Did he say anything else to you?
24     A    He said that don't let me go through the

Page 16

1  children to get to whatever I have to do.  I mean I'm
2  not saying exact words, but this is what he said.  Don't
3  allow me to go through them.  I said don't bother with
4  them.  That's what I said.  And he left.
5      Q    Okay.  Did he say anything else to you or you
6  to him?
7      A    I said what I said.
8      Q    Okay.  Was that the last -- was that the only
9  time that a process server came to your home?
10     A    No.  I think in the first week of December he
11 came back on a Saturday morning.  He just knocked and
12 then he said he had his papers and he said the Court
13 hired asked them to be delivered at the house and I said
14 that he doesn't live here.  He said these are the papers
15 for him.  I said he didn't live here.  And he said that
16 these were by court order and that his name is on the
17 utility bills and other things so he has -- they have to
18 deliver the papers.  Why is that so?  I mean I've been
19 paying for all the bills and everything.  I haven't had
20 the time to change his name on the utility bills.  I
21 wasn't even paying attention, but he hasn't lived here
22 in a long time since the previous summer basically.  He
23 said that I'm going to drop them off here.  And he
24 dropped them off at the front door.  And I said, you

Page 17

1  know, that -- he had said the mail is being delivered.
2  There are different mail with his name that are being
3  delivered to the home.  I said, yeah, the mail just
4  stays here.  And whenever their office or something like
5  that they have, they take it.  So he just dropped it off
6  in the front door, and he left.
7      Q    Did you or he say anything else at that time
8  to each other?
9      A    No.
10     MR. SHMIKLER:  Okay.  That's all I have.
11     MR. BLACKMAN:  Okay.  I'd like to begin the
12 subpoenaed deposition of the witness.
13     MR. SHMIKLER:  At this time again we object that
14 there's no authority for subpoena.  We agree that they
15 have the right to cross-examine based on the examination
16 of the testimony that we've taken.  But the subpoena is
17 not valid, is unauthorized.  So to the extent that the
18 examination purports to be in the nature of discovery or
19 pursuant to their subpoena or exceeds the scope of the
20 direct examination, we object and reserve all objections
21 to that.
22     MR. ROSE:  We also join in the objection as to the
23 propriety of the deposition to the extent that it's not
24 valid under the federal rules.  Also, just to make a

5  (Pages 14 to 17)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 18

1 statement for the record, I spoke with Mr. Blackman
2 earlier this morning and indicated that I did not
3 believe that we had any documents that were responsive
4 to the documents that had been requested in the rider.
5 This morning, though, my client did provide me with some
6 documentation and I have copies here. I'm now producing
7 the documents to both counsel here. And for the record,
8 although I have not counted the number of pages, there's
9 I'd say roughly 20 or so pages of documents. And based
10 upon my review of the documents, you're obviously
11 welcome to make your own independent review, they appear
12 to be documents that are relating to the ownership of
13 the home at 7529 Ridgewood Lane in Burr Ridge. And just
14 to generally describe them, they appear to consist
15 mostly of a title insurance policy, the policy --
16     MR. BLACKMAN: I can go through it with her.
17     MR. ROSE: -- conditions. Just so I have for the
18 record what it is that we're producing. I understand
19 there are additional documents we are continuing to
20 investigate and look for responsive documents. And
21 we'll respond once we've had an opportunity to go ahead
22 and complete our initial investigation as to responsive
23 documents.
24     MR. BLACKMAN: Well, today is the subpoena. So

Page 19

1 next week -- this testimony is intended to preserve her
2 testimony so she does not have to appear at trial. And
3 so to the extent there are any documents that we
4 requested that support her affidavit that have not been
5 produced, then either we will have to bring her back for
6 another deposition or she'll have to appear at trial.
7 This is not a discovery deposition. This is a
8 deposition in lieu of testimony.
9     MR. ROSE: Right. Just are you done?
10     MR. BLACKMAN: Yeah, I'm done.
11     MR. ROSE: So based upon the investigation that
12 I've conducted to date and an interview of the client
13 and without waiving any obviously attorney-client
14 communications, our position at the present based upon
15 the investigation to date that in response to the first
16 paragraph rider number 1 paragraph number 1, that there
17 are not documents, additional documents that are
18 responsive to that paragraph. Number two, we have
19 produced some documentation today. I anticipate there's
20 probably some additional documentation we'll continue to
21 investigate.
22     Similarly with regard to paragraph 3, the
23 refinance of the home, we are investigating and can
24 produce some additional documentation. And then with

Page 20

1 regard to any mail, it's my understanding that there
2 have been some documents. She doesn't have any of those
3 documents with her today. And we'll obviously continue
4 to investigate.
5     MR. BLACKMAN: All right. You're not really
6 understanding my point. You can continue to
7 investigate, but the purpose of today's deposition is to
8 preserve her testimony for trial. So there is no other
9 date on which she's scheduled to appear. And to the
10 extent, you know, that there are additional documents
11 that are produced, then she will need to either reappear
12 for deposition or come into the trial to testify. So
13 this is not the point in time where the parties can be
14 investigating whether there's any additional documents.
15 We can -- Dan and I can fight about that in court, but I
16 just want to be clear with you that this is not a
17 deposition in the middle of a case that there'll be some
18 supplemental production. Now, if she wants to turn this
19 into something else and then you produce something and
20 then appear at trial, that's fine. But what she has
21 today is all that she has, and that's all we're going to
22 be able to question her on.
23     MR. ROSE: Okay.
24     MR. BLACKMAN: Why don't we get started.

Page 21

1     MR. ROSE: I just want to respond to that just so
2 we're clear. I don't agree or disagree with your
3 assertions. If you want to go ahead and renotice her or
4 notice her for trial or whatever, do whatever you're
5 going to do. We will respond. And if we believe
6 there's an appropriate objection to continue this
7 deposition beyond today, we will evaluate and assert
8 whatever objection you believe is appropriate at that
9 time.
10     MR. BLACKMAN: Can we get started now?
11     MR. SHMIKLER: One thing I want to point out, I
12 think counsel just said that their subpoena is not in
13 the nature of discovery, which I think puts a rest to
14 the issue about the documents because the request for
15 documents is clearly discovery. The witness -- we're
16 not putting in any documents with regard to this
17 witness. As far as I know, they're not putting any
18 documents with regard to this witness. So the only
19 issue there -- if they're also here just preserving
20 trial testimony, then there's no issue with regard to
21 documents.
22     MR. BLACKMAN: That's your opinion. We'll fight
23 about that later.
24     MR. ROSE: Obviously there's issues surrounding the

6 (Pages 18 to 21)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 22

1  reasonableness of the amount of time that's passed in
2  order to be able to assemble the --
3      MR. BLACKMAN: Guys, can we get started?
4      MR. ROSE: I think so. Are you ready?
5          (Sastri Deposition Exhibit
6          No. 1 was marked for
7          identification.)
8  BY MR. BLACKMAN:
9      Q   I'd like to show you what is marked as
10 Exhibit 1, notice of subpoena with an attached subpoena
11 for your testimony at my office today at 10:00 a.m.
12 Have you seen that before? Ma'am, have you seen that
13 before?
14     A   I had this.
15     Q   Can I see that?
16     A   I did not have this.
17     MR. ROSE: For the record just the witness --
18     THE WITNESS: That's why I was looking at this.
19     MR. ROSE: -- is indicating that she does not --
20     THE WITNESS: There was a check attached to this
21 and this. That's what was given to me by my daughter.
22 BY MR. BLACKMAN:
23     Q   You're referring to the subpoena that is on
24 the third page of the notice that I just handed to you;

Page 23

1  is that right?
2      A   That is what was given.
3      Q   So you received the subpoena, but you didn't
4  get the notice that was attached on top that went to
5  your husband's counsel? I just want to confirm that you
6  got the subpoena. Correct?
7      A   Yes.
8      MR. ROSE: The subpoena Exhibit A is a five-page
9  document. The first two pages consist of the notice of
10 subpoena and the certificate of service, and then the
11 remainder three pages consist of the actual subpoena and
12 a rider to subpoena. He's asking you --
13     THE WITNESS: I did not receive the later. The two
14 pages in between with a check was what I . . . I did
15 get it like this.
16 BY MR. BLACKMAN:
17     Q   So is it your testimony that you never
18 received --
19     A   I think.
20     Q   Is it your testimony that you received the
21 check, you received the subpoena, but that the rider was
22 not attached? Are you stating that under oath, ma'am?
23     A   You know, this is what I remember. And if
24 there were some other papers that are mixed up

Page 24

1  somewhere, I don't know. This is what I remember.
2      Q   Ma'am, I want you to listen to my question.
3  Is it your testimony under oath that you received the
4  subpoena, that you received the check, but that you did
5  not receive a rider?
6      MR. SHMIKLER: Objection, asked and answered.
7      THE WITNESS: I earlier mentioned that I don't
8  remember seeing this page at all.
9      MR. ROSE: By this page she's referring to the
10 rider.
11     THE WITNESS: The rider to subpoena and then this
12 other thing.
13 BY MR. BLACKMAN:
14     Q   So you don't remember seeing it, but you may
15 have gotten it with the subpoena? It may have been
16 attached?
17     MR. SHMIKLER: Objection, asked and answered.
18     THE WITNESS: I answered what I remember.
19 BY MR. BLACKMAN:
20     Q   Well, I'm asking you a different question.
21 It may have been attached, correct?
22     MR. SHMIKLER: Objection, asked, answered, and
23 foundation.
24     THE WITNESS: I'm sorry. Anything is possible, but

Page 25

1  this is what I remember. And I'm thinking this is what
2  I saw.
3  BY MR. BLACKMAN:
4      Q   So when you got the subpoena, what did you
5  do?
6      A   Just looked at it.
7      Q   Did you call anybody?
8      A   It was in the evening 7:00 o'clock, so I
9  didn't call anybody. I just talked to my daughter and
10 asked her what happened. And she told me that somebody
11 knocked on the door or bell or something and she opened
12 the door and this person just thrust this into her hand.
13 And she said, what is this? And that person said it's a
14 subpoena for me. And she said my mother is not home so
15 take it back.
16     Q   Ma'am --
17     MR. SHMIKLER: I think the witness is allowed to
18 complete her answers.
19     MR. BLACKMAN: Not if she's not answering the
20 question responsively.
21     MR. SHMIKLER: You can always follow-up.
22     MR. BLACKMAN: You can make your objection. You're
23 not her lawyer. You can't interrupt.
24     MR. SHMIKLER: As a party to these proceedings, we

7 (Pages 22 to 25)

Page 26

1  are entitled to request that all witnesses be allowed to
2  complete their responses.
3      MR. BLACKMAN: You can request that.
4  BY MR. BLACKMAN:
5      Q    Did you contact any lawyer -- I'm not talking
6  about your family members. Did you contact anybody
7  outside of your family once you got served with the
8  subpoena to tell them I got served with the subpoena?
9  Did you call Mr. Shmikler?
10     MR. SHMIKLER: Objection, compound.
11     THE WITNESS: No. It was Sunday evening.
12 BY MR. BLACKMAN:
13     Q    Did you call him the next day?
14     A    I did not yet. I was at work. And he called
15 me to follow-up on our earlier arrangement of the
16 meeting to verify where it was going to be and whatnot,
17 and that is when I said I have been served with
18 subpoena.
19     Q    And what date? Was that on Monday,
20 yesterday?
21     A    Monday.
22     Q    Okay. Do you know what time?
23     A    About the morning time like after 9:00, 9:30,
24 between 9:30, 10:00 o'clock, something like that.

Page 27

1      Q    Prior to your conversation with counsel
2  yesterday, had you agreed on coming downtown for your
3  deposition?
4      A    We were still deciding on where we were going
5  to meet.
6      Q    Okay. Did you agree on what day?
7      A    We did not have any agreement as such, but we
8  had -- he had asked me for a tentative time, and I said
9  I may be available on Tuesday mornings. I have to clear
10 my schedule.
11     Q    And when did you tell him that?
12     A    Later part of last week.
13     Q    Do you know whether he ever checked with our
14 office to see whether we were available on Tuesday
15 mornings?
16     MR. SHMIKLER: Objection to foundation.
17     THE WITNESS: He was still waiting for my time.
18 And whether he did or not, you can't ask me whether he
19 did. You have to ask him.
20 BY MR. BLACKMAN:
21     Q    So as of yesterday when you spoke with him,
22 you hadn't scheduled today's deposition with him yet.
23 That was scheduled yesterday?
24     A    We were scheduling it.

Page 28

1      Q    Right. Listen to my question.
2      MR. SHMIKLER: I object to the relevance of any of
3  these questions.
4      THE WITNESS: We scheduled the time already. I had
5  told him preferably 10:00 o'clock would be suitable to
6  me, and I had said that on Friday or Thursday or
7  whenever.
8      MR. SHMIKLER: Let me interpose an objection to
9  this line of questioning as being completely irrelevant
10 to any matter that's at issue at the hearing.
11 BY MR. BLACKMAN:
12     Q    So is it your testimony, ma'am, that on
13 Friday you agreed that you would be deposed at 10:00
14 a.m. today downtown? That's not what you said a couple
15 minutes ago.
16     MR. SHMIKLER: Objection to form.
17     THE WITNESS: What did I say a couple minutes ago?
18 BY MR. BLACKMAN:
19     Q    That you were trying to schedule a time. But
20 as of yesterday morning, you hadn't scheduled a firm
21 deposition date for 10:00 a.m. downtown today.
22     MR. ROSE: Objection to the extent it
23 mischaracterizes her prior testimony.
24     THE WITNESS: I did already said I had scheduled

Page 29

1  this meeting. We were only going to confirm that so
2  that he can finalize on it.
3  BY MR. BLACKMAN:
4      Q    So you scheduled -- when you say meeting, you
5  scheduled the deposition with counsel. You scheduled
6  that and confirmed that when?
7      A    We were still confirming until this morning
8  for that purpose. The thing is that there are so many
9  things that are in play here. For you to -- the thing
10 is that we had an originally prearranged deposition that
11 we had discussed about, and I was willing to cooperate
12 for the deposition. So that is how it was. So it
13 was --
14     Q    All I'm asking, ma'am, all I want to know is
15 at what point did you agree to produce yourself for
16 deposition at this office this morning? Was that
17 something that you agreed with counsel on yesterday or
18 Friday or Thursday? I just want to know when the
19 deposition that counsel has scheduled for today that he
20 just took, when you agreed to do that.
21     A    Pretty much last week, the early part of last
22 week. I had -- it's not even towards the end. The
23 deposition is something that we agreed upon, and he was
24 arranging it. So I said okay.

8  (Pages 26 to 29)

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 30

1    Q    Now, do you have the rider in front of you?
2    A    Yes.
3    Q    Now, your counsel has produced some documents
4  in response to this that pertain to the ownership of the
5  home, correct?
6    A    Yeah.
7    Q    Okay. And when did you give these to your
8  counsel?
9    A    This morning.
10    Q    Okay. And when did you retain -- I don't
11  want to know what you talked about with your lawyer, but
12  when did you retain him?
13    A    Yesterday.
14    Q    Last night after you and I spoke on the
15  phone?
16    A    Of course.
17    Q    So it was around 10:00 o'clock, 11:00
18  o'clock?
19    A    Why would that be . . .
20    MR. ROSE: Just answer his question. Do you
21  remember what time it was you retained me to represent
22  you?
23    THE WITNESS: It was late in the evening. I don't
24  know exact time.

Page 31

1    MR. ROSE: His question is do you remember the
2  time? Either you remember or you don't remember.
3    MR. BLACKMAN: It doesn't matter. Let me withdraw
4  it.
5    THE WITNESS: I don't remember the exact time,
6  between 9:00 and 10:00 or 9:30.
7    MR. BLACKMAN: It doesn't matter. I'll withdraw
8  that. It's not important.
9  BY MR. BLACKMAN:
10    Q    How did you know to call Mr. Rose is it?
11    MR. ROSE: Yes.
12  BY MR. BLACKMAN:
13    Q    How did you know to call Mr. Rose?
14    MR. ROSE: Wait a second. Go ahead.
15    THE WITNESS: I had called another friend of mine
16  and found out if he had any attorney. I had no idea who
17  to call. So another attorney I had tried to reach, and
18  he wouldn't be able to be reached until this morning.
19  And then I talked to Dan Shmikler and asked him to refer
20  me to somebody who can represent me on such a short
21  notice, and he was kind enough to find somebody
22  yesterday who could even talk to me yesterday. So
23  between the two options, then I called another friend
24  and said somebody is able to talk to me yesterday. So I

Page 32

1  would rather use this person, so that I let go of the
2  other one.
3  BY MR. BLACKMAN:
4    Q    So Mr. Rose was recommended to you by
5  Mr. Shmikler?
6    A    Yes.
7    Q    And then when you spoke with -- and
8  Mr. Shmikler is not your lawyer, is he?
9    A    He's not.
10    Q    And he's never represented you personally?
11    A    That's correct.
12    Q    Okay. When you spoke with Mr. Rose last
13  night on the phone, was Mr. Shmikler on the phone?
14    A    No.
15    Q    Have you ever had any conversations since
16  last night with Mr. Rose and Mr. Shmikler?
17    A    Together?
18    Q    Uh-huh, in the same room the three of you.
19    A    Just before now we met.
20    Q    Can you tell me what you talked about?
21    A    Just introducing each and we just talked
22  about the deposition and the . . .
23    Q    Instead of telling me generally, tell me what
24  you recall was actually said between the three of you.

Page 33

1    A    We were just going through like actually the
2  time, I mean generally just tell whatever is the detail
3  of the what shall I say? Be truthful and
4  straightforward answers to questions.
5    Q    You said he was going through the time. Were
6  you about to say going through the time line of what
7  happened and when? Was that something you discussed?
8    A    Not really. We just were there for a short
9  time. I was answering my phones and other things there.
10  Mainly like when, you know, whether I had a doubt as to
11  the exact dates of the filing of the divorce and
12  everything so I was talking to him and then --
13    Q    Him being Dan?
14    A    And we were able to look at the divorce
15  petition filed, the date. I wanted to get the date.
16    MR. ROSE: I'm just going to interject for the
17  record. There were two meetings that we had. One was
18  with my client alone. And since the two meetings took
19  place one obviously right after the other, there was an
20  initial very short meeting where the three of us were in
21  the room together, and I was actually being cautious to
22  see if she was going to confuse the two. But there was
23  really nothing of substance discussed in the first
24  meeting with the three of us there obviously being

9 (Pages 30 to 33)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 34

1 sensitive to issues of attorney-client privilege. And
2 the only things it was just very general things about
3 the proceeding itself and the deposition and the
4 subpoena. I did mention to Mr. Shmikler that I did have
5 documents that I was going to make available to
6 everybody and then Mr. Shmikler left the room and then I
7 proceeded to meet with my client without him being
8 present. So there was really nothing of any substance.
9     MR. BLACKMAN: Okay. I appreciate that. Thank
10 you.
11 BY MR. BLACKMAN:
12    Q    When you brought in the documents with
13 respect to the home ownership this morning that you gave
14 to us, how did you know to bring this in?
15    A    I'm thinking it might be this. It might have
16 been there maybe.
17    Q    When you say there, ma'am, you're pointing to
18 the rider?
19    A    Rider, rider to the subpoena because --
20    Q    As your counsel stated before you began
21 testifying, this document which we'll mark in a minute
22 which is pertaining to home purchase documents, I
23 believe counsel stated that that was responsive to the
24 rider request number 2 where it says the ownership of

Page 35

1 your home located at 7529 Ridgewood Lane. That's what
2 the documents that counsel referenced this morning are
3 being produced in response to? Is that accurate?
4     MR. ROSE: Did you hear his question?
5 BY MR. BLACKMAN:
6    Q    Ma'am, you need to pay attention to me when
7 I'm asking questions. Now, you've brought in some
8 documents this morning with respect to ownership,
9 correct? You have to answer out loud.
10    A    Yes.
11    Q    Okay. And the rider that your counsel was
12 discussing before you began testifying asks for
13 ownership documents in number 2. Do you have that in
14 front of you?
15    A    Uh-huh.
16    Q    Okay. And your counsel said that these
17 documents that you brought in this morning were
18 responsive to request number 2?
19    A    Yes.
20    Q    Okay. Is that your understanding that these
21 documents you're producing are in response to the
22 request for ownership documents number 2?
23    A    Yes.
24    Q    Okay. So then how did you know that this

Page 36

1 request was made?
2     MR. ROSE: Objection to the extent that it requires
3 disclosure of an attorney-client communication. Let's
4 take a minute to step out for one second. Off the
5 record.
6         (A short break was taken.)
7     MR. ROSE: We're back on the record just to say
8 that you're free to examine her further about this.
9     MR. BLACKMAN: Unless you want to explain it to us
10 and save us some time. I'm happy to listen to you.
11     MR. ROSE: The truth is actually that she's not
12 sure and I'm not sure exactly whether she knows about
13 the documents that were requested based upon
14 communications that she and I had or whether she did
15 actually see the rider. She's not 100 percent sure
16 about that. And so to the extent there's any disclosure
17 of attorney-client communications there, it's without
18 waiver. But there was, you know, some -- she may have
19 learned -- it's possible she may have learned about the
20 nature of the documents, the fact that documents were
21 requested based upon communications with counsel or it
22 may have been that she saw it. She's not sure.
23     THE WITNESS: It's possible that --
24     MR. BLACKMAN: Wait a second, ma'am. There's not a

Page 37

1 question pending.
2     All I want to clarify to cut to the chase here
3 is that at some point prior to walking in this morning
4 with these documents, with these ownership documents,
5 she was aware either through you or being handed the
6 subpoena or through counsel, I don't care, that these
7 were the four categories because she obviously walked in
8 with documents responsive to one of them. Now, she may
9 have learned about it through getting the rider and
10 having it in her hand. You may have asked her this is
11 what they're asking for. Go look through it. That's
12 all I want to clarify, that she's producing documents
13 responsive as you said to one of the categories and that
14 whether she has them or not is a different issue. She
15 was aware of these other three categories before she
16 walked in today.
17     MR. ROSE: She was aware of all four categories
18 prior to us beginning this morning.
19     MR. BLACKMAN: Okay. That's all I want to know.
20     MR. ROSE: That's fine.
21 BY MR. BLACKMAN:
22    Q    Ma'am, I'd ask you to take a look at request
23 number 1 on the rider. Do you have it in front of you?
24    A    Yes.

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 38

1    Q    And it asks for any documents that support
2  what you've put forth in an affidavit that you've
3  submitted in this case. Do you remember reading that or
4  being told about that?
5    A    I read it.
6    Q    Okay. Now, did you bring with you
7  today -- Strike that.
8        Do you understand when it references an
9  affidavit what we are referring to?
10   A    Yes.
11   Q    You understand that in this case in support
12  of a pleading or a document filed by your husband, that
13  you have submitted to the Court and to us an affidavit?
14  You're aware of that, are you not?
15   A    Yes, I do.
16   MR. ROSE: Do you understand his question?
17   THE WITNESS: Yes.
18   MR. BLACKMAN: Now, I want to mark the affidavit as
19  Exhibit 2. I have copies if anybody needs them.
20   MR. SHMIKLER: Are you just going to show it to
21  her, or are you going to ask her questions about it?
22   MR. BLACKMAN: I'm going to ask her questions about
23  it.
24   MR. SHMIKLER: Then I need a copy.

Page 39

1  BY MR. BLACKMAN:
2    Q    We'll come back to this in a minute but the
3  affidavit --
4    MR. SHMIKLER: Wait. I think the reporter needs to
5  mark it.
6              (Sastri Deposition Exhibit
7              No. 2 was marked for
8              identification.)
9  BY MR. BLACKMAN:
10   Q    So when we're referring, ma'am, to your
11  affidavit, that's what we've marked as Exhibit 2 and
12  that's the documents that you signed on February 13,
13  2008?
14   A    Uh-huh.
15   Q    You have to answer --
16   A    Yes. I'm sorry.
17   Q    She can only take down a yes or a no.
18   A    Sorry.
19   Q    Going back to Exhibit 1, which is the rider
20  to the subpoena, have you brought in any documents that
21  support any of the statements made in your affidavit
22  other than the documents with respect to ownership that
23  your counsel gave this morning?
24   MR. ROSE: Objection to form. Did you understand

Page 40

1  the question?
2    THE WITNESS: No.
3  BY MR. BLACKMAN:
4    Q    Okay. Thank you for telling me that. I'll
5  rephrase it.
6        You understand that you have given us an
7  affidavit, right? That's in front of you?
8    A    Yes.
9    Q    You've made certain statements in that
10  affidavit that you're testifying under oath are true?
11   A    Yes.
12   Q    Okay. The rider to the subpoena, which is
13  right in front of you, request number 1 asks for any
14  documents or papers or records that support any of the
15  statements made by you in the affidavit. Do you
16  understand what that means?
17   A    Yes.
18   Q    Okay. And have you brought any?
19   A    It is my understanding that I am not here as
20  such for the subpoena because I don't have all these
21  documents. So I was not preparing all these documents.
22   MR. ROSE: Just answer his question.
23   THE WITNESS: I don't have --
24   MR. ROSE: Stop, stop. Just answer his question.

Page 41

1  He asked you did you bring in any documents. Just
2  answer his question. Did you bring in any documents
3  that relate to number 1 on the rider?
4    THE WITNESS: I didn't bring any documents.
5  BY MR. BLACKMAN:
6    Q    Okay. Now, did you before coming in this
7  morning undertake a search for any documents at your
8  house that would support any of the statements that
9  you've said in your affidavit?
10   A    No.
11   Q    Okay. Why not?
12   A    Because I wasn't sure if there's anything
13  that I can produce as documentation for any of these
14  things. I wasn't aware.
15   Q    You weren't aware of what?
16   A    What documentation that I'm requested to
17  produce.
18   Q    Well, you were aware that you -- you knew
19  what to produce with respect to number 2, right, because
20  you brought in documents with respect to the ownership
21  of the house?
22   A    That's because it said ownership of the
23  house. It's number 2.
24   Q    All right. Did you ever --

11 (Pages 38 to 41)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 42

1    MR. ROSE: I just want to assert an objection here
2  based upon the opportunity of the witness to confer with
3  counsel regarding a legal document served upon her and
4  what are the appropriate steps to take in response to
5  the subpoena, that the objection is that she has not had
6  a meaningful and adequate amount of time to consult with
7  an attorney regarding the details of what, in fact, is
8  required for her to produce. But under the
9  circumstances we have made as best efforts as are
10  possible under the circumstances to provide you with the
11  material that's readily available.
12    MR. BLACKMAN: To be clear because this will be a
13  matter that will be before the judge very shortly, she
14  is here so she does not have to testify at the
15  evidentiary hearing. When she got served with the
16  subpoena if someone wanted to say I need a couple more
17  days to retain counsel, I don't want to go ahead on
18  Tuesday because I need time to produce documents, I'm
19  not prepared to say this morning, any one of you could
20  have said that. But the deposition, you know, was
21  purportedly scheduled by Mr. Shmikler. And in our
22  conversation this morning, you know, we confirmed that
23  we had a valid subpoena. Now, there's nothing that
24  prevents anybody from us not going ahead because you

Page 43

1  need more time to consult with her or because the
2  witness needs more time to produce documents. So the
3  idea that there's going to be some further discovery or
4  investigation in response to our questions doesn't
5  really work in that situation where she's not coming in
6  to testify.
7    MR. ROSE: For the record, I did have a
8  conversation this morning with Mr. Blackman prior to his
9  deciding to come over here to participate in these
10  proceedings. And in those conversations I made it clear
11  that, in fact, I did not have -- I did not believe I had
12  any documentation and that if he wished to proceed under
13  those conditions that that was his choice. As it turns
14  out, my representation that I did not have any documents
15  was not entirely accurate as I later learned that there
16  were some materials that the witness was able to recover
17  after making a limited search based upon the amount of
18  time that she and I had had an opportunity to confer
19  about this and we did produce those here this morning.
20  So we have made it clear all along what the conditions
21  are about proceeding this morning, and you've decided to
22  proceed under those conditions.
23    MR. BLACKMAN: No, I have not agreed to proceed
24  under those conditions. The only reason that we were

Page 44

1  here is because we were told a deposition was going
2  ahead at 10:00 a.m. this morning by opposing counsel and
3  that we were welcome to proceed and this was the time
4  that he was going to be asking the witness questions
5  about what would be her testimony if she testified. So
6  that's why we're here. We're not forcing this. You are
7  her counsel, and you had every opportunity to say to
8  both of us we're not prepared to produce this witness to
9  either of you because I was just retained and she
10  doesn't have time to look for documents.
11    So, again, I appreciate your getting involved.
12  I appreciate what you're saying. I understand that you
13  are in a delicate position. But the fact of the matter
14  is that the only reason we're taking her deposition is
15  because the defendant's counsel asked for permission to
16  do that in lieu of presenting her at trial. Now, we
17  will obviously after the deposition do whatever we need
18  to do to clarify it, but let's just move on.
19    MR. ROSE: I just want to make it clear that I
20  obviously do not have the larger context here, nor do I
21  know exactly how these documents necessarily fit into
22  whatever theories of the case counsel has. The only
23  thing I can do is simply be upfront, which I have
24  definitely been in terms of saying, look, here's what

Page 45

1  we're prepared to do. We're prepared to present her if
2  you want to proceed and question her. And I was very
3  upfront about the documentation that I did or didn't
4  have. And then as soon as I learned there were
5  documents, I obviously made it clear so.
6    MR. SHMIKLER: Just very briefly, I don't know how
7  productive all this is but just to make it clear for a
8  couple things for the record. Number one is that if
9  we're talking about time lines, the only reason that
10  they subpoenaed her was to make sure that her testimony
11  was taken in preparation for the hearing. Well,
12  obviously that took place. But, in fact, there's this
13  additional issue where they want discovery of certain
14  documents, and it is discovery and that could have been
15  requested long ago. They should have sought leave to
16  get that long ago, and they didn't do that. Instead
17  they served Sunday night a subpoena for her to produce
18  documents on a Tuesday morning, and then they were told
19  prior to coming over here that those documents were not
20  forthcoming and they proceeded. All of this, of course,
21  on a subpoena that we assert was invalid. Under those
22  circumstances I think the notion that they can come back
23  and get more bites of this apple is quite unfounded.
24    MR. ROSE: Let's proceed because her time is

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 46

1  limited.
2      MR. BLACKMAN: We'll accept that as a continuing
3  objection all the way through. You don't need to say it
4  each time.
5  BY MR. BLACKMAN:
6      Q    Ma'am, all I want to know is with respect to
7  the rider in front of you, you brought in some documents
8  with respect to the ownership in number 2, correct?
9      A    Yes.
10      Q    Okay. Now, did you undertake a review or an
11  investigation to see whether you have any documents that
12  support anything that you're saying in your affidavit?
13      MR. SHMIKLER: Objection, asked and answered.
14      MR. ROSE: Join in the objection.
15      THE WITNESS: Can you be more clear about your
16  question as to what documents you're talking about so I
17  can answer better?
18  BY MR. BLACKMAN:
19      Q    Okay. Did you look for any documents other
20  than the documents that reflect ownership?
21      MR. SHMIKLER: Objection, asked and answered.
22      THE WITNESS: I looked for the refi, but there's
23  nothing there in the refinance of the home. It's all
24  nowadays done through the Internet, and I left a message

Page 47

1  with the banker to get me those documents. The file
2  that I had only had the application. Nowadays they
3  don't even send anything in paper.
4  BY MR. BLACKMAN:
5      Q    All right. Let me try to make this --
6      A    So I asked her to send to me.
7      Q    With respect to any allegations or any
8  documents that support your allegations, and this is
9  regardless of whether they're attached to the rider or
10  not, you've stated in paragraph 2 that your husband has
11  not lived at the home since 2006. Do you see where I'm
12  saying?
13      A    Yes.
14      Q    Do you have anything to prove that? Do you
15  have any documents that support that that you've brought
16  with you today?
17      A    I'm not sure how I can prove that.
18      Q    Well, do you have any bills that shows that
19  you were the only person on the utility bills?
20      A    I answered earlier that -- I mean I was just
21  saying earlier I didn't change the utility name at all
22  up until, you know, I was told that it wasn't changed.
23  I didn't pay attention to it. I didn't change any name
24  on any of the bills.

Page 48

1      Q    So the bills that come to the house for
2  utilities and that would be heat, electric, and cable,
3  Internet, are those still in both yours and your
4  husband's name?
5      MR. ROSE: Objection, compound question, object to
6  form.
7  BY MR. BLACKMAN:
8      Q    Go ahead.
9      A    Same are in my name even from before. Some
10  are in joint name. Some are in his name. Whatever name
11  that was originally set up remained the same.
12      Q    So the bills that were originally in both of
13  your names, yours and your husband's, those are still in
14  both of your names?
15      A    Yeah.
16      MR. ROSE: Object to form.
17      THE WITNESS: It's possible. Yeah, I didn't change
18  anything except like recently one of the utility bills I
19  put my name on.
20  BY MR. BLACKMAN:
21      Q    Up until recently was how long ago?
22      A    Just last month.
23      Q    Prior to that one bill that you're referring
24  to, is it to the best of your knowledge because you

Page 49

1  haven't brought in any documents, is it your
2  understanding that the bills that were in both your name
3  and your husband's name remain in both your name and
4  your husband's name?
5      MR. SHMIKLER: Objection, asked and answered.
6      THE WITNESS: Yes.
7  BY MR. BLACKMAN:
8      Q    Okay. And with respect to your statement
9  that he has not lived at the home since 2006, is there
10  anything that you can produce to us in terms of
11  documents that supports what you've said there?
12      MR. SHMIKLER: Objection, asked and answered.
13      THE WITNESS: In what way do you think?
14  BY MR. BLACKMAN:
15      Q    It's your statement, ma'am. I mean you've
16  signed an affidavit that says he moved out in the summer
17  of 2006. All I'm asking is whether or not you have any
18  documents that would establish that that's true.
19      MR. SHMIKLER: Same objection.
20      THE WITNESS: He moved out. That's all. I don't
21  have anything --
22  BY MR. BLACKMAN:
23      Q    Listen to my question. I understand that
24  you're saying that today. I understand that you're

13 (Pages 46 to 49)

Page 50

1  saying that in an affidavit. What I'm asking you is, do
2  you have any documentation, any documents, any papers
3  that support what you're saying there?
4      A   I'm not sure.
5      Q   Okay. Well, did you undertake an
6  investigation for any documents that support that
7  statement?
8      A   I did not have time for looking into that.
9  That is the reason why I did not come here for a
10 subpoena as such to your place.
11     Q   Are you aware of any documents as you sit
12 here today that prove that what you're saying here is
13 true?
14     A   I --
15     MR. ROSE: I object to form. Wait. When I object,
16 let me object. Object to form.
17     MR. BLACKMAN: Let me rephrase that because prove
18 is a bad word.
19 BY MR. BLACKMAN:
20     Q   Are you aware of any documents as you sit
21 here today that support the statement that you have made
22 in your affidavit that your husband moved out in the
23 summer of 2006?
24     MR. ROSE: Just answer his question as best as you

Page 51

1  can yes or no.
2      THE WITNESS: It might be possible, but I right now
3  don't have them. I don't know if they exist.
4  BY MR. BLACKMAN:
5      Q   Okay. I'd ask you to look at the next line
6  in paragraph 2 of your affidavit that says prior to the
7  summer of 2006 your husband did reside with you but
8  permanently moved out as part of your separation. Do
9  you have any documents that support your statement that
10 he permanently moved out?
11     A   Much of what happened was all verbal between
12 me and my husband. So documentation is something that
13 I'm not sure they exist. They were communications that
14 we had. Whether it was written communication or verbal,
15 I don't know. He moved out. The thing is like
16 physically he took his stuff, his belongings and
17 everything. And his car is not there. So those are the
18 things are physical.
19     MR. ROSE: Can we go off the record, and maybe this
20 will move things.
21         (A short break was taken.)
22     MR. BLACKMAN: I don't remember if there was a
23 question pending, but I'll try again.
24     MR. ROSE: Go ahead.

Page 52

1  BY MR. BLACKMAN:
2      Q   Are you aware of any documents that exist
3  that support the statement in your affidavit that your
4  husband permanently moved out of the Ridgewood residence
5  in 2006?
6      A   I am not aware.
7      Q   Okay. Now, with respect to paragraph 3 of
8  your affidavit, you state, quote, it is my understanding
9  that when he moved out, Dr. Vish, can I call him that?
10 Is that okay?
11     A   Uh-huh, yes.
12     Q   Is that what you call him? Dr. Vish
13 established his own separate abode. Now, what do you
14 mean by that when you say it's my understanding?
15     A   Exactly what it means. It's my
16 understanding.
17     Q   How did you come to that understanding?
18     A   Like I mentioned earlier, that we learned
19 that he has an apartment in LaGrange.
20     Q   When did you learn that?
21     A   Some time in 2006 school year and when my
22 daughters could go there and she could park and go,
23 whatnot.
24     Q   And do you know for how long your husband had

Page 53

1  that apartment?
2      A   I had no connection with any of those things,
3  so I wouldn't know.
4      Q   Well, you say no connection. You're his
5  wife, are you not?
6      A   Yeah.
7      Q   The divorce is not final?
8      A   Yeah, but he doesn't tell me everything.
9      Q   Please, just listen to my questions.
10     A   Sorry.
11     Q   There's a parenting agreement in place that
12 allows each parent to see the children?
13     A   Yes.
14     Q   So when your husband moved out in the summer
15 of 2006, it's your testimony that he moved into an
16 apartment in LaGrange, that you learned that then?
17     A   What time period did you say, 2006?
18     Q   Summer of 2006.
19     A   Summer, yeah.
20     Q   And for how long did he live there?
21     A   See, I don't know when he moved out from
22 there. That's the reason why I don't know how long he
23 lived there.
24     Q   So do you know if he was living in that

14  (Pages 50 to 53)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 54

1   apartment in November of 2007?
2       A   I don't know that.
3       Q   Do you know if he was living in December of
4   2007?
5       A   I don't know when he moved out.
6       Q   And you've never been to the apartment?
7       A   I don't remember.  I know where it is.
8       Q   Did you ever go in?
9       A   I may have gone in one time.
10      Q   Do you remember when that was?
11      A   No.
12      Q   How old are your children?
13      A   They are now 18 and 15.
14      Q   When would have been the earliest that you
15  remember him living in LaGrange?
16      A   Probably in 2006 around late spring,
17  summertime, something like that.
18      Q   Okay.  Now, who prepared this affidavit for
19  you to sign, Exhibit 2?
20      A   I don't know that.
21      Q   It wasn't you, was it?
22      A   I did not.
23      Q   And was it Mr. Shmikler?
24      A   It's possible.  I don't know.  Mr. Shmikler

Page 55

1   was arranging these things, and he asked me.  Exactly
2   who did, I don't know.  And I was talking with
3   Mr. Shmikler.
4       Q   Okay.  And when was it that you first spoke
5   with Mr. Shmikler about this case?
6       A   I don't recall exactly when.
7       Q   Generally?
8       A   Not too long ago.  Within the last year,
9   February or something.
10      Q   Did he call you, or did you call him?
11      A   I don't remember.
12      Q   And did you meet with him in person before --
13      A   This is the first time I met him.
14      Q   So that would be a no, right?
15      A   Yes.
16      Q   Okay.  Did you spend time on the phone
17  talking about your affidavit?
18      A   Yes.
19      Q   And what did Mr. Shmikler tell you when you
20  spoke to him on the phone about your affidavit?
21      A   No.  He asked me questions, and I told him
22  what happened.  So he was drafting it on the other line
23  as to what the affidavit was.
24      Q   Okay.  Did you take any notes when you were

Page 56

1   talking to him?
2       A   No, I don't think so.
3       Q   Did Mr. Shmikler ask you for any documents
4   that might support what was being said in the affidavit?
5       A   No.
6       Q   Did he ask you who was on the utility bills?
7       A   No.
8       Q   Did he ask you who owned the property?
9       A   No.
10      Q   Now going back to the rider, with respect to
11  number 3, there's a request related to the refinance of
12  the home in May of 2007.  Do you see that?
13      A   Yes.
14      Q   Okay.  Did you bring in any documents
15  responsive to that?
16      A   No.
17      Q   And do you recall that in May of 2007 the
18  home was refinanced?
19      A   I don't remember the exact date whether it
20  was May or whenever.  We did do the refinancing, yes.
21      Q   Okay.  And you said we did the refinancing.
22  Who are you speaking about?
23      A   Refinancing was done because the house is in
24  both our names, it was by both of us, myself and

Page 57

1   Visvabharathy.
2       Q   And that was a refinance with Private Bank?
3       A   No.
4       Q   MB Financial?
5       A   MB.
6       Q   Right.  And did you have to fill out an
7   application?
8       A   Yes.
9       Q   And did you list on your application that you
10  were married?
11      A   I don't know.  I'd have to look through.  I
12  am married.
13      Q   Do you have a copy of the application?
14      A   I should have a copy of that application.
15      Q   Is there a reason why you didn't bring it in
16  this morning?
17      A   Because it said refinance of the home and
18  then I was looking for the actual refinancing documents.
19  I only had the application.  I recall that I never
20  received anything.  It was all only on the E files.  And
21  so they never sent me anything.
22      Q   But you filled out an application for a loan?
23      A   Just on my own.
24      Q   Well, the refinance was in both your names,

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 58

1  was it not?
2      A    They gave -- the refinancing was -- the
3  application was just my own. I have to find out exactly
4  what it is. But he needed to be signing off under or
5  something that he needed a signature because his name
6  was on the application. But the bank gave the
7  refinancing based on whatever my credentials were.
8      Q    And those documents can be produced after
9  today's deposition?
10     A    Of course. Whatever I have I will be happy
11 to provide.
12     Q    Now, number 4 says any and all mail received
13 by your husband at the home. Do you understand what
14 that means?
15     A    No. I had a question.
16     Q    When you had these questions, did you ask
17 your lawyer?
18     A    There is really no time.
19     MR. ROSE: Objection as to attorney-client
20 privilege.
21     MR. BLACKMAN: That privilege doesn't cover a
22 question asked by her of you. The privilege covers the
23 response by you to her.
24     MR. ROSE: It's attorney-client privilege.

Page 59

1      MR. BLACKMAN: Are you instructing her not to
2  answer on that basis, or do you want to hear what she
3  wants to say first?
4      MR. ROSE: Can I have the question read back,
5  please.
6          (Whereupon, the record was read
7           as requested.)
8      MR. ROSE: It's attorney-client privilege. I
9  instruct you not to answer. Just wait. There's no
10 question.
11 BY MR. BLACKMAN:
12     Q    Ma'am, are you not answering the question
13 based upon the advice of your counsel?
14     A    Of course.
15     Q    Okay. Now, your husband's mail has never
16 been forwarded to any other address. Isn't that true?
17     MR. SHMIKLER: Objection to foundation.
18     THE WITNESS: He doesn't live there so there is no
19 need to be -- he did not forward mail from our home.
20     MR. BLACKMAN: Right.
21     THE WITNESS: Whenever any mail that he has his own
22 address and so he would need to forward his mail from
23 his address. This is not the address he lives, so he
24 didn't have to forward anything.

Page 60

1  BY MR. BLACKMAN:
2      Q    Are you aware of anything filed by your
3  husband with the post office so that any mail that would
4  come to your home on Ridgewood would be forwarded to his
5  new address?
6      MR. SHMIKLER: Objection to foundation.
7      MR. BLACKMAN: That's why I asked are you aware.
8      THE WITNESS: I don't know what exactly he would
9  have done. I can't answer that question. But what in
10 practicality that would work very well for us was most
11 of the mail during this time period anything that is of
12 importance that he really should have was given to his
13 office which was very close to our home that was 101
14 Burr Ridge but now they moved to Pearson 333 so.
15     MR. ROSE: Just answer his question. His question
16 was, are you aware of anything that he would have done
17 to forward mail? Are you aware that he had a forwarding
18 notice? Did you get something from the post office
19 saying that mail is being forwarded? Are aware of it?
20 That's his question. Just answer his question yes or
21 no.
22     THE WITNESS: Say that again whether something was
23 being forwarded from our home to --
24     MR. ROSE: Are you aware that he was forwarding

Page 61

1  mail, yes or no?
2      THE WITNESS: Yes, he was.
3  BY MR. BLACKMAN:
4      Q    And how would he do that?
5      MR. ROSE: Objection to foundation.
6      MR. BLACKMAN: She just answered she was aware. So
7  she's already said in answer to your question, Counsel,
8  that she was aware. So we don't have to worry about
9  foundation.
10     MR. SHMIKLER: We still have to worry about
11 foundation. I join in the objection.
12 BY MR. BLACKMAN:
13     Q    What do you mean when you say that you were
14 aware he was forwarding mail?
15     A    Because the number of mail that was coming to
16 our home significantly lessened. We were not getting
17 much mail at all.
18     Q    Did you get any mail of his?
19     A    Occasionally some mail would come. Nowadays
20 mostly junk.
21     Q    Well, in the fall of 2000 and before -- I'm
22 sorry. The fall of 2007 and before were you getting
23 mail that would then be picked up from someone from his
24 office?

16 (Pages 58 to 61)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 62

1    A    Yes.
2    Q    Okay. Do you know why the mail was still
3  coming to your house at all?
4    A    Sometimes it's just those people who are
5  sending didn't have his forwarding address.
6    Q    And then what would you do with the mail when
7  it would come in addressed to him?
8    A    They will be saved and if they have any of
9  their office people --
10   Q    Who's they?
11   A    Occasionally the mail for me that goes to
12 them would be given to me by somebody from the office
13 would bring it. So then I would just give his mail to
14 that office person.
15   Q    Okay. So when you say the office person, are
16 you talking about someone that works in your husband's
17 business office?
18   A    Yes.
19   Q    Okay. Do you know which office that was?
20   A    He has only one office.
21   Q    And where is that at?
22   A    They now recently moved to Pearson, 333
23 Pearson.
24   Q    Which company is that?

Page 63

1    A    Hawthorne Development Corporation.
2    Q    So somebody from Hawthorne Development
3  Corporation would come to the home and pick up any mail
4  that was sent there that was addressed to your husband?
5    A    Sometimes that would happen occasionally.
6    Q    Okay.
7    A    Some I would put it in the mail and send it
8  to their office.
9    Q    So you would put it in the mail and send it
10 to their office because that's where he could pick it
11 up?
12   A    Hopefully. That's the only address I knew so
13 that's why I would send.
14   Q    Ma'am, you said you knew he was living in
15 LaGrange as early as 2006. Why didn't you send the mail
16 there?
17   A    I'm talking about recently. I'm not talking
18 about that.
19   Q    So were you originally sending mail to
20 LaGrange?
21   A    No.
22   Q    Okay. Why not?
23   A    Because Vish would be coming to pick up our
24 children so I will give it to him directly.

Page 64

1    Q    For some period of time he would come and
2  pick up his mail at the house?
3    A    He would come to pick up the children so I
4  will give the mail to him, whichever way you want to put
5  it.
6    Q    Okay. And for how long did he come to pick
7  up his mail at the house?
8    MR. SHMIKLER: Objection, mischaracterizes prior
9  testimony.
10   THE WITNESS: He didn't come to pick up the mail.
11 He came to see the children.
12 BY MR. BLACKMAN:
13   Q    Okay. For how long did it occur that when he
14 was there picking up the children he would also pick up
15 his mail? How long did that happen for?
16   A    2007, the end of 2007.
17   Q    And was it after that that whatever mail was
18 sent to your house addressed to him would be picked up
19 by the people from his office?
20   A    Lately, no. If I happened -- most of the
21 time they are pretty much, you know, I will just wait
22 until occasionally, yeah, maybe office or I would just
23 forward it, forward it by mail.
24   Q    Okay. Do you have any recollection of ever

Page 65

1  taking his mail on a regular basis and mailing it to
2  someplace other than your house between the summer of
3  2006 and today?
4    A    Can you please repeat the question.
5    MR. BLACKMAN: Can you read it back, please.
6        (Whereupon, the record was read
7         as requested.)
8    THE WITNESS: No.
9  BY MR. BLACKMAN:
10   Q    Now, you said that your husband would when he
11 would come and see the children pick up whatever mail
12 was there I think you said through the end of 2007?
13   A    Not through the end of 2007.
14   Q    November?
15   A    I can't say exactly when the last time it
16 was, maybe October or maybe before. I don't know
17 exactly when he came to see the children last.
18   Q    Okay. Now, when you were served with the
19 summons and the complaint, the papers, and that
20 was . . .
21   A    November or December.
22   Q    What did you do with them?
23   A    It stayed there.
24   Q    Okay. Did you call your husband and tell him

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 66

1    that you had been served with these papers?
2        A    I didn't, I didn't have any contact with him
3    at that time.
4        MR. ROSE: Objection to the form of the question.
5    BY MR. BLACKMAN:
6        Q    Okay. So is it your testimony that you
7    haven't had any contact with your husband at all since
8    November of 2007?
9        A    Please repeat the question.
10       Q    Is it your testimony that you haven't had any
11   contact at all with your husband since December or
12   November of 2007?
13       A    It is not my testimony that I did not have
14   any contact with my husband since November 2007.
15       Q    So after you were served with the papers in
16   this case, did you tell him that you had been served
17   with the summons and the complaint?
18       A    Please repeat the question.
19       Q    After you were served with the papers, the
20   summons and the complaint in late November or early
21   December 2007, did you ever tell your husband that you
22   had been served with these papers?
23       MR. ROSE: Objection to form. You can go ahead and
24   answer.

Page 67

1        THE WITNESS: I may have.
2    BY MR. BLACKMAN:
3        Q    And when might you have done that?
4        A    Pardon me?
5        Q    When might you have done that?
6        A    Maybe in December 2007.
7        Q    Okay. And was this on a phone conversation?
8        A    Yes.
9        Q    And do you recall what he said to you and
10   what you said to him?
11       MR. ROSE: Objection. I'm sorry. Can you read the
12   question back.
13           (Whereupon, the record was read
14            as requested.)
15       THE WITNESS: I think --
16       MR. ROSE: Hang on. I'm going to object based upon
17   privilege between husband and wife.
18       MR. BLACKMAN: There's no privilege between husband
19   and wife in a civil action when she is representing that
20   she's estranged and she doesn't live there on a motion
21   to quash. You know, this is not a criminal matter. Do
22   you really want to make that objection? Because she
23   will be back here tomorrow or whenever the judge asks us
24   to. They've put her affidavit in to support their

Page 68

1    position that he does not live there and that the
2    service was improper. So do you really want to have her
3    not answer these questions?
4        MR. SHMIKLER: That question is not on the issue of
5    whether he lives there or not or doesn't live there.
6        MR. BLACKMAN: Okay. Well, you can make relevance
7    objections, which is fine and the judge may end up
8    throwing out half of this stuff. But do you want to
9    claim a privilege and instruct her not to answer these
10   questions with respect to conversations about the
11   service of these papers? I mean I'm not playing hard
12   ball. I'm just honestly trying to avoid having her come
13   back downtown. And if you want a minute to think about
14   it, that's fine.
15       MR. ROSE: Let me confer with my client.
16           (A short break was taken.)
17       MR. ROSE: All right. So I've had an opportunity
18   to confer with my client. We do continue to believe
19   that there is a husband-wife privilege, that it applies
20   in the context of this case. Despite the application of
21   the privilege after conferring, I'm going to permit my
22   client to -- she's agreed to waive the privilege. She's
23   agreed to waive the privilege and to testify only in the
24   very limited respect as to issues pertaining to the

Page 69

1    service of a subpoena as it relates to the complaint.
2        MR. SHMIKLER: Service of process.
3        MR. ROSE: Service of process matters as it relates
4    to the complaint that you guys have filed.
5        MR. BLACKMAN: Okay. Well, I'm not agreeing to the
6    limitation but we'll go as far as we can.
7    BY MR. BLACKMAN:
8        Q    After you were served with the summons and
9    the complaint --
10       MR. ROSE: Object to form. Just so we're not
11   playing games, what I wasn't sure about and I think I
12   have some clarification but since I'm new to this case,
13   you'll correct me if my understanding of what's going on
14   here is not correct. You were saying before that you
15   were serving her with the summons and complaint, and I
16   was objecting to form because it's my understanding that
17   she was not served with the summons and complaint. So
18   just maybe if we can be clear about the nomenclature.
19       MR. BLACKMAN: The issue is not whether or not she
20   received the papers, which would technically be a
21   different dispute. The issue is whether or not
22   she -- whether or not this is a proper service to serve
23   her on a case where her husband is a defendant. So I'm
24   using the term service so that she understands that I'm

18 (Pages 66 to 69)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 70

1 talking about when she was given the papers. If it
2 makes you feel better, I can say when you were given the
3 papers instead of serving the papers.
4     MR. ROSE: You don't need to make me feel better.
5 I just want the record to be clear.
6     MR. BLACKMAN: I understand.
7 BY MR. BLACKMAN:
8     Q    When you received the summons and complaint,
9 it was your testimony before you broke to speak with
10 your counsel that you did have a conversation with your
11 husband about what you were given?
12     MR. ROSE: I think there was a question pending I
13 think.
14     MR. BLACKMAN: The question pending was what did
15 you say to him and what did he say to you, and I'm happy
16 to start with that.
17     MR. ROSE: Did you recall a conversation but go
18 ahead. Objection to form.
19     THE WITNESS: Papers were dropped off. That was
20 just information. That's it.
21     MR. ROSE: Do you recall having a conversation with
22 your husband pertaining to the documents, the papers
23 that were dropped off at the home?
24     THE WITNESS: It was just an information. There

Page 71

1 were papers dropped off.
2 BY MR. BLACKMAN:
3     Q    And did you call him, or was it on a call
4 where he had called you?
5     A    I don't remember.
6     Q    And did you tell him what the papers were?
7     A    That these were papers dropped off for him.
8     Q    Did you tell him what they were? Did you
9 tell him what they were called, or did you just call
10 them papers?
11     A    I don't know, whatever the papers are called.
12 Because I don't have them in front of me, so I don't
13 want to tell you something else. But these are some
14 court papers that were dropped off for him.
15     Q    You told him that they were court papers?
16     A    I don't know. See, I can't tell you
17 something that I would have called them but anyway some
18 kind of legal documents.
19     Q    And then did he ask you what kind of legal
20 documents they were?
21     A    You know, I don't know, whatever. The sense
22 of it was that there is some kind of lawsuit by the bank
23 and he's being served these papers.
24     Q    Right. I understand.

Page 72

1     A    That's all.
2     Q    And then did he tell you what to do with
3 them?
4     A    He didn't tell me what to do with them.
5     Q    Did you ask him what should I do with these?
6     A    Yes.
7     Q    What did he say?
8     A    He asked me to just inform Mr. Collins, so I
9 just sent it to him.
10     Q    Mr. Collins is Michael Collins?
11     A    Michael.
12     Q    Who is one of his lawyers?
13     A    Yeah.
14     Q    And Michael Collins is a lawyer in Chicago?
15     A    Uh-huh, yes.
16     Q    You have to answer out loud. So that when
17 you were advised to send the papers to Michael Collins,
18 did you do that?
19     A    Yes.
20     Q    How did you know where to send it to?
21     A    Why not?
22     Q    How did you know -- do you know who Michael
23 Collins is?
24     A    Yes.

Page 73

1     Q    How do you know him?
2     A    He and me -- they are our estate lawyers.
3 They did our estate planning and other things. I've
4 known him for a long time.
5     Q    So Mr. Collins has both represented both you
6 and your husband personally?
7     A    Harold Collins is his father, so he was the
8 estate lawyer. And through him we knew Mike Collins.
9     Q    Okay. However you got to know him, Michael
10 Collins is your -- has been your personal lawyer?
11     A    No.
12     Q    Okay. Somebody else at Michael Collins's
13 firm is your personal lawyer?
14     MR. SHMIKLER: Object to relevance.
15     THE WITNESS: The estate lawyer. I don't know what
16 you call personal lawyer. They did my estate planning I
17 said.
18 BY MR. BLACKMAN:
19     Q    So somebody else at Mr. Collins' office has
20 represented you and your husband on your estate
21 planning?
22     MR. ROSE: Objection to form.
23     MR. SHMIKLER: I object to relevance.
24

19 (Pages 70 to 73)

Page 74

1  BY MR. BLACKMAN:
2      Q    Go ahead.
3      A    Yes.
4      Q    Okay.  And so when you sent the papers to
5  Mr. Collins, did you do that by mail or did you do that
6  by messenger?
7      MR. ROSE:  Object to the form.
8      THE WITNESS:  I don't exactly remember which one I
9  did.
10 BY MR. BLACKMAN:
11     Q    Is it possible that you might have driven the
12 papers and dropped them off personally?
13     A    No.  That I know I didn't.
14     Q    All right.  That you know.  Is it possible
15 that someone from Mr. Collins' office came to your house
16 and picked up the papers?
17     A    No.  I'm not sure how I -- I remember talking
18 to Mike about it.  So after that I don't remember.
19     Q    Okay.  And Mr. Collins, he is the lawyer for
20 your husband's businesses?
21     A    Yes.
22     MR. ROSE:  Objection to form.  There's two
23 Mr. Collins I heard.
24

Page 75

1  BY MR. BLACKMAN:
2      Q    Michael Collins is the lawyer for your
3  husband's businesses?
4      A    Mike actually has done our partnership.  Mike
5  Collins and I as a family, he's our partnership lawyer
6  also.
7      Q    You're talking about your family trusts and
8  your family partnerships?
9      A    Yes.
10     Q    And when you dropped off the documents -- or
11 strike that.
12          However they got to Mr. Collins, you might
13 have mailed them, you might have messengered them, did
14 you put a note with that?
15     A    No.
16     Q    You just put it in an envelope, and there was
17 nothing else in there?
18     A    That's correct.
19     Q    And then did you have a conversation with
20 Mr. Collins about what you were sending him?
21     A    You know, this whole thing I don't exactly
22 recall what happened; but I remember talking with him
23 about these papers.
24     Q    And what was it that you said to him, and

Page 76

1  what did he say to you?
2      MR. ROSE:  Objection to attorney-client privilege.
3      MR. BLACKMAN:  I think it's her privilege to claim,
4  not yours but I don't think it's clear that that
5  conversation with respect to the papers constitutes,
6  Counsel, that we can't get into when she's put an
7  affidavit in.  So that's not to say you can't assert it
8  and tell her not to answer, but I think we can get into
9  it.  I think it's very relevant.
10     MR. ROSE:  Can I have the question read back,
11 please.
12               (Whereupon, the record was read
13               as requested.)
14     MR. ROSE:  You can go ahead and answer it.
15 BY MR. BLACKMAN:
16     Q    Go ahead.
17     MR. ROSE:  Do you remember the question that he
18 last asked you?
19     THE WITNESS:  Could you please repeat the question.
20     MR. ROSE:  What did you say to him?
21 BY MR. BLACKMAN:
22     Q    I'll say it again.  What did you say to
23 Mr. Collins, and what did he say to you?
24     A    Oh, I said to Mr. Collins that there was some

Page 77

1  court papers that were dropped off and I would like to
2  forward them to him.  I don't exactly recall how the
3  conversation went, but he said that -- I was asking him
4  should I just fax it to him but then it was pretty
5  voluminous.  So I don't know if I sent everything or
6  just some things were like really jargon there so I may
7  have sent just a couple of pages that were relevant.  I
8  don't know exactly how I sent, mail or fax or something
9  that I did.
10     Q    Do you recall anything else that you said to
11 him or he said to you?
12     A    No.
13     Q    Did you tell Mr. Collins, Michael Collins,
14 that your husband had asked that these be sent to him?
15     A    I might have said that.  I don't know.
16     Q    Now, going back to Exhibit 1, which is the
17 rider and finish that off, it requests on number 4 any
18 and all mail received by your husband at the home.  Have
19 you brought in any mail that's addressed to him that is
20 at your home?
21     A    No.
22     Q    Is there any mail there now?
23     A    Yes.
24     Q    Okay.  Why didn't you bring it in?

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 78

1      A    I was not coming here prepared for the
2  subpoena. That is why I did not bring this in because
3  that was a question about the validity of the subpoena,
4  whatnot that was going on. And I did not have enough
5  time for all the documents.
6      Q    Well, you brought in some documents with
7  respect to number 2, right?
8      A    Yes.
9      MR. SHMIKLER: Objection, asked and answered many
10  times.
11  BY MR. BLACKMAN:
12      Q    And did your lawyer tell you not to bring in
13  any more documents?
14      MR. ROSE: Objection, objection as to
15  attorney-client privilege. You're instructed not to
16  answer.
17      MR. SHMIKLER: I'd also like to interpose in
18  addition to our many objections to the subpoena, I think
19  that there's some issues with regard to the mail whether
20  or not those should be turned over to the other side by
21  this procedure if it's mail that's Dr. Vish's mail.
22  That's an issue for another day.
23      THE WITNESS: That is the question that I had that
24  I raised here earlier. How can I give his mail to you?

Page 79

1  This mail is addressed to him. There are checks and
2  other things and I would just send it to -- sometimes
3  it's just the investment checks and I don't want to give
4  the check to you. That's the reason why -- I didn't
5  even think of it anyway, but that was a relevant
6  question I had in my mind.
7  BY MR. BLACKMAN:
8      Q    Well, did you when you had that question in
9  your mind, did you -- and I don't want to know the
10  content of what you said, but did you talk to anybody
11  about that?
12      A    No.
13      Q    Now, you mentioned checks and things like
14  that. These are things that are I assume not junk mail.
15  There are things of a personal nature?
16      A    Yes.
17      Q    And do you know why those are still coming to
18  your house?
19      MR. SHMIKLER: Objection to foundation.
20      THE WITNESS: No, I don't know why. I usually
21  write send the correct forwarding address.
22  BY MR. BLACKMAN:
23      Q    And you write that to who?
24      A    To his secretary who usually will take care

Page 80

1  of it. That's how most of the mail --
2      Q    You don't know whether that was ever done, do
3  you?
4      A    Yeah. They have been done. That's the
5  reason I'm not getting all the mail.
6      Q    How do you know that?
7      A    Because I will write to her, Jenny, forward
8  these mails and she will take care of it.
9      Q    Listen to my question. How do you know that
10  your husband took steps to forward his mail from the
11  home to some other address?
12      MR. SHMIKLER: Objection, asked and answered.
13      THE WITNESS: I know how he does this because he'll
14  say he will tell me like ask my secretary to have these
15  forwarded. If I say why you should have these forwarded
16  and say you will just send to my secretary, which is
17  what I did.
18  BY MR. BLACKMAN:
19      Q    But when your husband is saying, and maybe
20  you're not understanding my question, when he's saying
21  to tell my secretary to forward these on to him, what
22  I'm asking is a little different. What I'm asking is,
23  do you know whether your husband ever filed anything
24  with the post office telling the post office that he was

Page 81

1  no longer living at your home and that his mail should
2  be going to someplace else? Do you know whether he ever
3  did that?
4      MR. SHMIKLER: Objection, asked and answered.
5      THE WITNESS: I wouldn't know that. I know usually
6  it is the secretary who will take care of these sort of
7  things for him. And when mail comes here, I will give
8  it back to her.
9  BY MR. BLACKMAN:
10      Q    Ma'am, all I want to know is do you know
11  whether he did that or not?
12      MR. SHMIKLER: Objection, asked and answered.
13      THE WITNESS: No, sir.
14  BY MR. BLACKMAN:
15      Q    You said that he moved out and he took all
16  his stuff in the summer of 2006. That was your earlier
17  testimony?
18      A    Most of the things.
19      MR. ROSE: Objection to the extent it
20  mischaracterizes her prior testimony, but go ahead.
21  BY MR. BLACKMAN:
22      Q    Well, did I just mischaracterize your
23  testimony?
24      A    What did you say?

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 82

1    Q   I said it was your testimony that in the
2  summer of 2006 your husband moved out and took all of
3  his stuff. Am I saying something wrong, or is that
4  accurate?
5    A   He did take many things.
6    Q   Okay. Did he leave some things?
7    A   Some of his personal things are still there.
8    Q   Like what? Give me an example.
9    A   Some clothes he never wears and stuff like
10 that.
11   Q   Anything else that you recall?
12   A   That's all.
13   Q   So the only thing that you know of as you sit
14 here today that's in the house that belongs to your
15 husband is his clothes. There's nothing else there that
16 belongs to him?
17   MR. SHMIKLER: Objection, asked and answered.
18   THE WITNESS: I can't say that. There are many
19 things that are his.
20 BY MR. BLACKMAN:
21   Q   Can you give me some other examples of things
22 that are his in addition to his clothes?
23   A   Lots of books and things like that, magazines
24 and all kinds of things. Anything that's important that

Page 83

1  he has already taken whatever that he would use.
2    Q   Can you give me some more examples in
3  addition to some books and magazines and some clothing?
4    A   We have not really divided which is his,
5  which is ours. So pretty much everything that's in the
6  house I think many things we bought together and
7  everything is there the way they are. He only took
8  whatever his immediate necessities and he left. So I
9  can't say it's mine or it's his. It's both. The
10 furniture and that, I mean furniture and all that kind
11 of silly things, anything that he may later claim as
12 his. He usually doesn't do those things.
13   Q   So would it be fair to say that the majority
14 of the items in the home belong to both of you?
15   MR. ROSE: Objection.
16   THE WITNESS: I --
17   MR. ROSE: Hang on. Hang on. Hang on. Objection
18 to the . . .
19   MR. BLACKMAN: I'll withdraw it. I'll withdraw it.
20 BY MR. BLACKMAN:
21   Q   Some of the items in there are his personal
22 items?
23   MR. SHMIKLER: Objection, asked and answered.
24

Page 84

1  BY MR. BLACKMAN:
2    Q   Correct?
3    A   His personal items he has already taken. I
4  already mentioned whatever that's left were it could be
5  his personal but he never uses any of those. These are
6  all old magazines and books and stuff like that and
7  extra clothing that he's not really using.
8    Q   Is there a reason you haven't thrown out the
9  clothing if he moved out almost two years ago?
10   A   We're just getting on with whatever we have
11 to do. That's one less thing. I may do it one of these
12 days.
13   Q   Is it your testimony that the other items in
14 the house belong to the both of you?
15   MR. ROSE: Objection to the extent that it calls
16 for a legal conclusion.
17 BY MR. BLACKMAN:
18   Q   Go ahead. The stuff in the house belongs to
19 both of you?
20   A   Yes. The stuff in the house belongs to both
21 of us everything he can say. But it's mostly children's
22 furniture, my furniture and his furniture. Those things
23 are just material. It doesn't matter to me.
24   Q   I'm not asking whether it matters to you.

Page 85

1  I'm asking --
2    A   It belongs to both.
3    Q   Okay. Now, is there a reason why -- Strike
4  that.
5        The divorce is still ongoing; is that correct?
6    A   Yes.
7    Q   Do you know why the divorce has not been
8  ended or resolved or finalized?
9    MR. SHMIKLER: Object to the extent it calls for a
10 legal conclusion.
11   THE WITNESS: I don't know.
12   MR. SHMIKLER: Also object to foundation.
13 BY MR. BLACKMAN:
14   Q   You don't know? Do you know what's left to
15 do in your divorce proceeding?
16   MR. SHMIKLER: Same objections.
17   THE WITNESS: Whoever knows. This is too long a
18 process. I hate it.
19 BY MR. BLACKMAN:
20   Q   I understand that. My question is not about
21 that. My question is, do you know what is left to do to
22 finalize your divorce?
23   MR. SHMIKLER: Same objections.
24   THE WITNESS: We both have to agree.

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 86

BY MR. BLACKMAN:

1   BY MR. BLACKMAN:
2   Q    What is it that you have to agree on?
3   A    We have to agree to divorce each other.
4   Q    But are you not in agreement to do that? Are
5   you challenging the divorce?
6   MR. SHMIKLER: I object. This is far beyond the
7   bounds of relevance in this case.
8   MR. BLACKMAN: I disagree. I think it's extremely
9   relevant. I think it's very relevant to the issue of
10  whether or not that is his home and his relationship
11  with somebody who is still his wife. You can make those
12  objections, you know, when we submit our papers. But I
13  think it's very relevant.
14  MR. SHMIKLER: I can make those objections right
15  now, and I'm making them.
16  MR. BLACKMAN: All right. They're noted.
17  THE WITNESS: Say that again, please.
18  BY MR. BLACKMAN:
19  Q    The divorce that's been filed, did you file
20  that or did he file that?
21  A    I filed it.
22  Q    So you want the divorce?
23  A    Yes.
24  Q    Does he want the divorce?

Page 87

1   MR. ROSE: Hang on one second.
2   MR. SHMIKLER: In addition to whatever objections
3   counsel has, I'm going to have an objection to relevance
4   and foundation.
5   THE WITNESS: He --
6   MR. ROSE: Wait, wait. It's a husband-wife
7   communication. It's privileged. It does not as I can
8   see -- I'm going to instruct the witness not to answer.
9   MR. BLACKMAN: Just to be clear, I'm not asking
10  about a communication from him to her. I don't agree
11  that there's a privilege there anyways. But what I'm
12  asking is whether or not she believes he wants a divorce
13  which could be very relevant to whether or not he
14  considers this his home and wants to hang on to it as
15  his home. And that's why maybe he's keeping all his
16  stuff there, and maybe that's why he hasn't made a
17  permanent move. These things are all very relevant.
18  Now, I don't think there's an objection -- you can
19  laugh, Counsel, all you want.
20  MR. SHMIKLER: I can laugh at the notion that you
21  say that he keeps all the stuff there, which is contrary
22  to the testimony, that he hasn't permanently moved out,
23  which is contrary to the testimony. These things are
24  laughable.

Page 88

1   MR. ROSE: Do you believe --
2   MR. BLACKMAN: Hang on, Counsel. I would ask for a
3   little bit of professionalism. Okay. Don't laugh in
4   public. If you have an objection, you can make it.
5   This is not a silly proceeding.
6   MR. SHMIKLER: I don't think the proceeding is
7   silly, but I think that when you throw around
8   misrepresentations like that, that's problematic.
9   MR. BLACKMAN: She is represented by counsel. He
10  is I'm sure very capable and able to make an objection
11  if he thinks it's irrelevant. I would just appreciate
12  you not laughing during a deposition.
13  MR. SHMIKLER: I'm sorry. It was a gut reaction to
14  a blatant misrepresentation, and I can't promise it
15  won't happen again. I'll try.
16  BY MR. BLACKMAN:
17  Q    Go ahead, ma'am.
18  MR. ROSE: Do you believe -- the question is, do
19  you believe that your husband wants to divorce. Is that
20  accurate?
21  MR. BLACKMAN: Uh-huh.
22  MR. SHMIKLER: And our objections are to relevance
23  and to foundation.
24  THE WITNESS: That's not the question he asked. I

Page 89

1   would like you to ask first and then I will answer the
2   question and then I will answer your question, if I may.
3   MR. SHMIKLER: It's only his questions that you're
4   answering.
5   BY MR. BLACKMAN:
6   Q    Let me try to simplify it. Do you believe
7   that your husband -- Strike that.
8   Do you know whether your husband has agreed to
9   the divorce?
10  MR. SHMIKLER: Objection to the extent it calls for
11  a legal conclusion.
12  THE WITNESS: Obviously --
13  MR. ROSE: Hang on. Before you're asking about her
14  belief, which that's fine. Do you know whether he has
15  agreed, the only way that she could know whether there's
16  an agreement is based upon a communication whether oral
17  or written in which case it would bring it within the
18  context of a communication. If you want to ask about
19  her beliefs, you are free to ask her about her beliefs.
20  If you're going to ask about communications where we're
21  at right now, I'm going to direct her not to answer the
22  question.
23  MR. BLACKMAN: What's your basis for that?
24  MR. ROSE: Husband and wife privilege. It applies

23 (Pages 86 to 89)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 90

1  in both civil -- in civil proceedings even where the
2  parties have separated but there's no divorce that's
3  final, the privilege still attaches. It's statutory.
4      MR. BLACKMAN: Is it your position then that any
5  conversation between them with respect to any matter is
6  privileged? What are the boundaries for that privilege?
7      MR. ROSE: Right. I believe that, you know, first
8  of all, whether I'm able to articulate --
9      MR. BLACKMAN: You made the objection so I'm just
10 asking. You're saying it's clearly privileged. I'm
11 asking you what is it about this request that is
12 privileged and what are the boundaries of that.
13     MR. ROSE: According to 735 ILCS 54/8-801, neither
14 may testify to any communication or admission made by
15 either of them to the other or as to any conversation
16 between them during marriage. That is I believe a
17 parcel recitation of the statutory provision.
18     MR. BLACKMAN: So it's your position that that's
19 with respect to any matter?
20     MR. ROSE: As you have seen, I mean there's
21 flexibility and we did permit you to inquire as to
22 certain things that would otherwise be privileged and
23 we'll take it up on a case-by-case basis. If you want
24 to ask about her beliefs --

Page 91

1  BY MR. BLACKMAN:
2      Q    Okay. Let me first ask whether your husband
3  has agreed to a divorce that you initiated.
4      A    He's cooperating.
5      MR. SHMIKLER: That's the same question that he had
6  asked just before that you objected to.
7      THE WITNESS: He's cooperating with the divorce
8  proceedings. And divorce proceedings as you know take
9  forever in this country, and it is extremely slow and
10 impossible on many occasions. And this is one of those
11 when there are so many complicated business
12 relationships that are ongoing. But personally we are
13 separated and he has his own house and we are trying to
14 parent as best as possible. And there we go.
15 BY MR. BLACKMAN:
16     Q    When you say he has his own house?
17     A    He had his own house. I'm sorry. He had.
18     Q    The one in LaGrange?
19     A    Yeah.
20     Q    But you don't know how long he lived there
21 for?
22     A    He lived --
23     MR. SHMIKLER: Objection, asked and answered.
24

Page 92

1  BY MR. BLACKMAN:
2      Q    Your testimony earlier was that you did not
3  know for how long.
4      MR. SHMIKLER: Objection, asked and answered.
5      THE WITNESS: I told you that I did not know
6  exactly when he moved out, but I know how long he was
7  there through 2006 and 2007.
8  BY MR. BLACKMAN:
9      Q    Okay. We can go back. That wasn't your
10 testimony earlier. When I asked you whether or not you
11 knew whether he was living there in November and
12 December of 2007, you stated that you did not know.
13     A    That's correct.
14     Q    Okay. So where is he living now?
15     A    But in October, September my children went
16 and visited with him there. So I know when he lived
17 there. Exactly when he moved out is when I don't know.
18 And in November and December pertaining to my statement,
19 he did not live in my house. That's what was my
20 testimony. I didn't talk about when he was living.
21     Q    All right. So at some point he moved from
22 LaGrange. Is that your testimony?
23     A    Yes.
24     Q    Where did he move to?

Page 93

1      A    I don't know.
2      Q    Do you know where he's living now?
3      A    No.
4      Q    Do you know what country he's living in?
5      A    He's probably in India.
6      Q    Now, is it your testimony then that -- Strike
7  that.
8           Have you had any contact with him since
9  November or December of 2007?
10     MR. ROSE: Objection, compound. You can answer.
11     THE WITNESS: Yes.
12 BY MR. BLACKMAN:
13     Q    Okay. Was that on the phone?
14     A    Yeah.
15     Q    Was it -- how many times have you spoken with
16 him since November of 2007?
17     A    I don't know. Infrequently.
18     Q    Once a week?
19     A    No.
20     Q    Less than that?
21     A    Yes.
22     Q    When you've spoken with him, where was he
23 calling from?
24     A    Don't know.

24  (Pages 90 to 93)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 94

1    Q    Now, did you ever ask him where he was
2  living?
3    A    No. I might have, but I don't know where he
4  is. He never told me where he is.
5    Q    I understand that he never told you. But is
6  it your testimony that you never asked him where he
7  lives since he moved out in whenever the fall of 2007
8  whenever he moved out from where he was at? Is that
9  your testimony, ma'am?
10   A    I probably asked him where he lived, but I
11 don't know where he lives. He didn't tell me.
12   Q    Okay. And is it your belief or understanding
13 that he has moved to India permanently?
14   A    No.
15   MR. SHMIKLER: By the way, I object to foundation
16 to the last question.
17 BY MR. BLACKMAN:
18   Q    So you don't know whether he has moved
19 permanently or not?
20   A    I don't think he's moved permanently.
21   Q    And that's because --
22   MR. SHMIKLER: Same objection.
23   THE WITNESS: Pardon me?
24

Page 95

1  BY MR. BLACKMAN:
2    Q    And why don't you think he has moved
3  permanently to India?
4    A    He has many unfinished business here so he's
5  coming back.
6    Q    What kind of unfinished business?
7    A    So many things he has ongoing. He has his
8  business, and he has so many things here.
9    Q    Can you give me some examples, please?
10   A    For example, his children are here.
11   Q    So the parenting agreement that specifically
12 sets forth when your husband would be able to spend time
13 with the children, and it's very detailed and I read it,
14 that is still in effect to the best of your knowledge?
15   MR. SHMIKLER: Objection to the extent it calls for
16 a legal conclusion.
17   THE WITNESS: Of course it's in effect.
18 BY MR. BLACKMAN:
19   Q    Okay. And the businesses that you are
20 referring to, can you tell me what those pertain to?
21   MR. SHMIKLER: Objection to foundation.
22   THE WITNESS: He has an ongoing project here at
23 Pearson.
24

Page 96

1  BY MR. BLACKMAN:
2    Q    That's at 222 East Pearson?
3    A    Yes.
4    Q    What's your husband's involvement with that
5  project?
6    A    I have no clue.
7    Q    Well, what do you know about that? Why would
8  you think that's one of his businesses?
9    MR. SHMIKLER: Object to relevance.
10   THE WITNESS: It is.
11 BY MR. BLACKMAN:
12   Q    Is he the developer?
13   A    Yes.
14   Q    You have to speak up, ma'am.
15   A    Yes.
16   MR. SHMIKLER: I object to foundation and
17 relevance.
18 BY MR. BLACKMAN:
19   Q    And do you know -- Strike that.
20       If India is not his permanent residence, do
21 you know where he's residing in the United States?
22   MR. SHMIKLER: Objection to foundation.
23   THE WITNESS: I don't know.
24

Page 97

1  BY MR. BLACKMAN:
2    Q    Do you know where he -- Strike that.
3       Do you know whether your husband has been back
4  to the United States since November of 2007?
5    MR. SHMIKLER: Objection to foundation and to
6  relevance.
7    THE WITNESS: Could have. I don't know.
8  BY MR. BLACKMAN:
9    Q    Could have?
10   A    Yeah.
11   Q    What makes you think that he could have?
12   A    He goes back and forth. He has businesses.
13   MR. SHMIKLER: Same objections to that last
14 question by the way.
15   MR. BLACKMAN: You want to make a continuing?
16   MR. SHMIKLER: Well, I don't know. Some of the
17 questions are foundation problems, and some there
18 aren't.
19   MR. BLACKMAN: I'm not hearing any objection from
20 her counsel, so I don't know whether he's joining in or
21 not.
22 BY MR. BLACKMAN:
23   Q    How do you know he was going back and forth?
24 You said he was going back and forth. How do you know

25 (Pages 94 to 97)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 98

1  that?
2  A   He would come back.  He says he's coming
3  back.  So I'm thinking that he will be coming back.
4  Q   So he's told you that he's coming back?
5  A   Yes.
6  Q   When did he tell you that?
7  A   Some conversation that he will come back.  I
8  think that's my understanding.
9  Q   And have you seen your husband in person
10  since November of 2007?
11  MR. SHMIKLER: Objection to relevance.
12  THE WITNESS: I think yeah.  He was here once.  My
13  mother had passed away.  So he met me to offer
14  condolences.
15  BY MR. BLACKMAN:
16  Q   I'm sorry to hear that.  When was that?
17  A   She passed away in January.
18  Q   And was there a funeral?
19  A   Yes.
20  Q   Did he come to the funeral?
21  A   He was not here.  He didn't come to the
22  funeral, so he came afterwards.
23  Q   So after the funeral you saw him?
24  A   Yes.

Page 99

1  Q   You have to answer out loud.
2  A   Yes.
3  MR. SHMIKLER: Object to relevance to this line.
4  BY MR. BLACKMAN:
5  Q   And do you know when he came in for the
6  funeral where he stayed?
7  MR. ROSE: Objection to form and to the extent it
8  misstates her prior testimony.
9  THE WITNESS: No.
10  BY MR. BLACKMAN:
11  Q   It doesn't matter whether it's in for a
12  funeral or in after a funeral.  But when you saw him in
13  January when he came in after your mother died, do you
14  know where he stayed?
15  MR. SHMIKLER: Objection to relevance.
16  THE WITNESS: No.
17  BY MR. BLACKMAN:
18  Q   Do you know how long he was in for?
19  A   Not long.  I don't know.  I just saw him
20  briefly.  He just came and offered condolences, and he
21  left.  It was barely a few minutes.
22  Q   And when he came, did he come to the house?
23  A   Yes, he did.
24  Q   Did he see the children?

Page 100

1  A   One of the children was there, so he saw her.
2  Q   Did he pick up his mail?
3  A   That was not the situation we were talking
4  about mail.
5  Q   I understand that wasn't why he was there,
6  but did he pick up his mail when he came in?
7  A   No.
8  Q   Do you know whether he conducted any business
9  when he was in?
10  A   I have no clue.
11  MR. SHMIKLER: Objection, foundation.
12  BY MR. BLACKMAN:
13  Q   Is that the only time that you've seen him
14  since November of 2007?
15  A   Yes.
16  Q   And do you know whether he maintains a
17  residence or other place to live or sleep in the United
18  States right now?
19  A   No.
20  Q   And have you discussed with your husband how
21  it is he can continue to see the children under the
22  parenting agreement if he's living in India?
23  MR. ROSE: Can I have that back, please.
24  (Whereupon, the record was read

Page 101

1  as requested.)
2  MR. ROSE: Objection to privilege.  I direct the
3  witness not to answer.
4  BY MR. BLACKMAN:
5  Q   When you bought the house in 2004, who paid
6  for it?
7  A   We both.
8  MR. SHMIKLER: Object to relevance.
9  BY MR. BLACKMAN:
10  Q   And how much do you recall was the cost?
11  MR. SHMIKLER: Object to relevance.
12  THE WITNESS: Exact amount I don't know.
13  BY MR. BLACKMAN:
14  Q   Approximately?
15  A   It was like 650 or something around that.
16  Maybe we had a down payment on top of it.  I don't
17  exactly know total amount of the purchase price.
18  Q   And did your husband pay for a portion of
19  that?
20  MR. SHMIKLER: Object to relevance.
21  THE WITNESS: Yes.
22  BY MR. BLACKMAN:
23  Q   Do you know what percentage?
24  MR. SHMIKLER: Same objection.

26 (Pages 98 to 101)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 102

1    THE WITNESS: I don't know the percentage.
2    BY MR. BLACKMAN:
3    Q    Did he pay for most of it, or did you pay for
4    most of it?
5    MR. SHMIKLER: Same objection.
6    MR. BLACKMAN: I think you have a continuing
7    objection while I go through this whole line.
8    MR. SHMIKLER: Yeah. Objection to the purchase of
9    the house, ownership of the house is not relevant to
10   whether or not he lived there at the time that he was
11   purportedly served there.
12   BY MR. BLACKMAN:
13   Q    Do you recall whether you paid for most of
14   the house or he paid for most of the house?
15   A    We pretty much were almost equal or whatever.
16   I don't exactly remember, but substantial amounts we
17   both shared.
18   Q    And I think you've testified that you both
19   own the house currently?
20   A    Yes.
21   Q    And has your husband paid for any of the
22   utilities since he moved out in the summer of 2006?
23   A    No. He had to -- I'm sorry. He did have to
24   pay some amount per court order the amounts. So he paid

Page 103

1    through 2006, shared in the expenses in 2006. And I
2    don't know exactly how much he paid in 2007. I have to
3    look through.
4    Q    Do you know whether -- Strike that.
5        Does your husband get any phone calls at the
6    house?
7    MR. SHMIKLER: Objection to relevance.
8    THE WITNESS: Rarely.
9    BY MR. BLACKMAN:
10   Q    Now, how many rooms are there?
11   MR. SHMIKLER: Object to relevance.
12   THE WITNESS: We have four bedrooms and then the
13   other living room, kitchen, dining, family room and
14   study and basement.
15   BY MR. BLACKMAN:
16   Q    Are each of the bedrooms being used?
17   MR. SHMIKLER: Object to relevance.
18   THE WITNESS: Yes.
19   BY MR. BLACKMAN:
20   Q    And that's for you and your two children or
21   three children?
22   A    We have three children but one is like a
23   guest room.
24   Q    Okay. Have you ever advised anyone in your

Page 104

1    divorce proceeding that your husband moved to India?
2    A    I'm not exactly sure what you're asking.
3    Q    Have you ever advised anybody in connection
4    with your divorce proceeding that your husband moved to
5    India?
6    A    Do you mean if I advised my divorce lawyers?
7    Q    Anybody connected, either the lawyers or the
8    judge.
9    A    He didn't move to India, no, because he
10   didn't move to India.
11   Q    So if he didn't move to India, do you know
12   where he's living now?
13   A    I think he's staying in India conducting
14   whatever business that he has.
15   Q    Now, when you refinanced the house in May of
16   2007.
17   A    Yes.
18   Q    That was something that you were required to
19   do by court order because his lawyer said come into
20   court asking for permission to refinance. Is that
21   accurate? Do you remember that?
22   A    There was no court order to refinance.
23   Q    You don't recall any proceedings within your
24   divorce where your husband's lawyers came in and asked

Page 105

1    you to cooperate in the refinance of any properties?
2    A    That is not for refinancing of the house. It
3    is refinancing for Pearson project.
4    Q    So he wanted to refinance that, and he needed
5    your permission to do that?
6    A    My cooperation.
7    MR. SHMIKLER: Objection to relevance.
8    BY MR. BLACKMAN:
9    Q    And his lawyers came into court and asked
10   that you be required to cooperate?
11   A    Yes.
12   MR. SHMIKLER: Same objection.
13   BY MR. BLACKMAN:
14   Q    And with respect to the home refinance, do
15   you know whether any moneys were taken out of the
16   refinance?
17   A    Yes.
18   MR. SHMIKLER: Objection to relevance.
19   BY MR. BLACKMAN:
20   Q    And where did those go?
21   MR. SHMIKLER: Same objection.
22   THE WITNESS: I had to refinance my -- there was
23   some Private Bank loans that were coming to mature, so I
24   needed extra moneys to pay down or pay off that loan.

27 (Pages 102 to 105)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 106

1  BY MR. BLACKMAN:
2      Q    This was a loan that both you and your
3  husband were on at Private Bank?
4      A    Yes.
5      MR. SHMIKLER: Same objection.
6  BY MR. BLACKMAN:
7      Q    And was that loan paid off then?
8      A    Yes.
9      MR. SHMIKLER: Same objection.
10     MR. BLACKMAN: Do you have a continuing objection?
11  It's easier just to say that.
12     MR. SHMIKLER: You switched subject matters and I
13  want to make sure it's clear when I've got it.
14  BY MR. BLACKMAN:
15     Q    And this was a loan that both you and your
16  husband were personally responsible for?
17     MR. SHMIKLER: Objection to relevance.
18     THE WITNESS: Yes.
19  BY MR. BLACKMAN:
20     Q    Do you remember how much was used from the
21  house to pay down the loan?
22     MR. SHMIKLER: I object to relevance.
23     THE WITNESS: Uh-huh, yes.
24

Page 107

1  BY MR. BLACKMAN:
2      Q    How much?
3      MR. SHMIKLER: Same.
4      THE WITNESS: I think exact amount I can't say, but
5  probably I think it's 288,000.
6  BY MR. BLACKMAN:
7      Q    And that went to Private Bank?
8      MR. SHMIKLER: Same objection.
9      THE WITNESS: Approximately, yes.
10  BY MR. BLACKMAN:
11     Q    Now, going back to your affidavit, which is
12  Exhibit 2, paragraph 3 says again it is my understanding
13  that when he moved out, Dr. Vish established his own
14  separate abode.
15     A    Yes.
16     Q    That's your understanding as you sit here
17  today, or was that your understanding when you signed
18  this in February of '08?
19     MR. SHMIKLER: I object, asked and answered.
20     THE WITNESS: Obviously it was executed on February
21  13, 2008.
22  BY MR. BLACKMAN:
23     Q    But is that your understanding as you sit
24  here today that your husband has, in fact, established

Page 108

1  his own residence somewhere or his own abode which is
2  what this says?
3      MR. SHMIKLER: Object to form. That actually does
4  mischaracterize what it says.
5  BY MR. BLACKMAN:
6      Q    Fine. I'll go with counsel's objection.
7  I'll quote it. Quote, it is my understanding that when
8  he moved out, Dr. Vish established his own separate
9  abode, unquote.
10     A    Yes.
11     Q    And is it your testimony that that was when
12  he moved out of your house in 2006? Is that what that
13  paragraph pertains to?
14     A    It really pertains to Dr. Visvabharathy
15  having a place to stay. Whether it is 2006 or 7 or 8 he
16  obviously stays somewhere. He's not living with me, so
17  he's living somewhere else. I knew 2006 to 2007 he had
18  an address that I knew that my children were going to,
19  but now he's staying somewhere that I don't know. I
20  know he's in India. But when he comes here, he has
21  another abode, you know. I mean that's what it means.
22  He's in his own house.
23     Q    But you don't know whether he was in that
24  house in November and December of 2007?

Page 109

1      MR. SHMIKLER: Objection, asked and answered.
2      MR. ROSE: Object to form.
3  BY MR. BLACKMAN:
4      Q    Go ahead.
5      A    No.
6      Q    And have you reviewed any affidavits signed
7  by Dr. Vish?
8      A    No.
9      Q    Now, one of the things that Dr. Vish states
10  is, quote, I have been traveling abroad for the past
11  several months beginning in about October 2007.
12     A    Lately, yes.
13     Q    To the best of your knowledge, if you know,
14  is that a true and accurate statement?
15     A    Yes.
16     MR. SHMIKLER: Objection to foundation.
17  BY MR. BLACKMAN:
18     Q    So it's your understanding that beginning in
19  2007, October 2007 your husband was traveling abroad for
20  many months?
21     MR. SHMIKLER: Objection to foundation, asked and
22  answered.
23  BY MR. BLACKMAN:
24     Q    It's your understanding?

28 (Pages 106 to 109)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 110

1    MR. SHMIKLER: Again, you're asking her the same
2  question twice in a row. It's asked and answered, and
3  there's still no foundation.
4  BY MR. BLACKMAN:
5    Q   Go ahead. You can answer.
6    A   Yes.
7    Q   Now, do you know where he was?
8    A   No.
9    Q   Do you know whether when he began traveling
10 abroad in October of 2007 whether he had a home
11 anywhere?
12   MR. SHMIKLER: Object to foundation.
13   THE WITNESS: No.
14 BY MR. BLACKMAN:
15   Q   Now, on your --
16   A   If you don't mind, I have to answer some
17 pages because I'll be getting in big trouble if I don't
18 answer.
19   Q   We can take a break. I have one more
20 question. Then we can take a break if you want.
21       On paragraph 6 of your affidavit, do you have
22 it in front of you? Do you see where I'm referring,
23 ma'am?
24   A   Yes.

Page 111

1    Q   It says, quote, I have not given Dr. Vish any
2  of the papers left by the process server. Now, is it
3  still your testimony that you have not given him any
4  papers?
5    A   Yes.
6    Q   But you have given them to your lawyer?
7    MR. ROSE: Objection to the extent it
8  mischaracterizes prior testimony.
9    MR. SHMIKLER: I join in the objection.
10 BY MR. BLACKMAN:
11   Q   Am I wrong? Did you not give the papers to
12 Mr. Collins?
13   A   I may have sent a portion of some of the
14 front pages or something because I remember talking with
15 him about faxing some of it. And then I said, okay, now
16 there's like so many pages. I won't be able to send you
17 all of that. So I don't know exactly what I sent to him
18 what I can tell you.
19   Q   But you sent some portion of the papers that
20 you're referring to in paragraph 6 to your husband's
21 lawyer?
22   A   Michael Collins, yes.
23   MR. BLACKMAN: Okay. How long do you want to break
24 for, 15 minutes?

Page 112

1    THE WITNESS: No. A couple of minutes. I just
2  want to answer these phones, and I'll be right back
3  because I have to go. I have to make rounds. I have
4  patients scheduled.
5    MR. BLACKMAN: Ma'am, you signed an affidavit. I'm
6  sorry if it's inconvenient for you.
7    MR. ROSE: Gary, what's your best estimate as to
8  how much more?
9    MR. BLACKMAN: I think it'll be no more than an
10 hour.
11   THE WITNESS: See the thing is I'm so sorry. It's
12 not a subpoena that I am prepared for this. I had
13 really --
14   MR. BLACKMAN: You can talk to your lawyer about
15 that. It's between you and your lawyer.
16       (A short break was taken.)
17   MR. ROSE: She's indicated that she has a patient
18 who is currently in the ICU and she's been paged
19 regarding that. So if we can try to keep it within the
20 hour time frame so she can attend to her professional
21 duties, that would be appreciated.
22   MR. BLACKMAN: I will do my best. Just mark the
23 documents you produced before the deposition as Exhibit
24 3. Did you have copies of that for the court reporter?

Page 113

1    MR. ROSE: I have three copies. We can use this
2  copy. The witness copy will be the exhibit.
3       (Sastri Deposition Exhibit
4        No. 3 was marked for
5        identification.)
6    MR. ROSE: Go ahead.
7  BY MR. BLACKMAN:
8    Q   We've marked as Exhibit 3 the documents you
9  brought in. I'm not really going to spend any time on
10 these other than just to confirm that this is documents
11 that reflect that both you and your husband are
12 currently the owners of the property where you're
13 currently residing?
14   MR. ROSE: Objection to the extent that it, number
15 one, mischaracterizes the documents and, number two, it
16 requires a legal interpretation of them. The best
17 evidence of the documents is the documents themselves.
18 BY MR. BLACKMAN:
19   Q   Okay. You can answer.
20   THE WITNESS: Can you repeat the question, please.
21   MR. BLACKMAN: Can you read it back, please.
22       (Whereupon, the record was read
23        as requested.)
24   THE WITNESS: Yes.

29 (Pages 110 to 113)

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 114

BY MR. BLACKMAN:
2    Q    And if you can look to the second to the last
3    page.
4        MR. ROSE:  Schedule A of the Alta owner's policy?
5        MR. BLACKMAN:  Correct.
6    BY MR. BLACKMAN:
7        Q    It says Ganesan Visvabharathy and Suriya
8    Visvabharathy Sastri, husband and wife, not as joint
9    tenants or as tenants in common but as tenants by the
10   entirety.  Do you see where I'm referring?
11       A    Okay.
12       Q    And is it your understanding that that is an
13   accurate statement?
14       A    Yes.
15       MR. SHMIKLER:  I object to the extent it calls for
16   a legal conclusion.
17   BY MR. BLACKMAN:
18       Q    Did you say yes, ma'am?
19       A    That's what it says.
20       MR. ROSE:  Same objection.
21   BY MR. BLACKMAN:
22       Q    You are husband and wife?
23       MR. SHMIKLER:  Objection, asked and answered.
24       THE WITNESS:  Yeah, but we are separated.

Page 115

1        MR. BLACKMAN:  I understand.
2        (Sastri Deposition Exhibit
3            No. 4 was marked for
4            identification.)
5    BY MR. BLACKMAN:
6        Q    I'll show you, ma'am, what we'll mark as
7    Exhibit 4.
8        MR. ROSE:  One second to review it.
9        MR. BLACKMAN:  Sure.
10       MR. SHMIKLER:  I'd just say in addition to and
11   without waiving any of our other objections to this
12   portion of the proceeding, we additionally object in
13   that the plaintiff was supposed to provide any documents
14   that they were going to use for here in testimony
15   promptly and certainly in advance of that testimony and
16   they did not do so and this is the first time that we've
17   received this document from them.
18       MR. BLACKMAN:  For the record, this is her own
19   divorce file and these are documents that you have
20   referenced in her affidavit when she states that there
21   are divorce proceedings ongoing.  We also received I
22   think your documents yesterday, and then we received
23   some new documents from the witness this morning.
24       MR. SHMIKLER:  The latter is between you and the

Page 116

1    witness, and the pro former you received documents
2    yesterday as soon as we got them for a testimony that is
3    to be taken several days in advance.  So we were careful
4    to do that.  We believe that that was in accordance with
5    what the Court wanted the parties to do as opposed to
6    what's been done here.
7        MR. BLACKMAN:  I disagree.
8    BY MR. BLACKMAN:
9        Q    Are you ready, ma'am?
10       MR. ROSE:  No.  Give us a second, please.
11       We're ready.
12   BY MR. BLACKMAN:
13       Q    Okay.  I will represent that this is an
14   agreed order that was entered in your divorce proceeding
15   that we obtained from the court file.  And I'd ask you
16   to look to paragraph 1, and I'm going to read the first
17   part of paragraph 1.  Quote, this order is entered
18   without prejudice to either party's right to an
19   evidentiary hearing on the issues addressed herein and
20   with the parties' acknowledgment that they are both
21   residing in the marital residence located at 7529
22   Ridgewood Lane, Burr Ridge, Illinois, with their minor
23   children Sowmya, S-o-w-m-y-a, and Vidya, V-i-d-y-a.  Do
24   you see where I'm referring?

Page 117

1        A    Yes.
2        Q    Was that an accurate statement at the time?
3        A    At that time, yes.
4        Q    So June 29 of '06 you and your husband were
5    still residing at the Ridgewood Lane home; is that
6    correct?
7        MR. SHMIKLER:  Objection, asked and answered.
8        THE WITNESS:  It's possible, yes.
9    BY MR. BLACKMAN:
10       Q    Well, I'm not asking if it's possible.  It
11   says here in a court order that you are.  And is it your
12   testimony that that was accurate at the time?
13       MR. ROSE:  Objection to foundation.
14       MR. SHMIKLER:  Objection, asked and answered.
15       THE WITNESS:  Yes.
16   BY MR. BLACKMAN:
17       Q    Okay.  Now, it goes on to say that based on
18   the above, which is the portion I just read, commencing
19   on June 1 Vish would pay the following and then there's
20   a list, real estate taxes, homeowner's insurance, gas,
21   electricity, telephone bills that's in subparagraph A.
22   And then there's other issues pertaining to the children
23   in B and C and D.  Do you see where I'm referring?
24       A    Yeah.

30 (Pages 114 to 117)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 118

1    Q    Now, did your husband pay those expenses
2  pursuant to this order after June 29, 2006?
3    A    As I mentioned earlier, he paid through 2006.
4  But he was paying everything to the bank afterwards. It
5  was really very hard times. So I paid everything. I
6  have -- whenever he could pay, he paid. When he
7  couldn't pay, it doesn't matter. I took care of
8  everything. So to the end of 2006 sporadically he
9  supported. But in 2007 maybe once in a while but after
10  that no.
11    Q    So is it your testimony that he stopped
12  paying because he didn't have the money to pay?
13    A    I wouldn't say that. The thing is in reality
14  in 2007 I know that there were some financial hardships
15  and things like that. So if he didn't pay, I didn't
16  bother.
17    Q    Okay.
18    A    I took care of the expenses.
19    Q    My question is, with respect to this order,
20  is it your understanding that after June 29, 2006, based
21  on this order your husband was required to make the
22  payments that are set forth in the order? Is that your
23  understanding?
24    A    Yes.

Page 119

1    Q    Now, did either you or him ever go back to
2  the divorce court and change this order to tell the
3  Court that he should not have to pay these?
4    MR. ROSE: Objection to foundation.
5    THE WITNESS: No, we did not. We didn't change
6  this, but there were subsequent court orders.
7  BY MR. BLACKMAN:
8    Q    There were many court orders.
9    A    Yes.
10    Q    Right. But with respect to this order which
11  states that the parties --
12    MR. SHMIKLER: I think you should let her finish
13  her answer. I think she was still going.
14    MR. BLACKMAN: Is that an objection?
15    MR. SHMIKLER: Yeah. It's an objection that you
16  cut off the witness and not let her be able to finish.
17    MR. BLACKMAN: You're lucky. You have two
18  attorneys today.
19  BY MR. BLACKMAN:
20    Q    Were you finished, ma'am?
21    A    No. I'm just actually looking through here.
22  Because it is a divorce proceeding that were evolving
23  through our individual personal and financial
24  situations, that what was entered was only applied as we

Page 120

1  evolved in our separation process. So whatever was
2  pertinent we enforced. Whatever was not we didn't. I
3  suppose I have to look through the subsequent orders to
4  see whether these have subsequently been already
5  addressed because I remember sometimes we already have
6  entered how much he needed to pay for the children and
7  other things, and we already entered subsequently like
8  he needed to pay lump sums of money. So because that
9  was done, this didn't become relevant.
10    Q    Well, that's not my question. All right.
11  I'll ask it again. Are you aware of any order that
12  specifically revises this order wherein the Court is
13  told that the parties are no longer living in the same
14  house?
15    A    We did not inform the Court specifically that
16  we are not living together anymore, but he did move out.
17    Q    I understand that from your prior testimony.
18        Now, I'm going to show you what we'll mark as
19  Exhibit 5.
20        (Sastri Deposition Exhibit
21        No. 5 was marked for
22        identification.)
23    MR. BLACKMAN: Can we go off the record for one
24  second.

Page 121

1        (Discussion off the record.)
2    MR. SHMIKLER: I can't remember. Did I tell you we
3  have the same objections to the document as to Exhibit
4  4.
5    MR. ROSE: Okay. You may proceed.
6    MR. BLACKMAN: Thank you, sir. Thank you, good
7  sir.
8  BY MR. BLACKMAN:
9    Q    Ma'am, this was an order I'll represent that
10  was entered in your divorce proceeding and I think we've
11  got some agreement that this was entered in November of
12  2006. And it requires your husband in number 1 to pay
13  you $12,000 a month without prejudice for the months of
14  November and December 2006. Do you see where I'm
15  referring?
16    MR. ROSE: By way of objection, I don't know
17  there's any agreement. I would say we've made our best
18  efforts to try to ascertain the date of the document and
19  that it is what it is but I don't know that we've agreed
20  or that we could agree that it's such a date.
21    MR. BLACKMAN: You probably could, but that's okay.
22  BY MR. BLACKMAN:
23    Q    The order that you're looking at required in
24  paragraph 1 your husband to pay you $12,000 in November

31 (Pages 118 to 121)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 122

1 and December 2006 for his contribution to household
2 expenses. Do you see where I'm referring?
3    A    Yes.
4    Q    Okay. And did he, in fact, pay his
5 contribution to household expenses?
6    A    Yes.
7    Q    And the household expenses would include
8 things like household bills, utilities?
9    A    Sure.
10    Q    Real estate taxes?
11    A    Yeah. The real estate taxes for 2007 were
12 paid by me individually, and he did not pay --
13    Q    Ma'am, there is no question pending. Your
14 lawyer can ask you whatever he wants.
15    A    Since you mentioned real estate taxes, I
16 clarified.
17    Q    Ma'am, there's no --
18    A    I'm continuing on the answer. I'm sorry.
19    MR. BLACKMAN: I just want to show you what we'll
20 mark as Exhibit 6.
21            (Sastri Deposition Exhibit
22            No. 6 was marked for
23            identification.)
24    MR. SHMIKLER: We have the same objection to

Page 123

1 Exhibit 6 as to the previous two exhibits.
2    MR. BLACKMAN: Just tell me when you're ready.
3    MR. ROSE: Are you ready?
4    THE WITNESS: Yeah.
5 BY MR. BLACKMAN:
6    Q    Now, this is an agreed order dated March 7,
7 2007, that precludes Dr. Vish from pledging or otherwise
8 disposing of various assets. Is that your
9 understanding?
10    A    Yes.
11    Q    Okay. And then this order was entered
12 because you had gone into the bankruptcy court and asked
13 for that?
14    A    Bankruptcy?
15    Q    Not bankruptcy court. The divorce court and
16 asked for that?
17    MR. SHMIKLER: I object to relevance.
18    THE WITNESS: It seems like that.
19 BY MR. BLACKMAN:
20    Q    It says that this is coming to be heard on
21 your emergency petition for temporary restraining order.
22 Were you concerned that your husband was going to be
23 transferring assets away from you?
24    MR. SHMIKLER: Objection to relevance.

Page 124

1    MR. ROSE: Objection to foundation.
2    THE WITNESS: Repeat the question, please.
3 BY MR. BLACKMAN:
4    Q    Were you concerned that your husband was
5 going to be transferring assets away from you?
6    MR. SHMIKLER: Same objection.
7    THE WITNESS: I don't know. It's one of those
8 things that the divorce proceedings take a course of
9 their own and I suppose I was advised to do it and so I
10 have done this to protect the assets.
11 BY MR. BLACKMAN:
12    Q    Do you know why it was required or
13 needed -- Strike that.
14    Do you know why your lawyers sought to get an
15 order protecting the assets?
16    A    Because they are joint assets.
17    Q    And was there a concern, if you know, as to
18 whether your husband would be transferring or somehow
19 disposing of assets that belonged in part to you?
20    MR. SHMIKLER: Continuing objection to relevance.
21    MR. ROSE: Yeah, object to foundation.
22    THE WITNESS: I did not say he shouldn't -- written
23 agreement of the parties. So it is basically asking
24 that I will be involved in this decision. I'm not

Page 125

1 precluding him from anything. I'm saying that together
2 we will make a decision since they are joint properties,
3 so that's what was done.
4 BY MR. BLACKMAN:
5    Q    Well, the first paragraph of the agreed order
6 states that this matter was coming to be heard on your
7 emergency petition for a restraining order and that out
8 of that came this agreement. And maybe you don't know
9 the answer to this because it's a question that's better
10 suited for your lawyers. But my question is whether or
11 not you know why it was necessary for you to go into
12 court on an emergency petition for a temporary
13 restraining order with respect to these assets.
14    MR. SHMIKLER: Objection, asked and answered.
15    MR. ROSE: Just answer his question. Do you know
16 why?
17    THE WITNESS: It's a question better suited for my
18 lawyers.
19 BY MR. BLACKMAN:
20    Q    Okay. Let me show you Exhibit 7. Let me go
21 back to Exhibit 6, I'm sorry, for a moment. These four
22 properties that are listed here, the 8999 South County
23 Line Road, the Ridgewood Lane, the property held in the
24 VCM Trust, do you know what that stands for, VCM?

32 (Pages 122 to 125)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 126

1    A    Visvabharathy, V-i-s-v-a-b-h-a-r-a-t-h-y,
2  Children's Minors' Trust.
3    Q    And then the property held in the Suriya
4  Sastri Trust?
5    A    Yes.
6    Q    Those assets are all owned jointly with you
7  and your husband?
8    MR. SHMIKLER:  Object to relevance.
9    THE WITNESS:  No.
10 BY MR. BLACKMAN:
11   Q    No.  Okay.  Because I thought you had
12 testified a few minutes ago that these were assets that
13 belonged to both of you which is why they're in this
14 order.  Am I wrong about that?
15   A    No.  In the divorce proceedings everything is
16 a marital estate.  So that is in that context that we
17 wanted to have whatever that is pertinent to be
18 protected.  And whatever decision that is being taken
19 involves my approval.
20   Q    And is it your understanding that those
21 assets still exist?
22   A    Yes.
23   MR. SHMIKLER:  I'm going to object on relevance
24 here.  It's clear at this point the notion that this is

Page 127

1  not a discovery deposition has been pretty well shot
2  down.  They're going well on to the issue of the
3  substance of what assets might be out there, and it's
4  completely improper.
5    THE WITNESS:  It is.
6    MR. BLACKMAN:  Ma'am, you've got lawyers who can
7  speak for you.  The reason why -- is everybody done?
8  Let me just finish this objection.  The reason why it's
9  relevant is when you're seeking to establish whether or
10 not he has a residence here, whether he has an abode
11 here, the witness has testified that she thinks that he
12 has not permanently moved because he has businesses and
13 assets here.  It's very relevant to whether or not his
14 move to India is permanent or not.  So, again, I don't
15 want to debate it with you.  I just want to put it on
16 the record.  Judge Guzman will go through this and I'm
17 sure he'll tell us very quickly what is and what is not
18 relevant.
19   MR. SHMIKLER:  For the record, I own assets in
20 Romania and I don't live there.
21   MR. BLACKMAN:  But you're not making a
22 representation in court under oath that you do not have
23 a residence in the United States.  So that's the
24 difference.

Page 128

1    MR. SHMIKLER:  The question is still the same where
2  you live, but go ahead.
3        (Sastri Deposition Exhibit
4         No. 7 was marked for
5         identification.)
6  BY MR. BLACKMAN:
7    Q    I'm going to show you Exhibit 7.  Do you
8  recognize this as the joint parenting agreement that is
9  in effect between yourself and your husband that was
10 file stamped September 7, 2007?
11   A    Yes.
12   MR. SHMIKLER:  We have the same objection to this
13 document as to the last three exhibits.
14 BY MR. BLACKMAN:
15   Q    And is it your testimony that this is the
16 most recent -- Strike that.
17       Are you aware of any other joint parenting
18 agreement that came after this one?
19   A    No.
20   Q    And is this the agreement that both you and
21 your husband are currently bound to?
22   A    Yes.
23   MR. ROSE:  Just note for the record that the
24 document itself seems to indicate that there's

Page 129

1  pages -- there's 24 pages.  The document that I have in
2  front of me as Exhibit 7 appears to have 23 pages.
3    MR. BLACKMAN:  As does mine.  Yeah.  Page 23 looks
4  like the signature page.  I don't know if there is a
5  24th page.
6        We're going to adjourn and we'll reserve the
7  right to redepose her or call her to testify at the
8  trial or at the evidentiary hearing depending upon what
9  transpires after today in terms of documents or other
10 issues between the lawyers.  We'd rather not.  It's not
11 our hope to do that.  But, again, issues arose this
12 morning that required me to say that.  And I'll speak
13 with you, Counsel, after the deposition.
14       Ma'am, thank you very much for coming down.  I
15 know that it's someplace you don't want to be, and I
16 appreciate your time.
17   THE WITNESS:  You're welcome.
18   MR. BLACKMAN:  Are you waiving signature?  Oh, you
19 don't need to.  We're in federal court so.
20   MR. ROSE:  And for the record, the official copies
21 that the court reporter marked I'm going to tender back
22 to the court reporter to have her keep together with the
23 transcript.
24   MR. SHMIKLER:  And obviously in addition to

33 (Pages 126 to 129)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 130

1  objections we have to the proceeding today, we would
2  reserve all objections to any attempt to continue with
3  the proceeding.
4      MR. ROSE:  We will similarly evaluate any
5  subsequent requests to have this witness reappear and
6  assert whatever objections are appropriate at that time.
7      MR. BLACKMAN:  No objection go unstated, so all
8  right.  Thank you.
9      MR. ROSE:  Did you have any other follow-up
10  questions you wanted to ask, Mr. Shmikler?
11     MR. SHMIKLER:  No.  We're done.
12     MR. ROSE:  Thank you.  We're off the record.
13            (Further deponent saith
14             naught.)
15
16
17
18
19
20
21
22
23
24

Page 131

1  STATE OF ILLINOIS )
2               ) SS:
3  COUNTY OF C O O K )
4      I, JENNIFER A. BUCKLEY, a notary public within and
5  for the County of Cook and State of Illinois, do hereby
6  certify that heretofore, to-wit, on the 8th day of April
7  2008, personally appeared before me, at 55 West Monroe
8  Street, Suite 3200, Chicago, Illinois, SURIYA SASTRI, in
9  a cause now pending and undetermined in the United
10  States District Court, wherein INDYMAC BANK, F.S.B. is
11  the Plaintiff, and GANESAN VISVABHARATHY is the
12  Defendant.
13     I further certify that the said witness was first
14  duly sworn to testify the truth, the whole truth and
15  nothing but the truth in the cause aforesaid; that the
16  testimony then given by said witness was reported
17  stenographically by me in the presence of the said
18  witness, and afterwards reduced to typewriting by
19  Computer-Aided Transcription, and the foregoing is a
20  true and correct transcript of the testimony so given by
21  said witness as aforesaid.
22     I further certify that the taking of this
23  deposition was pursuant to Notice, and that there were
24  present at the deposition the attorneys hereinbefore

Page 132

1  mentioned.
2      I further certify that I am not counsel for nor in
3  any way related to the parties to this suit, nor am I in
4  any way interested in the outcome thereof.
5      IN TESTIMONY WHEREOF:  I have hereunto set my hand
6  and affixed my notarial seal this _____ day of
7  _____ 2008.
8
9
10
11
12        _____
12        NOTARY PUBLIC, COOK COUNTY, ILLINOIS
13
14
15
16
17
18
19
20
21
22
23
24

34 (Pages 130 to 132)

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| INDYMAC BANK, F.S.B., a Federal Savings Bank | ) ) ) | 07 C 6224 |
| v. | ) ) ) | JUDGE RONALD A. GUZMAN |
| GANESAN VISVABHARATHY, an individual | ) ) ) | |

### NOTICE OF SUBPOENA

Suriya Sastri
7529 Ridgewood Lane
Burr Ridge, Illinois 60527

To:   See Attached Service List

YOU ARE HEREBY COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case

See Attached Rider(s)

Levenfeld Pearlstein, LLC
2 N. LaSalle St., Ste. 1300
Chicago, Illinois 60602

Date:   April 8, 2008 – 10:00 a.m.

INDYMAC BANK, F.S.B.

By: _____
One of Its Attorneys

GARY I. BLACKMAN (ARDC # 6187914)
JAMES G. MARTIGNON (ARDC # 6277974)
LEVENFELD PEARLSTEIN, LLC
2 N. LaSalle, Suite 1300
Chicago, Illinois 60602
(312) 346-8380
(312) 346-8434

EXHIBIT
1
4-8-08

LP 1602151.1 \ 31849-73191

## CERTIFICATE OF SERVICE

Under penalties of perjury as proved in 735 ILCS §5/2-206, the undersigned certifies that he caused a copy of the foregoing Notice and Subpoena to be served on:

Bruce A. Sperling
Daniel A. Shmikler
Sperling & Slater, P.C.
55 W. Monroe Street, Suite 3200
Chicago, Illinois 60603

by first class mail, postage prepaid, by depositing the same in the U.S. Mail Chute located at 2 North LaSalle, Chicago, Illinois, prior to 5:00 p.m. on April 3, 2008.

_____
Steve A. James

Subscribed and Sworn to before me
this **3** day of April, 2008.

_____
Notary Public

OFFICIAL SEAL
LETRIC WATSON
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:05/04/08

AO88  (Rev. 12/06) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

FOR THE NORTHERN     DISTRICT OF     ILLINOIS EASTERN DIVISION

INDYMAC BANK, F.S.B., a Federal Savings Bank

V.

GANESAN VISVABHARATHY, an individual

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  07 C 6224

TO:   Suriya Sastri
     7529 Ridgewood Lane
     Burr Ridge, Illinois 60527

☐   YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
|  | DATE AND TIME |

☑   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   Levenfeld Pearlstein, LLC, 2 N. LaSalle St., Ste. 1300, Chicago, Illinois 60602 | DATE AND TIME 4/8/2008 10:00 am |
| --- | --- |

☑   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

Produce documents in the attached rider at time and place of deposition (See Attached Rider)

| PLACE | DATE AND TIME |
| --- | --- |

☐   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
| --- | --- |

     Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) *(Attorney for Plaintiff)* | DATE 4/3/2008 |
| --- | --- |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Levenfeld Pearlstein, LLC, 2 N. LaSalle St., Ste. 1300, Chicago, Illinois 60602

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

## RIDER TO SUBPOENA

Produce all books, documents, papers, and/or records in your custody, possession or control regarding the following matters:

1.  Supporting the allegations made by you in your Affidavit, dated February 13, 2008.

2.  The ownership of your home located at 7529 Ridgewood Lane, Burr Ridge, Illinois 60527 (the "Home").

3.  The refinance of the Home in or about May 2007.

4.  Any and all mail received by Ganesan Visvabharathy at the Home.

*[handwritten annotations: "no docs", "no docs", "not available"]*

# EXHIBIT 2

02/13/2008 15:23 FAX                                                          002
Case 1:07-cv-06224    Document 35-3    Filed 04/15/2008    Page 43 of 115
Case 1:07-cv-06224    Document 19    Filed 02/14/2008    Page 7 of 14

## AFFIDAVIT OF SURIYA V. SASTRI

1.   I am over the age of 21. I make this affidavit based on my personal knowledge.

2.   I reside at 7529 Ridgeweood Lane, Burr Ridge, Illinois. My husband, Dr. Ganesan Visvabharathy, has not lived there since at least the summer of 2006. Prior to the summer of 2006, he did reside there with me, but permanently moved out as part of our separation. Divorce proceedings are pending.

3.   It is my understanding that, when he moved out, Dr. Visvabharathy established his own separate abode.

4.   In November 2007, a man came to my residence asking for Dr. Visvabharathy. I told him that Dr. Visvabharathy no longer lived there. He then said that he was a process server, there to serve legal papers on Dr. Visvabharathy, and threatened to have the police serve the papers at midnight. I responded that, no matter what time anyone came for Dr. Visvabharathy, they would not find him at my residence, because he did not live there anymore. The server also threatened to harass my children for information about Dr. Visvabharathy. The server left without attempting to give me any papers at that time.

5.   On December 1, 2007, the process server returned to my residence, again asking for Dr. Visvabharathy. I again told him that Dr. Visvabharathy did not live there. The server responded that the judge had ordered that papers be served at my residence and, when I would not accept them, he left the papers at my front door.

6.   I have not given Dr. Visvabharathy any of the papers left by the process server.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: February 13, 2008

_____
Suriya V. Sastri

EXHIBIT
2
4-8-08  JB

# EXHIBIT 3

# Jonathan A. Vold

**Attorney at Law**

900 East Northwest Hwy., Mount Prospect, Illinois 60056
Tel. (847) 259-5214        Fax. (847) 259-5247

Re:     Home purchase documents

Dear Clients:

Enclosed please find the following documents related to the purchase of your home:

      **Warranty Deed,** filed and recorded by the county recorder's office.
      **Owner's Title Policy,** updated from the waived title commitment issued at closing.

I will maintain copies of these documents in your file for future reference, but I am sending you the originals for your own safekeeping.

*Please be assured that while some administrative delay may have occurred in processing, recording and transferring these documents, this delay does not affect your rightful ownership of the property or condition of clear title established at closing. If you have any questions related to these issues, please do not hesitate to call me.*

Thank you again for allowing me to represent you in your home purchase. Please let me know if I can assist you in any other home, family, business or personal estate matter.

Yours truly,

Jonathan A. Vold
Attorney at Law

JAV/jv
Enclosures

EXHIBIT

3

4-8-08

AMERICAN LAND TITLE ASSOCIATION
OWNER'S POLICY
(10-17-92)

# CHICAGO TITLE INSURANCE COMPANY

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, CHICAGO TITLE INSURANCE COMPANY, a Missouri corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;
2. Any defect in or lien or encumbrance on the title;
2. Any defect in or lien or encumbrance on the title;
3. Unmarketability of the title;
4. Lack of a right of access to and from the land.

The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title, as insured, but only to the extent provided in the Conditions and Stipulations.

*In Witness Whereof,* CHICAGO TITLE INSURANCE COMPANY has caused this policy to be signed and sealed as of Date of Policy shown in Schedule A, the policy to become valid when countersigned by an authorized signatory.

Chicago Title Insurance Company

By

*President*

Attest

*Secretary*

1. DEFINITION OF TERMS

The following terms when used in this policy mean:

(a) "insured": the insured named in Schedule A, and, subject to any rights or defenses the Company would have had against the named insured, those who succeed to the interest of the named insured by operation of law as distinguished from purchase including, but not limited to, heirs, distributees, devisees, survivors, personal representatives, next of kin, or corporate or fiduciary successors.

(b) "insured claimant": an insured claiming loss or damage.

(c) "knowledge" or "known": actual knowledge, not constructive knowledge or notice which may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land.

(d) "land": the land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.

(e) "mortgage": mortgage, deed of trust, trust deed, or other security instrument.

(f) "public records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge. With respect to Section 1(a)(iv) of the Exclusions From Coverage, "public records" shall also include environmental protection liens filed in the records of the clerk of the United Sates district court for the district in which the land is located.

(g) "unmarketability of the title": an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title.

2. CONTINUATION OF INSURANCE AFTER CONVEYANCE OF TITLE

The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest. This policy shall not continue in force in favor of any purchaser from the insured of either (i) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured.

3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if title to the estate or interest, as insured, is rejected as unmarketable. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

4. DEFENSE AND PROSECUTION OF ACTIONS, DUTY OF INSURED CLAIMANT TO COOPERATE

(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a defense as required or permitted by the provisions of this policy, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order.

(d) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

5. PROOF OF LOSS OR DAMAGE

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company within 90 days after the insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy which constitutes the bases of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the insured claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph shall terminate any liability of the Company under this policy as to that claim.

6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; · TERMINATION OF LIABILITY

In case of claim under this policy, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Insurance.

To pay or tender payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay.

Upon the exercise by the Company of this option, all liability and obligations to the insured under this policy, other than to make the payment required, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, and the policy shall be surrendered to the Company for cancellation.

(b) To Pay of Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.

(i) to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs (b)(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

## 7. DETERMINATION, EXTENT OF LIABILITY AND COINSURNACE

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extend herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A; or,

(ii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

(b) In the event the Amount of Insurance stated in Schedule A at the Date of Policy is less than 80 percent of the value of the insured estate or interest or the full consideration paid for the land, whichever is less, or if subsequent to the Date of Policy an improvement is erected on the land which increase the value of the insured estate or interest by at least 20 percent over the Amount of Insurance stated in Schedule A, then this Policy is subject to the following:

(i) where no subsequent improvement has been made, as to any partial loss, the Company shall only pay the loss pro rata in the proportion that the amount of insurance at Date of Policy bears to the total value of the insured estate or interest at Date of Policy; or

(ii) where a subsequent improvement has been made, as to any partial loss, the Company shall only pay the loss pro rate in the proportion that 120 percent of the Amount of Insurance stated in Schedule A bears to the sum of the Amount of Insurance stated in Schedule A and the amount expended for the improvement.

The provisions of this paragraph shall not apply to costs, attorneys' fees and expenses for which the Company is liable under this policy, and shall only apply to that portion of any loss which exceeds, in the aggregate, 10 percent of the Amount of Insurance stated in Schedule A.

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

## 8. APPORTIONMENT

If the land described in Schedule A consists of two or more parcels which ~ not used as a single site, and a loss is established affecting one or more ~e parcels but not all, the loss shall be computed and settled on a pro rate ~asis as if the amount of insurance under this policy was divided pro rata as to the value on Date of Policy of each separate parcel to the whole, exclusive of any improvements made subsequent to Date of Policy, Unless a liability or value has otherwise been agreed upon as to each parcel by the Company and the insured at the time of the issuance of this policy and shown by an express statement or by an endorsement attached to this policy.

## 9. LIMITATION OF LIABILITY

(a) If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack or a right of access to or from the land, or cures the claim of unmarketability of the title, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title as insured.

(c) The Company shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in setting any claim or suit without the prior written consent of the Company

## 10. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY

All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto.

## 11. LIABILITY NONCUMULATIVE

It is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which ~nsured has agreed, assumed, or taken subject, or which is hereafter ..ted by an insured and which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy to the insured owner.

## 12. PAYMENT OF LOSS

(a) No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fix~ in accordance with these Conditions and Stipulations, the loss or damag~ shall be payable within 30 days thereafter.

## 13. SUBROGATION UPON PAYMENT OR SETTLEMENT

(a) The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this polic~ all right of subrogation shall vest in the Company unaffected by any act ~ the insured claimant.

The Company shall be subrogated to and be entitled to all rights an~ remedies which the insured claimant would have had against any person ~ property in respect to the claim had this policy not been issued. If requeste~ by the Company, the insured claimant shall transfer to the Company a~ rights and remedies against any person or property necessary in order t~ perfect this right of subrogation. The insured claimant shall permit th~ Company to sue, compromise or settle in the name of the insured claima~ and to use the name of the insured claimant in any transaction or litigatio~ involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the~ insured claimant, the Company shall be subrogated to these rights and~ remedies in the proportion which the Company's payment bears to the~ whole amount of the loss.

If loss should result from any act of the insured claimant, as stated above~ that act shall not void this policy, but the Company, in that event, shall be~ required to pay only that part of any losses insured against by this policy~ which shall exceed the amount, if any, lost to the Company be reason of the~ impairment by the insured claimant of the Company's right of subrogation.

(b) The Company's Rights Against Non-insured Obligors.

The Company's right of subrogation against non-insured obligors shall~ exist and shall include, without limitation, the rights of the insured to~ indemnities, guaranties, other policies of insurance or bonds.~ notwithstanding any terms or conditions contained in those instruments~ which provide for subrogation rights by reason of this policy.

## 14. ARBITRATION

Unless prohibited by applicable law, either the Company or the insured~ may demand arbitration pursuant to the Title Insurance Arbitration Rules of~ the American Arbitration Association. Arbitrable matters may include, but are~ not limited to, any controversy or claim between the Company and the~ insured arising out of or relating to this policy, any service of the Company in~ connection with its issuance of the breach of a policy provision or other~ obligation. All arbitrable matters when the Amount of Insurance is $1,000,000~ or less shall be arbitrated at the option of either the Company of the insured.~ All arbitrable matters when the Amount of Insurance is in excess of~ $1,000,000 shall be arbitrated only when agreed to by both the Company~ and the insured. Arbitration pursuant to this policy and under the Rules in~ effect on the date the demand for arbitration is made or, at the option of the~ insured, the Rules in effect at Date of Policy shall be binding upon the~ parties. The award may include attorneys' fees only if the laws of the state in~ which the land is located permit a court to award attorneys' fees to a~ prevailing party. Judgment upon the award rendered by the Arbitrator(s) may~ be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title~ Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

## 15. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT

(a) This policy together with all endorsements, if any, attached hereto by~ the Company is the entire policy and contract between the insured and the~ Company. In interpreting any provision of this policy, this policy shall be~ construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, and~ which arises out of the status of the title to the estate or interest covered~ hereby or by any action asserting such claim, shall be restricted to this~ policy.

(c) No amendment of or endorsement to this policy can be made except by~ a writing endorsed hereon or attached hereto signed by either the President.~ a Vice President, the Secretary, an Assistant Secretary, or validating officer of~ authorized signatory of the Company.

## 16. SEVERABILITY

In the event any provision of the policy is held invalid or unenforceable~ under applicable law, the policy shall be deemed not to include that~ provision and all other provisions shall remain in full force and effect.

## 17. NOTICES, WHERE SENT

All notices required to be given the Company and any statement in writing~ required to be furnished the Company shall include the number of this policy~ and shall be addressed to the Company at the issuing office or to:

Chicago Title Insurance Company
Claims Department
171 North Clark Street
Chicago, Illinois 60601-3294

IN WITNESS WHEREOF, the Grantor as aforesaid, has hereunto set her hand and seal this 9th day of December, 2004.

*Nancy B Graham*

**NANCY B. GRAHAM**

STATE OF ~~ILLINOIS~~ *TEXAS* )
COUNTY OF ~~DUPAGE~~ *Harris* ) SS.

I, the undersigned, a Notary Public, in and for the County and State aforesaid, CERTIFY THAT **NANCY B. GRAHAM**, personally known to me to be the person whose name is subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that she signed, sealed and delivered the said instrument as her free and voluntary act, for the uses and purposes therein set forth, including the release and waiver of the right of homestead.



JENNY GAVRANOVIC
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 11-26-07

*Jenny Gavranovic*
*12/8/04*

This instrument was prepared by:

· Dennis W. Winkler
Dennis W. Winkler, Ltd.
3051 Oak Grove Drive
Suite 220
Downers Grove, Illinois 60515-1181
FOR RECORDER'S OFFICE BOX NO. _____

~~After Recording~~ please ~~mail and~~ send Subsequent Tax Bills to:

Ganesan and Suriya Visvabharathy
7529 Ridgewood Lane
Burr Ridge, IL 60525

*After recording, mail to:*

*Jonathan A. Veld*
*900 E. Northwest Hwy.*
*Mt. Prospect, IL 60056*

Macintosh HD:Users:nancy:Library:Mail:Mailboxes:INBOX.mbox:MailViewer.mimeattach:Warranty Deed.doc

IN WITNESS WHEREOF, GRANTOR has here unto set his seal this 9th day of December, 2004.

_____                    _____
**Witness**                                          **Donald G. Graham**

SUBSCRIBED AND SWORN to before me this 8th day of December, 2004.

_____
Notary Public

```
OFFICIAL SEAL
ELLEN E. PIPKINS
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
```

This document was prepared by, and after recording return to:

Dennis W. Winkler
Dennis W. Winkler, Ltd.
3051 Oak Grove Drive, Suite 220
Downers Grove, IL 60515

ORDER NO.: 1301  -  004348487
ESCROW NO.: 1301  -  004348487        1

STREET ADDRESS: 7529 RIDGEWOOD LANE
CITY: BURR RIDGE          ZIP CODE: 60527          COUNTY: COOK
TAX NUMBER: 18-30-408-015-0000

*EXHIBIT 'A'*

**LEGAL DESCRIPTION:**

LOT 94 IN BURR OAKS GLEN UNIT NUMBER 2, A SUBDIVISION OF PART OF THE WEST 1/2 OF THE SOUTHEAST 1/4 OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

4348487 (1/3)

## WARRANTY DEED



Doc#: 0435647050
Eugene "Gene" Moore   Fee: $30.00
Cook County Recorder of Deeds
Date: 12/21/2004 08:17 AM  Pg: 1 of 4

**THE GRANTORS, DONALD G. GRAHAM AND NANCY B. GRAHAM,** married to each other, of the City of Burr Ridge, County of Cook, for and in consideration of Ten ($10.00) Dollars, and other good and valuable consideration in hand paid, CONVEYS and WARRANTS to, GANESAN VISVABHARATHY AND SURIYA VISVABHARATHY SASTRI, GRANTEES, of the County of ~~DuPage~~ Cook, State of Illinois, not as Tenants in Common, and not as Joint Tenants but as Tenants by the Entirety, the following described Real Estate situated in the County of Cook, in the State of Illinois, to wit:

4348487 JP Ret ~ 1/3

**LEGAL DESCRIPTION:** SEE **EXHIBIT A** ATTACHED HERETO AND MADE A PART HEREOF.

hereby releasing and waiving all rights under and by virtue of the Homestead Laws of the State of Illinois.

SUBJECT TO: General real estate taxes not due or payable at the time of closing, covenants, conditions and restrictions of record, building lines and easements, if any, so long as they do not interfere with the current use and enjoyment of the property.

**PERMANENT REAL ESTATE INDEX NUMBER:** 18-30-408-015-0000

**ADDRESS OF REAL ESTATE:** 7529 Ridgewood Lane, Burr Ridge, IL 60527



**COOK COUNTY**
REAL ESTATE TRANSACTION TAX

DEC.15.04

REVENUE STAMP



COUNTY TAX

# 0000023066

**REAL ESTATE TRANSFER TAX**

0030350

FP 103017



**STATE OF ILLINOIS**

DEC.14.04

REAL ESTATE TRANSFER TAX
DEPARTMENT OF REVENUE

STATE TAX

# 0000023342



**REAL ESTATE TRANSFER TAX**

00607.00

FP 103014

4

P:\Graham, Donald & Nancy\Warranty Deed.wpd

A Policy Issuing Agent of Chicago Title Insurance Company

---

**ALTA OWNER'S POLICY (REV. 10/17/92)**    **LEGAL DESCRIPTION**

---

5.   **THE LAND REFERRED TO IN THIS POLICY IS DESCRIBED AS FOLLOWS:**

LOT 94 IN BURR OAKS GLEN UNIT NUMBER 2, A SUBDIVISION OF PART OF THE WEST 1/2 OF THE SOUTHEAST 1/4 OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

*THIS POLICY VALID ONLY IF SCHEDULE B IS ATTACHED.*

GTTS2AL 02/00 LB

| ALTA OWNER'S POLICY (REV. 10/17/92) | SCHEDULE B |
|---|---|

NOTWITHSTANDING THE PROVISIONS OF THE CONDITIONS AND STIPULATIONS OF THIS POLICY, ALL ENDORSEMENTS, IF ANY, ATTACHED HERETO ARE VALID DESPITE THE LACK OF SIGNATURE BY EITHER THE PRESIDENT, A VICE PRESIDENT, THE SECRETARY, AN ASSISTANT SECRETARY, OR VALIDATING OFFICER OR AUTHORIZED SIGNATORY OF THE COMPANY.

## EXCEPTIONS FROM COVERAGE

THIS POLICY DOES NOT INSURE AGAINST LOSS OR DAMAGE SUSTAINED BY THE INSURED (AND THE COMPANY WILL NOT PAY COSTS, ATTORNEY'S FEES OR EXPENSES) BY REASON OF THE FOLLOWING EXCEPTIONS:

GENERAL EXCEPTIONS:

(1) RIGHTS OR CLAIMS OF PARTIES IN POSSESSION NOT SHOWN BY PUBLIC RECORDS.

(2) ENCROACHMENTS, OVERLAPS, BOUNDARY LINE DISPUTES, OR OTHER MATTERS WHICH WOULD BE DISCLOSED BY AN ACCURATE SURVEY AND INSPECTION OF THE PREMISES.

(3) EASEMENTS, OR CLAIMS OF EASEMENTS, NOT SHOWN BY THE PUBLIC RECORDS.

(4) ANY LIEN, OR RIGHT TO A LIEN, FOR SERVICES, LABOR OR MATERIAL HERETOFORE OR HEREAFTER FURNISHED, IMPOSED BY LAW AND NOT SHOWN BY THE PUBLIC RECORDS.

(5) TAXES OR SPECIAL ASSESSMENTS WHICH ARE NOT SHOWN AS EXISTING LIENS BY THE PUBLIC RECORDS.

SPECIAL EXCEPTIONS: THE MORTGAGE, IF ANY, REFERRED TO IN ITEM 4 OF SCHEDULE A.

A    6. GENERAL REAL ESTATE TAXES FOR THE YEAR 2004.
TAX NO. 18-30-408-015, VOL. 84.

NOTE: THE 2004 TAXES ARE NOT YET DUE AND PAYABLE.

B    7. MORTGAGE DATED AUGUST 19, 1996 AND RECORDED JULY 21, 1997 AS DOCUMENT NO. 97523992 MADE BY FRANK J. MARTUSIELLO AND LISA M. MARTUSCIELLO TO HARRIS BANK HINSDALE, TO SECURE AN INDEBTEDNESS OF $100,000.00.

F    8. COVENANTS AND RESTRICTIONS (BUT OMITTING ANY SUCH COVENANTS OR RESTRICTIONS BASED ON RACE, COLOR, RELIGION, SEX, HANDICAP, FAMILIAL STATUS OR NATIONAL ORIGIN, IF ANY) CONTAINED IN THE DECLARATION RECORDED AS DOCUMENT NO. 25279514, AS AMENDED BY DOCUMENT NO. 91208535, RELATING TO EASEMENTS, BUILDING AREAS, HEIGHT, CELLAR, ASSOCIAITON, ARCHITECTURAL AND LANDSCAPING CONTROLS, ETC.

H    9. EASEMENTS FOR PUBLIC UTILITIES AND DRAINAGE OVER, UPON AND UNDER THE NORTH 7.5 FEET, THE EAST 10 FEET AND THE SOUTH 7.5 FEET OF THE LAND AS SHOWN ON THE PLAT OF SUBDIVISION AND THE CERTIFICATE OF CORRECTION RECORDED AS DOCUMENT NUMBER 26455186.

I    10. BUILDING SETBACK LINE OF 35 FEET (FROM THE WEST LOT LINE) AS SHOWN ON THE PLAT OF SUBDIVISION.

J    11. STORMWATER DRAINAGE AND DETENTION RESTRICTIONS AND EASEMENTS AS SHOWN ON THE

GATEWAY AGENT Case 1:07-cv-06224    Document 35-3    Filed 04/15/2008    Page 55 of 115
A Policy Issuing Agent of Chicago Title Insurance Company

POLICY NO.: 1301    004348487
ORDER NO.: 1301 004348487   GATEL

---

ALTA OWNER'S POLICY (REV. 10/17/92)                    SCHEDULE B (CONT.)

---

PLAT OF SUBDIVISION RECORDED JANUARY 4,1 982 AS DOCUMENT NUMBER 26112609 A PERPETUAL EASEMENT FOR STORM WATER AND DETENTION DRAINAGE AND FLOOD CONTROL AND ALL PROVISIONS CONTAINED THEREIN.

x    12.    ENCROACHMENT OF CONCRETE WALK, OVER AND ONTO THE AFORESAID NORTH 7.5 FOOT EASEMENT, AS DISCLOSED BY SURVEY.

END OF SCHEDULE B

---

ALTA OWNER'S POLICY (REV. 10/17/92)                    POLICY SIGNATURE PAGE

---

THIS POLICY SHALL NOT BE VALID OR BINDING UNTIL SIGNED BY AN AUTHORIZED SIGNATORY.

ISSUED BY:                                         GATEWAY AGENT

DENNIS W. WINKLER, LTD.                            BY
3051 OAK GROVE DRIVE, SUITE# 220
DOWNERS GROVE, IL 60515

Refer Inquiries To:                               _____
                                                  *Authorized Signatory*
(630)515-1400 FAX:(630)434-0444

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.    (a)    Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting form a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

       (b)    Any governmental policy power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2.    Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3.    Defects, liens, encumbrances, adverse claims or other matters:

       (a)    created, suffered, assumed or agreed to by the insured claimant;

       (b)    not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

       (c)    resulting in no loss or damage to the insured claimant;

       (d)    attaching or created subsequent to Date of Policy; or

       (e)    resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.

4.    Any claim, which arises out of the transaction vesting in the Insured the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:

       (i)    the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer; or

       (ii)    the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure:

             (a)    to timely record the instrument of transfer; or

             (b)    of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

# GATEWAY AGENT
A Policy Issuing Agent of Chicago Title Insurance Company

ENDORSEMENT

Attached to and forming a part of ORDER NUMBER:  1301 004348487 GATEL

POLICY MODIFICATION ENDORSEMENT 12B

THE COMPANY HEREBY INSURES THE INSURED AGAINST LOSS OR DAMAGE (INCLUDING COSTS, ATTORNEYS' FEES, AND EXPENSES OF DEFENSE AS PROVIDED IN THE CONDITIONS AND STIPULATIONS OF THIS POLICY) WHICH THE INSURED SHALL SUSTAIN BY REASON OF THE ENTRY OF A FINAL ORDER IN A PROCEEDING COMMENCED SUBSEQUENT TO DATE OF POLICY IN A COURT OF COMPETENT JURISDICTION TO ENFORCE THE LIEN, ENCUMBRANCE OR INTEREST NOTED AT EXCEPTION LETTER(S) B, WHICH SAID ORDER DETERMINES THAT SAID LIEN, ENCUMBRANCE OR INTEREST HAS PRIORITY OVER THE ESTATE OR MORTGAGE INSURED BY THIS POLICY AND ENFORCES OR AWARDS FULL OR PARTIAL SATISFACTION THEREOF OUT OF THE LAND DESCRIBED IN SCHEDULE A.

THIS ENDORSEMENT IS MADE A PART OF THE POLICY AND IS SUBJECT TO ALL OF THE TERMS AND PROVISIONS THEREOF AND OF ANY PRIOR ENDORSEMENTS THERETO. EXCEPT TO THE EXTENT EXPRESSLY STATED, IT NEITHER MODIFIES ANY OF THE TERMS AND PROVISIONS OF THE POLICY AND ANY PRIOR ENDORSEMENTS, NOR DOES IT EXTEND THE EFFECTIVE DATE OF THE POLICY AND ANY PRIOR ENDORSEMENTS, NOR DOES IT INCREASE THE FACE AMOUNT THEREOF.

ISSUED BY:

DENNIS W. WINKLER, LTD.
3051 OAK GROVE DRIVE, SUITE# 220
DOWNERS GROVE, IL 60515

Refer Inquiries To:

(630)515-1400 FAX:(630)434-0444

GATEWAY AGENT
BY:

_____
Authorized Signatory

# GATEWAY AGENT

A Policy Issuing Agent of Chicago Title Insurance Company

ENDORSEMENT

Attached to and forming a part of ORDER NUMBER: 1301 004348487 GATEL

POLICY MODIFICATION ENDORSEMENT 4

GENERAL EXCEPTION NUMBERS 1, 2, 3, 4 AND 5 OF SCHEDULE B OF THIS POLICY ARE HEREBY DELETED.

THIS ENDORSEMENT IS MADE A PART OF THE POLICY AND IS SUBJECT TO ALL OF THE TERMS AND PROVISIONS THEREOF AND OF ANY PRIOR ENDORSEMENTS THERETO. EXCEPT TO THE EXTENT EXPRESSLY STATED, IT NEITHER MODIFIES ANY OF THE TERMS AND PROVISIONS OF THE POLICY AND ANY PRIOR ENDORSEMENTS, NOR DOES IT EXTEND THE EFFECTIVE DATE OF THE POLICY AND ANY PRIOR ENDORSEMENTS, NOR DOES IT INCREASE THE FACE AMOUNT THEREOF.

ISSUED BY:

DENNIS W. WINKLER, LTD.
3051 OAK GROVE DRIVE, SUITE# 220
DOWNERS GROVE, IL 60515

Refer Inquiries To:

(630)515-1400 FAX:(630)434-0444

GATEWAY AGENT

BY:

_____
Authorized Signatory

A Policy Issuing Agent of Chicago Title Insurance Company

---

## ALTA OWNER'S POLICY (REV. 10/17/92)                    SCHEDULE A

DATE OF POLICY: DECEMBER 21, 2004

AMOUNT OF INSURANCE: $638,625.00

ORDER REFERENCE:    7529 RIDGEWOOD LANE

ISSUED BY:

DENNIS W. WINKLER, LTD.
3051 OAK GROVE DRIVE, SUITE# 220
DOWNERS GROVE, IL 60515

Refer Inquiries To:

(630)515-1400 FAX:(630)434-0444

1.  NAME OF INSURED:

    GANESAN VISVABHARATHY AND SURIYA VISVABHARATHY SASTRI, HUSBAND & WIFE, NOT AS
    JOINT TENANTS OR AS TENANTS IN COMMON BUT AS TENANTS BY THE ENTIRETY

2.  THE ESTATE OR INTEREST IN THE LAND AND WHICH IS COVERED BY THIS POLICY IS A
    FEE SIMPLE, UNLESS OTHERWISE NOTED.

3.  TITLE TO SAID ESTATE OR INTEREST AT THE DATE HEREOF IS VESTED IN:

    THE INSURED.

4.  THE LAND HEREIN DESCRIBED IS ENCUMBERED BY THE FOLLOWING MORTGAGE OR TRUST DEED
    AND ASSIGNMENTS:

    NONE

AND THE MORTGAGES OR TRUST DEEDS, IF ANY, SHOWN IN SCHEDULE B HEREOF.

*THIS POLICY VALID ONLY IF SCHEDULE B IS ATTACHED.*

# Jonathan A. Vold

**Attorney at Law**

**900 East Northwest Hwy., Mount Prospect, Illinois 60056**
**Tel. (847) 259-5214      Fax. (847) 259-5247**

January 26, 2005

Dennis W. Winkler, Esq.

via fax to 630-434-0444

Re:     Sale of 7529 Ridgewood, Burr Ridge; Graham to Visvabharathy

Dear Mr. Winkler,

  This follows our closing on December 9, 2004.  At closing, funds were paid out to Greater Illinois Survey for a post-closing survey of the property, but the purchaser has not yet received that survey.  The purchaser also requests the final title policy.  Please advise.

      Sincerely,

      Jonathan A. Vold

cc:     Ganesan Visvabharathy 630-986-2903

# EXHIBIT 4

EXHIBIT

#42030

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT-DOMESTIC RELATIONS DIVISION

IN RE THE MARRIAGE OF:                )
                                      )
SURIYA V. SASTRI,                     )
                                      )
            Petitioner,               )
                                      )   No. 06 D 530086
    and                               )
                                      )
GANESAN VISVABHARATHY,                )
                                      )
            Respondent.               )

**ENTERED**
JUDGE EDWARD R. JORDAN -1631
JUN 2 9 2006
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, Il
DEPUTY CLERK

### _AGREED ORDER_

This cause coming to be heard for a pre-trial conference on SURIYA V. SASTRI's ("Suriya") Petition for Temporary Maintenance and Child Support, attorneys for both parties and the child's representative being present, and the court being advised in the premises;

It is Ordered:

1.    This Order is entered without prejudice to either parties' right to a evidentiary hearing on the issues addressed herein, and with the parties' acknowledgement that they are both residing in the marital residence located at 7529 Ridgewood Lane, Burr Ridge, Illinois, with their minor children, Sowmya and Vidya.    Based on the above, commencing June 1, 2006, GANESAN ("Vish") shall pay the following:

    a.    The real estate taxes, homeowner's insurance, gas, electricity and telephone bills for the marital residence;

    b.    The children unreimbursed medical expenses;

    c.    The children's tuition, summer camp, and activity expenses to which the parties agree in advance.

    d.    The issue of whether other children's expenses were recommended to be paid by Vish shall be addressed at the case management conference on 7/13/06 at 10:30 A.M.

2.     Nothing in this Order shall be construed as evidence that Suriya is entitled to receive maintenance and/or child support.

3.     Vish may answer Suriya's Notice to Produce and Supplemental Notice to Produce requesting the production of voluminous business documents by identifying the location of the documents and making them available for inspection. *If Not voluminous with Vish Shall comply with usual discovery Rules He*

4.     *Vish* shall produce a Rule 13 disclosure statement within 30 days of the entry of this Order.

AGREED: _____

    Howard LeVine *with changes*
    Attorney for SURIYA SASTRI

ENTER:

_____
JUDGE

DATED: _____

BERGER | SCHATZ
Attorneys for Respondent
161 North Clark #2800
Chicago, IL 60601
312/782-3456
Attorney No. 42030

#322883

# EXHIBIT 5



CCG N002-300M-2/24/05 (          )

Order

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Suriya Sastri

v.                                   No. 06 D530086

Ganesan Visvabharty

**ENTERED**
JUDGE EDWARD R. JORDAN
NOV - 2 20
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY
DEPUTY CLERK

ORDER

This cause coming on to be heard for hearing on Suriya's Motion to Compel Payment of unpaid Expenses & For Rule to Show Cause For Finding of Indirect Civil contempt & other Relief + 750 ILCS 5 501(DX2) Petition For Relief & Modification of Court Order & Petition for Prospective Attorney Fees & Costs, Motion to Compel, & on Ganesan represented by counsel, Motion to Supervise Discovery, both parties being advised in the premises; the court having conducted a pre-trial, & Dec. 9, 2006.

IT IS HEREBY ORDERED:

payable on Nov. 9 & Dec. 9, 2006.

(1) Ganesan shall pay Suriya $12,000.00/month, without prejudice, for the months of November & December, as & for his contribution to household expenses, & not to be used as evidence of an appropriate support amount at subsequent hearing.

(2) Said order is without prejudice to Suriya's Petition for Rule to Show Cause & claim for past due support.

(3) The Petition for Rule to Show Cause & Modification of Court order is set for hearing on January 8, 2006. If Rule issues, it shall be returnable instanter. Any proof of payment to be tendered at least 4 days prior to hearing at 10:30 am

Atty. No.: 25158                    ENTERED:

Name: Latino, et al              Dated: _____

Atty. for: Suriya

ddress: 900 Maple                **EXHIBIT**
                                   5
City/State/Zip: Homewood IL 60430   6-8-08 JB

Telephone: 708-957-5500          Judge                Judge's No.

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

# EXHIBIT 6

#42030

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, DOMESTIC RELATIONS DIVISION

IN RE: THE MARRIAGE OF                )
                                      )
SURIYA V. SASTRI,                     )
                                      )
            Petitioner,               )
                                      )     No.  06 D 530086
      - and -                         )
                                      )     Calendar:  A
GANESAN VISVABHARATHY,                )
                                      )
            Respondent.               )

**ENTERED**
JUDGE EDWARD R. JORDAN - 1031

MAR 0 7 2007

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY IL
DEPUTY CLERK

## <u>AGREED ORDER</u>

This cause coming to be heard on SURIYA V. SASTRI's ("Suriya") Emergency Petition for Temporary Restraining Order and Preliminary Injunction and by agreement of the parties, the Court being advised in the premises;

It is Ordered:

1.    Pending further Order of Court or written agreement of the parties, Vish VISVABHARATHY ("Vish") shall not pledge the following real property as collateral or cause any additional lien or encumbrance to be recorded against the property subsequent to the entry of this Order:

      a.    8999 South County Line Road, Burr Ridge, Illinois, subject to an existing lien of approximately, $1,000,000;

      b.    7529 Ridgewood Lane, Burr Ridge, Illinois;

      c.    The property held in the VCM Trust; and

      d.    The property held in the Suriya Sastri Trust.

2.    The parties acknowledge that the properties listed in paragraph 1 above may have previously been pledged as collateral in connection with Vish's real estate developments, which shall not be considered a violation of this Order.

3.    Vish shall provide Suriya with the sum of $10,000 per month for temporary child support, from which Vish shall pay all of the children's expenses.  Vish shall direct deposit the temporary child support into Suriya's MB Financial checking account on the 1st day of each month.  This Order shall supersede and replace all prior Orders regarding temporary support and is entered without prejudice to both parties' right to an evidentiary hearing on the issue.

**EXHIBIT**

6

4.   This Order shall revoke the Power of Attorney executed by Suriya authorizing Vish to sign documents on behalf of Suriya, the children's trust and/or Suriya's trust.

5.   Vish shall provide Suriya with 14 days advance notice of his intent to invest in any new developments.

6.   Vish shall pay the monthly interest in connection with the line of credit against the County Line Road, Burr Ridge, Illinois, property.

7.   The issue of whether the Mt. Vernon property (50 acres of vacant land) should be pledged as collateral to the Indymac Bank in connection with the Venue development in Orlando Florida, shall be set for hearing on April 25, 2007, at 2:00 p.m. Vish shall be granted 21 days to file a Motion on the issue and Suriya shall be granted 14 days to respond. Neither party shall transact with the Mt. Vernon property without written agreement or until the Court has ruled on the issue.

AGREED: _____

One of the attorneys for Suriya Sastri

ENTER:

_____

JUDGE

DATED: _____

BERGER | SCHATZ
Attorneys for Respondent.
161 North Clark #2800
Chicago, IL 60601
312/782-3456
Attorney No. 42030

#351014

# EXHIBIT 7

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - DOMESTIC RELATIONS DIVISION

IN RE THE MARRIAGE OF:

SURIYA V. SASTRI,
       Petitioner,

and

GANESAN VISVABHARATHY,
       Respondent.

ASSOC. JUDGE
Elizabeth L. Rivera
SEP 07 2007
CIRCUIT COURT - 1760

No. 06 D 530086

Calendar A

## JOINT PARENTING AGREEMENT

This Joint Parenting Agreement, made this 31 day of August, 2007, in Chicago, Illinois, by and between SURIYA V. SASTRI (hereinafter "**MOTHER**"), of Burr Ridge, County of DuPage, State of Illinois, and GANESAN VISVABHARATHY (hereinafter "**FATHER**"), of Burr Ridge, County of DuPage, State of Illinois (sometimes collectively referred to as the "parties" or "parents.")

## PREAMBLE

In order to secure the maximum involvement and cooperation of both parents regarding the physical, mental, moral and emotional well-being of the parties' two (2) minor children, namely: SOWMYA SASTRI, born November 24, 1989, and presently seventeen (17) years of age, and VIDYA VISVABHARATHY, born August 26, 1992, and presently nearly fifteen (15) years of age; both now and in the future, **MOTHER and FATHER** jointly request the Court to approve this Joint Parenting Agreement, and incorporate it into any Judgment for Dissolution of Marriage that may be entered in this matter.

The parties herein agree that both are fit and proper persons to share in the care, custody and control of the parties' minor children, and the maximum involvement and cooperation of each of them on all major issues regarding the physical, mental, emotional and moral wellbeing of their

Page 1 of 24

**EXHIBIT**

7

4-8-08

GV

minor children is in the best interests of the children. Further, both parties acknowledge that it is in the minor children's best interests to have contact and involvement with both of their parents on a regular and consistent basis, and that each party has a duty, not just a right, to have contact and involvement with the minor children as provided for in this Joint Parenting Agreement. Both parties will use their respective best efforts to foster the respect, love and affection of the minor children toward each parent and will work to implement a cooperative relationship with one another that will provide the minor children with the maximum feeling of security and stability that may be possible. Toward this end, the parties shall communicate with one another on a regular basis, in civilized and respectful manner, to ensure that each parent is fully informed and involved in the children's upbringing and care.

The parties have freely and voluntarily negotiated, reviewed and entered into this Joint Parenting Agreement, and find it to be in the best interests and welfare of their minor children. Each party intends to be bound by its terms and provisions, and request its entry as an Order of this Court.

NOW THEREFORE, in consideration of the mutual and several promises contained herein, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties do hereby freely and voluntarily agree as follows, to-wit:



SS

GV

## ARTICLE I
## CUSTODY, RESIDENCE, AND GENERAL DECISION MAKING

1.1    <u>Custody</u>.  **MOTHER** and **FATHER** agree that it is in the best interests of the minor children that they be granted the joint legal custody of the two (2) minor children. For the purposes of this Agreement, the terms "joint custody" and "joint parenting" mean that both parties shall have equal rights and responsibilities regarding the rearing and overall well being of the minor children, and that the parties shall make joint decisions on any major question or issue that may arise involving the minor children's physical, mental, emotional and moral upbringing. The parties agree that they shall share these responsibilities and rights in a cooperative and collaborative manner so as to cause the least amount of disruption or disharmony in the minor children's lives.

1.2    <u>Primary Residence</u>. The parties further agree that **MOTHER** is a fit and proper person to be designated the primary residential parent of the minor children, and that **FATHER** shall have liberal parenting time with the minor children as set forth more fully in Article II below.

1.3    <u>Commitment</u>.  The parties shall cooperate fully in implementing the terms and provisions contained herein, and to exercise the parenting and vacation schedules hereinafter set forth in such a collaborative manner so as to accommodate the health care, educational, extracurricular, religious, and social commitments of the children. While the parties intend and agree to be bound by schedules hereinafter set forth, the parties recognize that the ongoing relationship between them and the minor children will require some flexibility from time-to-time, and therefore acknowledge that the general spirit of this Agreement is as important as compliance herewith.

1.3    <u>General Information Sharing</u>. Both parties shall actively participate in the raising and guiding of the minor children and, to that end, shall share all salient information concerning the physical, mental, emotional, and social development and welfare of the minor child. This shall include all information about the medical, dental, and mental health care needs of the children, and


SS

GV

the children's education and progress in school. Medical and educational records shall be available to both parents, and each of them shall be notified of consultations and invited to confer with medical professionals, teachers, counselors, and other professionals concerning the minor children's development and welfare.

To effectuate the overall purpose of this Agreement, each party shall keep the other informed at all times of the exact address where each of them resides, the telephone number of said residences, his or her cellular telephone number, his or her place of employment, the telephone numbers of said places of employment, and an e-mail address that he or she checks on a regular basis. Each party agrees that neither shall contact the other party at work, except in case of to emergency contact necessary to inform the other party of an immediate and urgent health and welfare issue regarding the children.

Further, as set forth more fully in Article VII herein, if either party plans to travel out-of-town overnight with the minor children, the traveling party shall provide the other party with an itinerary of his or her trip, including the departure and return dates, the name, address and phone number of the hotel, lodging facility or residence where the minor children will be staying, the names of the persons who will be traveling with the minor children, and airline information, if any. If either party travels out-of-town for more than forty-eight hours (without the minor child), he or she will provide the other party with contact information, and the parties shall work together to facilitate phone contact between the minor children and the traveling parent.

GV

## ARTICLE II
## PARENTING TIME

2.1    Day to Day. The parties agree that parenting time is governed by standards of reasonableness and common sense, and is intended to promote a healthy relationship between the minor children and her parents. Both parties acknowledge that it is in the children's best interests to have contact with both parties and agree to communicate on a regular basis with one another so as to ensure that the minor children has frequent contact with both parents.

The parties agree to implement the parenting schedule set forth herein in such a manner that will provide the minor children with a feeling of security and family, now reconstituted in two households. Paramount is the fostering of love between the children and her parents, and parenting time or its denial is not intended to be used as a weapon by either parent against the other. No access, whether in person or by telephone, shall be denied to **MOTHER** or **FATHER** as a result of either parent's disciplining of the child.

In the event that either party necessitates a change in parenting time, telephone, written or electronic (e-mail) notice prior to any requested changes shall be given at least twenty-four (24) hours prior to the scheduled period of parenting time, unless otherwise stated. If circumstances occur which would require a change in scheduled parenting time with less than twenty-four (24) hour notice, notice shall occur by telephone as soon as the party requiring the change becomes aware of it. All requested changes in parenting time, except for emergency situations, must be expressly accepted by the other party, preferably in writing, before becoming effective. The parties shall use their best efforts to schedule an alternative period of parenting time for the party requesting the change, in light of the circumstances necessitating the change, and the commitments, activities and schedules of the parties and the children. The parties acknowledge that alternative parenting time is preferred, but is not mandatory.

SS

GV

2.2    Parenting Schedule. **FATHER** and **MOTHER** shall share the division of regular, holiday and vacation time with the minor children as the parties may agree upon from time-to-time. The parties agree to communicate on a regular (at least once monthly) basis to determine the parenting schedule for the following month. The parties agree that they shall review and consider **MOTHER**'s call schedule when determining how to share between them regular parenting time, holidays and cultural celebrations and festivals. Further, both parents agree that they shall give consideration and preference to Vidya's academic and extra curricular schedules in planning out-of-town trips/country with the minor children. In the absence of an agreement otherwise, the parties shall have parenting time with the minor children as follows:

A)    MOTHER's Regular Parenting Time. **MOTHER** shall have parenting time with the minor children at all times except during **FATHER**'s parenting time, as set forth herein.

B)    FATHER's Alternating Weekend Parenting Time. Beginning the first Friday following the entry of this Agreement, and continuing every other weekend thereafter, **FATHER** shall have overnight parenting time with the minor children on alternating weekends, from Friday at 5:00 p.m. to Sunday, at 7:00 p.m. **FATHER** shall provide **MOTHER** with at least three (3) days notice of his intent to exercise his alternating weekend parenting time.

C)    FATHER's Weekday Parenting Time. Beginning the first ~~Thursday~~ evening following the entry of this Agreement, and continuing every ~~Thursday~~ week [*Tuesday] thereafter, **FATHER** shall have parenting time with the minor children for dinner, from after school to 7:00 p.m. **FATHER** shall provide **MOTHER** with at least twenty-four (24) hour notice of his intent to exercise his weekday parenting time.

D)    Summer Vacation. The parties shall follow the Regular Schedule set forth in Paragraphs A-C above during the summer months, except that each party shall be entitled to two (2) weeks of uninterrupted vacation parenting time with the minor children during the summer. For the purposes of this Agreement, one (1) week shall be defined as seven (7) consecutive days. Either party may exercise his or her summer vacation parenting time in two (2) separate one-week periods, or for one (1) continuous two-week period. Neither party shall exercise summer vacation for a period of longer than fourteen (14) consecutive days without first securing the consent of the other

SS

GV

party. Each party shall submit his or her preferred vacation dates to the other party by May 1 preceding the summer in question. In the event of a conflict, **FATHER**'s preference shall take precedence in even-numbered years, and **MOTHER**'s preference shall take precedence in odd-numbered years, except that the failure of one party to submit his or her desired vacation dates to the other party by April 15th, shall confer conflict priority on the party who submitted his or her preferred dates by the deadline date, regardless of whose priority "year" it is.

SS

GV

the parties, the party with parenting time shall be solely responsible for the transportation of the minor children on that day. If the minor children attend school on the day that a period of parenting time begins or ends, then the party with parenting time shall pick the minor children up and drop the minor children off at school. Otherwise, the pick up and drop off of the minor children shall occur at the other party's residence. Other than in cases of emergency or sudden illness, both parties shall provide the other at least twenty-four (24) hour notice if he or she is unable to keep a planned parenting time with the minor children, or if he or she shall be late in picking up or dropping off the minor child. In cases of emergency or sudden illness such notification shall occur (by phone or email) as soon as the party becomes aware of it.

H)    **Right of First Refusal.** The parties agree that parenting time is for each parent to spend quality time with the minor children, and not for any third party to spend time with the minor children.  In the event either **MOTHER** or **FATHER** is unable to or chooses not to exercise his or her right to parenting time with the minor children pursuant to the terms of this Agreement, or in the event that either parent shall be apart from the minor children for an overnight period of time, then that parent shall make access to the minor children available to the other parent before he or she grants access to the children to a third party caregiver. Both parties acknowledge and agree that this Right of First Refusal applies in such circumstances where the party him or herself is unable to care for the minor children and requires the services of a third-party caregiver, but shall not apply in situations where the minor children are engaged in extracurricular or social activities. The parties agree that **FATHER** shall not leave the minor children unattended with any third party without obtaining **MOTHER**'s prior express consent.

2.3    **Daily Telephone Contact.** The party who does not have overnight parenting time with the minor children on any given day shall be allowed daily telephone contact with the minor child each night between the hour of 7:00 p.m. and 8:00 p.m. The party who has overnight parenting time with the minor children on such days shall provide the other party with a telephone number where the minor children may be reached between the hour of 7:00 p.m. and 8:00 p.m., and shall make the minor children available for a reasonable period of time to speak with the telephoning parent in private. If there is no answer or the minor children is unavailable when telephoning parent calls, he or she shall leave a message, and the parent with possession of the minor children shall have the affirmative obligation to have the children return the phone call that same evening. The minor

GV

SS

...... shall be allowed to speak with the telephoning parent, in private, for a reasonable amount of ..... The minor children may initiate telephone or other contact with either party at any time, within reason.

2.4    <u>Conflicts in Parenting Schedule</u>. In the case of a parenting time conflict, unless otherwise agreed to by the parties, holiday and special day parenting time shall take precedence over any and all vacation period parenting time provided for herein, and vacation period parenting time shall take precedence over any and all regular parenting time provided for herein. Neither parent shall schedule his or her vacation time with the minor children so as to interfere with the other party's assigned holiday parenting time without first obtaining the written consent of the other party.

**ARTICLE III**
**EDUCATION**

3.1    <u>Educational Decision Making</u>. Everyday decisions regarding the minor children's education shall be made by the party with physical possession of the minor children on the day in question. All other decisions regarding the education of the minor children, including choice of school, shall be the joint decision of **MOTHER** and **FATHER**. All major educational decisions shall be made after the parties have had reasonable opportunity to consult with each other and with the appropriate professionals who can provide guidance and insight on educational issues, including teachers, counselors and special service providers. In the event that the parties cannot reach an agreement, the issue of choice of school shall be submitted to conflict resolution mediation, as set forth specifically in Article VIII of this Agreement.

3.2    <u>School-Related Expenses</u>. In order to provide the minor children with the best available educational opportunities, the parties specifically agree that they will each pay one-half (½) of all agreed-upon school-related expenses, including tuition, as required and mandated by the school that the children attends. All daycares, preschools and schools shall be directed to send

SS

GV

extraordinary medical, dental, psychiatric or other health care, **FATHER** and **MOTHER** shall consult each other before incurring any major medical expenses. In situations where the parties cannot agree as to whether or not the expense should be incurred, and delay will not cause harm to the children, the issue shall be submitted to Conflict Resolution Mediation, and either party may petition the Court for an alternate decision he or she disagrees with the outcome of the mediation. It is understood by both parties that each party's obligation to consult with the other shall not apply in cases of emergency where the life or health of the children might be imperiled by delay.

4.3 <u>Decision Making</u>. **MOTHER** and **FATHER** shall discuss and jointly make all major decisions regarding any and all health and medical concerns that arise regarding the minor child. In making decisions, the parties shall take into primary consideration the advice and recommendations of the children's healthcare providers. Whether a decision is "major" or not shall be governed by rules of common sense and in light of the circumstances in which it must be made.

Ordinary day-to-day decisions concerning the overall medical, dental, optical and other health care of the minor children shall be made by the parent who, at the time, is with the child. However, care shall be taken so that ordinary health care decisions by one parent shall not affect the other party's parenting time with the children (such as scheduling medical appointments during the other party's parenting time).

In a case of a medical emergency, where time does not allow consultation with the other parent, the parent with physical possession of the minor children shall take whatever emergency action is necessary to meet the health needs of the child. As soon as possible, the parent making such an emergency decision will advise the other parent regarding the facts, circumstances, decision, location and condition of the minor child.

4.4 <u>Choice of Health Provider</u>. With respect to the minor children's medical, dental and

GV

SS

*optical* welfare, the parties hereto agree that the minor children shall continue to see her current pediatricians, physicians, psychiatrists, dentists, optometrists, psychologists and therapists. In the event that it becomes necessary for the minor children to see a new healthcare practitioner, either party may interview prospective providers and the parties shall jointly select the new health care providers. Either party is entitled, at his or her own cost, to seek second medical opinions for the minor child.

4.5     <u>Information Sharing</u>. The parties shall provide each other with all pertinent information regarding the names, addresses, telephone numbers and any other necessary facts concerning the providers of any medical or health care of the minor child. Each party shall inform all providers of medical or health care of the name, address and telephone number of the other party, and instruct said any and all healthcare providers to release all medical information to the other parent and to keep the other party informed as to the physical, mental and emotional well being and development of the minor child. If one of the parties makes a medical or dental appointment for the minor children, he or she shall immediately advise the other parent of the date and time of said appointment. Both parties shall share and attend the minor children's medical appointments and shall have the right to confer with their healthcare providers regarding same.

Both parents shall inform each other of any serious medical or health problems which arose while he or she had physical possession of the children when the information of said medical or health problem would aid the other parent in the care and treatment of the child. Both parents shall provide each other with any medications that the children is taking at the time of transfer of physical possession to ensure that the minor children takes said medication as directed, and to obtain refills of said medication, if necessary.





GV

## ARTICLE V
## RELIGIOUS UPBRINGING

5.1    The parties agree that the children shall be raised in the Hindu faith, and that all religious decisions shall be made jointly by both parties. Both parties agree to facilitate the minor children's attendance at religious school on Sundays during his or her parenting time, and to facilitate the children's participation in field trips and other religious activities.

## ARTICLE VI
## ADDITIONAL PARENTING GUIDELINES

6.1    The parties shall adhere to the following additional rules and guidelines with respect to the custody of and parenting time with the minor children:

A.    The parties shall do everything within their power to foster the love and affection of the children for both parents and to attempt to reach agreement on all questions involving the children, her welfare and future;

B.    In fostering the children's respect and affection for both parents, the parties shall be allowed unmonitored communication with the children by telephone and other means as long as said communication is reasonable and the children are willing participants. However, neither parent shall visit or telephone the minor children at unreasonable hours;

C.    The parties shall work cooperatively to arrange parenting time schedules which shall take into account the minor children's educational, extracurricular, religious and social activities. Each party shall take the minor children to appropriately planned activities that occur during his or her parenting time, and either party may attend said activities;

D.    Neither parent shall speak ill, make derogatory statements, ridicule, defame, belittle or in any other way seek to undermine the children's love and respect for the other parent. Each parent shall refrain from discussing the conduct of the other parent in the presence of the minor children except in a laudatory or complimentary way, and shall instruct relatives and friends to do the same;

E.    Access to the children shall not be withheld as a result of either parent's failure to pay financial support. Under no circumstances shall questions of financial support, either as to amount, manner or transmission of payment be raised in the presence of the child;

F.    Neither party shall threaten to withhold parenting time from the other party;

SS

GV

nor shall either party prevent or delay the return of the minor children to after a period of parenting time;

G.  The parties shall prepare the minor children, both physically and mentally, for parenting time with the other parent. The minor children shall be available and dressed appropriately at the time mutually agreed upon by the parties for the beginning and end of parenting time;

H.  Neither parent shall unreasonably question the children regarding the circumstances or activities of the other parent;

I.  Neither parent shall expose the minor children to any immoral conduct;

J.  Neither party shall have members of the opposite sex not related by blood or marriage to stay overnight in his or her residence when the minor children are present, unless that party is engaged to be married to the person staying overnight with a date certain set for the marriage to take place. If either party is residing with an unrelated member of the opposite sex on a conjugal basis without a date set for a marriage to take place, then that parent shall ask the third party to vacate the house during his or her parenting time, or, in the alternative, shall exercise his or her parenting time outside of that residence The parties further agree that the minor children shall have no babysitting or other obligation toward the minor children either party's romantic partner, and that the minor children do not have to share their father or mother's parenting time with the minor children of his or her romantic partner.

*until the entry Judicial at which this proviso shall no longer apply.*

L.  If the minor children does not sleep at either parent's residence during a period of parenting time, then that parent shall provide the other parent with the location and telephone number of where the minor children is sleeping;

M.  Both parents shall, at all times, conduct themselves in a manner that promotes the beneficial effect on the minor children of parenting time with the both parties;

N.  Both parents shall foster a loving relationship for the minor children and shall guide her to comply with the terms set forth in this Joint Parenting Agreement. Neither party shall frustrate the terms of this Agreement in an attempt to gain additional time with the minor children or sabotage their relationship with the other parent.

O.  *The parties shall communicate directly and not through the children regarding matters pertaining to this Agreement.*

## ARTICLE VII
## REMOVAL

7.1  <u>Permanent Removal</u>. So that the intention of this Agreement, that the minor children spend substantial amounts of time with both parents, is facilitated, except by prior written agreement

SS

GV

of the parties or Order of Court, both parties agree that they shall reside in the State of Illinois during the children's minority.

7.2    <u>Temporary Removal/Travel Guidelines</u>. Either party may remove the minor children temporarily from the State of Illinois or the country during his or her parenting time for vacation, or for other good reason, with at least forty-eight (48) hours notice to the other party.

A party intending to travel out-of-town overnight with the minor children must provide the other party with a detailed itinerary, including the departure and return dates, the name, address and phone numbers of the hotel, lodging facility or residence where the minor children will be staying, the names of the persons who will be traveling with the minor children, and airline information, if any. Further, the party leaving town with the minor children shall ensure that the children do not go more than twenty-four (24) hours without having telephone contact with the other parent.

In the event that either party desires to leave the State of Illinois with the minor children during a period of time designated as the other party's parenting time herein, he or she must first obtain the written consent of the other party, and the other party shall be entitled, upon the children's return, to make-up parenting time for the period of time missed. If the party desiring to leave town with the minor children during the other party's parenting time has a good faith reason for his or her request, for example, so that the children may attend an out-of-town family obligation (weddings, family reunions, graduations, funerals), the other party shall not unreasonably withhold his or her consent.

**ARTICLE VIII**
**CONFLICT RESOLUTION**

8.1    <u>Dispute Resolution Process</u>. The parties agree that in the event that they cannot reach a joint decision on major issues as provided for herein, they shall participate in mediation with a mutually agreed upon, qualified mediator in an attempt to resolve said dispute prior to proceeding to

hearing in a Court of competent jurisdiction. More specifically, the procedures for resolving

conflicts arising under this Agreement, except for any provisions that specifically provide some

other alternative procedure for resolving a conflict, are as follows:

A.  If any conflict arises between the parents which they cannot resolve, or problems arise regarding the implementation of any portion of this Agreement, the complaining parent shall first notify the other parent of the nature of the complaint and both parents shall make reasonable attempts to negotiate a settlement of the conflict by and between themselves. Whenever practical under the circumstances, the complaint should be made in a written form and given directly or mailed (including e-mail) to the other parent. The parent receiving the complaint should likewise, whenever practical, reply to the complaint in a similar manner in written form.

B.  If the parties are unable to arrive at an agreement through this direct communication, and the parties continue to disagree about this Joint Parenting Agreement, including but not limited to, its implementation, interpretation or meaning, or if there are disputes or alleged breaches, proposed changes, either temporary or permanent, changes of circumstances, or other difficulties or disagreements, they shall participate in mediation with a mutually agreed upon, qualified mediator in an attempt to resolve said dispute prior to proceeding to a hearing in a court of competent jurisdiction. If the parties cannot agree upon a qualified mediator, they shall participate in mediation with a mediator approved by the Chicago Bar Association. The cost of the first such mediation shall be shared equally by the parties, with subsequent costs to be determined by the mediator.

C.  In undertaking the dispute resolution processes, both parents agree that preference will be given in carrying out this the terms and intention of this Joint Parenting Agreement.

D.  If the parties are unable to arrive at an agreement through mediation, then either party may seek determination by this Court to resolve the conflict upon proper petition, notice and hearing.

E.  If this Court finds that a parent has intentionally used or frustrated the conflict resolution process in bad faith, the Court may award attorney's fees to the prevailing party.

8.2  <u>Jurisdiction</u>. The parties agree that irrespective of parties domiciles, the Circuit Court

of Cook County, Illinois, shall at all times maintain jurisdiction of this matter for the purposes of

enforcing and/or modifying the terms of this Joint Parenting Agreement.





## ARTICLE IX
## FUTURE EVENTS

9.1    <u>Remarriage</u>. In the event of the remarriage of either party, the party remarrying shall have the affirmative obligation to make known to that party's new spouse the terms and provisions of this Joint Parenting Agreement and to encourage the new spouse to comply with the intentions of the parties as set forth herein.

9.2    <u>Surviving Parent</u>. In the event of the death of one of the parents during the children's minority, the surviving parent shall have the sole custody of the minor children and shall cooperate in arranging parenting time between the children and the family of the deceased parent.

9.3    <u>Review</u>. The parties may amend the provisions of this Joint Parenting Agreement solely in writing and by mutual consent. The parties agree, pursuant to Section 602.1 of the Illinois Marriage and Dissolution of Marriage Act, to annually review the terms and conditions of this Joint Parenting Agreement on an annual basis as to its adequacy, feasibility and appropriateness in view of the children's age and developmental progress.

9.4    <u>Incorporation in Judgment</u>. In the event of the entry of a Judgment for Dissolution of Marriage in the pending action, this Agreement and all of its provisions shall be incorporated into such Judgment, either directly or by reference.

## ARTICLE X
## CHILDREN'S BILL OF RIGHTS

10.1    The parties specifically subscribe to the following Children's Bill of Rights:

A.    The right of the children to be treated as an interested and affected persons and not as pawns of this divorce;

B.    The right to grow up in a home environment that will guide and discipline, under the protection of both parents;

C.    The right to the day-by-day love, care, discipline, and protection of both parents;

SS

GV

D.   The right to know each parent and to have the benefit of each parent's love and guidance through adequate parenting time;

E.   The right to a positive and constructive relationship with both parents, with neither parent permitted to degrade the other parent in the children's mind;

F.   The right to have moral and ethical values inculcated by precept and example, and to have limits set forth so that the children may develop self-discipline early in life;

G.   The right to the most adequate level of economic support that can be provided by the efforts of both parents;

H.   The right to such periodic review of custodial arrangements and children support orders as the parents' circumstances and the children's benefit require;

I.   The right to the recognition of the fact that children involved in a divorce are always the disadvantaged parties, and the law must take affirmative steps to assure their welfare.


**IN WITNESS WHEREOF**, the parties have hereunto set their hands this _____ day of

August, 2007.

_____
SURIYA V. SASTRI

_____
GANESAN VISVABHARATHY

ENTER: _____  DATE

_____
JUDGE

Drafted by:
LEVIN & ASSOCIATES

SS

GV

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IBA, LLC, a Delaware limited liability company | ) ) ) | |
| Petitioner, | ) ) | Case No. 07 C 6219 |
| vs. | ) ) | Judge Wayne R. Andersen |
| GANESAN VISVABHARATHY, an individual | ) ) ) | |
| Respondent. | ) ) | |

**THIRD-PARTY CITATION TO DISCOVER ASSETS**

To:    The Private Bank and Trust Company
       70 W. Madison Street, Ste. 200
       Chicago, IL 60602

YOU ARE REQUIRED to appear and file your answer to this Citation on April 10, 2008 at 9:00 a.m. before the Honorable Judge Wayne R. Andersen or any judge sitting his stead, in Room 1403 at the Dirksen Federal Building located 219 S. Dearborn, Chicago, IL 60604.

A judgment in favor of IBA, LLC and against Ganesan Visvabharathy was entered on February 5, 2008 in the amount of $10,504.447.77 and $10,504,447.77 remains unsatisfied.  Your answer will inform the Court as to property you may hold belonging to: Ganesan Visvabharathy.

YOU ARE COMMANDED to produce at the examination:    **See Attached Rider**

YOU ARE REQUIRED to do the following upon receiving this Citation until further Order of Court , or until this Citation is dismissed by the Court or by Stipulation:

YOU ARE PROHIBITED from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to the judgment debtor or to which the judgment debtor may be entitled or which may be acquired by or become due to the judgment debtor and from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to the judgment debtor, until further order of court or termination of the proceedings. You are not required to withhold payment of any money beyond double the amount of the judgment.

WARNING:    YOUR FAILURE TO APPEAR IN COURT AS HEREIN DIRECTED MAY CAUSE YOU TO BE ARRESTED AND BROUGHT BEFORE THE COURT TO ANSWER TO A CHARGE OF CONTEMPT OF COURT, WHICH MAY BE PUNISHABLE BY IMPRISONMENT IN THE FEDERAL JAIL.

MICHAEL W. DOBBINS, CLERK

DAVID JOZWIAK

MAR 2 5 2008

## CERTIFICATE OF ATTORNEY

In the United States District Court, Northern District of Illinois on February 5, 2008 a judgment in the amount of $10,504,474.77 was entered in favor of IBA, LLC and against Ganesan Visvabharathy in Case No. 07 C 6219 and a balance of $10,504,474.77 remains unsatisfied.

_____ /s/ Gary I. Blackman _____

Gary I. Blackman [ARDC #6187914]
James G. Martignon [ARDC #6277974]
Levenfeld Pearlstein, LLC
2 N. LaSalle St., Ste. 1300
Chicago, IL 60602
T: (312) 346-8380; F: (312) 346-8434
gblackman@lplegal.com
jmartignon@lplegal.com
Counsel for Petitioner

## PROOF OF SERVICE

The undersigned, on oath states:

     I am over 18 years of age and not a party to this case.   I served this *Citation to Discover Assets to Third Party* as follows:

### By a copy via U.S. Mail

Bruce S. Sperling
Daniel A. Shmikler
Sperling & Slater, P.C.
55 W. Monroe Street , Suite 3200
Chicago, IL 60603
(312) 641-3200

prior to 5:00 p.m. on March 25, 2008.

Steve A. James

Subscribed and Sworn to before me
this 25 day of March, 2008.

Notary Public

OFFICIAL SEAL
LETRIC WATSON
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:05/04/08

## DOCUMENTS TO BE PRODUCED BY PRIVATE BANK AND TRUST COMPANY

All books, papers or records in your possession or control which may contain information concerning Ganesan Visvabharathy, including, but not limited to the property or income of, or indebtedness due judgment debtor, Ganesan Visvabharathy, including, but not limited to:

    A.    Account Numbers (Amount held)*

    B.    Savings Account (Amount held)*

    C.    Checking and/or Now Account (Amount held)*

    D.    Certificate of Deposit (Amount held at maturity date)**

    E.    Money Market Account (Amount held)*

    F.    Trust Account (Amount held)*

    G.    Shares of Stock/Bonds (Amount held)

    H.    Safety Deposit Box

    I.    Other Personal Property (Describe)

    J.    Mortgages, Appraisals or Loan Documents

    K.    Financial Statements furnished by Judgment Debtor for any purpose in the past three years

    L.    Income Statements and balance sheets prepared by Judgment Debtor for any purpose in the past three years

* For any account(s) which are no longer open, please state the date on which said account(s) were closed, the individual who closed said account(s).

** For any certificates of deposit, please indicate the amount of each certificate of deposit and the maturity date of each such certificate.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IBA, LLC, a Delaware limited liability company | ) ) ) | |
| Petitioner, | ) ) | Case No. 07 C 6219 |
| vs. | ) ) | Judge Wayne R. Andersen |
| GANESAN VISVABHARATHY, an individual | ) ) ) | |
| Respondent. | ) | |

## THIRD-PARTY CITATION TO DISCOVER ASSETS

To:    222 East Pearson Condominium Association
Michael R. Collins – Registered Agent
8 S. Michigan – Ste 1414
Chicago, Illinois 60603

YOU ARE REQUIRED to appear and file your answer to this Citation on April 10, 2008 at 9:00 a.m. before the Honorable Judge Wayne R. Andersen or any judge sitting his stead, in Room 1403 at the Dirksen Federal Building located 219 S. Dearborn, Chicago, IL 60604.

A judgment in favor of IBA, LLC and against Ganesan Visvabharathy was entered on February 5, 2008 in the amount of $10,504.447.77 and $10,504,447.77 remains unsatisfied. Your answer will inform the Court as to property you may hold belonging to: Ganesan Visvabharathy.

YOU ARE COMMANDED to produce at the examination:    <u>See Attached Rider</u>

YOU ARE REQUIRED to do the following upon receiving this Citation until further Order of Court , or until this Citation is dismissed by the Court or by Stipulation:

YOU ARE PROHIBITED from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to the judgment debtor or to which the judgment debtor may be entitled or which may be acquired by or become due to the judgment debtor and from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to the judgment debtor, until further order of court or termination of the proceedings. You are not required to withhold payment of any money beyond double the amount of the judgment.

WARNING:    YOUR FAILURE TO APPEAR IN COURT AS HEREIN DIRECTED MAY CAUSE YOU TO BE ARRESTED AND BROUGHT BEFORE THE COURT TO ANSWER TO A CHARGE OF CONTEMPT OF COURT, WHICH MAY BE PUNISHABLE BY IMPRISONMENT IN THE FEDERAL JAIL.

MICHAEL W. DOBBINS, CLERK

DAVID JOZWIAK

MAR 2 5 2008

## CERTIFICATE OF ATTORNEY

In the United States District Court, Northern District of Illinois on February 5, 2008 a judgment in the amount of $10,504,474.77 was entered in favor of IBA, LLC and against Ganesan Visvabharathy in Case No. 07 C 6219 and a balance of $10,504,474.77 remains unsatisfied.

_____/s/ Gary I. Blackman_____

Gary I. Blackman [ARDC #6187914]
James G. Martignon [ARDC #6277974]
Levenfeld Pearlstein, LLC
2 N. LaSalle St., Ste. 1300
Chicago, IL 60602
T: (312) 346-8380; F: (312) 346-8434
gblackman@lplegal.com
jmartignon@lplegal.com
Counsel for Petitioner

## PROOF OF SERVICE

The undersigned, on oath states:

I am over 18 years of age and not a party to this case.   I served this *Citation to Discover Assets to Third Party* as follows:

### By a copy via U.S. Mail

Bruce S. Sperling
Daniel A. Shmikler
Sperling & Slater, P.C.
55 W. Monroe Street , Suite 3200
Chicago, IL 60603
(312) 641-3200

prior to 5:00 p.m. on March 25, 2008.

_____
Steve A. James

Subscribed and Sworn to before me
this 25 day of March, 2008.

_____
Notary Public

```
OFFICIAL SEAL
LETRIC WATSON
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:05/04/08
```

## DOCUMENTS TO BE PRODUCED AT CITATION

Any and all documents related to Ganesan Visvabharathy ("Visvabharathy"), including but not limited to, any documents related to his investment in or involvement with 222 East Pearson Condominium Association as either a developer or in any other capacity. Any loans made to or by Visvabharathy, all stock certificates or other evidence of ownership and all correspondence (including e-mail), documents or information provided to 222 East Pearson Condominium Association by Visvabharathy with respect to any matter.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IBA, LLC, a Delaware limited
liability company

        Petitioner,

        vs.

GANESAN VISVABHARATHY,
an individual

        Respondent.

)
)
)
)
)   Case No. 07 C 6219
)
)   Judge Wayne R. Andersen
)
)
)
)
)
)

<u>THIRD-PARTY CITATION TO DISCOVER ASSETS</u>

To:   222 East Pearson REO LLC
      Michael R. Collins – Registered Agent
      8 S. Michigan – Ste 1414
      Chicago, Illinois 60603

     YOU ARE REQUIRED to appear and file your answer to this Citation on April 10, 2008 at 9:00 a.m. before the Honorable Judge Wayne R. Andersen or any judge sitting his stead, in Room 1403 at the Dirksen Federal Building located 219 S. Dearborn, Chicago, IL 60604.

A judgment in favor of IBA, LLC and against Ganesan Visvabharathy was entered on February 5, 2008 in the amount of $10,504.447.77 and $10,504,447.77 remains unsatisfied. Your answer will inform the Court as to property you may hold belonging to: Ganesan Visvabharathy.

     YOU ARE COMMANDED to produce at the examination:    <u>See Attached Rider</u>

     YOU ARE REQUIRED to do the following upon receiving this Citation until further Order of Court , or until this Citation is dismissed by the Court or by Stipulation:

     YOU ARE PROHIBITED from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to the judgment debtor or to which the judgment debtor may be entitled or which may be acquired by or become due to the judgment debtor and from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to the judgment debtor, until further order of court or termination of the proceedings. You are not required to withhold payment of any money beyond double the amount of the judgment.

WARNING:   YOUR FAILURE TO APPEAR IN COURT AS HEREIN DIRECTED MAY CAUSE YOU TO BE ARRESTED AND BROUGHT BEFORE THE COURT TO ANSWER TO A CHARGE OF CONTEMPT OF COURT, WHICH MAY BE PUNISHABLE BY IMPRISONMENT IN THE FEDERAL JAIL.

MICHAEL W. DOBBINS, CLERK

     DAVID JOZWIAK

MAR 2 5 2008

## CERTIFICATE OF ATTORNEY

In the United States District Court, Northern District of Illinois on February 5, 2008 a judgment

in the amount of $10,504,474.77 was entered in favor of IBA, LLC and against Ganesan Visvabharathy in

Case No. 07 C 6219 and a balance of $10,504,474.77 remains unsatisfied.

_____/s/ Gary I. Blackman_____

Gary I. Blackman [ARDC #6187914]
James G. Martignon [ARDC #6277974]
Levenfeld Pearlstein, LLC
2 N. LaSalle St., Ste. 1300
Chicago, IL 60602
T: (312) 346-8380; F: (312) 346-8434
gblackman@lplegal.com
jmartignon@lplegal.com
Counsel for Petitioner

## PROOF OF SERVICE

The undersigned, on oath states:

      I am over 18 years of age and not a party to this case.   I served this *Citation to Discover Assets to Third Party* as follows:

### By a copy via U.S. Mail

Bruce S. Sperling
Daniel A. Shmikler
Sperling & Slater, P.C.
55 W. Monroe Street , Suite 3200
Chicago, IL 60603
(312) 641-3200

prior to 5:00 p.m. on March 25, 2008.

Steve A. James

Subscribed and Sworn to before me
this **25** day of March, 2008.

Notary Public

OFFICIAL SEAL
LETRIC WATSON
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:05/04/08

## DOCUMENTS TO BE PRODUCED AT CITATION

Any and all documents related to Ganesan Visvabharathy ("Visvabharathy"), including but not limited to, any documents related to his investment in or involvement with 222 East Pearson REO LLC as either a developer or in any other capacity. Any loans made to or by Visvabharathy, all stock certificates or other evidence of ownership and all correspondence (including e-mail), documents or information provided to 222 East Pearson REO LLC by Visvabharathy with respect to any matter.

# EXHIBIT D

## Daniel Shmikler

| | |
|---|---|
| **From:** | Daniel Shmikler |
| **Sent:** | Friday, March 07, 2008 11:08 AM |
| **To:** | Gary I. Blackman |
| **Cc:** | James G. Martignon; Bruce Sperling |
| **Subject:** | RE: Indymac/Vish - Vish Motion to Quash Service of Summons |

Gary,

We remain unauthorized to accept service, but I can advise you that Dr. Vish has taken up residence in India, and we can provide you with his address there so that he can be properly served pursuant to Fed. R. Civ. P. 4(f). Please let me know if you would like to pursue appropriate service at his actual residence.

Dan

---

**From:** Gary I. Blackman [mailto:gblackman@lplegal.com]
**Sent:** Wednesday, March 05, 2008 6:33 PM
**To:** Daniel Shmikler
**Cc:** James G. Martignon; Bruce Sperling
**Subject:** RE: Indymac/Vish - Vish Motion to Quash Service of Summons

I'll await your email. I offer again to give your client the time necessary to respond if he accepts service. This is a colossal waste of everyone's time.

---

**From:** Daniel Shmikler [mailto:DShmikler@sperling-law.com]
**Sent:** Tuesday, March 04, 2008 12:01 PM
**To:** Gary I. Blackman
**Cc:** James G. Martignon; Bruce Sperling
**Subject:** RE: Indymac/Vish - Vish Motion to Quash Service of Summons

Gary,

I had responded to Jim when we met at the courthouse last week – I am working on getting updated dates from Dr. Vish and Dr. Sastri in light of the Court's delay of the hearing date.

We expect to call the two of them as witnesses. I presume you will call your process server – do you intend to call anyone else?

If it is just these three witnesses, we can schedule the hearing for a morning or an afternoon, and should probably have 3 alternative dates to present to the Court. I'll get back to you with dates we can do it, and would appreciate if you did the same.

Dan

---

**From:** Gary I. Blackman [mailto:gblackman@lplegal.com]
**Sent:** Monday, March 03, 2008 7:16 PM
**To:** Daniel Shmikler
**Cc:** James G. Martignon
**Subject:** RE: Indymac/Vish - Vish Motion to Quash Service of Summons

Dan, can I get a response on this? We are up on March 10 and I would like to be able to coordinate with you so we can get a hearing date that day. Thank you. Gary

3/13/2008

**From:** Gary I. Blackman
**Sent:** Friday, February 22, 2008 11:05 AM
**To:** 'dshmikler@sperling-law.com'
**Cc:** James G. Martignon; Steve A. James
**Subject:** Indymac/Vish – Vish Motion to Quash Service of Summons

Dan, I know we have a difference of opinion on the merits of your motion to quash service, but now that the judge is requiring that your client come to court and testify as to his true place of abode (after which, even if our initial service is bad, he will be served) now might be a good time for you to accept service and get the time you need to respond - which we will, of course, agree to give you. Otherwise, we are all wasting a lot of time and money with the end result being the same. If this is not agreeable to your client, let us know by the close of business Monday when Vish and his wife are available to testify so we can check our schedules before we have to report back to the court on Wednesday. Thank you.

Gary I. Blackman
LEVENFELD PEARLSTEIN, LLC
2 N. LaSalle St. Suite 1300
Chicago, Illinois 60602
312.476.7536   Fax: 312.346.8434   Cell: 312.371.8961
gblackman@lplegal.com
www.lplegal.com



Please feel free to contact my assistant Candy Graham at 312.476.7651.

Levenfeld Pearlstein is committed to our environment. Please join us and consider not printing this e-mail unless necessary.

In conformity with U.S. Treasury Department Circular 230, tax advice contained in this communication and any attachments is not intended to be used, and cannot be used, for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code, nor may any such tax advice be used to promote, market or recommend to any person any transaction or matter that is the subject of this communication and any attachments. The intended recipients of this communication and any attachments are not subject to any limitation on the disclosure of the tax treatment or tax structure of any transaction or matter that is the subject of this communication and any attachments.

This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

--
This message has been scanned for viruses and
dangerous content by **MailScanner**, and is
believed to be clean.

Levenfeld Pearlstein is committed to our environment. Please join us and consider not printing this e-mail unless necessary.

In conformity with U.S. Treasury Department Circular 230, tax advice contained in this communication and any attachments is not intended to be used, and cannot be used, for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code, nor may any such tax advice be used to promote, market or recommend to any person any transaction or matter that is the subject of this communication and any attachments. The intended recipients of this communication and any attachments are not subject to any

3/13/2008

limitation on the disclosure of the tax treatment or tax structure of any transaction or matter that is the subject of this communication and any attachments.

This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

--
This message has been scanned for viruses and dangerous content by **MailScanner**, and is believed to be clean.

3/13/2008

# EXHIBIT E

## Daniel Shmikler

| | |
|---|---|
| **From:** | Daniel Shmikler |
| **Sent:** | Thursday, March 13, 2008 10:47 AM |
| **To:** | James G. Martignon |
| **Cc:** | Gary I. Blackman; Bruce Sperling |
| **Subject:** | Indymac v. Vish – service |

Jim,

I haven't heard back from you regarding our conversation yesterday, or my subsequent voicemail. As I said in my message, much of the reason that our client is willing to enter into the compromise we offered regarding service of process is to avoid the expense of additional pleading on the issue. Accordingly, I asked whether, at a minimum, you would join an agreed motion to put over the remaining briefing for a week while we determine whether plaintiff will accept the proffered compromise. Otherwise, we will have to file our reply today in support of our motion to set aside the default order in the matter pending before Judge Gottschall, which may undermine my client's interest in our proposal. Please contact me immediately to advise whether you are amendable either to the compromise, or the agreed motion.

Dan

3/13/2008

# EXHIBIT F

**Daniel Shmikler**

| | |
|---|---|
| **From:** | Gary I. Blackman [gblackman@lplegal.com] |
| **Sent:** | Wednesday, April 02, 2008 2:14 PM |
| **To:** | Daniel Shmikler |
| **Cc:** | Bruce Sperling; James G. Martignon |
| **Subject:** | RE: Indymac/Vish |

First, congratulations on the new baby. As for the offer, we just don't see how we benefit. Your client has always had the ability to accept service and come in and ask for time and to vacate defaults. You don't need our permission for that and, as you well know, the likelihood of a judge not vacating a default when you are standing there saying you want time to respond is so low as to be non-existent. So our trust level is pretty low when you say you will accept service but want 90 days to respond to a guaranty claim filed 4 months ago. Its not a complicated claim. If Vish is serious about resolving this or offering something of value (if he can) and not just playing out the clock, we will always pick up the phone and talk but we are not interested in voluntarily waiting until July to start responding to motions to dismiss. Offer to accept service, 30 days to respond and agree to not dissipate assets and there may be something to talk about. Gary


-----Original Message-----
From: Daniel Shmikler [mailto:DShmikler@sperling-law.com]
Sent: Wednesday, April 02, 2008 11:52 AM
To: James G. Martignon
Cc: Gary I. Blackman; Bruce Sperling
Subject: Indymac/Vish

Jim,

I wanted to make sure you got my voicemail of yesterday regarding service. As I said, we have consulted with our client, and are again willing to accept service in all three federal guarantee actions, provided that we agree to (i) clear all defaults and judgments; and (ii) provide us with a reasonable time to respond in each, until July 1.

Please let me know today whether this is acceptable to you, in light of our hearing tomorrow in front of Judge Gottschall. I am away from the office due to the recent birth of our son, but you can reach me by email or on my cell, 773-266-3080.

Dan
P Levenfeld Pearlstein is committed to our environment. Please join us and consider not printing this e-mail unless necessary.
In conformity with U.S. Treasury Department Circular 230, tax advice contained in this communication and any attachments is not intended to be used, and cannot be used, for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code, nor may any such tax advice be used to promote, market or recommend to any person any transaction or matter that is the subject of this communication and any attachments. The intended recipients of this communication and any attachments are not subject to any limitation on the disclosure of the tax treatment or tax structure of any transaction or matter that is the subject of this communication and any attachments.

This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

--
This message has been scanned for viruses and dangerous content by MailScanner, and is believed to be clean.

1

# EXHIBIT G

KEYS

**United States District Court**
**Northern District of Illinois - CM/ECF LIVE, Ver 3.1.3 (Chicago)**
**CIVIL DOCKET FOR CASE #: 1:07-cv-06219**

IBA, LLC et al vs. Visvabharathy                          Date Filed: 11/02/2007
Assigned to: Honorable Wayne R. Andersen                  Jury Demand: None
Cause: 28:1332 Diversity-Breach of Contract               Nature of Suit: 190 Contract: Other
                                                          Jurisdiction: Diversity

**Plaintiff**

**IBA, LLC**                              represented by **Gary Irwin Blackman**
*a Delaware limited liability company*                   Levenfeld Pearlstein
                                                          2 North LaSalle Street
                                                          13th Floor
                                                          Chicago, IL 60602
                                                          (312)346-8380
                                                          Email: gblackman@lplegal.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **James G Martignon**
                                                          Levenfeld Pearlstein, LLC
                                                          2 North LaSalle Street
                                                          Suite 1300
                                                          Chicago, IL 60602
                                                          (312)346-8380
                                                          Email: jmartignon@lplegal.com
                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Ganesan Visvabharathy**                 represented by **Bruce S. Sperling**
*an individual*                                          Sperling & Slater
                                                          55 West Monroe Street
                                                          Suite 3200
                                                          Chicago, IL 60603
                                                          (312)641-3200
                                                          Email: bss@sperling-law.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Daniel A. Shmikler**
                                                          Sperling & Slater
                                                          55 West Monroe Street
                                                          Suite 3200
                                                          Chicago, IL 60603
                                                          (312)641-3200
                                                          Email: dshmikler@sperling-law.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/02/2007 | 1 | COMPLAINT filed by IBA, LLC; Filing fee $ 350 (Exhibits). (Poor Quailit Orginal - Paper Document on File)(tlm) Modified on 11/5/2007 (tlm) (Entered: 11/05/2007) |
| 11/02/2007 | 2 | CIVIL Cover Sheet. (tlm) (Entered: 11/05/2007) |
| 11/02/2007 | 3 | ATTORNEY Appearance for Plaintiff IBA, LLC by James G Martignon. (tlm) (Entered: 11/05/2007) |
| 11/02/2007 | 4 | ATTORNEY Appearance for Plaintiff IBA, LLC by Gary Irwin Blackman. (tlm) (Entered: 11/05/2007) |

| | | |
|---|---|---|
| 11/02/2007 | 6 | RULE 7.1 and LOCAL Rule 3.2 Disclosure STATEMENT by IBA. (tlm) (Entered: 11/05/2007) |
| 11/05/2007 | | SUMMONS issued, 2 and 2 copies, as to Defendant Ganesan Visvabharath. tlm) (Entered: 11/05/2007) |
| 01/02/2008 | 7 | MOTION by Plaintiff IBA, LLC for default judgment as to *Ganesan Visvabharathy* (Attachments: # 1 Exhibit)(Martignon, James) (Entered: 01/02/2008) |
| 01/02/2008 | 8 | NOTICE of Motion by James G Martignon for presentment of motion for default judgment 7 before Honorable Wayne R. Andersen on 1/17/2008 at 09:00 AM. (Martignon, James) (Entered: 01/02/2008) |
| 01/17/2008 | 9 | MINUTE entry before Judge Wayne R. Andersen :Plaintiff's motion for default judgment 7 is granted. Prove up set for 1/31/2008 at 09:00 AM.Mailed notice (tsa, ) (Entered: 01/22/2008) |
| 01/25/2008 | 10 | ATTORNEY Appearance for Defendant Ganesan Visvabharathy by Daniel A. Shmikler (Shmikler, Daniel) (Entered: 01/25/2008) |
| 01/25/2008 | 11 | ATTORNEY Appearance for Defendant Ganesan Visvabharathy by Bruce S. Sperling (Sperling, Bruce) (Entered: 01/25/2008) |
| 01/31/2008 | 12 | MINUTE entry before Judge Wayne R. Andersen :Status hearing and prove -up hearing held on 1/31/2008.Mailed notice (tsa, ) (Entered: 02/05/2008) |
| 02/05/2008 | 13 | MINUTE entry before Judge Wayne R. Andersen: Enter Order. It is hereby ordered that judgment is entered in favor of the plaintiff and against Defendant Ganesan Visvabharathy, in the amount of $10,348,488.62 as of 01/15/08 plus per diem interest of $2,557.15 through the date of judgment. There is no just cause or reason to delay the enforcement or appeal of this order. Mailed notice (tlm) (Entered: 02/11/2008) |
| 02/05/2008 | 14 | ORDER 13 signed by Judge Wayne R. Andersen on 2/5/2008. Mailed notice (tlm) (Entered: 02/11/2008) |
| 02/14/2008 | 15 | MOTION by Defendant Ganesan Visvabharathy to set aside judgment (Shmikler, Daniel) (Entered: 02/14/2008) |
| 02/14/2008 | 16 | NOTICE of Motion by Daniel A. Shmikler for presentment of motion to set aside judgment 15 before Honorable Wayne R. Andersen on 2/21/2008 at 09:00 AM. (Shmikler, Daniel) (Entered: 02/14/2008) |
| 02/14/2008 | 17 | MEMORANDUM by Ganesan Visvabharathy in support of motion to set aside judgment 15 *and quash service* (Shmikler, Daniel) (Entered: 02/14/2008) |
| 02/21/2008 | 18 | MINUTE entry before Judge Wayne R. Andersen :Defendant's motion to set aside judgment 15 is taken under advisement.Advised in open court notice (tsa, ) (Entered: 02/21/2008) |
| 03/19/2008 | 20 | MEMORANDUM of Judgment 19 signed by Judge Honorable Wayne R. Andersen on 3/19/2008. Mailed notice (tlm) (Entered: 03/24/2008) |
| 03/20/2008 | 19 | MINUTE entry before Judge Honorable Wayne R. Andersen: Enter Memorandum of Judgment in favor of the plaintiff and against the defendant, Ganesan Visvabharathy, in the amount of $10,348,488.04 as of 01/15/2008 plus per diem interest of $2,557.15 through date of judgment totaling $10,504,447.77 as of today, 03/17/2008. Mailed notice (tlm) (Entered: 03/24/2008) |
| 03/25/2008 | 21 | CITATION to Discover Assets issued, 3 originals and 3 copies, as to 222 East Pearson Condominium Association, The Private Bank and Trust Company, and 222 East Pearson REO LLC. (tlm) Modified on 4/1/2008 (kmt, ). (Entered: 03/26/2008) |
| 04/10/2008 | 22 | MINUTE entry before Judge Honorable Wayne R. Andersen:Status hearing held on 4/10/2008 and continued to 4/24/2008 at 09:00 AM. Citation to discover assets held and continued to 4/24/2008. The Court orders defendant to maintain documents.Advised in open court notice (tsa, ) (Entered: 04/11/2008) |

### PACER Service Center

#### Transaction Receipt

04/14/2008 17:33:21

| | | | |
|---|---|---|---|
| PACER Login: | sp0087 | Client Code: | 943.001 |
| Description: | Docket Report | Search Criteria: | 1:07-cv-06219 |
| Billable Pages: | 2 | Cost: | 0.16 |

# EXHIBIT H

COLE

**United States District Court**
**Northern District of Illinois - CM/ECF LIVE, Ver 3.1.3 (Chicago)**
**CIVIL DOCKET FOR CASE #: 1:07-cv-06226**

Indymac Bank, F.S.B. v. Visvabharathy
Assigned to: Honorable Joan B. Gottschall
Cause: 28:1331 Fed. Question: Breach of Contract

Date Filed: 11/02/2007
Jury Demand: None
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**Indymac Bank, F.S.B.**
*a Federal Savings Bank*

represented by **Gary Irwin Blackman**
Levenfeld Pearlstein
2 North LaSalle Street
13th Floor
Chicago, IL 60602
(312)346-8380
Email: gblackman@lplegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James G Martignon**
Levenfeld Pearlstein, LLC
2 North LaSalle Street
Suite 1300
Chicago, IL 60602
(312)346-8380
Email: jmartignon@lplegal.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Ganesan Visvabharathy**
*an individual*

represented by **Daniel A. Shmikler**
Sperling & Slater
55 West Monroe Street
Suite 3200
Chicago, IL 60603
(312)641-3200
Email: dshmikler@sperling-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bruce S. Sperling**
Sperling & Slater
55 West Monroe Street
Suite 3200
Chicago, IL 60603
(312)641-3200
Email: bss@sperling-law.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/02/2007 | 1 | COMPLAINT filed by Indymac Bank, F.S.B.; Filing fee $ 350.(vmj, ) (Entered: 11/06/2007) |
| 11/02/2007 | 2 | CIVIL Cover Sheet (vmj, ) (Entered: 11/06/2007) |
| 11/02/2007 | 3 | ATTORNEY Appearance for Plaintiff Indymac Bank, F.S.B. by Gary Irwin Blackman (vmj, ) (Entered: 11/06/2007) |
| 11/02/2007 | 4 | ATTORNEY Appearance for Plaintiff Indymac Bank, F.S.B. by James G Martignon (vmj, ) (Entered: 11/06/2007) |

| | | |
|---|---|---|
| 11/02/2007 | 5 | RULE 7.1 and Local Rule 3.2 Disclosure Statement by Indymac Bank, F.S.B. (vmj, ) (Entered: 11/06/2007) |
| 11/02/2007 | 7 | 2 SUMMONS and 2 copies Issued as to Defendant Ganesan Visvabharathy (2 difference addresses) (vmj, ) (Entered: 11/06/2007) |
| 11/26/2007 | 8 | MINUTE entry before Judge Joan B. Gottschall :Status hearing set for 1/23/2008 at 09:30 AM. Plaintiff is directed to advise the defendants of the status hearing forthwith. Parties are directed to discuss settlement of case, consent to proceed before the Magistrate Judge and a proposed discovery plan. Mailed notice (rj, ) (Entered: 11/26/2007) |
| 01/02/2008 | 9 | MOTION by Plaintiff Indymac Bank, F.S.B. for default judgment as to *Ganesan Visvabharathy* (Attachments: # 1 Exhibit)(Martignon, James) (Entered: 01/02/2008) |
| 01/02/2008 | 10 | NOTICE of Motion by James G Martignon for presentment of motion for default judgment 9 before Honorable Joan B. Gottschall on 1/17/2008 at 09:30 AM. (Martignon, James) (Entered: 01/02/2008) |
| 01/17/2008 | 11 | MINUTE entry before Judge Joan B. Gottschall: Motion hearing held. Plaintiff's motion for default judgment 9 is granted. It is hereby ordered that default is entered against defendant, Ganesan Visvabharathy for failure to appear or file an answer or responsive pleading. Prove-up hearing is set for 1/23/08 at 9:30 a.m. Mailed (vmj, ) (Entered: 01/17/2008) |
| 01/22/2008 | 12 | MINUTE entry before Judge Joan B. Gottschall :Prove-up hearing set for 1/23/2008 is stricken and reset to 1/30/2008 at 09:30 AM by request of Plaintiff's counsel via telephone. Mailed notice (rj, ) (Entered: 01/22/2008) |
| 01/25/2008 | 13 | ATTORNEY Appearance for Defendant Ganesan Visvabharathy by Daniel A. Shmikler (Shmikler, Daniel) (Entered: 01/25/2008) |
| 01/25/2008 | 14 | ATTORNEY Appearance for Defendant Ganesan Visvabharathy by Bruce S. Sperling (Sperling, Bruce) (Entered: 01/25/2008) |
| 01/30/2008 | 15 | MINUTE entry before Judge Joan B. Gottschall :Status hearing held. Oral motion by Defendant's counsel for leave to file motion to quash service by 2/14/2008 is granted. Response is due by 2/28/2008. Reply in support is due by 3/13/2008. Plaintiff is given leave to file motion for default judgment with supporting memoranda by 2/6/2008 which will be entered and continued. Ruling by mail.Mailed notice (gej, ) (Entered: 01/31/2008) |
| 02/06/2008 | 16 | MOTION by Plaintiff Indymac Bank, F.S.B. for judgment *Motion for Entry of Judgment* (Martignon, James) (Entered: 02/06/2008) |
| 02/06/2008 | 17 | MEMORANDUM by Indymac Bank, F.S.B. in support of motion for judgment 16 *Memorandum in Support of Motion for Entry of Judgment* (Martignon, James) (Entered: 02/06/2008) |
| 02/06/2008 | 18 | NOTICE of Motion by James G Martignon for presentment of motion for judgment 16 before Honorable Joan B. Gottschall on 2/14/2008 at 09:30 AM. (Martignon, James) (Entered: 02/06/2008) |
| 02/14/2008 | 19 | MINUTE entry before Judge Joan B. Gottschall : Motion hearing held on 2/14/2008. MOTION by Plaintiff Indymac Bank, F.S.B. for entry of judgment 16 is denied. Movant failed to appear. Mailed notice (rj, ) (Entered: 02/14/2008) |
| 02/14/2008 | 20 | MOTION by Defendant Ganesan Visvabharathy to vacate order on motion for default judgment,, motion hearing,, terminate motions,, set/reset hearings, 11 (Shmikler, Daniel) (Entered: 02/14/2008) |
| 02/14/2008 | 21 | MEMORANDUM by Ganesan Visvabharathy in support of motion to vacate, motion for relief,,, 20 (Shmikler, Daniel) (Entered: 02/14/2008) |
| 02/14/2008 | 22 | NOTICE by Ganesan Visvabharathy re MOTION by Defendant Ganesan Visvabharathy to vacate order on motion for default judgment,, motion hearing,, terminate motions,, set/reset hearings, 11 20 , memorandum in support of motion 21 (Shmikler, Daniel) (Entered: 02/14/2008) |
| 02/22/2008 | 23 | MOTION by Plaintiff Indymac Bank, F.S.B. to vacate order on motion for judgment, motion hearing 19 *Plaintiff's Motion to Vacate Order of February 14, 2008* (Martignon, James) (Entered: 02/22/2008) |
| 02/22/2008 | 24 | *Notice of Motion - Plaintiff's Motion to Vacate Order of February 14, 2008* NOTICE of Motion by James G Martignon for presentment of motion to vacate, motion for relief, 23 before Honorable Joan B. Gottschall on 2/28/2008 at 09:30 AM. (Martignon, James) (Entered: 02/22/2008) |
| 02/28/2008 | 25 | RESPONSE by Indymac Bank, F.S.B. to MOTION by Defendant Ganesan Visvabharathy to vacate order on motion for default judgment,, motion hearing,, terminate motions,, set/reset hearings, 11 20 *Indumac Bank's Response to Defendant's Motion to Vacate Order of Default and Quash Service* (Martignon, James) (Entered: 02/28/2008) |
| 02/28/2008 | 26 | NOTICE by Indymac Bank, F.S.B. *Notice of Filing - Plaintiff's Response to Defendant's Motion to Vacate Order of Default and Quash Service* (Martignon, James) (Entered: 02/28/2008) |
| 02/28/2008 | 27 | MINUTE entry before Judge Joan B. Gottschall : Plaintiff's motion to vacate order of 2/14/08 23 is granted. Motion by Indymac Bank F.S.B. for entry of judgment 16 is reinstated and entered and continued consistent with this court's 1/30/08 order. Mailed (vmj, ) (Entered: 02/29/2008) |

4/14/2008 5:36 PM

| 03/13/2008 | 28 | REPLY by Defendant Ganesan Visvabharathy *in Support of Motion to Vacate Order of Default and to Quash Service* (Shmikler, Daniel) (Entered: 03/13/2008) |
| 03/25/2008 | 29 | MOTION by Plaintiff Indymac Bank, F.S.B. to file instanter *Motion to File Instanter Surreply to Defendant's Reply* (Martignon, James) (Entered: 03/25/2008) |
| 03/25/2008 | 30 | MEMORANDUM by Indymac Bank, F.S.B. in support of motion to file instanter 29 *Memorandum of Law in Support of Its Motion to File Surreply to Defendant's Reply* (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Martignon, James) (Entered: 03/25/2008) |
| 03/25/2008 | 31 | *Notice of Motion - Motion to File Instanter Surreply to Defendant's Reply and Memorandum of Law in Support* NOTICE of Motion by James G Martignon for presentment of motion to file instanter 29 before Honorable Joan B. Gottschall on 4/3/2008 at 09:30 AM. (Martignon, James) (Entered: 03/25/2008) |
| 04/03/2008 | 32 | MINUTE entry before Judge Honorable Joan B. Gottschall:MOTION by Plaintiff Indymac Bank, F.S.B. to file instanter Motion to File Instanter Surreply to Defendant's Reply 29 is granted. Motion hearing held on 4/3/2008. Response is due by 4/17/2008. Mailed notice (rj, ) (Entered: 04/07/2008) |
| 04/09/2008 | 33 | MOTION by Defendant Ganesan Visvabharathy for extension of time to file response/reply *to plaintiff's sur-reply* (Shmikler, Daniel) (Entered: 04/09/2008) |
| 04/09/2008 | 34 | NOTICE of Motion by Daniel A. Shmikler for presentment of motion for extension of time to file response/reply 33 before Honorable Joan B. Gottschall on 4/17/2008 at 09:30 AM. (Shmikler, Daniel) (Entered: 04/09/2008) |

**PACER Service Center**

**Transaction Receipt**

04/14/2008 17:34:09

| PACER Login: | sp0087 | Client Code: | 943.001 |
| Description: | Docket Report | Search Criteria: | 1:07-cv-06226 |
| Billable Pages: | 3 | Cost: | 0.24 |