IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
                            EASTERN DIVISION

INDYMAC BANK, F.S.B., a        )
Federal Saving Bank,           )
                               )
            Plaintiff,         )
                               )   No. 07 C 6224
      vs.                      )
                               )
GANESAN VISVABHARATHY, an      )
individual and HAWTHORNE       )
ORLANDO CORPORATION, a         )
Florida corporation,           )
                               )
            Defendants.        )

        The telephonic evidence deposition of

GANESAN VISVABHARATHY called for examination

pursuant to Notice and the Rules of Civil Procedure

for the United States District Courts pertaining to

the taking of depositions, taken before Anna Maria

Castle, a Notary Public within and for the County

of Will and State of Illinois, at 55 West Monroe,

Suite 3200, Chicago, Illinois, on the 19th day of

April, 2008, at the hour of 10:00 o'clock a.m.

REPORTED BY:  ANNA MARIA CASTLE, CSR

LICENSE NO.:  084-004148

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 2

1  APPEARANCES:
2      LEVENFELD PEARLSTEIN, LLC,
3      BY: MR. GARY I. BLACKMAN and
4      MR. JIM MARTIGNON
5      Two North LaSalle Street, Suite 1300
6      Chicago, Illinois 60602
7      (312) 476-7536
8          Representing the Plaintiff;
9
10     SPERLING & SLATER,
11     BY: MR. DANIEL A. SHMIKLER
12     55 W. Monroe Street, Suite 3200
13     Chicago, Illinois 60603
14     (312) 641-3200
15         Representing the Defendants.
16
17
18
19
20
21
22
23
24

Page 3

1              I N D E X
2
3  WITNESS                         PAGE
4  GANESAN VISVABHARATHY
5  Direct Examination by Mr. Shmikler    4
6  Cross Examination by Mr. Blackman    29
7
8
9
10
11          E X H I B I T S
12  NUMBER              MARKED FOR ID
13  Deposition Exhibit
14
15  Nos. 1 and 2            13
16  No. 3                  16
17  No. 4                  19
18  No. 5                  106
19  No. 6                  130
20
21
22
23
24

Page 4

1          (Witness sworn.)
2      GANESAN VISVABHARATHY,
3  called as a witness herein, having been first duly
4  sworn, was examined and testified as follows:
5          DIRECT EXAMINATION
6  BY MR. SHMIKLER:
7      Q.  Good morning, or maybe I should say good
8  evening to you.
9          Where are you calling from?
10     A.  India.
11     Q.  And could you state and spell your name
12  for the record, please.
13     A.  Ganesan Visvabharathy, G-a-n-e-s-a-n
14  V-i-s-v-a-b-h-a-r-a-t-h-y.
15     Q.  And where do you currently reside?
16     A.  In India.
17     Q.  What is your address there?
18     A.  It is 196/8 Asiad Colony, Anna Nagar West,
19  Chennai 600101.
20     Q.  How long have you lived there?
21     A.  Since about November of '07.
22     Q.  Are you married?
23     A.  Yes.
24     Q.  What is your wife's name?

Page 5

1      A.  Suriya Sastri, S-a-s-t-r-i.
2      Q.  Does your wife reside with you?
3      A.  No, sir, we are separated.
4      Q.  Is there a divorce proceeding that's
5  pending?
6      A.  Yes.
7      Q.  How long has that been pending since?
8      A.  Since February of '06.
9      Q.  Who filed for divorce, you or your wife?
10     A.  She did.
11     Q.  Are you contesting her right to a divorce?
12     A.  No, we are only in dispute about division
13  of property.
14     Q.  And where does your wife live?
15     A.  7529 Ridgewood Lane, Burr Ridge, Illinois.
16     Q.  Did you formally live at that address?
17     A.  Yes.
18     Q.  When did you begin living at that address?
19     A.  When did I begin living?
20     Q.  At that address, yes.
21     A.  That address, I think we bought the home
22  in December of '04.  So since December of '04 I was
23  living there.
24     Q.  And when did you move out?

2  (Pages 2 to 5)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 6

1    A.  About the summer of '06.
2    Q.  When you left, did you move out
3  temporarily and permanently?
4    A.  Permanently.
5    Q.  And what do you mean when you say you
6  moved out permanently?
7    A.  Well, because, you know, we were
8  separating. I'm going through a divorce, so there
9  was no point in living in that house, so I moved
10  out.
11    Q.  When you moved out, did you intend to move
12  back at any point?
13    A.  No.
14    Q.  When you moved out, did you complete a
15  forwarding address request for the post office?
16    A.  Yes.  I instructed one of my employees to
17  do that.
18    Q.  What's his name?
19    A.  Viswamatham, V-i-s-w-a-m-a-t-h-a-m.
20    Q.  Is that his first name or last name?
21    A.  That's his last name.
22    Q.  Do you know his first name?
23    A.  I don't know his first name.
24    Q.  Do you know whether he did that, that is,

Page 7

1  put in the address change request?
2    A.  Yes, I know he did that because I talked
3  to him and he said he had made that, change of
4  address form.  And also subsequently, I received a
5  lot of mail forwarded from Burr Ridge to my new
6  home in LaGrange.
7    Q.  Despite that, do you know if any of your
8  mail has gone to the Ridgewood Lane or Burr Ridge
9  address since you left?
10    A.  Some mail could have gone there since I
11  left, yes.
12    Q.  Okay.  Have you ever picked up mail to you
13  that was sent to the Burr Ridge after you moved
14  out?
15    A.  I'm not able to hear you.
16    Q.  Sorry.
17      Have you ever picked up any mail that was
18  sent to Burr Ridge after you moved out?
19    A.  Yes, yes.  When I go to get the children,
20  my wife would sometimes give me mail that would
21  come for me and sometimes she would forward it to
22  my office.
23    Q.  Now, after you moved out, did you ever
24  tell anyone that Burr Ridge was your address and

Page 8

1  that they should send you mail there?
2    A.  When I moved out?
3    Q.  After you moved out.
4    A.  No.
5    Q.  Now, when you would get mail from your
6  wife, either at your office or directly, that had
7  been sent to you at Burr Ridge, what would you do
8  with it?
9    A.  Oh, you mean when I get the mail from
10  Burr Ridge?
11    Q.  Right.  You said that sometimes you would
12  get mail from your wife and then she would send it
13  to your office; that it would be sent to
14  Burr Ridge.  When that would happen, what would you
15  do?
16    A.  If it was not junk mail, I would have my
17  secretary inform the sender of my current address
18  in LaGrange.
19    Q.  You mean your then current address?
20    A.  Yes, that's what I mean, then current
21  address.
22    Q.  Do you still own any financial interest in
23  that Burr Ridge house?
24    A.  Yes.  And I expect I will until it's

Page 9

1  resolved in my divorce proceeding.
2    Q.  It's your understanding it's part of the
3  marital estate that's being divided?
4    A.  That's my understanding.
5    Q.  Do you have any possessions of yours still
6  at the Burr Ridge address?
7    A.  I have left some old clothes and books and
8  things like that but nothing of any value.
9    Q.  Have you ever gone back to Burr Ridge for
10  the purpose of retrieving any of that stuff?
11    A.  No, not for the purpose of retrieving any
12  of that stuff, no.
13    Q.  Do you have any intent of going back to
14  get it at any point?
15    A.  No.
16    Q.  Would you care if your wife just threw
17  that stuff out?
18    A.  I don't care.
19    Q.  All right.  When you left Burr Ridge, did
20  you go live somewhere else?
21    A.  Yes.
22    Q.  Where did you go to live?
23    A.  400 South Catherine Avenue in LaGrange.
24    Q.  That's in Illinois?

3  (Pages 6 to 9)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 10

1    A.  Yes, Illinois.
2    Q.  Now, after you moved out of Burr Ridge to
3  go live in LaGrange, did you ever go back to live
4  at the Burr Ridge house?
5    A.  No, not to live at the Burr Ridge house.
6  I did stay there temporarily to take care of my
7  children for about a month, I don't know, between
8  the end of '06 and the beginning of '07 when my
9  wife went to India, but I was only house sitting
10  and watching the children.  But I did not intend to
11  establish a residence there.  And I maintained my
12  residence in LaGrange during that time.  My
13  belongings remained in LaGrange, and I was still
14  paying the utilities in LaGrange.
15    Q.  Was that the only time that you even
16  stayed at the Burr Ridge house after you moved out?
17    A.  Was that the only time what?
18    Q.  That you stayed at the Burr Ridge house
19  after you had moved out?
20    A.  Yes, yes, to baby-sit my children.
21    Q.  Now, how long did you live at that address
22  in LaGrange?
23    A.  Oh, until -- LaGrange, until October of
24  '07.

Page 11

1    Q.  Okay.  Now, you've got some documents over
2  there I think were forwarded on to you for use in
3  this examination.
4      If you would, I'd like you to get ahold of
5  your affidavit that's dated March 13th of 2008.
6    A.  You mean March 13th?
7    Q.  March 13th, 2008.
8      Let me know when you've got that in front
9  of you.
10    A.  Okay.
11    Q.  Are you still looking for it?
12    A.  Yeah.  Hold on.  Hold on.  I'll be able to
13  get it.
14      March 13th?
15    Q.  Right.  The date you'll find at the bottom
16  of it next to your signature.
17    A.  Hold on.
18    Q.  Are you still looking?
19    A.  Yes, I have my affidavit dated February
20  14.
21    Q.  Right.  There should be another one.
22  There should be the March 13th one that has the two
23  bills attached to.
24    A.  That has what attached to it?

Page 12

1    Q.  Two bills.
2    A.  Oh, two bills attached to it.  Yeah, I got
3  that.  I got the bills.  Yes, I got that.
4    Q.  Do you have the affidavit or just the
5  bills?
6    A.  I have the bills.
7    Q.  All right.  We don't need the affidavit.
8  Let's mark the bills as Exhibits 1 and 2.
9    A.  I think I can get the affidavit.
10    Q.  The other side might want to ask you about
11  the affidavit.  I'm only going to ask you about the
12  bills anyway.
13    MR. BLACKMAN:  It's pretty short.  Why don't
14  you just read it into the record.
15    MR. SHMIKLER:  That's fine.
16  BY MR. SHMIKLER:
17    Q.  So you do or you don't have the affidavit
18  on you?
19    A.  I can pull up the affidavit.  It's going
20  to take a little bit.
21    Q.  Let's focus on the bills right now.  We'll
22  mark those as Exhibits 1 and 2.  Exhibit 1 will be
23  the ComEd bill.
24      (Whereupon, Deposition Exhibits

Page 13

1      Nos. 1 and 2 was marked for
2      identification.)
3    THE WITNESS:  Okay.
4  BY MR. SHMIKLER:
5    Q.  You have those two in front of you?
6    A.  Yes.
7    Q.  If you take a look at the ComEd bill.
8    A.  Yes.
9    Q.  Let's see.  Direct your attention towards
10  the top here, that's your name, and that's the
11  address in LaGrange where you described you were
12  living at the time?
13    A.  That's correct.
14    Q.  That has an issue date of September 14th
15  of 2007, so you were living at that address at that
16  time?
17    A.  Correct.
18    Q.  So the electric service -- is this
19  something you received?
20    A.  Yes.
21    Q.  All right.  So I take it the electric was
22  in your name at that location at that time?
23    A.  Right.
24    Q.  Now, if you'll flip over to the next page

4  (Pages 10 to 13)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 14

1  or to the other bill which looks like it's a Direct
2  TV bill dated October 5th of 2007; do you see that?
3      A.  Yes, I see that.
4      Q.  Is this also a bill that you received and
5  paid to that address?
6      A.  Yes.
7      Q.  I think you said you lived in LaGrange
8  until October of 2007?
9      A.  Correct.
10      Q.  Where did you go to live after that?
11      A.  I moved to India to live with my cousin in
12  Chennai.
13      Q.  When you left LaGrange, was it your
14  intention to at some point go back to living in
15  LaGrange at some point in the future?
16      MR. BLACKMAN:  Objection as to leading.
17      THE WITNESS:  When I left LaGrange, was it my
18  intention to come back to LaGrange you mean?
19  BY MR. SHMIKLER:
20      Q.  Right.
21      MR. BLACKMAN:  Same objection.
22      THE WITNESS:  No.
23  BY MR. SHMIKLER:
24      Q.  Did you mean to move out temporarily or

Page 15

1  permanently?
2      A.  Permanently.
3      Q.  Why did you move to India?
4      A.  For business, you know, real estate market
5  is cold there considerably and, you know, there
6  were still many opportunities in India.
7      Q.  When you moved to India, was it your
8  intent to establish a permanent residence there?
9      MR. BLACKMAN:  Objection, asked and answered.
10      THE WITNESS:  Yes.
11  BY MR. SHMIKLER:
12      Q.  When you did that, did you have to
13  register with Indian immigration or any other
14  Indian government immigration agency?
15      A.  Usually only the arrival registration, and
16  beyond that I don't have to register yet at this
17  time.
18      Q.  Are you a citizen of India?
19      A.  No, I'm not a citizen of India.  I had to
20  give up my Indian citizenship when I became a U.S.
21  citizen.  But as a former citizen of India, I'm
22  entitled to OCI status overseas in India.  I don't
23  have to register for that yet, but when the time
24  comes, I intend to do so.

Page 16

1      Q.  You said you're entitled to the OCI status
2  is that what you said, Dr. Vish?
3      A.  Yes.
4      Q.  What does OCI stand for?
5      A.  OCI stands for Overseas Citizen of India.
6      Q.  Now, you said you had the February 14th
7  affidavit on hand.  Why don't you take a look at
8  that, please.  We'll mark it as Exhibit 3.
9          (Whereupon, Deposition Exhibit
10          No. 3 was marked for
11          identification.)
12      THE WITNESS:  Yes, I have it.
13  BY MR. SHMIKLER:
14      Q.  All right.  I want to direct your
15  attention -- first of all, is that your signature
16  at the bottom?
17      A.  Yeah, I see the date at the bottom.
18      Q.  And is that your signature?
19      A.  Yes.
20      Q.  Did you execute this on or about the date
21  February 14th?
22      A.  That is correct.
23      Q.  I want to direct your attention to
24  paragraph 4 of that affidavit where you had said,

Page 17

1  "I have been travelling abroad for the past several
2  months beginning in about October of 2007"; do you
3  see that?
4      A.  Yeah, I have the affidavit.
5      Q.  Do you see that paragraph I just referred
6  to?
7      A.  Hello?
8      Q.  Can you hear me?
9      A.  Hello?
10      Q.  Can you hear me?
11      A.  Hello?
12      Q.  Yes, hello?
13      A.  Hello?
14      Q.  Hello, can you hear me?
15      MR. SHMIKLER:  Off the record for a second.
16          (Discussion off the record.)
17  BY MR. SHMIKLER:
18      Q.  Before we were disconnected I was
19  directing you to paragraph 4 of your February 14th
20  affidavit; do you see that?
21      A.  Yes.
22      Q.  Do you recall that paragraph you wrote, "I
23  have been travelling abroad for the past several
24  months beginning in about October 2007"; do you see

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS  (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 18

1  that?
2     A.  Yes.
3     Q.  In light of your testimony that around
4  that time you moved to India, what did you mean by
5  this in this affidavit?
6     A.  Well, right after I moved to India I did a
7  lot of travelling on business to many different
8  places but my residence was Chennai.
9     Q.  Where were you travelling?
10    A.  Different cities in India, Bombay, Delhi,
11 Bangalore, Chennai.  And I also went to Sri Lanka.
12 I was in Austria, France, other places.
13    Q.  What kind of places were you looking at
14 while you were travelling?
15    A.  Well, I was just looking at potential real
16 estate projects.
17    Q.  Where were you living on December 1st,
18 2007?
19    A.  In Chennai.
20    Q.  Again, among the documents you should have
21 for use of this deposition are a series of -- I
22 think it's six pages of bills from Chennai; do you
23 have that?
24    A.  Yes.

Page 19

1     MR. SHMIKLER:  Let's mark this as Group Exhibit
2  4.
3             (Whereupon, Group Deposition
4             Exhibit No. 4 was marked for
5             identification.)
6  BY MR. SHMIKLER:
7     Q.  I'm going to start with the order I happen
8  to have them here.  The first one looks like it's a
9  bill from Vasanth & Company, V-a-s-a-n-t-h.  And it
10 looks like it's dated December 12 of '07, assuming
11 it's the date they use over there.  Do you see that
12 one; it's for a washing machine?
13    A.  Yeah, washing machine, yes.
14    Q.  In India, that date that it says there,
15 6.12.2007, what does that mean?
16    A.  In India they always put the day first.
17 Month is second.  Day, month, and year.
18    Q.  That was December 6 of 2007?
19    A.  That is December 6 of 2007, yes.
20    Q.  And what does this reflect, what
21 transaction does this reflect?
22    A.  This is purchase of a washing machine.
23    Q.  You bought it?
24    A.  Yes.

Page 20

1     Q.  And what was it for?
2     MR. BLACKMAN:  To wash clothes.
3     THE WITNESS:  For use in the residence.
4  BY MR. SHMIKLER:
5     Q.  And the next page, it looks like another
6  bill from the same company, what's the date on this
7  one?
8     A.  What date are you referring to?
9     Q.  I'm sorry, I forgot you don't have them in
10 the order I do.  I have one for Whirlpool High
11 Cool?
12    A.  Yeah, Whirlpool High Cool, that has
13 December 1, yes.
14    Q.  And again, was this something that you
15 bought?
16    A.  Yes.
17    Q.  And for what use?
18    A.  That's for use in the residence.
19    Q.  And the next one I have, again, the same
20 company.  It looks like for a television set?
21    A.  Yes.
22    Q.  What's the date on that one?
23    A.  That is November 30th.
24    Q.  And this television was for what use?

Page 21

1     A.  This is a TV, again, for use in the
2  residence.
3     Q.  The next one I have is a bill from a Megha
4  Systems, M-e-g-h-a?
5     A.  Yeah.
6     Q.  What's the date on this one?
7     A.  That's November 28.
8     Q.  Okay.  What was this for?
9     A.  This is -- they came to fix the computer.
10    Q.  And it has the -- on the "to" line there,
11 was that your name and your address at the time?
12    A.  Yes.
13    Q.  All right.  The next page I got is from
14 Udison Technologies, U-d-i-s-o-n?
15    A.  Right.
16    Q.  What's the date on this one?
17    A.  That is November 19th.
18    Q.  And what was this for?
19    A.  This is the purchase of the computer.
20    Q.  Is that your name and address at the time
21 that's listed on the invoice?
22    A.  That's correct.
23    Q.  And then the last one I got is Amma Air
24 Cons?

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS  (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 22

1    A.  Right.
2    Q.  What's the date on this?
3    A.  That's December 28.
4    Q.  What was this for?
5    A.  This is the air-conditioner.
6    Q.  Is it the same air-conditioner that we saw
7  before or different air-conditioner?
8    A.  No, no, we had washing machine,
9  refrigerator.
10   Q.  Right.
11   A.  High Cool is a refrigerator.  It's not an
12  air-conditioner.  Then TV, and this is the
13  air-conditioner.
14   Q.  My mistake.  Is that your name and address
15  up on the invoice as of this date?
16   A.  That's correct.
17   Q.  And these bills that we looked at in these
18  last six bills, these are true and correct copies
19  of, you know, invoices that you received as they
20  appear?
21   A.  Yes.
22   Q.  Is it your intention to live permanently
23  in India?
24     MR. BLACKMAN:  Objection, asked and answered

Page 23

1  twice.
2  BY MR. SHMIKLER:
3    Q.  You can answer.
4    A.  Yes, it is my intention to live in India
5  permanently.
6    Q.  Do you have any present intention of
7  moving back to Chicago or anywhere else in the
8  United States?
9    A.  I do not have present intention of moving
10  back to Chicago or any other place in the U.S.
11   Q.  What about your remaining business
12  interest in the United States?
13   A.  Well, I have my staff there who can take
14  care of it, and I'm always available by phone,
15  e-mail, fax, and occasional visits, if needed, and,
16  you know, I'm always available to my people.  So
17  it's not a problem these days.  You know, you can
18  run a business from anywhere.
19   Q.  You have children though here in the U.S.,
20  correct?
21   A.  That's correct.
22   Q.  What about them, if you live in India?
23     MR. BLACKMAN:  Objection as to form.
24     THE WITNESS:  Two of my children are over 18

Page 24

1  and so they're grown and they are in college.  My
2  second one is actually starting college in a few
3  months -- a few weeks actually.  And my youngest
4  one and I, we speak on the own.  And I do plan to
5  visit her and, you know, have her visit me.
6  Actually, I talked to her about having her spend a
7  couple of months with me in the summertime here in
8  India.
9  BY MR. SHMIKLER:
10   Q.  Have you discussed those plans with your
11  wife?
12   A.  Yes, I have.
13   Q.  Now, this change in your residence to
14  India, is that consistent -- well, let me back up
15  for a second and lay a foundation for this.
16     In your divorce do you recall you have a
17  joint parenting agreement in effect?
18   A.  Yes.
19   Q.  And this change in your residence to
20  India, is that consistent with your joint parenting
21  agreement?
22     MR. BLACKMAN:  Objection as to form.  I don't
23  know what that means "consistent."  Are you asking
24  whether that it's something he can legally do?

Page 25

1     MR. SHMIKLER:  I'll rephrase it.
2  BY MR. SHMIKLER:
3    Q.  Is it consistent with your obligations and
4  understandings with your wife pursuant to that
5  agreement?
6     MR. BLACKMAN:  Same objection.
7     When you say "consistent with," are you
8  asking his legal opinion as to whether he has the
9  right to permanently move?
10     MR. SHMIKLER:  No, I'm asking his understanding
11  whether he can do this whether it causes any
12  problems under the joint parenting agreement.
13     MR. BLACKMAN:  Objection as to form.  You're
14  asking him whether or not he has the right to do
15  this legally because that's what problems means?
16     MR. SHMIKLER:  I'll rephrase it.
17  BY MR. SHMIKLER:
18   Q.  Is it your understanding that your joint
19  parenting agreement prevents you from moving to
20  India?
21     MR. BLACKMAN:  Objection to calling for a legal
22  conclusion and foundation as to his knowledge and
23  understanding of it to begin with.
24  BY MR. SHMIKLER:

7  (Pages 22 to 25)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 26

1    Q. You can go ahead and answer.
2    A. I do not think so because the agreement is
3  old and outdated in several places. It claims that
4  two of my children are minor and that's not the
5  case today. And as long as me and my wife agree,
6  there should not be any problems.
7    Q. Are you working with your wife to get
8  agreement on how you'll interact with the children
9  basically with your new residence?
10   A. Yes, I'm working on that agreement, yes.
11 I think we should be able to work that out no
12 problem.
13   Q. Has your wife ever told you that your new
14 residence in India creates a problem with your
15 joint parenting agreement?
16   MR. BLACKMAN: Objection as to form.
17 BY MR. SHMIKLER:
18   Q. You can answer it.
19   A. Has my wife ever told me that my moving to
20 India will cause any problems with the joint
21 parenting agreement?
22   Q. Right.
23   A. No, she has not.
24   Q. Now, have you received any legal papers

Page 27

1  that relate to Indymac from your wife?
2    A. No.
3    Q. You're aware that Indymac takes the
4  position in this case that they served you by
5  delivering legal papers to your wife, right?
6    A. They served some papers to my wife.
7    Q. That you're aware that that's their
8  position?
9    A. Sorry?
10   Q. You're aware, generally speaking, that's
11 their position?
12   MR. BLACKMAN: Objection as to form and that's
13 their position. Are you asking him what Indymac's
14 legal position is?
15   MR. SHMIKLER: I'm asking what his
16 understanding is.
17   MR. BLACKMAN: You're asking him what his
18 understanding of Indymac's legal position is?
19   MR. SHMIKLER: Right. That he was served by
20 dropping papers off with his wife.
21   MR. BLACKMAN: All right.
22 BY MR. SHMIKLER:
23   Q. Do you understand generally speaking that
24 that's what they're saying in this case?

Page 28

1    A. Repeat that, please. What are they saying
2  in this case?
3    Q. All right. Much to do about nothing.
4  Let's move on a little bit.
5        You're aware that Indymac had a process
6  server deliver some legal papers for you with your
7  wife, right?
8    A. Some papers were delivered, yes, to my
9  wife.
10   Q. Do you have any knowledge of your wife
11 giving any of those papers to your lawyer,
12 Michael Collins?
13   A. I have no knowledge.
14   Q. Has Michael Collins at any time been
15 authorized to accept service for you in this
16 matter?
17   A. No.
18   Q. Now, you have authorized us, your lawyers,
19 to accept service in this matter under certain
20 conditions, right?
21   A. Correct.
22   Q. And what were those conditions?
23   A. Well, as long as Indymac agrees to
24 vacating all the defaults and gives us some time to

Page 29

1  answer the Complaint, I have -- that's fine. Then
2  you're authorized to accept service on my behalf.
3    MR. BLACKMAN: Objection as to relevance.
4  BY MR. SHMIKLER:
5    Q. Do you have any understanding why that
6  agreement hasn't been reached?
7    MR. BLACKMAN: Objection as to relevance as to
8  whatever settlement discussions we had.
9    THE WITNESS: Well, my understanding is Indymac
10 would only agree if I agree to freeze my assets
11 which I don't believe is reasonable.
12   MR. SHMIKLER: All right. I don't have
13 anything further.
14       CROSS EXAMINATION
15 BY MR. BLACKMAN:
16   Q. All right, Doctor, my name is Gary
17 Blackman, and I represent Indymac. And I'm going
18 to be asking you some questions.
19       I want to start with, prior to today's
20 deposition did you speak with your wife about her
21 testimony yesterday?
22   A. No.
23   Q. Were you aware that she gave a deposition
24 on Tuesday of this week?

8  (Pages 26 to 29)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 30

1    A.  I was aware that she was giving a
2  deposition, yeah, I think so, yeah.
3    Q.  Did you -- I don't want to know what you
4  said, but did you discuss your wife's deposition
5  with your lawyer?
6    MR. SHMIKLER:  I'm going to object on the
7  grounds of attorney-client privilege.  I think even
8  the subject matter raises issues of privilege.
9    MR. BLACKMAN:  I disagree.  I think it goes to
10  his credibility and your specific answers coming
11  off of her deposition -- or questions to him.
12  BY MR. BLACKMAN:
13    Q.  Are you not instructing, sir, based upon
14  your advice of counsel?
15    MR. SHMIKLER:  You mean he's answering?
16  BY MR. BLACKMAN:
17    Q.  You're not answering, sir, that question
18  as to whether --
19    A.  Yeah, I'm not answering, no.
20    Q.  Just to be clear, that question is whether
21  you had any conversations with your lawyer about
22  the deposition testimony of your wife on Tuesday;
23  that's the question that you're not answering?
24    MR. SHMIKLER:  Again, that's the question we

Page 31

1  are objecting to and advising him not to answer.
2    THE WITNESS:  Right.  I'm not answering.
3  BY MR. BLACKMAN:
4    Q.  Okay.  Now, did you read your wife's
5  deposition transcript?
6    A.  Did I read my wife's deposition
7  transcript?  My wife's deposition transcript?
8  Yeah, I read some of it.
9    Q.  When was that sent to you, yesterday when
10  we got the transcripts?
11    MR. SHMIKLER:  Couldn't have been sent before
12    THE WITNESS:  I don't recall when.
13  BY MR. BLACKMAN:
14    Q.  Well, her deposition was Tuesday and today
15  is Thursday.  So sometime between Tuesday and
16  Thursday you read her deposition transcript?
17    A.  Yeah, sometime during that time.
18    Q.  And that was sent to you by Mr. Shmikler?
19    A.  Yeah, that was sent by Mr. Shmikler.
20    Q.  Were you advised as to why this was being
21  sent to you?
22    MR. SHMIKLER:  Objection, attorney-client
23  privilege and instruct the witness not to answer.
24  BY MR. BLACKMAN:

Page 32

1    Q.  You're not answering, sir, based on advice
2  of counsel?
3    A.  No, no.
4    Q.  Now, when you read the deposition, was
5  there anything in there you disagreed with?
6    A.  I -- you know, I didn't really read in any
7  great detail or anything.
8    Q.  That's not my question.  My question
9  wasn't whether you read it in great detail.  My
10  question was whether you read it, was there
11  anything in there you disagreed with?
12    MR. SHMIKLER:  Object to form.
13    THE WITNESS:  Well, there are areas I disagree
14  with, yeah.
15  BY MR. BLACKMAN:
16    Q.  Can you tell me what those areas are?
17    A.  Well, you know, I definitely have moved
18  here to India and she thinks I'm coming back.  You
19  know, that's clearly a difference.
20    Q.  You're referring to your wife's testimony
21  that she believes you told her you were coming
22  back?
23    A.  I don't know.
24    Q.  You don't know what?

Page 33

1    MR. SHMIKLER:  I object.  Mischaracterizes her
2  testimony.
3  BY MR. BLACKMAN:
4    Q.  Go on, sir.
5    A.  That's her -- you know, that's her
6  testimony.  I don't know what you're really
7  referring to.
8    Q.  Well, is it your understanding that your
9  wife testified in her deposition that you had told
10  her you were coming back?
11    MR. SHMIKLER:  Again, same objection.
12    THE WITNESS:  I don't think I have told her I
13  was coming back.
14  BY MR. BLACKMAN:
15    Q.  Listen to my question, sir.  That's not
16  what I'm asking.
17    Do you recall seeing in your wife's
18  deposition her testimony that you were coming back?
19    MR. SHMIKLER:  Same objection.  You guys don't
20  have another copy of that, do you?
21    THE WITNESS:  I don't recall that.
22  BY MR. BLACKMAN:
23    Q.  Do you have the deposition in front of
24  you?

9  (Pages 30 to 33)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 34

1    MR. SHMIKLER: Do you have it there, Dr. Vish,
2  with you or no?
3    THE WITNESS: I have to see if I can get it.
4  No, I don't have it in front of me.
5  BY MR. BLACKMAN:
6    Q.  Where did it go between yesterday and
7  today?
8    MR. SHMIKLER: Objection, form.
9    THE WITNESS: Sorry?
10  BY MR. BLACKMAN:
11    Q.  What happened to it?
12    A.  Some other place, I don't know.  I must
13  have kept it somewhere else or something.
14    Q.  Was it sent to your residence or was it
15  sent to your business?
16    When you were sent the deposition
17  yesterday by Mr. Shmikler, was it sent to your
18  residence or your business?
19    A.  It was sent to the business.
20    Q.  Okay.  And is that where you read it at?
21    A.  Yeah, I only -- I didn't have much time at
22  all.  I only glanced through it really.  I mean, it
23  was too long.  And really, I don't -- you know, I
24  just -- who has the time to read this.  I mean, you

Page 35

1  guys are lawyers.  I don't have time for all of
2  this.
3    Q.  You don't have time for all this?
4    A.  Sorry?
5    MR. SHMIKLER: Objection.
6  BY MR. BLACKMAN:
7    Q.  This is not important enough to you?
8    MR. SHMIKLER: Objection, compound to form and
9  harassing the witness.  He told you he didn't have
10  time to read the transcript.
11    MR. BLACKMAN: He said who has time for all of
12  this.
13    MR. SHMIKLER: He's talking about reading the
14  transcript clearly.  Let's not harass and get the
15  testimony.
16  BY MR. BLACKMAN:
17    Q.  Go on, sir.
18    Well, let me ask you this, what's the
19  business address that Mr. Shmikler sent the
20  transcript to?
21    A.  Sorry?
22    Q.  You said that Mr. Shmikler sent you the
23  transcript to your business address.  What's --
24    A.  What's your question?

Page 36

1    Q.  My question is, you just testified that
2  Mr. Shmikler sent your transcript to your business
3  address.  I asked you if it was sent to your
4  residence or your business and you said your
5  business address, and I'm asking what the address
6  is of your business?
7    MR. SHMIKLER: Objection, mischaracterizes his
8  prior testimony.
9    MR. BLACKMAN: He can clarify.  That's why I'm
10  asking.
11    MR. SHMIKLER: I understand.
12    THE WITNESS: No, it's just a computer version.
13  BY MR. BLACKMAN:
14    Q.  So when you said business address, what
15  were you referring to when you testified --
16    A.  Business address in India.
17    Q.  Okay.  What is your business address in
18  India?
19    A.  Well, I can get you all of that no
20  problem.
21    Q.  I'm confused, sir.
22    A few minutes ago you stated that
23  Mr. Shmikler sent your transcript to your business
24  address.

Page 37

1    Now, my question is, what are you
2  referring to when you say your business address?
3    A.  It's 36 Vidyaraman Street, in Chennai.
4    Q.  36 what?
5    A.  Vidyaraman Street.
6    Q.  Can you spell that please?
7    A.  V-i-d-y-a-r-a-m-a-n Street.
8    Q.  Okay.  Was that where the transcript was
9  sent?
10    A.  Yeah.
11    Q.  Okay.  And then is that -- is that an
12  office?
13    A.  Yes.
14    Q.  Do you still have the letterhead?  Is it
15  addressed to that address?
16    A.  No, no.  It's sent teletronically.
17    Q.  So it was sent by e-mail?
18    A.  Yeah.
19    Q.  And it was sent by e-mail -- do you have a
20  personal e-mail address or just a business e-mail
21  address?
22    A.  Well, just business address.
23    Q.  Okay --
24    MR. SHMIKLER: Object to the relevance.

10  (Pages 34 to 37)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

| | |
|---|---|
| Page 38 | Page 40 |

**Page 38**

1  BY MR. BLACKMAN:
2    Q.  So -- I'm just trying to understand, sir.
3  When you say you got a business address, have you
4  set up a business in India?
5    MR. SHMIKLER:  Object to relevance.  Actually,
6  I'll withdraw that objection.
7    MR. BLACKMAN:  It's all relevant.
8    MR. SHMIKLER:  I'll withdraw that objection.
9  BY MR. BLACKMAN:
10    Q.  Sir?
11    A.  Yes.
12    Q.  When you refer to your business address
13  that you said you received an e-mail from
14  Mr. Shmikler.
15    A.  Yeah.
16    Q.  Is that a different e-mail address than
17  your personal e-mail address?
18    MR. SHMIKLER:  Object to relevance.
19    THE WITNESS:  Is that -- your question is, is
20  that a different e-mail address?
21  BY MR. BLACKMAN:
22    Q.  Yes.
23    A.  From personal?
24    Q.  Yes.

**Page 39**

1    A.  Yeah.
2    Q.  Okay.  What's your business e-mail
3  address?
4    MR. SHMIKLER:  Object to relevance.
5    THE WITNESS:  I mean, is this something --
6  BY MR. BLACKMAN:
7    Q.  Yes, it is.
8    MR. SHMIKLER:  Dr. Vish, I object on the
9  grounds of relevance.  It's not relevant, but you
10  can go ahead and answer it.  Hopefully, he will not
11  sign you up for any spam lists.
12  BY MR. BLACKMAN:
13    Q.  What's your business e-mail address?
14    THE WITNESS:  Is that something I can answer,
15  Dan?
16    MR. SHMIKLER:  Yeah, go ahead and answer it.
17    THE WITNESS:  It's vish, v-i-s-h,
18  @hawthorne-corp.com.
19  BY MR. BLACKMAN:
20    Q.  Is that an old business address or is that
21  a new business e-mail address?
22    MR. SHMIKLER:  Object to relevance.
23    MR. BLACKMAN:  Just for the record -- hang on
24  second.  This is all relevant to whether or not he

**Page 40**

1  has established his -- a permanent residence out
2  there and to judge his credibility.  You've put
3  these issues into relevance so --
4    MR. SHMIKLER:  People change their e-mail
5  address --
6    MR. BLACKMAN:  I'm not debating you.  I'm just
7  responding.
8    MR. SHMIKLER:  You responded, so I'm going to
9  reply.
10    MR. BLACKMAN:  Go ahead.
11    MR. SHMIKLER:  A person's e-mail address is
12  good worldwide, whether they have the same or
13  different e-mail has absolutely no bearing on where
14  their residence --
15    MR. BLACKMAN:  In this case --
16    MR. SHMIKLER:  In no case is that true.
17  BY MR. BLACKMAN:
18    Q.  Sir, the e-mail address
19  vish@hawthorne-corp.com, is that a new e-mail
20  address or is that one you had while you were
21  living in the United States?
22    MR. SHMIKLER:  Object to relevance.
23    THE WITNESS:  It's the same, same e-mail
24  address, nothing new.

**Page 41**

1  BY MR. BLACKMAN:
2    Q.  What's your personal e-mail address?
3    MR. SHMIKLER:  Object to relevance.
4    THE WITNESS:  I don't have to --
5  BY MR. BLACKMAN:
6    Q.  Yes, you do, yes, you do.
7    MR. SHMIKLER:  Dr. Vish, it's totally
8  irrelevant.  We've objected on that basis.  Don't
9  worry.  I'm sure the judge will throw this out, but
10  go ahead and give that answer.
11    THE WITNESS:  You want my personal e-mail
12  address?
13    MR. SHMIKLER:  That's what he's asking for.
14    THE WITNESS:  Hello?
15  BY MR. BLACKMAN:
16    Q.  Sir, I've asked that three times.  Do
17  you not --
18    A.  Hello?
19    Q.  Do you not --
20    A.  Hello?
21    Q.  Yes.
22    MR. SHMIKLER:  Hello, can you hear us?
23    THE WITNESS:  Hello?
24    MR. BLACKMAN:  That's convenient.

11 (Pages 38 to 41)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 42

1    THE WITNESS: Hello?
2    MR. SHMIKLER: Can you hear us, Dr. Vish?
3    THE WITNESS: Hello?
4    MR. SHMIKLER: Let's go off.
5        (Discussion off the record.)
6    MR. SHMIKLER: We can hear you now. We're
7  going to go back on the record.
8  BY MR. BLACKMAN:
9    Q. Dr. Vish, what is your personal e-mail
10 address?
11   A. It's vishg81@yahoo.com.
12   Q. Is that a new e-mail --
13   A. No.
14   Q. -- let me finish my question.
15       Is that a new e-mail or is that the one
16 you were using when you were living in the United
17 States?
18   MR. SHMIKLER: Object to relevance.
19   THE WITNESS: It's not a new one.
20 BY MR. BLACKMAN:
21   Q. Okay. Do you have any other e-mail
22 addresses that you're using?
23   A. No.
24   MR. SHMIKLER: Object to relevance.

Page 43

1  BY MR. BLACKMAN:
2    Q. Now, you gave a business address of 36
3  Vidyaraman?
4    A. Yeah.
5    Q. Is that an office?
6    A. Yes.
7    Q. And is there a name that you use when you
8  work out of that office?
9    A. Is there a name here?
10   Q. Is there a company name that you're using
11 when you're working out of that office?
12   A. It's Real Estate Consultants Private
13 Limited.
14   Q. What's it called, Real Estate Consultants
15 Private Limited?
16   A. Right.
17   Q. When was that formed?
18   A. I don't know, maybe a year and a half ago.
19   Q. Okay. So was this a business that you had
20 in India before you say you moved there?
21   A. Yeah.
22   Q. What does that business do?
23   A. Sorry?
24   Q. And what does that business do?

Page 44

1    A. Hello?
2    MR. SHMIKLER: Can you hear us?
3    THE WITNESS: Yeah, I can hear you now.
4  BY MR. BLACKMAN:
5    Q. What does that business do?
6    A. Well, we just -- it's basically supporting
7  the U.S. -- sale of U.S. real estate, you know,
8  whatever projects I have in the U.S. This is more
9  like a call center operation and they make calls to
10 customers in the U.S. and then transfer it live to
11 your salesman arranging site visits and helping the
12 U.S. sale.
13   Q. So that company, if I understand what
14 you're saying, is that helps you make the sales for
15 the developments that you're doing in Chicago?
16   A. Hello?
17   MR. SHMIKLER: Can you hear us?
18   THE WITNESS: Hello?
19   MR. SHMIKLER: Can you hear us okay? Dr. Vish?
20 Hello?
21   THE WITNESS: Hello?
22       (Discussion off the record.)
23 BY MR. BLACKMAN:
24   Q. Sir, are you staying in one place while

Page 45

1  we're asking these questions or are you walking
2  around?
3    A. No, no, no, the phone has a problem.
4    MR. SHMIKLER: Do you have another phone?
5    THE WITNESS: Let me see if I can substitute it
6  with a different phone or something. Hold on.
7        (Discussion off the record.)
8        (Whereupon the record was read
9         as requested.)
10       (Discussion off the record.)
11 BY MR. BLACKMAN:
12   Q. Dr. Vish, the entity that you just
13 mentioned, the Real Estate Private Limited which
14 you stated, if I understand you correctly, handles
15 the sales calls for the developments that you're
16 doing in Chicago?
17   A. Yes, Chicago, and they did try to do the
18 Florida sales also but obviously Florida is going
19 nowhere. And it was set up to help all U.S. sales,
20 Chicago and Florida. There is no more Florida.
21   Q. Does it have employees?
22   A. Do I have employees?
23   Q. Does it have employees?
24   A. Yeah, I have a couple of employees.

12 (Pages 42 to 45)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 46

1    Q.  Are they still doing sales now for the 222
2  Pearson?
3    A.  Yes.
4    Q.  Is there any other properties that they
5  are handling sales for other than 222 Pearson?
6    A.  No.
7    Q.  And how many units are left to be sold?
8    MR. SHMIKLER:  Object to relevance.  This
9  doesn't have anything to do with the service issue.
10    THE WITNESS:  I think about 50 or so.
11  BY MR. BLACKMAN:
12    Q.  And then you have people that are working
13  for you in Chicago to finish that project?
14    MR. SHMIKLER:  Object to relevance.
15    MR. BLACKMAN:  I think it's very relevant to
16  whether or not he is going to India for this whole
17  purpose of avoiding debts and obligations while at
18  the same time running businesses in Chicago from
19  which he's getting funds.
20    MR. SHMIKLER:  He's acknowledged that he's
21  running businesses in Chicago.  The details of the
22  businesses are not relevant.
23    MR. BLACKMAN:  It's absolutely relevant to what
24  extent he has actually permanently moved to India

Page 47

1  or whether he's saying that to avoid service and to
2  avoid this Complaint.
3    MR. SHMIKLER:  He's offered to accept service,
4  so --
5    MR. BLACKMAN:  I'm not debating you.  I'm just
6  responding to your relevancy objection.
7    MR. SHMIKLER:  You don't have to respond.  If
8  you do, I'm going to reply.
9  BY MR. BLACKMAN:
10    Q.  Sir, you have --
11    A.  Yes.
12    Q.  You have employees that are working for
13  you here?
14    MR. SHMIKLER:  Same objection, relevance.
15    THE WITNESS:  Working for me where?
16  BY MR. BLACKMAN:
17    Q.  You have employees that are working for
18  you in Chicago to sell the remaining units at 222
19  Pearson?
20    A.  Right.
21    Q.  What are their names?
22    MR. SHMIKLER:  Object to relevance.
23  BY MR. BLACKMAN:
24    Q.  Sir?

Page 48

1    A.  Yeah.
2    Q.  What are their names?
3    A.  Oh, the names?
4    Q.  What are the names of the people working
5  for you in Chicago to sell your condominium units?
6    A.  Arjun Ramdarajan, Pria then --
7    Q.  Sir, I'm going to need you to spell each
8  of these.
9    A.  Arjun -- why is this any relevance?  Why
10  is this relevant to what we have --
11    MR. SHMIKLER:  Sir, the answer is that it's not
12  relevant --
13    MR. BLACKMAN:  Are you having a conversation
14  with your client?
15    MR. SHMIKLER:  I'm trying to get your answer.
16  So I think it will be helpful to let me advise the
17  client.
18    MR. BLACKMAN:  I think it will be helpful if we
19  follow the procedures.
20  BY MR. BLACKMAN:
21    Q.  Sir, your lawyer is the one that makes the
22  objections, not you.  So we cannot have a dialogue
23  in the middle of a deposition between you and him
24  as to whether people like my questions or not.

Page 49

1    So when I ask you the questions, your
2  lawyer will make the objections.  Unless he
3  instructs you not to answer, you have to answer.
4    So that's the way this process works.  So
5  I don't want to debate with you why I'm asking
6  questions every time I'm asking that; do you
7  understand that?
8    THE WITNESS:  Yeah, but I need to know --
9    MR. BLACKMAN:  No, sir, you don't need to know
10  anything.  All you need to know is you've got a
11  lawyer who is representing you who will make
12  objections.  And if he instructs you not to answer
13  a question, then you don't have to answer.  But
14  until he does that you have to answer.
15    So what are the names of the people and
16  spell them who are working for you selling your
17  units at 222 Pearson?
18    MR. SHMIKLER:  I object that it's completely
19  irrelevant to the service question.  What's going
20  on here is an improper attempt to conduct a
21  citation type proceeding to aid them in a different
22  matter which is entirely improper.
23  BY MR. BLACKMAN:
24    Q.  Go ahead, sir.

13 (Pages 46 to 49)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 50

1     MR. SHMIKLER: You can answer it.
2     THE WITNESS: Arjun.
3  BY MR. BLACKMAN:
4     Q.  You're going to have to spell each of
5  these.
6     A.  A-r-j-u-n. Pria.
7     Q.  Is this one person or two different
8  people? Is that his last name?
9     A.  No, two different -- two different people.
10    Q.  Okay. What's Arjun's full name?
11    A.  Ramdarajan.
12    Q.  Arjun is his first name?
13    A.  Yeah.
14    Q.  How do you spell his last name?
15    A.  Ramdarajan.
16    Q.  How do you spell his last name?
17    A.  Hello?
18    MR. SHMIKLER: Can you hear us, Dr. Vish? Do
19  you hear us?
20    THE WITNESS: Ramdarajan.
21  BY MR. BLACKMAN:
22    Q.  How do you spell his last name?
23    A.  Hello?
24    MR. SHMIKLER: Can you spell Arjun's last name

Page 51

1  Dr. Vish?
2     THE WITNESS: Hello?
3     MR. SHMIKLER: If I had any control --
4     MR. BLACKMAN: I think you do. If we can't do
5  his deposition, he's going to have to come in.
6        (Discussion off the record.)
7     THE WITNESS: I can hear you now.
8     MR. SHMIKLER: He wants you to spell Arjun's
9  last name, Dr. Vish.
10    THE WITNESS: Hello?
11    MR. SHMIKLER: Dr. Vish, he wants you to spell
12  Arjun's last name, please.
13    THE WITNESS: R-a-m-d-a-r-a-j-a-n.
14  BY MR. BLACKMAN:
15    Q.  Okay. And who are the other primary
16  individuals who are overseeing the sale of the
17  units at 222?
18    A.  Well, there is Thiru, T-h-i-r-u, Thiru,
19  and then there is Brian and Gerry and Griselda.
20    Q.  What's Thiru's last name?
21    MR. SHMIKLER: Object to relevance on each of
22  these names.
23    MR. BLACKMAN: You've made your point.
24  BY MR. BLACKMAN:

Page 52

1     Q.  What's Thiru's last name?
2     A.  It's Thiru Narayanan, N-a-r-a-y-a-n-a-n.
3     Q.  Okay. And what's Brian's last name?
4     A.  I don't know his last name.
5     Q.  What's Gerry's last name?
6     A.  I don't remember.
7     Q.  Now, sir, I want to go back to -- it seems
8  like a long time ago -- the question that began
9  with my asking you about the deposition of your
10  wife. And I will read this into the -- I will read
11  this into the record.
12       On page 98 of your wife's deposition --
13    MR. SHMIKLER: Can I go get a copy of this?
14  Otherwise we're going to have an objection whether
15  you've read it completely, so on and so forth.
16    MR. BLACKMAN: Hold on, Doctor.
17        (A short break was taken.)
18    MR. BLACKMAN: Ready?
19    MR. SHMIKLER: Yeah. What page did you say you
20  were on?
21    MR. BLACKMAN: I'll say it again.
22  BY MR. BLACKMAN:
23    Q.  Doctor, I'm going to read a question and
24  answer from your wife's deposition on Tuesday.

Page 53

1     A.  Okay.
2     Q.  And I'm going to start with page 97 --
3  actually, I'm going to start, sir, I'm sorry, with
4  page 94. And this is on line 12 and the question
5  is:
6        "Okay, period, and is it your belief or
7  understanding that he has moved to India
8  permanently?"
9        And your wife's answer was, "No."
10       And then there was some objections. And
11  then the question on line 18 is:
12       "So you don't know whether he has moved
13  permanently or not?"
14       "Answer: I don't think he's moved
15  permanently."
16       And then I'm going to go to page 97, line
17  23, the question:
18       "How do you know he was going back and
19  forth? You said he was going back and forth. How
20  do you know that?"
21       "Answer: He would come back -- he says
22  he's coming back, so I'm thinking that he will be
23  coming back."
24       "Question: So he's told you that he's

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 54

1 coming back?"
2     "Answer: Yes."
3     Now, sir, I want to ask you, is it your
4 testimony that your wife is not telling the truth?
5     A.  No, no, I cannot interpret for that.  It's
6 her interpretation, so that's all.  No, I can't say
7 that.
8     Q.  But are you denying that you ever told her
9 that you were not moving there permanently?
10    MR. SHMIKLER:  Objection, mischaracterizes her
11 testimony.
12    THE WITNESS:  I don't think we ever had an
13 opportunity to talk about this.  We don't talk
14 much.  Why you guys -- we're going through a
15 divorce.  Don't you understand we're going through
16 a divorce.
17 BY MR. BLACKMAN:
18    Q.  Sir, are you denying that you ever advised
19 your wife that you were coming back?
20    MR. SHMIKLER:  Objection, asked and answered.
21 No, withdraw the objection.  You fixed the
22 question.  Sorry.
23 BY MR. BLACKMAN:
24    Q.  Are you denying that you ever advised your

Page 55

1 wife that you were coming back?
2     A.  I don't recall any such conversation, sir.
3 That's all.
4     Q.  Is it possible that you did?
5     A.  No, I don't recall any such conversation.
6     Q.  Okay.  So if she recalls that
7 conversation, she would be wrong?
8     A.  I'm not going to conclude anything about
9 what she said.  I do not recall any such
10 conversation, period.
11    Q.  Okay.  Now, I want to go through the
12 timetable of when you moved because I'm kind of
13 confused about it.
14        You state that you moved out of the
15 Ridgewood residence in the summer of 2006?
16    A.  Correct.
17    Q.  And do you recall when that was exactly?
18    MR. SHMIKLER:  I object.  It mischaracterizes
19 his testimony.  You said December?
20    MR. BLACKMAN:  The summer.
21    MR. SHMIKLER:  Sorry.  I'll withdraw.  I
22 misheard you.
23 BY MR. BLACKMAN:
24    Q.  Is that your testimony that you moved out

Page 56

1 of the Ridgewood residence the summer of 2006?
2     A.  Yes.
3     Q.  Do you recall when?
4     A.  I don't recall exactly when.
5     Q.  Do you recall approximately when?
6     A.  It's -- I don't know.  To the best of my
7 recollection, it was probably somewhere around
8 either June or August.
9     Q.  Okay.  And then where did you go from
10 there?
11    A.  To LaGrange.
12    Q.  Okay.  Now, is that a rental or a condo?
13    A.  It's a rental.
14    Q.  Who owns it?
15    A.  I don't know the name of the owner.  They
16 were in Singapore.
17    Q.  Who did you pay your rent to?
18    A.  It was paid to a fellow by the name Mark
19 Shure.
20    Q.  Mark -- what's the --
21    A.  S-h-u-r-e.  He's an attorney.  You can go
22 through the Sullivan's and get his name and verify
23 all my rent payments --
24    Q.  Sir, sir, sir, just listen to my question

Page 57

1 and answer it.  If there's any other questions,
2 I'll ask you those later.
3     A.  Yes.
4     Q.  Now, Mr. Shure, was he the landlord or was
5 he the landlord's attorney?
6     A.  He was the representative for the landlord
7 and he is an attorney, so...
8     Q.  And when did your -- did you have a lease?
9     A.  Yes, I did have a lease.
10    Q.  You had a written lease?
11    A.  Sorry?
12    Q.  You had a written lease?
13    A.  Yes, I did.
14    Q.  Well, when did it end?
15    A.  I do not recall when it ended.  I don't
16 have an exact recollection of when it ended.
17    Q.  Well, approximately when did it end?  Did
18 it end in 2007?
19    A.  I don't recall.  It was 2007 sometime.
20    Q.  When did you move out?
21    A.  I moved out, you know, late October, maybe
22 early November, during that period.
23    Q.  Okay.  And then you didn't move back in,
24 right?

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 58

1  A. No.
2  Q. And then did you take your belongings and
3  send them -- what did you do with your belongings
4  when you moved out?
5  A. I took them with me.
6  Q. Okay. Did you take -- did you send
7  anything over to the house on Ridgewood?
8  A. Did I put anything over to the house on
9  Ridgewood?
10  Q. Right.
11  A. No, no.
12  Q. What did you do with your car?
13  A. Well, the car is parked in Pearson.
14  Q. That's the Lexus?
15  A. Yeah.
16  Q. Okay. And that's parked at Pearson. Why
17  is it parked at Pearson?
18  A. Well, you know, that's my project.
19  Q. Okay. But you've moved to India. Why
20  would you have your car in Chicago?
21  A. Well, I have not had, you know, time to
22  really decide what to do with the car and this and
23  that.
24  Q. What would you need to decide?

Page 59

1  A. Hello?
2  Q. What would you need to decide? I mean, if
3  you moved --
4  A. Hello?
5  MR. SHMIKLER: Can you hear us now?
6  THE WITNESS: Hello?
7  MR. SHMIKLER: Hello, Dr. Vish?
8  (Discussion off the record.)
9  MR. BLACKMAN: For the record this deposition
10  has been repeatedly interrupted by the inability of
11  the witness for whatever reason to stay on the
12  phone in the middle of the questioning. And it
13  appears that the only time Dr. Vish has a problem
14  staying on the phone is when I'm asking him a
15  question that he doesn't want to answer. We didn't
16  seem to have these technical difficulties when his
17  counsel was asking him questions. So every five
18  minutes we have to stop and reconnect. And so at
19  this point we're going to keep trying to go
20  forward, but we have an inability to take this
21  man's deposition in a normal and rational way prior
22  to Tuesday's hearing.
23  MR. SHMIKLER: I just point out that I think
24  there's some inaccuracies in there. We had the

Page 60

1  exact same problem during my examination. I don't
2  think there's any correlation between the technical
3  difficulties we're having and the questions that
4  counsel is asking. Questions as spelling last
5  names, we had a problem, so -- hi, Dr. Vish?
6  THE WITNESS: Yes.
7  MR. SHMIKLER: Hang on one second.
8  We agree there's a technical problem.
9  We're doing what we can to address it. We'll take
10  further measures if it gets worse and it's
11  something that we're all dealing with.
12  BY MR. BLACKMAN:
13  Q. Dr. Vish, I was asking about your car. If
14  you moved from the United States to India
15  permanently, as is your testimony, why would you
16  still have your car in Chicago at your place of
17  business here?
18  A. Well, I may visit and still have my
19  children there, I may visit, and I may occasionally
20  come to take care of business so...
21  Q. Okay. So who is charged with taking care
22  of your car while you're gone?
23  A. Sorry?
24  Q. Who's in charge of taking care of your car

Page 61

1  while you're gone?
2  A. Really the car doesn't need much. It's a
3  Lexus and really the people, the fellows there that
4  park the car, and they take care of it.
5  Q. Okay. Is the car in your name?
6  A. I do not recall if it is in my name or in
7  one of the company's name. I do not recall that,
8  sir.
9  Q. Okay. So you -- I don't recall whether
10  you told me when you moved out of LaGrange.
11  MR. SHMIKLER: I think he did. It was
12  answered.
13  BY MR. BLACKMAN:
14  Q. Late October, early November?
15  A. Right.
16  Q. Now, was your lease up at that time?
17  A. Sorry?
18  Q. Was your lease up at that time?
19  A. Was there a lease at that time?
20  Q. Was that the end of your lease in October
21  or early November?
22  A. My -- my best recollection is that was the
23  end of the lease.
24  Q. Well, do you have any documents other than

16 (Pages 58 to 61)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 62

1  what you have given us to support which is a couple
2  of bills from September and October that support
3  that you were at LaGrange from 2006 through the
4  fall of 2007, do you have any other documents other
5  than these two bills?
6      A.  Well, I have a lease agreement, signed a
7  lease agreement.  I don't know where it is.  I got
8  to track it down, but I know the realtor who set up
9  the house and I also know the lawyer that is the
10  caretaker for the house, Mark Shure.  He will have
11  a copy and somewhere in my office may have a copy
12  and I can also go to the realtor and, you know,
13  and --
14     Q.  Sir --
15     A.  -- ask her.
16     Q.  The only documents that you have provided
17  to your counsel with respect to that LaGrange
18  address, are these two bills, one is a ComEd bill
19  and one is a direct TV bill, right?  Those are the
20  only two bills, only two documents you provided
21  them with respect to LaGrange; is that correct?
22     A.  That may be so.
23     Q.  Okay --
24     A.  But I do have -- I am saying under oath I

Page 63

1  do have a lease agreement.  I did sign a lease
2  agreement.  And in all probability Mark Shure, the
3  attorney, whom you can find in the Sullivan's will
4  have a copy, and I will make an attempt to get it.
5      Q.  That's too late, sir, because this
6  deposition today is in lieu of you coming in for
7  your trial testimony on Tuesday.  So whatever
8  documents there were supposed to be given to your
9  lawyer so we could ask you questions at your
10  deposition.
11         We're doing this now so you do not have to
12  testify at trial.  So there is no further date.  So
13  I just want to confirm that the only things that
14  you have -- and I think you've confirmed this --
15  that you've given us are these two bills.
16         Now, when you moved out in late October,
17  early November, where did you go?
18     A.  Well, I travelled a little bit in the U.S.
19  and then I moved to India.
20     Q.  Well, I want to know specifically when you
21  left in early November did you first travel in the
22  U.S.?
23     A.  Yes.
24     Q.  Okay.  And then for how long were you

Page 64

1  travelling in the U.S.?
2      A.  Oh, about three days, three, four days.
3      Q.  Okay.  Where would you stay when you would
4  travel in the U.S.?
5      A.  Well, I was in Cleveland.
6      Q.  Okay.  Is that for business?
7      A.  No, I was visiting some relatives.
8      Q.  Okay.  And then where did you go from
9  Cleveland?
10     A.  Then I went to India.
11     Q.  When did you go to India?
12     A.  Somewhere around the early part of
13  November.
14     Q.  Can you be --
15     A.  Maybe the 7th, 10th, something like that.
16  I don't remember the exact date.
17     Q.  Now, when you went to India on the 7th or
18  the 10th -- how did you get there; was it Air
19  India?
20     A.  No.
21     Q.  What did you fly on?
22     A.  My best recollection it was Air France.
23     Q.  Okay.  So then when you went to India on
24  or about the 7th or the 10th of December --

Page 65

1      A.  No, not December, November.
2      Q.  Sorry.  November.  You're right.
3          Were you aware at the time that you owed
4  money to Indymac?
5      MR. SHMIKLER:  Objection to the extent it calls
6  for a conclusion, a legal conclusion.
7      MR. BLACKMAN:  I don't think it's a legal
8  conclusion to know whether you owe money to
9  someone.
10     MR. SHMIKLER:  It is because it depends on the
11  appraisals of the properties.
12  BY MR. BLACKMAN:
13     Q.  Sir?
14     A.  Yes.
15     Q.  When you went to India, were you in
16  default to Indymac under its loans?
17     MR. SHMIKLER:  Same objection.
18     THE WITNESS:  I do not know.
19  BY MR. BLACKMAN:
20     Q.  Well --
21     A.  I do not recall.
22     Q.  You don't recall whether or not you were
23  in default to Indymac under the loans when you went
24  to India; is that your recollection?

17 (Pages 62 to 65)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 66

1  A. There were -- there were just too many
2 papers. Maybe there was -- maybe some loans were
3 in default. I don't quite recall that. I know
4 there was some default.
5  Q. Well, do you recall that on May 1st, 2007,
6 Hawthorne Grand defaulted on its loans to Indymac?
7  MR. SHMIKLER: Again, object to legal
8 conclusion.
9  THE WITNESS: I'm -- they may have sent some
10 notices, you know, stating default.
11 BY MR. BLACKMAN:
12  Q. Well, sir, do you recall being in my
13 office at a meeting before the lawsuit was filed
14 speaking with the -- hang on -- speaking with the
15 representatives at Indymac about how you were going
16 to repay what was owed?
17  A. Yes, there was a meeting at your office.
18 I recall that.
19  Q. And when you were meeting at my office
20 with the representatives of Indymac and myself --
21  A. Hello?
22  MR. SHMIKLER: Can you hear us?
23  THE WITNESS: Hello?
24  MR. SHMIKLER: Can you hear us?

Page 67

1  THE WITNESS: Yeah, I can hear you now.
2 BY MR. BLACKMAN:
3  Q. When you were meeting in our office, that
4 was before you moved to India, wasn't it?
5  A. Yeah.
6  Q. And the purpose of the meeting was to
7 discuss -- the purpose of the meeting was to
8 discuss with you --
9  A. Hello?
10  MR. SHMIKLER: Can you hear us now? Dr. Vish?
11 Dr. Vish?
12  THE WITNESS: Hello?
13  MR. SHMIKLER: Can you hear us? Are you there?
14  THE WITNESS: Hello?
15  (Discussion off the record.)
16  MR. SHMIKLER: I think we heard you say you
17 wanted to try your cell phone?
18  THE WITNESS: Yes, I want to see -- you know, I
19 will talk as much as I can. And if I lose you
20 again, I'm going to try it from my cell phone. I'm
21 just hooking it up. Hang on one second.
22  MR. SHMIKLER: Can you hear us?
23  THE WITNESS: Yeah, I can hear you, yeah, go
24 ahead.

Page 68

1  MR. SHMIKLER: If you lose us again, call us
2 back on the cell. In the meantime we're setting up
3 a conference call and number which may help.
4  THE WITNESS: Okay.
5 BY MR. BLACKMAN:
6  Q. Sir, when you were in my office with my
7 clients to discuss the loans that were made to you
8 and your companies, you were in default at that
9 time; were you not?
10  MR. SHMIKLER: Object to the extent it calls
11 for a legal conclusion. If you want to ask if he
12 knew it was their position.
13  MR. BLACKMAN: I'm asking him that.
14  MR. SHMIKLER: Fine. That's our objection.
15 BY MR. BLACKMAN:
16  Q. Go ahead.
17  A. I'm not going to draw a legal conclusion
18 it was in default. It's a claim made by Indymac
19 and, you know --
20  Q. Are you current?
21  A. Sorry?
22  Q. Are your companies current in their
23 obligations to Indymac; is that what you're saying?
24  A. No, they may not be current.

Page 69

1  Q. When you were in our office, is it your
2 testimony that the loans were in good standing at
3 that point?
4  MR. SHMIKLER: Objection, calls for a legal
5 conclusion.
6  THE WITNESS: I don't know what you mean by
7 good standing. I mean, everybody knows the
8 problems that we have in Florida, so the property
9 sale could not take place as per planned, so there
10 were difficulties.
11 BY MR. BLACKMAN:
12  Q. Sir, when you say there were difficulties,
13 I want to be clear and I want to be honest here,
14 when you were in our office, you were not in our
15 office because everything was fine; you were in our
16 office because you were in default to Indymac and
17 you owed it money.
18  MR. SHMIKLER: Objection. It calls for a legal
19 conclusion. I think to the extent you go beyond
20 what his understanding was as to their claims, I
21 don't think it's relevant.
22 BY MR. BLACKMAN:
23  Q. Go ahead.
24  A. Yeah, I'm not going to -- I'm not going to

18 (Pages 66 to 69)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 70

1   say it was in default --
2       Q.  Sir, you do not have a choice, sir.
3       MR. SHMIKLER:  What he's trying to tell you is
4   that he's not -- he doesn't have an opinion on the
5   legalities of it.  If you want to ask about the
6   facts --
7   BY MR. BLACKMAN:
8       Q.  What was the purpose of our meeting?  Why
9   did you come to our office?
10      A.  Well, the purpose of our meeting was to
11  see if we can come to some agreement with regard to
12  the property and the loan.
13      Q.  Okay.  And why did we need to do that?
14      A.  Hello?
15      Q.  Why did we need to do that?
16      A.  Hello?
17      MR. SHMIKLER:  Hello?  All right.
18      THE WITNESS:  Yeah.
19  BY MR. BLACKMAN:
20      Q.  Why did we need to do that?
21      A.  Why did we need to --
22      Q.  Why did we need to come to an agreement
23  about the property and the loan if everything was
24  fine?

Page 71

1       MR. SHMIKLER:  Objection, form.
2       THE WITNESS:  I'm not saying everything was
3   fine.  There were some issues, problems with regard
4   to sale and number of sales we can make and all of
5   that, so there were issues.
6   BY MR. BLACKMAN:
7       Q.  When you were in our office before you say
8   you moved to India, were you current on the loans;
9   were you current in your obligations?  I'm not
10  saying whether you were in default or not.  I'm
11  saying were you current in your obligations to
12  Indymac?
13      MR. SHMIKLER:  You're asking him personally or
14  the company?
15      MR. BLACKMAN:  Either.
16      MR. SHMIKLER:  I object to form.
17      MR. BLACKMAN:  Because he was there in both
18  capacities.
19      MR. SHMIKLER:  Just to be clear who we're
20  talking about.
21  BY MR. BLACKMAN:
22      Q.  Go ahead.
23      A.  You were talking about the company --
24  yeah, I mean.

Page 72

1       Q.  Was your company current to Indymac when
2   you were at our office?
3       A.  No, it was not.
4       Q.  And now you've signed a personal
5   guarantee?
6       A.  Yes.
7       Q.  Can you pay Indymac under that personal
8   guarantee today?
9       MR. SHMIKLER:  I object.  It's not relevant to
10  the issue of service.
11      MR. BLACKMAN:  I think it is.
12      MR. SHMIKLER:  I think it's beyond the scope of
13  these proceedings.
14      MR. BLACKMAN:  I think it is very relevant as
15  to why somebody three days after a lawsuit is filed
16  after being in our office trying to discuss a
17  workout all the sudden says he's moving to India
18  and is avoiding service, I think it's very
19  relevant.
20      MR. SHMIKLER:  He's not avoiding service.  He's
21  offered to accept service.
22      MR. BLACKMAN:  He doesn't need my permission to
23  accept service.  You can accept service and you can
24  go into the court and you can ask them to vacate

Page 73

1   defaults and you can ask them for whatever relief
2   you want.  You don't need my permission for that.
3   You keep suggesting that this is something that I
4   have some control over.  You had that right and
5   that ability since November.  So that is -- I'm not
6   sure what the relevance of that is.
7   BY MR. BLACKMAN:
8       Q.  But sir?
9       MR. SHMIKLER:  The issue --
10      MR. BLACKMAN:  Do you have an objection?
11      MR. SHMIKLER:  My objection is that it's not
12  relevant.
13  BY MR. BLACKMAN:
14      Q.  Okay.  Sir, can you pay your personal
15  guarantee right now?  Can you pay Indymac all the
16  money that your companies owe Indymac?
17      MR. SHMIKLER:  Objection.
18      THE WITNESS:  I wish to correct some statement
19  you made that three days after walking into your
20  office.  That is incorrect.
21  BY MR. BLACKMAN:
22      Q.  Sir, I'm not asking -- that wasn't a
23  question to you.
24      A.  Yes.

19  (Pages 70 to 73)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 74

1 Q. Listen to my question because I want to go
2 through this and be done with this.
3 Can you pay Indymac now on your personal
4 guarantee for the monies owed to Indymac under the
5 various loans; can you do that?
6 MR. SHMIKLER: Object to foundation.
7 THE WITNESS: You know, I do not think I need
8 to answer that question.
9 MR. SHMIKLER: You do need to answer it. Dr.
10 Vish, this is Dan. You do need to answer it.
11 THE WITNESS: Is that Dan?
12 MR. SHMIKLER: Yeah, this is Dan. I made my
13 objections. You can go ahead and answer the
14 questions.
15 THE WITNESS: Dan?
16 MR. SHMIKLER: Yes. I made my objections,
17 Dr. Vish. Go ahead and answer the question, if you
18 know.
19 THE WITNESS: Dan?
20 MR. SHMIKLER: Yes. Can you hear me?
21 Dr. Vish?
22 THE WITNESS: Hello?
23 MR. SHMIKLER: Dr. Vish?
24 MR. BLACKMAN: You don't see a pattern here?

Page 75

1 MR. SHMIKLER: I don't see a pattern here.
2 THE WITNESS: Hello?
3 (Discussion off the record.)
4 MR. SHMIKLER: We don't want these
5 interruptions anymore. Let's switch to the cell
6 phone now, okay?
7 THE WITNESS: Cell phone?
8 MR. SHMIKLER: Yeah, we don't want these
9 interruptions anymore. Switch to the cell phone.
10 THE WITNESS: Okay.
11 MR. SHMIKLER: Call us right back.
12 (A short break was taken.)
13 MR. SHMIKLER: Hello, Dr. Vish?
14 THE WITNESS: Yes.
15 MR. SHMIKLER: Can you hear us okay?
16 THE WITNESS: Yeah, I can hear you.
17 MR. SHMIKLER: We'll see if this works. If we
18 have any problems, we'll switch over to the AT&T
19 conference.
20 THE WITNESS: Okay.
21 MR. SHMIKLER: I don't know if you heard what I
22 was telling you. I said we made our objections to
23 it and you can go ahead and answer it. Do you
24 recall what it was?

Page 76

1 THE WITNESS: Okay. The question is.
2 MR. BLACKMAN: Could you please read it back?
3 (Whereupon the record was read
4 as requested.)
5 THE WITNESS: Pay Indymac under the various
6 loans, I do not know because I -- it is possible
7 that I may be able to pay because I still believe
8 the property has considerable value. So I think
9 there is enough in the properties to take care of
10 the loan.
11 BY MR. BLACKMAN:
12 Q. Sir, that's not my question. I want you
13 to listen my question --
14 MR. SHMIKLER: I object. I think it is the
15 question.
16 MR. BLACKMAN: Let me finish and you'll
17 understand why it's not my question.
18 MR. SHMIKLER: All right.
19 BY MR. BLACKMAN:
20 Q. My question is not whether there's enough
21 money if collateral is liquidated to pay down the
22 loan so that you won't have to pay monies under
23 your personal guarantee. My question is -- because
24 there's no requirement that collateral be

Page 77

1 liquidated first.
2 My question is, if Indymac comes to you
3 today and says, can you pay everything that's owed
4 pursuant to your personal guarantee, can you do
5 that?
6 MR. SHMIKLER: Object to foundation and to the
7 extent it calls for a legal conclusion.
8 Go ahead and answer it.
9 THE WITNESS: I can't -- you know, I cannot be
10 answering any hypothetical questions. I think my
11 understanding is that the first charge -- this is
12 my understanding. The first charge has got to be
13 the property. And if there is any deficiency left
14 after the property's value, then I'm responsible
15 for it.
16 BY MR. BLACKMAN:
17 Q. Okay. Well, sir, sir, it's not a
18 hypothetical and I want you to answer the question
19 because I'm not asking --
20 A. I have answered the best I can. That is
21 my --
22 Q. Sir --
23 A. -- that is my understanding.
24 Q. Sir --

20 (Pages 74 to 77)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 78

1    A.  That is my understanding.
2    Q.  Sir, when I am speaking you are not
3  allowed to speak; do you understand that?
4    MR. SHMIKLER:  Unless he's still answering the
5  question which has been the case a number of times
6  or if he needs clarification.
7    MR. BLACKMAN:  That's your job.
8    MR. SHMIKLER:  If he doesn't understand --
9    MR. BLACKMAN:  Stop.
10    MR. SHMIKLER:  Let's not make these blanket
11  statements.
12    MR. BLACKMAN:  You know, control your witness,
13  all right.
14    MR. SHMIKLER:  No, you don't want me to shut
15  up.  I try to help you and --
16  BY MR. BLACKMAN:
17    Q.  Dr. Vish, I want to ask you again because
18  you haven't answered the question.  I'm not asking
19  you whether there is sufficient collateral in your
20  opinion to be liquidated.  I'm asking you if
21  Indymac came to you today and asked you to pay all
22  amounts owed under all these loans pursuant to your
23  personal guarantees, would you personally have
24  sufficient financial assets to do that?

Page 79

1    MR. SHMIKLER:  I have the same objections as
2  the previous question.
3    THE WITNESS:  I'm not sure they have a right to
4  do that.  That's why I am saying it is a
5  hypothetical question.  You claim they have the
6  right.  I claim they don't.  So it is a
7  hypothetical question, as far as I'm concerned.
8  BY MR. BLACKMAN:
9    Q.  Sir, your lawyer is the one to make an
10  objection as to whether this is hypothetical.  You
11  are required to answer the question.  You don't
12  have that right; do you understand that?
13    MR. SHMIKLER:  Wait a minute.  First, I have an
14  objection.  In fact, included in your question was
15  your argument that it was not a hypothetical, he's
16  responding to that.  I think that's fine and he can
17  do that.  I think that he can.
18  BY MR. BLACKMAN:
19    Q.  Sir, how much is Indymac owed under the
20  loans?  Sir?
21    MR. SHMIKLER:  Object to foundation to the
22  extent it calls for a legal conclusion.
23  BY MR. BLACKMAN:
24    Q.  How much is Indymac owed by your companies

Page 80

1  under the loans?
2    MR. SHMIKLER:  Same objections.
3    THE WITNESS:  I don't have that data in front
4  of me.
5  BY MR. BLACKMAN:
6    Q.  Is it more than $50 million?
7    A.  You are talking about one loan or two
8  loans?
9    Q.  I'm talking about all three loans.  Is it
10  more than $50 million?
11    A.  I think so.
12    Q.  Is it more than 75 million?
13    A.  I don't exactly recall.
14    Q.  Okay.  Well, let's say it's more than 50
15  million.  Do you have $50 million in personal
16  assets to repay pursuant to your personal
17  guarantee?
18    MR. SHMIKLER:  Object to relevance.
19    THE WITNESS:  Do I have --
20  BY MR. BLACKMAN:
21    Q.  Do you have in excess of $50 million to
22  repay the loans if demand was made on you pursuant
23  to your personal guarantee?  Do you have those
24  financial assets?

Page 81

1    MR. SHMIKLER:  Same objection.
2    THE WITNESS:  I'm not sure they can make that
3  demand.
4  BY MR. BLACKMAN:
5    Q.  I understand your position, but I'm asking
6  you a different question.
7    I'm asking you whether or not you have the
8  financial ability to make a payment to a bank in
9  excess of $50 million?
10    MR. SHMIKLER:  Again, object to relevance.
11    THE WITNESS:  I am not sure that it is, you
12  know -- I do not see why this is not a hypothetical
13  question.
14    MR. SHMIKLER:  I got an idea.
15    MR. BLACKMAN:  I don't want an idea.
16    MR. SHMIKLER:  You just want to control my
17  witness.  I'm trying to help.
18    MR. BLACKMAN:  I don't want your help.
19    MR. SHMIKLER:  If you let me talk to him.
20    MR. BLACKMAN:  No, I'm not going to do it like
21  that.  It's not a difficult question.  I understand
22  you got an objection as to relevance.  We're
23  playing games here.
24  BY MR. BLACKMAN:

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS  (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 82

1    Q.  Dr. Vish, I'm going to ask you again, do
2  you have in excess of $50 million in your personal
3  assets to pay a demand in that amount if made by
4  Indymac?
5    A.  No, sir.
6    Q.  Okay.  Now, when you left the country in
7  October or November of 2007, did you take any
8  personal assets with you?
9    A.  What personal assets?
10   Q.  I mean, what are you living on in India?
11   A.  I have my clothes.
12   Q.  What are you living on in terms of monies
13 and dollars; how are you paying for anything?
14   MR. SHMIKLER:  Object to relevance.  I think
15 we're again moving to the area of a citation
16 proceeding.
17   MR. BLACKMAN:  I think it's relevant to whether
18 he's established a permanent residence in India.
19 BY MR. BLACKMAN:
20   Q.  Sir, how are you paying for living in
21 India?
22   A.  How does it matter?  Everything just looks
23 like a discovery.  This is not --
24   Q.  Sir, you've hired a very good attorney to

Page 83

1  represent you.  You are paying this lawyer to
2  represent you.  He will make an objection and the
3  judge will rule on it.  Until he tells you not to
4  answer, you have to answer.  So how are you living
5  in India from where -- strike that.
6        How is it that you are financially living
7  in India if your businesses are all here?
8    A.  No.  Business -- I have an operation here
9  to help support the U.S. sales.
10   Q.  Okay.  But the operation --
11   A.  And --
12   MR. SHMIKLER:  He's still answering the
13 question.  Please let him finish.
14 BY MR. BLACKMAN:
15   Q.  That operation --
16   MR. SHMIKLER:  I object.
17   THE WITNESS:  Wait a minute.  You don't want me
18 to interrupt nor can you interrupt me.
19   MR. SHMIKLER:  That's absolutely right.  Please
20 finish your answer.
21 BY MR. BLACKMAN:
22   Q.  Go ahead.  You're right, Doctor.
23   A.  Repeat the question, please.
24   Q.  How is it you are financially supporting

Page 84

1  yourself if you moved to India permanently if all
2  your businesses are in Chicago?
3    A.  Well, like I said, there is -- the
4  operation here is really helping the American
5  Sales, No. 1.  No. 2, it doesn't cost much to live
6  in India.  It costs very little to live in India.
7  My whole food expenses for a month is like, I don't
8  know, maybe $300 or something that.  I mean, it
9  doesn't --
10   Q.  Sir, it doesn't matter to me how much it
11 costs.
12        My question is how is it that you are
13 living in India, financially supporting yourself if
14 your businesses are in the United States?
15   MR. SHMIKLER:  Object to form.
16 BY MR. BLACKMAN:
17   Q.  Do your businesses send money from the
18 United States to you to support you in India?
19   MR. SHMIKLER:  Are you --
20   THE WITNESS:  No, I have my savings.
21 BY MR. BLACKMAN:
22   Q.  I'm sorry?
23   A.  I have my savings and -- you know, and I
24 told you it costs very little to live in India.

Page 85

1    Q.  So do any of your businesses ever send you
2  money to live on when you're in India?
3    MR. SHMIKLER:  I object to relevance.
4    MR. BLACKMAN:  I think it's very relevant --
5    MR. SHMIKLER:  It doesn't matter where it comes
6  from.  If you want to ask him does he have a bank
7  account in India, I mean, that would tell you where
8  he lives, but where he gets money sent from,
9  nothing to do with it.
10 BY MR. BLACKMAN:
11   Q.  Go ahead, sir, you can answer the
12 question.
13        Do you get money from the operations in
14 the United States?
15   A.  Do I get money from operations in the
16 United States?
17   Q.  Right.
18   A.  For what?
19   Q.  For anything.  For yourself personally,
20 for your living expenses, for anything that you're
21 doing.
22        Do you get money from your operations in
23 the United States that's sent to you in India?
24   A.  Look, even to support this operation here

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 86

1   just to help the U.S. sales, I am funding it here.
2       Q.  That's not my question.
3       A.  There is no cash there that can be used.
4   I wish there was.  There is no cash.  You know the
5   status of the real estate market.
6       Q.  Sir, sir.  I just want you to listen to my
7   questions.  I don't need an explanation.  I just
8   need you to listen and answer my questions.
9           My question is, is it your testimony since
10  you have allegedly moved to India in October or
11  November of 2007 that no monies have been
12  transferred to you from the United States to you or
13  for your use in India; is that your testimony?
14      MR. SHMIKLER:  Object to relevance.
15      THE WITNESS:  I don't recall that.
16  BY MR. BLACKMAN:
17      Q.  Is that true or is that not true?
18      MR. SHMIKLER:  Object to form and to relevance.
19      THE WITNESS:  I said I don't recall that.
20  BY MR. BLACKMAN:
21      Q.  You don't recall what?
22      A.  I don't recall any transfer of funds.
23      Q.  Okay.  Do you have access to your bank
24  accounts in the United States?

Page 87

1       A.  Do I have access to my bank accounts?
2   Yeah, I have access, yeah.
3       Q.  And are those the ones that are at
4   Private Bank and MB Financial?
5       A.  The MB Financial has got nothing to do
6   with me.
7       Q.  You've got your personal bank accounts at
8   Private Bank?
9       MR. SHMIKLER:  I object on the grounds for
10  relevance.
11  BY MR. BLACKMAN:
12      Q.  Sorry?
13      MR. SHMIKLER:  First, I'll object to the
14  grounds of relevance.
15      MR. BLACKMAN:  Look, you opened the door to all
16  of this when he says he permanently lives out
17  there.  We're entitled to explore his connections
18  to whatever assets he is maintaining here.  He's
19  not saying he's got two residences.  He's saying
20  that he's moving there and he's not coming back.
21  So you opened the door.  Whether or not that
22  benefits us in some other way, has nothing to do
23  with these proceedings.
24      MR. SHMIKLER:  It does because it's not

Page 88

1   relevant the fact he has an account here.
2       MR. BLACKMAN:  It all --
3       MR. SHMIKLER:  Where it is and so forth is not
4   relevant.
5       MR. BLACKMAN:  Okay.
6   BY MR. BLACKMAN:
7       Q.  Sir, do you maintain personal checking or
8   savings accounts in the United States?
9       MR. SHMIKLER:  Again, object on the grounds of
10  relevance.
11      THE WITNESS:  Yes.
12  BY MR. BLACKMAN:
13      Q.  Those are in Chicago?
14      A.  Yes.
15      Q.  And those are at Private Bank?
16      MR. SHMIKLER:  Same objections.
17      THE WITNESS:  Yes.
18  BY MR. BLACKMAN:
19      Q.  And are they at any other banks?
20      MR. SHMIKLER:  Same objections.
21      THE WITNESS:  None that I recall, no.
22  BY MR. BLACKMAN:
23      Q.  Okay.  Now, were those bank accounts in
24  existence when you left the country in October or

Page 89

1   November of 2007?
2       A.  Yes.
3       Q.  Okay.  Why did you not close your personal
4   bank accounts, if you were moving to India
5   permanently?
6       A.  Well, I do -- like I said, I do -- I do
7   have business interest in America still and I have
8   my children.  I mean, it's not like -- I can't cut
9   off my ties.  What are you talking about?
10      Q.  I assume you have business accounts that
11  are in Illinois and Chicago, correct?
12      A.  Yeah.
13      Q.  Okay.  I'm not speaking about those.
14      A.  No, no, you were talking about even
15  personal accounts.  I have my children.  I can't
16  cut off my ties to U.S.  I don't know what you are
17  implying.
18      Q.  Sir, I just want you to listen to my
19  questions --
20      A.  I am listening.  You just keep on --
21      MR. SHMIKLER:  Dr. Vish --
22      THE WITNESS:  I have no idea what are you
23  trying to do.
24      MR. SHMIKLER:  Dr. Vish, this is Dan.  I know

23  (Pages 86 to 89)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 90

1    that you're frustrated. We're all frustrated with
2    the fact that the examination has veered well off
3    what's relevant. But let's just answer the
4    questions and then we can be done with it. So
5    don't -- try not to argue or get upset. That's
6    better.
7        THE WITNESS: Okay.
8    BY MR. BLACKMAN:
9        Q.  Okay. Just to be clear, the personal
10   accounts that were in existence when you left the
11   country in October or November of 2007 are still in
12   existence; those have not been closed?
13       MR. SHMIKLER: Objection, asked and answered
14   and to relevance.
15   BY MR. BLACKMAN:
16       Q.  Is that correct?
17       A.  That is correct.
18       Q.  Okay. Thank you.
19           Now, you stated that when you left
20   Cleveland you went to India around the 7th or the
21   10th of November, correct?
22       A.  Yes.
23       Q.  Now when you went there --
24       A.  Yes.

Page 91

1        Q.  When you went there, where did you stay?
2        MR. SHMIKLER: To Cleveland or India?
3    BY MR. BLACKMAN:
4        Q.  When you went to India, you mentioned
5    something about staying at a cousin's house?
6        A.  Right.
7        Q.  Is that where you stayed when you first
8    got there?
9        A.  Right.
10       Q.  And what's his name?
11       A.  Krishna Murthi.
12       Q.  Can you spell that, please?
13       A.  K-r-i-s-h-n-a M-u-r-t-h-i.
14       Q.  For how long did you stay there?
15       A.  Well, I've been staying there.
16       Q.  Okay. So is that where you're calling
17   from now?
18       A.  No, I'm calling from a different place.
19       Q.  Where are you calling from now?
20       A.  I'm calling from the office.
21       Q.  Is that the office, the Real Estate
22   Private Limited office?
23       A.  Yeah, right.
24       Q.  Where does your cousin live?

Page 92

1        A.  Anna Nagar.
2        Q.  I'm sorry?
3        A.  Anna Nagar.
4        Q.  When you said the address that you put
5    into your affidavit, the 196/8 Asiad Colony, Anna
6    Nagar West, Chennai, that's your cousin's home;
7    right?
8        A.  Right.
9        Q.  And does he own that or does he rent that?
10       A.  He rents that.
11       Q.  He rents it. Okay.
12           Have you ever stayed there before 2007
13   when you went out there?
14       A.  Yeah, I have stayed there before.
15       Q.  How many times have you stayed there over
16   the past let's say three years?
17       A.  I don't know. Maybe one or two times.
18       Q.  So when you go out to India, is that where
19   you -- is that where you usually stay; is that your
20   family out there?
21       MR. SHMIKLER: Object to form.
22       THE WITNESS: No, not really. I travel and
23   maybe, you know, different places. And really it's
24   not like one place.

Page 93

1    BY MR. BLACKMAN:
2        Q.  Okay. But do you have other family that
3    you stay with when you go to India besides your
4    cousin?
5        MR. SHMIKLER: Before he moved is what you're
6    asking about, right?
7        MR. BLACKMAN: I guess at any point.
8    BY MR. BLACKMAN:
9        Q.  Are there different family members that
10   you've stayed with over time?
11       A.  Yeah, there are different family members,
12   yeah.
13       Q.  And is it your -- strike that.
14           Are you paying your cousin to stay at his
15   house?
16       A.  No. Practice in India is really not to --
17   not to pay relatives, but I help out in other ways.
18   I help out with maybe children's school or things
19   like that. We don't really have a habit of paying
20   our relatives.
21       Q.  So these various bills that your lawyer
22   went through with you, there was a washing machine,
23   there was a refrigerator, there was a TV, is that
24   for you or is that for you and your cousin?

24  (Pages 90 to 93)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 94

1  A.  It's for the common use, for me and my
2  cousin.
3  Q.  Are there other people living there
4  besides the two of you?  Does he have a wife or
5  children?
6  A.  Yes.
7  Q.  How many other people are living there?
8  A.  No, just the wife and the one daughter.
9  That's it.
10  Q.  So there's the four of you?
11  A.  Right.
12  Q.  How many rooms are in this apartment?
13  A.  There are like three, four rooms.
14  Q.  So do you have your own room?
15  A.  Yeah.
16  Q.  And the stuff that you bought, the washing
17  machine, the refrigerator, the TV, is that for
18  everybody's use or is that just for you?
19  MR. SHMIKLER:  Objection, asked and answered.
20  THE WITNESS:  No, it's for everybody's use.
21  BY MR. BLACKMAN:
22  Q.  Is that a gift to them or do you own that?
23  A.  I don't know.  We don't look at it like
24  this.  It's a different concept in India.  We don't

Page 95

1  say I own this.  We just -- I mean, it's -- you
2  will never understand.
3  Q.  I might understand but that's okay.
4  Well, let me ask you a different question.
5  If you choose to move back to the United
6  States, will you be bringing back the refrigerator
7  and the TV and the washing machine or will you
8  leave that for your cousin?
9  MR. SHMIKLER:  I object to form.  I object to
10  hypothetical and to relevance.
11  BY MR. BLACKMAN:
12  Q.  Go ahead, sir.
13  A.  You know, it's a hypothetical question.
14  Q.  You still have to answer it.
15  THE WITNESS:  Dan, do I have to answer
16  hypothetical questions?
17  MR. SHMIKLER:  Answer to the best of your
18  ability, Dr. Vish, and that's what you can do.
19  THE WITNESS:  I can't imagine this question
20  coming from a lawyer.  You know the answer.
21  BY MR. BLACKMAN:
22  Q.  I'd like to hear it, sir.
23  A.  I don't know.
24  MR. SHMIKLER:  You can answer it, if you know,

Page 96

1  Dr. Vish.
2  THE WITNESS:  I don't know.
3  BY MR. BLACKMAN:
4  Q.  So now you just said I wouldn't understand
5  about why somebody would buy appliances or gifts
6  and let everybody use them.
7  Is it your testimony that if you came back
8  to the United States that you might bring all that
9  with you?
10  MR. SHMIKLER:  I object to the preamble as it
11  mischaracterizes his testimony.  I object to the
12  remainder of the question as asked and answered,
13  hypothetical, additional objections to form and
14  relevance.
15  BY MR. BLACKMAN:
16  Q.  Is it your testimony, sir, that you don't
17  know whether or not you would bring that stuff back
18  or leave it with him?
19  A.  It's patently absurd that somebody would
20  think of bringing this.  What kind of question is
21  this?  How much does it cost to ship all of this?
22  What are you talking about?  Why you ask this
23  question?  I don't understand.
24  MR. SHMIKLER:  It's all right.  Even the

Page 97

1  ridiculous questions we're going to answer.  That's
2  okay.  Everyone knows they're ridiculous.
3  MR. BLACKMAN:  Dan, if you have an objection
4  make an objection.  Please do not be rude and do
5  not be unprofessional by having a dialogue with
6  your client in the middle of an evidence deposition
7  saying my questions are ridiculous.  Please don't
8  do that.  It only makes it difficult for me to ask
9  him questions.  He's put in an affidavit that this
10  is a permanent residence of his.  Now, these
11  questions may seem silly, but they're very
12  important because that's the position he's taking
13  please don't perpetuate the difficulty I am having
14  with asking him questions by having a dialogue with
15  him while I'm doing this saying how ridiculous this
16  is.  We're only here because he will not accept
17  service and is challenging this.  That's why we're
18  here, not because of anything I've done.  I would
19  just ask you make your objections and try to avoid
20  those kind of side comments.
21  MR. SHMIKLER:  Gary, I'm trying to help you
22  here.  I didn't interrupt you --
23  MR. BLACKMAN:  You're not helping me by --
24  MR. SHMIKLER:  Please let me finish.

25 (Pages 94 to 97)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 98

1    MR. BLACKMAN: You're not helping --
2    MR. SHMIKLER: You're still doing it. Please
3  allow me to finish.
4    MR. BLACKMAN: Go ahead.
5    MR. SHMIKLER: My response to this is, I'm
6  trying to help you here. The witness is
7  understandably upset because the notion that
8  whether he owns it or they own it or whoever owns
9  it, no one is going to take a refrigerator back
10  with them from India and everybody knows that. So
11  it's a ridiculous question. He's upset by that.
12  And I'm assuaging him to get him to answer the
13  questions even though he's upset and acknowledging
14  his feelings and that they're valid. Ultimately
15  this is to your benefit. If you want to continue
16  your examination, please do so.
17    MR. BLACKMAN: Just for the record, this is an
18  evidence deposition in lieu of trial testimony.
19  You would not be able to do this if we were
20  standing up before Judge Guzman and your client was
21  on the stand. So it does not matter to me whether
22  you think this helps or not. This is a formal
23  federal evidence deposition. This is not a
24  discovery deposition and this is just not an

Page 99

1  informal dialogue. You would not be able to do
2  that if he was on the stand and that's the purpose
3  he is here.
4    So again, limit your objections. Tell
5  him, if you want to assuage him, to answer the
6  questions. But do not agree with him about how
7  ridiculous they are.
8    MR. SHMIKLER: I will point out that also,
9  similarly, if you were on the stand you will not be
10  able to put in these preambles to your questions;
11  you would not be able to make these arguments to
12  the witness; you wouldn't be able to do any of
13  those.
14    MR. BLACKMAN: That's why you make objections.
15    MR. SHMIKLER: If you'd like to cut down on
16  those, then I can cut down on what I'm doing. It's
17  a two-way street. And I agree, let's both cut down
18  and keep this going, but don't put me in a position
19  where I have to respond.
20  BY MR. BLACKMAN:
21    Q.  Okay. Sir, have you discussed with your
22  cousin for how long you will be living with him and
23  his family?
24    A.  Well, we really, you know, do not have to

Page 100

1  discuss that. We know I'm living there
2  permanently. So he's aware of that. And, you
3  know, it's not our custom to say I'm going to be
4  here for two months or three months. I mean, it's
5  a very different culture, very, very different
6  culture.
7    Q.  Sir, please listen to my question. I'm
8  not asking for an explanation. You're making this
9  far longer than it needs to.
10    My only question was whether you ever
11  discussed with your cousin for how long you would
12  be staying there? That's all my question is.
13    MR. SHMIKLER: I object because he answered
14  that question.
15  BY MR. BLACKMAN:
16    Q.  Is the answer no?
17    A.  No, I did not discuss that.
18    Q.  Now, when you went to India to live with
19  your cousin, what did you take with you?
20    A.  Just my clothes and some books.
21    Q.  Do you own anything other than your
22  clothes and your books?
23    A.  There isn't any -- I mean, my needs are
24  very few and really other than clothes and books

Page 101

1  there isn't anything you can take. It doesn't make
2  sense.
3    Q.  Sir, sir, again, I want you to listen to
4  my question. I'm not asking you what your needs
5  are. I'm asking whether you own anything other
6  than the clothes and the books that you brought to
7  your cousin's?
8    MR. SHMIKLER: Object to form.
9    THE WITNESS: I have the car. You know that.
10  BY MR. BLACKMAN:
11    Q.  All right. Besides the car, do you own
12  anything else?
13    THE WITNESS: I can't recall.
14    MR. SHMIKLER: Are you talking about personal
15  possessions or marital estate stuff?
16    MR. BLACKMAN: Well, that's personal
17  possessions, too.
18  BY MR. BLACKMAN:
19    Q.  Did you read in your wife's deposition
20  that there are things of yours that are still at
21  the house on Ridgewood?
22    A.  Yeah.
23    Q.  Okay. And she testified that there were
24  some clothes of yours there?

26  (Pages 98 to 101)

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 102

1    A.  I don't recall what she testified, but I
2    know I have some old clothes and maybe some books
3    and things like that, pretty much of no value to
4    me.
5    Q.  And do you also own with your wife some of
6    the furniture in the house, in the Ridgewood house?
7    A.  I don't know that, sir, I don't know.  We
8    don't get -- it's not -- I don't know.  I won't
9    claim --
10    MR. SHMIKLER:  Dr. Vish, just answer his
11    question.  It's okay, all right?
12    THE WITNESS:  I don't know, I don't know.
13    That's my answer, I don't know.
14    BY MR. BLACKMAN:
15    Q.  Okay.  Now, since you went out to India,
16    November 7th or 10th, have you been back?
17    A.  Back where?
18    Q.  To the United States.
19    A.  Yes, I have been.
20    Q.  And how many times?
21    A.  Just once.
22    Q.  And was that when you came in for your
23    wife's mother's funeral?
24    A.  Yes.

Page 103

1    Q.  And when you came in, how long were you in
2    for?
3    A.  Just a few days.
4    Q.  And where did you stay?
5    A.  I stayed at the hotel.
6    Q.  Now, is it your testimony that your only
7    home right now is in India?
8    A.  You mean home by what?  I mean, if you're
9    talking about home, you mean by way of what?
10    Q.  I don't know.  I'm asking you.
11    A.  I don't know what you mean by your only
12    home because home means -- you know, I still
13    technically I have ownership interest in the house
14    in Burr Ridge.  So I don't know what you mean by --
15    you know, this is my residence here, permanent
16    residence here, and so I don't know what you mean
17    by --
18    Q.  Do you have any other residences -- strike
19    that.
20    Is it your testimony that you do not have
21    any other residences in the United States?
22    MR. SHMIKLER:  Object to form.
23    THE WITNESS:  Like I said, I do have some
24    ownership interest, but I do not have residence,

Page 104

1    you know, per se by way of staying permanently in
2    the United States, no, I don't.
3    BY MR. BLACKMAN:
4    Q.  So after you left LaGrange, you didn't
5    move into any place else or create any other
6    residence in Chicago or the United States?
7    A.  No, sir.
8    Q.  So on December 1st, which was the date
9    that your wife was served with the papers, the only
10    residence in your opinion was where you were
11    staying at your cousin's?
12    A.  Yes.
13    Q.  Okay.  Now, do you pay the utilities at
14    your cousin's?
15    A.  Do I pay the utilities?  No, I don't.
16    Q.  Do you pay the -- any of the bills?
17    A.  No, I buy some groceries, you know, I buy
18    foods, I buy groceries, I bring them.  So that's
19    how I help out and I buy some of these things.
20    Q.  When you were living in Illinois, would
21    you from time to time pick up the mail that was
22    addressed to you that was sent to the home on
23    Ridgewood?
24    MR. SHMIKLER:  Object to form.  You mean in

Page 105

1    LaGrange when he was living there?  Because
2    Illinois would include both houses.
3    BY MR. BLACKMAN:
4    Q.  Okay.  When you were living in LaGrange,
5    did you occasionally pick up your mail from the
6    Ridgewood property?
7    A.  Yes.
8    Q.  Okay.  And sometimes your office would
9    pick up mail for you from your wife at Ridgewood?
10    A.  Yes.
11    Q.  Now, did you ever put in a change of
12    address with the post office telling them that all
13    your mail should go to LaGrange?
14    A.  Yes, I instructed Viswamatham in my office
15    to do that and he did it.
16    Q.  Do you have before you one of the
17    documents that we asked your lawyer to send you
18    which was a notice from the post office with
19    respect to any change of address information?  Do
20    you have that in front of you?
21    A.  I can get that.  Hold on.
22    Q.  Okay.
23    A.  Yes, I have that.
24    MR. BLACKMAN:  I'm going to mark that as

27  (Pages 102 to 105)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 106

```
 1  Exhibit 5.
 2          (Whereupon, Deposition Exhibit
 3          No. 5 was marked for
 4          identification.)
 5  BY MR. BLACKMAN:
 6     Q.  Now, this document which has a file stamp
 7  circle from the post office dated March 10th, 2008,
 8  at the bottom; do you see that?
 9     A.  Yes.
10     Q.  And what this states is this is a notice
11  from the post office that says that, according to
12  the post office records, you are still located --
13  your address for purposes of the post office is
14  still at the Ridgewood Lane home?
15     MR. SHMIKLER:  I object to foundation.
16  BY MR. BLACKMAN:
17     Q.  Do you see that?
18     A.  I see that.
19     Q.  Okay.  Do you know why the post office
20  still shows your current address at 7529 Ridgewood
21  Lane in Burr Ridge?
22     A.  I have no idea.  It is absolutely
23  incorrect because I have received several mails to
24  LaGrange.  And Viswamatham told me he made it, the
```

Page 107

```
 1  change of address.
 2     Q.  Did you ever see or sign yourself a change
 3  of address?
 4     A.  No.  Whatever it was in that form.  I
 5  don't recall what I had to do.  If there was a
 6  signature needed, I'm sure he would have gotten my
 7  signature.  Absolutely, yes.  He does things
 8  correctly.
 9     Q.  But you don't have a copy of that, do you?
10     A.  No.
11     Q.  Now, your wife testified in her deposition
12  that after she was served with the court papers she
13  spoke with you on the phone.
14        Do you recall having a conversation with
15  your wife about what she was served with after she
16  was given the court papers?
17     MR. SHMIKLER:  Object to mischaracterization of
18  her testimony.
19     MR. BLACKMAN:  You want to do it the slow way.
20  We can go through and read it.
21     MR. SHMIKLER:  Just ask the question.  You
22  don't need the preamble.
23     MR. BLACKMAN:  That wasn't your basis.
24     MR. SHMIKLER:  I'm objecting to the preamble.
```

Page 108

```
 1  BY MR. BLACKMAN:
 2     Q.  Sir?
 3     A.  Yes.
 4     Q.  Do you recall having a conversation with
 5  your wife about the papers that she was served
 6  with?
 7     A.  I do not recall that.
 8     Q.  Okay.
 9     A.  I know there was -- so many papers came,
10  so I don't know which one it is.  I don't know.
11  There may be, but I have no specific recollection
12  of any one thing in particular.
13     Q.  Okay.  Now, if your wife testified at her
14  deposition on Tuesday that she spoke with you about
15  the Indymac court papers after she was served,
16  would you have any reason to dispute that?
17     MR. SHMIKLER:  Object to the extent it
18  mischaracterizes her testimony.
19     THE WITNESS:  I only said I do not recall.  I
20  mean, there is -- you know, it is entirely possible
21  I may have had that discussion.
22  BY MR. BLACKMAN:
23     Q.  Okay.  Now, your wife also testified that
24  you told her to send the papers to your lawyer,
```

Page 109

```
 1  Mr. Collins; do you recall doing that?
 2     MR. SHMIKLER:  Object to the extent it
 3  mischaracterizes his testimony.
 4     THE WITNESS:  Yeah, normally if there are any
 5  legal papers that come, I do tell her to send it to
 6  Michael Collins, yes.
 7  BY MR. BLACKMAN:
 8     Q.  Do you recall in this case telling your
 9  wife to send the papers to Mr. Collins?
10     A.  I -- I think so.
11     Q.  Okay.  And the reason that you did that
12  was because he is your personal lawyer?
13     A.  No, he's not my personal lawyer.  Usually
14  anything that comes -- you know, to get some idea
15  what it is, I have no idea what it is --
16     Q.  Sir, sir, my question is why did you send
17  it to Mr. Collins?  Isn't he your lawyer?
18     A.  Well, yes, he has been doing some work in
19  different areas.  And I can't specifically say he's
20  my lawyer.
21     Q.  Okay.  Well, he is the lawyer for a number
22  of your businesses; is he not?
23     A.  Yes.
24     Q.  Okay.  And your wife testified that he and
```

28  (Pages 106 to 109)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 110

1  his firm helped you and your wife establish family
2  trusts and partnerships with respect to your
3  children and your personal assets?
4     A.  Yes.
5     Q.  Okay.  And so he has represented you both
6  personally and in your business?
7     MR. SHMIKLER:  I object.  It mischaracterizes
8  his testimony.  You're talking about Michael
9  Collins?
10 BY MR. BLACKMAN:
11    Q.  Has Michael Collins represented you both
12 personally and in your business?
13    A.  Sir, I don't recall that.
14    Q.  Well, has Michael Collins -- your wife
15 testified that Michael Collins -- strike that.
16       Did Mr. Collins' firm represent your
17 family in helping it create partnerships and family
18 trusts?
19    A.  Did they help in what?
20    Q.  Did Mr. Collins' firm, and this was your
21 wife's testimony, assist your family in creating
22 family trusts and partnerships?
23    A.  They're mostly involved in some company
24 things and it is possible they may have done some,

Page 111

1  you know, partnership work.
2     Q.  Do you recall your wife telling you that
3  the papers that she was served with related to
4  Indymac?
5     A.  No, sir, I don't recall that.
6     Q.  Now, after the papers were sent to
7  Mr. Collins, did he ever call you about this
8  lawsuit?
9     MR. SHMIKLER:  Wait.  I object on the grounds
10 of attorney-client communication.  Direct the
11 witness not to answer.
12    MR. BLACKMAN:  For the record whether or not
13 phone call was made is not an attorney-client
14 communication.
15    MR. SHMIKLER:  You can ask him whether or not
16 there was a phone call, but you can't ask him the
17 subject matter.  You asked him about this lawsuit
18 which is the subject matter.
19 BY MR. BLACKMAN:
20    Q.  Go ahead, sir.
21    MR. SHMIKLER:  No, no, I'm instructing him not
22 to answer based on attorney-client privilege.
23 BY MR. BLACKMAN:
24    Q.  Sir, are you not answering the question of

Page 112

1  whether after the papers were sent to Mr. Collins
2  you and he spoke about the lawsuit; are you not
3  answering that question?
4     A.  I am not answering that.
5     Q.  Okay.  Now, is there a reason after your
6  wife was served with these papers that you have not
7  come into this case to defend yourself?
8     MR. SHMIKLER:  Object to the extent it calls
9  for a legal conclusion.
10    MR. BLACKMAN:  I'm not asking him a legal
11 opinion.  I'm asking him why he has moved to India
12 and not remained in the United States to defend
13 himself in this case.
14    MR. SHMIKLER:  Well, that's two different
15 questions.
16    MR. BLACKMAN:  Okay.
17    MR. SHMIKLER:  Why he moved to India which I
18 think he's already answered.  You're free to ask
19 that, but I think it's compound.  If this is a new
20 question you're asking, the objection is it's
21 compound and that it -- I object to form.
22 BY MR. BLACKMAN:
23    Q.  Go ahead, sir.
24    MR. SHMIKLER:  If you're able to.

Page 113

1     THE WITNESS:  What's your question?
2  BY MR. BLACKMAN:
3     Q.  Is there a reason why you have not, up
4  until now, have not chosen to come back to the
5  United States to defend yourself in this lawsuit?
6     MR. SHMIKLER:  Object to form.
7  BY MR. BLACKMAN:
8     Q.  Go ahead, sir.
9     A.  It's not chosen.  It's really -- I have an
10 attorney representing me.  That's what it is.  I
11 got an attorney representing me, so, you know, I
12 mean, I'm coward.
13    Q.  Right.  Now, do you understand that you
14 are and have been since December you have taken the
15 position that you are not a party to this lawsuit
16 yet because service of process was not valid; do
17 you understand that that's the position that you've
18 taken?
19    MR. SHMIKLER:  Object to the
20 mischaracterization to the extent it calls for a
21 legal conclusion.
22 BY MR. BLACKMAN:
23    Q.  Go ahead, sir.
24    A.  Sir, I am not going to draw any legal

29 (Pages 110 to 113)

Page 114

1 conclusions. I cannot answer that. I don't know,
2 okay? I cannot answer.
3    Q.  I'm not asking you a legal conclusion.
4    A.  You are, you are.
5    MR. SHMIKLER: Don't argue with him, Dr. Vish.
6 BY MR. BLACKMAN:
7    Q.  Those responses are objections to be made
8 by your lawyer, not you.
9       So my question is -- I'll ask a different
10 question.
11       Why is it, sir, that you have not agreed
12 to come into this lawsuit and defend yourself in
13 the claims made by Indymac?
14    MR. SHMIKLER: I object to the extent that it
15 mischaracterizes the facts. We have made that
16 offer. And caution the witness to the extent that
17 any of this calls for disclosure discussions you
18 had with your attorneys that you shouldn't answer.
19       But if you're able to respond without
20 doing so, you should do so to the best of your
21 ability.
22 BY MR. BLACKMAN:
23    Q.  Go ahead.
24    A.  What's your question?

Page 115

1    Q.  Why have you not come into this case as a
2 defendant to defend it on its merits?
3    MR. SHMIKLER: Same objections.
4    THE WITNESS: I have an attorney representing
5 me, sir. That's all. That's my answer. That is
6 my answer.
7 BY MR. BLACKMAN:
8    Q.  I hear you.
9    A.  That's it.
10    MR. SHMIKLER: Can I request a bathroom break
11 at this point?
12    MR. BLACKMAN: We're going to take a break,
13 sir. You should stay on the phone. Don't go
14 anywhere.
15    THE WITNESS: All right.
16       (A short break was taken.)
17 BY MR. BLACKMAN:
18    Q.  Doctor, do you know for how long your
19 cousin has owned or rented the place where you're
20 living?
21    A.  What is that?
22    Q.  Do you know for how long your cousin has
23 been renting the place where you are living?
24    A.  Oh, like seven or eight years.

Page 116

1    Q.  Okay. And you stated that you've stayed
2 there in the past, correct?
3    A.  Yes.
4    Q.  When you would stay there, would you stay
5 in the same bedroom that you're staying in now?
6    A.  Yeah.
7    Q.  Okay. And do you have any personal
8 belongings that are in storage anywhere?
9    A.  Here in Chennai?
10    Q.  Either there or here. You know what a
11 storage locker is, right?
12    A.  Yeah.
13    Q.  Do you have any personal belongings that
14 are in any storage facilities?
15    A.  No, I don't have anything in storage
16 facility.
17    Q.  I want to ask you about something I don't
18 really understand.
19       You said you moved to India, correct me if
20 I'm wrong, because there were business
21 opportunities out there; is that right?
22    A.  Yeah.
23    Q.  But you're still finishing a project as a
24 developer in Chicago at 222 Pearson, correct?

Page 117

1    A.  Yes.
2    Q.  And you are still in the middle of a
3 divorce that has not yet been completed, correct?
4    A.  Yes.
5    Q.  And there's still a parenting agreement
6 that gives you the right to visit with the children
7 every week or every month, correct?
8    A.  Correct.
9    Q.  And you have other businesses here besides
10 222 Pearson, correct?
11    A.  I don't know what you mean "other
12 businesses."
13    Q.  I mean besides the Pearson project, you
14 have other development companies?
15    A.  Do I have a development company?
16    Q.  Is Pearson the only project that you are
17 doing at this point in the United States?
18    A.  Yeah, Pearson is the only one. Florida is
19 underwater.
20    Q.  So why would you move to India now, in
21 particular the beginning of November, when you are
22 still in the middle of a divorce and in the middle
23 of a development that hasn't been completed? Why
24 would you choose now to move to India?

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 118

1    MR. SHMIKLER: Objection, asked and answered.
2    MR. BLACKMAN: I don't think it was.
3    THE WITNESS: I already answered it, sir.
4  BY MR. BLACKMAN:
5    Q.  Go ahead and answer it again.
6    A.  I said the opportunities here are better
7  and the American real estate market is not all that
8  great, and so I'm just exploring things here.
9    Q.  Well, you're doing more than exploring
10  things. You've stated that you've permanently
11  moved there, correct?
12    A.  Yes.
13    Q.  Without any intention of moving back to
14  the United States?
15    A.  Yes.
16    Q.  So my question is, why would you
17  permanently move to India at that particular time
18  while you were still in the middle of a divorce and
19  still in the middle of a development that you are a
20  principal in?
21    A.  Well, life always keeps moving. And you
22  know, what can you say? There's always going to be
23  -- there's -- you're always going to be in the
24  middle of something, so that never changes.

Page 119

1    Q.  That's right. You are always in the
2  middle of something, but you're not always in the
3  middle of a divorce and in the middle of a
4  development and in the middle of a lawsuit that's
5  been filed against you for in excess of $50
6  million.
7    MR. SHMIKLER: Object to the form.
8    MR. BLACKMAN: I'm going to withdraw that.
9  BY MR. BLACKMAN:
10    Q.  Why not move after the development is
11  done?
12    A.  It's not any -- I mean, I don't know, sir.
13  I don't have an answer.
14    Q.  And why not move after the divorce is
15  done?
16    A.  I don't know. I don't have an answer.
17    Q.  And why not move after the lawsuit is
18  done?
19    A.  I don't know.
20    Q.  Describe for me what the specific business
21  opportunities that caused you to move to India in
22  the beginning of November? What specifically made
23  you want to go right then?
24    A.  I mean, if you've been reading the papers

Page 120

1  the growth story, only India and China are going to
2  be carrying the war, so this is the rights of the
3  east. I think their time has come, so...
4    Q.  But what --
5    MR. SHMIKLER: He's still answering.
6  BY MR. BLACKMAN:
7    Q.  Go ahead. Are you done yet? Are you
8  still answering?
9    A.  I mean, yes, you keep interrupting my
10  thoughts. I don't know what I can do. You are a
11  lawyer so nobody can question you, but I'm
12  interrupted constantly, so I don't know what I can
13  do about that.
14    Q.  All right. Well, I'm going to try not to
15  do that, sir. Do you want to add anything else to
16  your last answer?
17    A.  No, I've already said there are
18  opportunities here.
19    Q.  Okay. And can you tell me of any specific
20  opportunity that prompted you to go to India in the
21  beginning of November of '07?
22    A.  It's not, you know, anything specific.
23  Overall, there are opportunities here, plenty of
24  opportunities. I've been coming here every year.

Page 121

1  It's not like it happened all of a sudden. I've
2  been coming here every year. I have been watching
3  what has been going on. I have been, you know,
4  watching the growth story over three, four years.
5    Q.  My question was, I think you answered it,
6  there was nothing specific that brought you to
7  India, a specific business opportunity, in the
8  beginning of November of '07?
9    A.  Well, specific in the sense I have been
10  watching over time. I have been -- I don't want to
11  really -- if you've been watching what has been
12  going on, it's like what is the best time and there
13  is no best time.
14    Q.  Sir, I'm not asking you what the best time
15  is. You're not listening to my question. I'm not
16  asking you what the best time is. I'm asking you
17  whether there was a specific business opportunity
18  that made you go to India in the beginning of
19  November, like a specific project that you were
20  working on or anything like that?
21    A.  No, I don't recall anything specific.
22    Q.  Now, in addition to the Indymac loans, are
23  there any other loans that are outstanding on which
24  you have personal liability?

31 (Pages 118 to 121)

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 122

1    MR. SHMIKLER: Object to relevance. Object to
2  the extent it calls for legal conclusions.
3    MR. BLACKMAN: Go ahead, sir.
4  BY MR. BLACKMAN:
5    Q.  Do you owe anybody else besides Indymac
6  any money?
7    MR. SHMIKLER: Same objections.
8    THE WITNESS: Yes, I do.
9  BY MR. BLACKMAN:
10    Q.  Who is it?
11    MR. SHMIKLER: Same objections.
12    THE WITNESS: I owe Private Bank; I owe Fifth
13  Third Bank; I owe AmeriMark Bank.
14  BY MR. BLACKMAN:
15    Q.  What's the last one?
16    A.  AmeriMark.
17    Q.  Merimark?
18    A.  AmeriMark.
19    Q.  AmeriMark?
20    A.  Yes.
21    Q.  Anybody else?
22    A.  That's all I could recall.
23    Q.  Are you involved in any other litigation
24  besides the Indymac claim?

Page 123

1    MR. SHMIKLER: Object to form.
2    THE WITNESS: Any other litigation --
3  BY MR. BLACKMAN:
4    Q.  Are you involved in any other litigation?
5    A.  I don't recall any.
6    Q.  What about your companies?
7    A.  I don't recall any.
8    Q.  What about Lisle Technology and the
9  judgment they got against you?
10    MR. SHMIKLER: Object to relevance.
11    THE WITNESS: Yeah, Lisle Technology, yes, I
12  do. Yes, what about that? I remember that now,
13  yeah.
14  BY MR. BLACKMAN:
15    Q.  Is it accurate that you owe
16  Lisle Technology at least $75,000 under a
17  settlement agreement that has not been paid?
18    MR. SHMIKLER: Object to form to the extent it
19  calls for a legal conclusion.
20    THE WITNESS: It is what it is. I don't know,
21  you know, what it is. I cannot be drawing
22  conclusions.
23  BY MR. BLACKMAN:
24    Q.  Sir, I'm not asking you to draw a

Page 124

1  conclusion. All I'm asking you is, are you aware
2  that there is a court order that required you to
3  pay Lisle Technology $75,000 and that that money
4  has not been paid; are you aware of that?
5    MR. SHMIKLER: Same objections.
6    THE WITNESS: Yes, I am aware, yes.
7  BY MR. BLACKMAN:
8    Q.  And why has not Lisle Technology been
9  paid?
10    MR. SHMIKLER: Object to relevance.
11  BY MR. BLACKMAN:
12    Q.  I'm sorry?
13    A.  What's your question?
14    Q.  My question is why have they not been
15  paid?
16    MR. SHMIKLER: Again, I object to relevance.
17    THE WITNESS: There is no money to pay.
18  BY MR. BLACKMAN:
19    Q.  So you don't have $75,000 to pay them?
20    A.  Yes.
21    Q.  Yes, that's true?
22    A.  I don't have $75,000 to pay them.
23    Q.  Okay. Now, how much do you owe
24  Private Bank?

Page 125

1    MR. SHMIKLER: Same objection, relevance.
2    THE WITNESS: I don't recall the number, sir, I
3  don't know.
4  BY MR. BLACKMAN:
5    Q.  Well, approximately.
6    A.  I don't know, maybe 16, $18 million,
7  somewhere around that range.
8    Q.  How much do you owe Fifth Third?
9    A.  I think a million dollars.
10    Q.  How much do you owe AmeriMark?
11    A.  I think about 3 million.
12    Q.  Now, do all your lenders know that you
13  have moved out of the country permanently?
14    MR. SHMIKLER: Object to foundation and to
15  relevance.
16    MR. BLACKMAN: It goes to his credibility.
17    THE WITNESS: I don't know that. I don't know.
18  BY MR. BLACKMAN:
19    Q.  Well, did you advise any of your lenders
20  that you were leaving the country and not
21  returning?
22    MR. SHMIKLER: Again, object to relevance.
23    MR. BLACKMAN: Well, it's very relevant to the
24  credibility on whether or not what he says he has

32  (Pages 122 to 125)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 126

1  left the country permanently, given the state of
2  his financial affairs, whether that is to be
3  believed. So it's very much relevant to his
4  affidavit and his credibility.
5       MR. SHMIKLER: It's not relevant to whether he
6  informed them or not. It's an issue between him
7  and them.
8       MR. BLACKMAN: I'm not debating.
9       MR. SHMIKLER: You are debating it. You
10  started a debate. You didn't have to. It has
11  nothing to do with whether or not he lived at his
12  wife's house on December 1st, 2007, which is the
13  only issue that's in question in this proceedings.
14       MR. BLACKMAN: Just for the record, if he
15  doesn't have a permanent residence someplace else
16  and he doesn't have a residence anyplace else in
17  the United States, that's his home. That's why
18  it's relevant.
19       MR. SHMIKLER: I understand that's your
20  position, but these are not relevant to that
21  question.
22  BY MR. BLACKMAN:
23       Q. Sir, did you ever advise any of your
24  lenders that you were moving out of the country

Page 127

1  permanently in early November 2007?
2       MR. SHMIKLER: Again, object to relevance.
3       THE WITNESS: I don't recall that.
4  BY MR. BLACKMAN:
5       Q. Okay. At any point in time between
6  November and today, have you ever advised any bank
7  or any lender or any financial institution that you
8  have moved out of the country, in your words,
9  permanently?
10       MR. SHMIKLER: Same objection.
11       THE WITNESS: I don't recall.
12  BY MR. BLACKMAN:
13       Q. Okay. Do you think that's something they
14  would care about?
15       MR. SHMIKLER: Object to foundation and to
16  relevance.
17  BY MR. BLACKMAN:
18       Q. Go ahead.
19       A. I don't know what they care about or not
20  or what. How can I answer that? I don't know.
21       Q. Can you give me the name of any person or
22  any institution that you have had a conversation
23  with where you advised them that you had moved
24  permanently out of the United States in early

Page 128

1  November '07 and did not have the intention of
2  returning; can you tell me anybody that you've told
3  that to?
4       A. Why is it relevant? Why I should tell
5  them -- if the loans are being paid --
6       MR. SHMIKLER: Dr. Vish --
7       THE WITNESS: If the project is running, if the
8  things are happening, project is running, and
9  that's all that matters. How does it matter?
10       MR. SHMIKLER: Dr. Vish, Dr. Vish, this is Dan.
11       THE WITNESS: Yeah.
12       MR. SHMIKLER: Just answer the question. He
13  wants to know is there anybody or any person or
14  institution that you've told that you moved
15  permanently to India?
16       THE WITNESS: I don't recall that.
17  BY MR. BLACKMAN:
18       Q. Okay. Do you know whether your lawyer in
19  the divorce case ever advised the court that you
20  had moved out of the country and had no intention
21  of returning?
22       A. I don't recall that.
23       Q. Now, sir, is it your understanding that
24  restraining orders have been entered in the divorce

Page 129

1  proceeding that prevents you from transferring or
2  dissipating various assets; is that your
3  understanding?
4       MR. SHMIKLER: Object to relevance.
5       THE WITNESS: Yeah, there is an order.
6  BY MR. BLACKMAN:
7       Q. There's more than one order, isn't there?
8       A. Yes.
9       MR. SHMIKLER: Again, object to relevance.
10  BY MR. BLACKMAN:
11       Q. And is it your testimony that you have
12  never violated that order?
13       MR. SHMIKLER: Object to relevance and to the
14  extent it calls for legal conclusions.
15       THE WITNESS: I cannot -- I cannot answer that,
16  sir. It's a legal conclusion. I cannot answer
17  that.
18  BY MR. BLACKMAN:
19       Q. So you're unable to answer whether or not
20  you have transferred assets in violation of a court
21  order?
22       MR. SHMIKLER: Same objections.
23       THE WITNESS: I cannot answer that. I don't --
24  you know, this is a legal conclusion, so I cannot

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 130

1  draw that. No, I cannot answer that.
2  BY MR. BLACKMAN:
3      Q.  Let me ask you a different way.
4      Are you aware of what assets the court
5  requires you to -- strike that.
6      Are you aware of the assets that the
7  divorce court has precluded you from transferring?
8      A.  I don't recall the exact ones. I mean, I
9  have some -- I have the order here and --
10     Q.  Which order is that, sir?
11     A.  This is entered March 7, '07, temporary
12 restraining order.
13     Q.  Okay.
14     A.  And preliminary injunction.
15     Q.  And that was entered -- let's mark that as
16 Exhibit 6.
17          (Whereupon, Deposition Exhibit
18           No. 6 was marked for
19           identification.)
20 BY MR. BLACKMAN:
21     Q.  And that's an order entered restraining
22 you from transferring assets with respect to South
23 Country Line Road, the Ridgewood Lane, the VCM
24 trust, and the Sastri trust, correct?

Page 131

1      A.  Yes.
2      Q.  Okay. Do you know why the order was
3  entered against you?
4      MR. SHMIKLER: I object to the characterization
5  just based on the fact that it's an agreed order.
6  BY MR. BLACKMAN:
7      Q.  Do you know why the order was entered?
8      A.  I don't know why the order was entered.
9      Q.  What is the VCM trust?
10     MR. SHMIKLER: Object to relevance.
11     THE WITNESS: It's a children's trust.
12 BY MR. BLACKMAN:
13     Q.  Okay. Who's the beneficiary of that? Is
14 it you or your wife?
15     MR. SHMIKLER: Object to relevance.
16     THE WITNESS: No, no, the children are the
17 beneficiary.
18 BY MR. BLACKMAN:
19     Q.  Sorry.
20     Who is the trustee of that trust, you or
21 your wife?
22     MR. SHMIKLER: Object to relevance.
23     MR. BLACKMAN: It's relevant to his claim that
24 he has permanently moved from the State of

Page 132

1  Illinois.
2      MR. SHMIKLER: I don't see how that addresses
3  the objection.
4  BY MR. BLACKMAN:
5      Q.  Go ahead, sir, who's the trustee, you or
6  your wife?
7      A.  My wife is the trustee.
8      Q.  Okay. So you have no investment or
9  interest in that trust?
10     MR. SHMIKLER: Object to relevance.
11     THE WITNESS: No, sir.
12 BY MR. BLACKMAN:
13     Q.  And then South County Line Road, is that a
14 property that's owned by you in the State of
15 Illinois?
16     MR. SHMIKLER: Object to relevance.
17     THE WITNESS: I don't quite recall. I think it
18 may be in my wife's name. I don't quite recall
19 whether I have any ownership interest in it.
20 BY MR. BLACKMAN:
21     Q.  Do you have any ownership interest in the
22 Sastri trust?
23     MR. SHMIKLER: Object to relevance.
24     THE WITNESS: No.

Page 133

1  BY MR. BLACKMAN:
2      Q.  Did you continue -- strike that.
3      At the point in time that you left the
4  United States in November of 2007, were you current
5  in your child support payments to your wife?
6      MR. SHMIKLER: Object to relevance.
7      THE WITNESS: No.
8  BY MR. BLACKMAN:
9      Q.  How much do you owe her?
10     MR. SHMIKLER: Object to relevance.
11     THE WITNESS: I don't recall but probably --
12 I'm just taking a guess but --
13     MR. SHMIKLER: Dr. Vish, don't guess. If you
14 have a solid estimate based on knowledge, you can
15 give it, but don't speculate or guess.
16 BY MR. BLACKMAN:
17     Q.  Go ahead.
18     MR. SHMIKLER: Answer it, if you can.
19     THE WITNESS: I don't know. It's probably in
20 excess of a quarter million dollars.
21 BY MR. BLACKMAN:
22     Q.  Are you in default -- strike that.
23     Other than your wife and -- strike that.
24     Do you know whether you are in default on

34  (Pages 130 to 133)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 134

1  any other agreements to any other creditors?
2      MR. SHMIKLER: Object to form and object to the
3  extent it calls for a legal conclusion and also
4  object to relevance.
5      THE WITNESS: I don't recall.
6  BY MR. BLACKMAN:
7      Q.  Well, do you know whether any lender other
8  than Indymac has told you that you are in default
9  under a loan agreement with them?
10     THE WITNESS: I don't recall.
11     MR. SHMIKLER: Object to relevance.
12  BY MR. BLACKMAN:
13     Q.  You don't recall?
14     A.  No.
15     Q.  Now, there's an office that you maintain
16  in Burr Ridge still; is there not?
17     A.  What is that?
18     Q.  There's an office -- your business office
19  is in Burr Ridge?
20     A.  No longer there.
21     Q.  Okay.  It was there in December of 2007?
22     A.  I don't think so.  I think they moved
23  right around maybe November or December, sometime
24  around that time they moved, so...

Page 135

1      Q.  What was the old address?
2      A.  It was 101 Burr Ridge Parkway.
3      Q.  Was that Unit 306?
4      A.  Yeah.
5      Q.  What's the new address?
6      A.  It's 222 East Pearson.
7      Q.  That's the building that you're
8  developing?
9      A.  Yes.
10     Q.  Who paid the rent on the office at
11  Burr Ridge?
12     A.  Who paid the rent?  The company paid the
13  rent.
14     Q.  The company is which company?
15     MR. SHMIKLER: Object to relevance.
16     THE WITNESS: It's probably -- I don't recall
17  which company.
18  BY MR. BLACKMAN:
19     Q.  What's the name of the company that's
20  developing the property?
21     MR. SHMIKLER: Object to relevance.
22     THE WITNESS: Developing Pearson?
23  BY MR. BLACKMAN:
24     Q.  Yes.

Page 136

1      A.  It's Hawthorne Development Corporation.
2      Q.  And other than Hawthorne Development
3  Corporation, are there any other entities, business
4  entities, that you are currently doing business
5  through in the United States?
6      A.  No, I mean --
7      Q.  No?
8      A.  I mean, each project it's got its own LLC.
9  So the Florida, for instance, it was Hawthorne LP
10  and so it's LLC in Florida, so...
11     Q.  Are those still active entities?
12     A.  Well, they are -- I don't know what you
13  would call active or inactive.  Maybe they're
14  active even though they are underwater.
15     Q.  What about Hawthorne Orlando Corporation,
16  is that an entity that you are still utilizing in
17  the United States?
18     MR. SHMIKLER: Object to form.
19     THE WITNESS: No, I mean it's got -- there's
20  nothing there.
21  BY MR. BLACKMAN:
22     Q.  What was that -- what was the purpose of
23  that entity?
24     MR. SHMIKLER: Object to relevance.

Page 137

1      THE WITNESS: That was the Orlando project.
2  BY MR. BLACKMAN:
3      Q.  Now, you mentioned that your business
4  office has been moved over to 222 Pearson?
5      A.  Yes.
6      MR. SHMIKLER: Object to relevance.
7  BY MR. BLACKMAN:
8      Q.  Do you personally own any units at 222
9  Pearson?
10     A.  No.
11     Q.  Does your wife?
12     MR. SHMIKLER: Object to relevance.
13     THE WITNESS: No, no.
14  BY MR. BLACKMAN:
15     Q.  What about the trusts?
16     MR. SHMIKLER: Object to relevance.
17     THE WITNESS: No.
18  BY MR. BLACKMAN:
19     Q.  Now, according --
20     A.  You got to give me a minute.  It's now
21  1:00 o'clock at night.  I got to eat something, so
22  I'm going to take a break.  I got to eat.  I'm so
23  hungry.  Please excuse me.
24     MR. SHMIKLER: How long do you need, Dr. Vish?

35  (Pages 134 to 137)

Page 138

1    THE WITNESS: Go ahead and talk. I still have
2  the phone on.
3  BY MR. BLACKMAN:
4    Q.  You can hear me and answer the questions
5  while you're doing whatever you're doing?
6    A.  I think so.
7    MR. SHMIKLER: You want to continue while
8  you're eating?
9    THE WITNESS: Yeah.
10    MR. SHMIKLER: That's fine.
11  BY MR. BLACKMAN:
12    Q.  Now, according to your divorce file, there
13  are a number of units at 525 Hawthorne Place
14  Condominium that are part of the trust of your
15  children; are you familiar with that?
16    MR. SHMIKLER: Object to relevance.
17  BY MR. BLACKMAN:
18    Q.  Sir?
19    A.  What is the question?
20    Q.  Are you familiar with a number of units
21  that are owned by your family trusts at 525
22  Hawthorne Place Condominium?
23    MR. SHMIKLER: I got to object to relevance.
24    THE WITNESS: Yes.

Page 139

1  BY MR. BLACKMAN:
2    Q.  Are those in the names of the trust or you
3  and your wife?
4    MR. SHMIKLER: Object to form.
5    MR. BLACKMAN: The units we just --
6    MR. SHMIKLER: I don't think I understood the
7  question.
8        Could you read back the question?
9        (Whereupon the record was read
10        as requested.)
11  BY MR. BLACKMAN:
12    Q.  Sir, do you know who owns those units?
13    MR. SHMIKLER: Object to relevance.
14    THE WITNESS: The one in Hawthorne?
15  BY MR. BLACKMAN:
16    Q.  Right.
17    A.  Which trust are you referring to?
18    Q.  There's the Sastri trust and then there's
19  the children's minor trust.
20    A.  Yeah.
21    Q.  Okay. Are those units -- do you have any
22  interest in any of those units?
23    A.  No, sir.
24    Q.  But they are still currently owned by your

Page 140

1  family?
2    MR. SHMIKLER: Object to relevance.
3    THE WITNESS: They're owned by both trust in
4  which I have no interest.
5  BY MR. BLACKMAN:
6    Q.  What about the parking spaces at Raintree
7  Court in Glen Ellyn, do you own those?
8    MR. SHMIKLER: Object to relevance.
9    THE WITNESS: No.
10  BY MR. BLACKMAN:
11    Q.  Who owns those?
12    MR. SHMIKLER: Object to relevance.
13    THE WITNESS: The children's trust.
14  BY MR. BLACKMAN:
15    Q.  What about the parcel of land in
16  Mount Vernon?
17    MR. SHMIKLER: Object to relevance.
18    THE WITNESS: I have no ownership interest.
19  BY MR. BLACKMAN:
20    Q.  Now, is there -- do you have an interest
21  in any tax refunds?
22    MR. SHMIKLER: Wait. I want to hear why this
23  is relevant.
24    MR. BLACKMAN: I'm going to withdraw that.

Page 141

1  BY MR. BLACKMAN:
2    Q.  Sir, explain to me -- strike that.
3        Other than the Lexus, do you have any
4  other cars that are titled in the United States?
5    MR. SHMIKLER: Object to relevance.
6  BY MR. BLACKMAN:
7    Q.  That are owned by you?
8    A.  No.
9    Q.  And when the units are sold at Pearson, do
10  you get any money from that?
11    MR. SHMIKLER: Object to relevance.
12    THE WITNESS: No.
13  BY MR. BLACKMAN:
14    Q.  Does your company?
15    MR. SHMIKLER: Same objection.
16    THE WITNESS: No.
17  BY MR. BLACKMAN:
18    Q.  Okay. It all goes to Private Bank?
19    MR. SHMIKLER: Object to relevance.
20    THE WITNESS: Yes.
21  BY MR. BLACKMAN:
22    Q.  Are you in default to Private Bank?
23    MR. SHMIKLER: Objection to relevance to the
24  extent it calls for a legal conclusion.

36  (Pages 138 to 141)

Page 142

1    THE WITNESS: No.
2  BY MR. BLACKMAN:
3    Q.  Sir?
4    A.  Yeah.
5    Q.  Are you familiar with what's called a UCC
6  filing?
7    MR. SHMIKLER: Object to relevance.
8    THE WITNESS: Yeah.
9  BY MR. BLACKMAN:
10    Q.  And if I told you there was a UCC filing
11  dated February 14th, 2008, made by Private Bank
12  with you personally as the debtor, do you know why
13  that would be?
14    MR. SHMIKLER: Object to relevance.
15    THE WITNESS: No, I don't know anything about
16  it.
17  BY MR. BLACKMAN:
18    Q.  So you're not aware of any financial
19  transactions between you and Private Bank in
20  February of 2008?
21    MR. SHMIKLER: Object to relevance.
22    THE WITNESS: No, I'm not aware of any.
23  BY MR. BLACKMAN:
24    Q.  Now, sir, have you taken out any loans

Page 143

1  where you filled out any financial applications
2  between the summer of 2006 and today?
3    MR. SHMIKLER: Object to relevance.
4    MR. BLACKMAN: It's relevant to see what he put
5  down as his residence.
6  BY MR. BLACKMAN:
7    Q.  Sir?
8    A.  Yeah.
9    Q.  Have you filled out any financial
10  applications, applications for credit between the
11  summer of 2006 and today?
12    A.  I don't recall any.
13    Q.  So Private Bank has not asked you to fill
14  out anything?
15    A.  I don't recall any.
16    Q.  Well, you had to fill out something when
17  you got a refinance of the Ridgewood property; did
18  you not?
19    A.  I did not -- I had no part in that
20  refinancing. I know nothing about it.
21    Q.  Well, did you have to sign any documents?
22    A.  None that I could recall. I don't
23  remember signing anything for that.
24    MR. SHMIKLER: I object to form. He answered

Page 144

1  the question. Whether he had to sign it, I don't
2  think he could answer.
3    MR. BLACKMAN: Whatever.
4  BY MR. BLACKMAN:
5    Q.  Sir, when do you plan on coming to Chicago
6  again?
7    MR. SHMIKLER: Object to relevance.
8    THE WITNESS: I don't have -- I don't have any
9  specific plan. Just, you know, when needed I
10  certainly will come.
11  BY MR. BLACKMAN:
12    Q.  How are you planning on seeing your
13  children under the parenting agreement if you have
14  no plans to come to Chicago?
15    MR. SHMIKLER: Object to the extent it
16  mischaracterizes his testimony.
17    THE WITNESS: No, I did not say I didn't have
18  plans to come. Why you are distorting my words, I
19  don't know.
20  BY MR. BLACKMAN:
21    Q.  So do you have any plans to come to
22  Chicago?
23    A.  Well, that's what I said. I think you --
24  I think as when needed I will come.

Page 145

1    Q.  I'm not asking when needed.
2      You're under a parenting agreement that
3  gives you the right to see your children on certain
4  dates and --
5    A.  I think it's already asked and answered.
6  I did say the agreement is in incorrect in places
7  because some of the things are inaccurate until
8  finally an agreement between me and my wife. So if
9  we agree that, you know, certain ways like my
10  children can come here and spend the summer or
11  anything like that, you know, then that's our
12  agreement.
13    Q.  That's not my question.
14      Do you have any plans to come to Chicago
15  to visit your children pursuant to the parenting
16  agreement?
17    MR. SHMIKLER: Object to relevance.
18    THE WITNESS: You know, it's an agreement
19  between me and my wife. And you know, we can, you
20  know, adjust our schedules, whatever, and can be in
21  the places that is suitable for everybody. So
22  that's how it will be with it.
23  BY MR. BLACKMAN:
24    Q.  I'm almost done, sir.

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 146

1      The bills that your lawyer was showing you
2  for the things that you ordered for your cousin's
3  house.
4      A.  Yes.
5      Q.  Now, these bills are dated -- well,
6  there's various dates.  One is December 6, one is
7  December 1st, one is November 30th.
8          When you ordered these items, did you
9  order them while you were in India or did you order
10  them here for delivery in India?
11      A.  No, I ordered them while I was in India.
12      Q.  And do you remember the date that you
13  moved into your cousin's house?
14      MR. SHMIKLER:  Objection, asked and answered.
15      THE WITNESS:  I think, to the best of my
16  recollection, it was like early November, you know,
17  early November.
18      BY MR. BLACKMAN:
19      Q.  Okay.  Did you go anyplace else after you
20  got to India or did you go right to your cousin's
21  house?
22      A.  I went right to my cousin's house.
23      Q.  When did you tell him that you would be
24  moving in with him?

Page 147

1      A.  When did I tell him?  I don't recall when
2  I told him.  I don't quite recall when.
3      Q.  I assume that you would have called him
4  from the United States and told him that you were
5  moving there and letting him know that you wanted
6  to move in with him, right?
7      A.  Like I said, I don't recall, but, you
8  know, that is -- that is quite possible.
9      Q.  Well, can you give me an estimate as to
10  when you first told him that -- or asked him, one
11  of the two, that you were going to go live with
12  him?
13      A.  No, I don't recall exactly when.
14      Q.  Okay.  Was it within a month of when you
15  went out there?
16      A.  Yeah, like I said, I don't quite recall.
17      Q.  I know you don't recall the exact date.
18          I'm asking you to try to estimate.  Was it
19  within a month when you went out there that you
20  talked to your cousin?
21      A.  It's quite possible it was within that
22  period, yes.
23      Q.  Was it within a couple weeks?
24      A.  No, maybe -- maybe within a month.

Page 148

1      Q.  Okay.
2      A.  Maybe three weeks.  I don't quite recall.
3      Q.  So you left LaGrange at the end of October
4  and the beginning of November; is that right?
5      A.  Yes.
6      Q.  Okay.  Is that when you made the decision
7  to move to India?
8      A.  Late October, yeah, around that time.
9      Q.  So you would have -- you would have called
10  your cousin sometime between late October and
11  November 7th or 10th when you say that you arrived
12  in India?
13      A.  Like I said, I don't quite recall.
14      Q.  I understand that.
15          But if you made the decision in late
16  October to move to India and you went to India
17  around the 6th or the 10th, then sometime between
18  late November -- I mean, late October 2007 and when
19  you arrived, that's when you would have told your
20  cousin, right?
21      A.  Sometime around that time.  Again, I don't
22  recall the dates and things.
23      Q.  I understand that.
24          Okay.  So would it be fair to say that it

Page 149

1  was within ten days or two weeks that you gave
2  your --
3      A.  I don't know.  I have answered enough.  I
4  don't think I can recall with any more accuracy.  I
5  have said that, and you know, I don't recall it
6  with any more accuracy just because you ask
7  questions again and again.  I said I don't recall
8  and you keep asking me, so...
9      Q.  When you moved to India, did you tell your
10  wife that you were moving there permanently?
11      A.  I don't recall that.
12      Q.  Okay.  And when you went to India, did you
13  tell your wife where you would be living?
14      A.  I -- to the best of my recollection, no.
15      Q.  Why not?
16      A.  Look, we are in a divorce court.
17      Q.  All right.  You still have children and
18  you still have a parenting agreement and you still
19  have a wife.
20          Is there any reason why you didn't tell
21  her where you were moving when you made the
22  decision to go out there?
23      A.  There is no reason, sir.
24      Q.  Are you still in litigation with Mr. Khan?

38  (Pages 146 to 149)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 150

1        MR. SHMIKLER:  Object to relevance.
2        THE WITNESS:  To the best of my knowledge, no.
3    BY MR. BLACKMAN:
4        Q.  Sir, have you filed your taxes?
5        A.  No.
6        Q.  When was the last time you filed your
7    personal taxes?
8        A.  I think '06.
9        Q.  '06?
10       A.  Yeah.
11       Q.  When you filed, would you file jointly
12   with your wife?
13       A.  I don't recall that.
14       Q.  Do you have an accountant in Chicago or
15   Illinois?
16       A.  Yes.
17       Q.  Who is that?
18       MR. SHMIKLER:  Object to relevance.
19       MR. BLACKMAN:  It's relevant, again, as to his
20   continued contacts here and whether or not it is
21   believable that he has moved permanently to India.
22       MR. SHMIKLER:  The fact he has an accountant
23   here and who it is --
24       MR. BLACKMAN:  It seems he's got everything.

Page 151

1        THE WITNESS:  Listen, this is in my opinion --
2    just because I have moved doesn't mean I have to
3    cut off all connections with the U.S., with my
4    accountant --
5        MR. SHMIKLER:  Dr. Vish --
6        THE WITNESS:  -- with my lawyers and
7    everything.
8        MR. SHMIKLER:  Dr. Vish, there's not a question
9    pending.  Just wait for a question.
10       THE WITNESS:  Yeah, but he keeps on -- it
11   doesn't matter.  He keeps on asking.
12       MR. SHMIKLER:  I know.
13       THE WITNESS:  He's going absolutely --
14       MR. SHMIKLER:  I know, Dr. Vish.  We're making
15   our objections.  Just answer the question.  That's
16   fine.
17   BY MR. BLACKMAN:
18       Q.  What is the name of your accountant here?
19       MR. SHMIKLER:  Again, object to relevance.
20       THE WITNESS:  Hold on one second, please.
21       MR. BLACKMAN:  I have to eat something.  Hold
22   on.
23              (A short break was taken.)
24   BY MR. BLACKMAN:

Page 152

1        Q.  Hi, Doctor, I think the last question was
2    do you still have an accountant in Illinois?
3        A.  Do I still have an accountant in Illinois?
4        Q.  That's right.
5        A.  Yes.
6        Q.  What's his name or her name?
7        A.  Shepard, Schwartz & Harris.
8        Q.  Other than Mr. Collins and Mr. Shmikler,
9    do you have any other lawyers that represent you or
10   your companies?
11       MR. SHMIKLER:  Object to relevance.
12       THE WITNESS:  From time to time we have had
13   different lawyers.
14   BY MR. BLACKMAN:
15       Q.  As you sit here today, is there anyone
16   that you can think of besides Mr. Collins and
17   Mr. Shmikler who are your counsel?
18       MR. SHMIKLER:  You're talking about the present
19   tense, not former counsel, right?
20       MR. BLACKMAN:  Yeah, as of now or let's say
21   between October of 2007 and today.
22       MR. SHMIKLER:  You mean firms, he doesn't have
23   to list anybody?
24       MR. BLACKMAN:  Firms.

Page 153

1        THE WITNESS:  Well, we have a Florida lawyer.
2        MR. SHMIKLER:  You said Florida lawyer?
3        THE WITNESS:  Yes.
4    BY MR. BLACKMAN:
5        Q.  Who is that?
6        A.  John Stump.
7        Q.  Anybody else, any other Chicago firms that
8    are doing legal work for you now besides
9    Mr. Collins and Mr. Shmikler?
10       A.  I don't recall any.
11       MR. SHMIKLER:  I don't have anything else.
12       MR. BLACKMAN:  I don't have anything else.
13       MR. SHMIKLER:  Dr. Vish, we're all done.
14       THE WITNESS:  Thank you.  Bye-bye.
15              (Off the record at 1:16 p.m.)
16              FURTHER DEPONENT SAITH NAUGHT
17
18
19
20
21
22
23
24

39  (Pages 150 to 153)

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b

Page 154

```
 1    STATE OF ILLINOIS )
                        ) SS:
 2    COUNTY OF C O O K )
 3       I, ANNA MARIA CASTLE, C.S.R., and Notary Public
 4    within and for the County of Will and State of
 5    Illinois, do hereby certify that heretofore,
 6    to-wit, on the 10th day of April, 2008, personally
 7    appeared before me, at 55 West Monroe, Suite 3200,
 8    Chicago, Illinois, GANESAN VISVABHARATHY, in a
 9    cause now pending and undetermined in the Circuit
10    Court of Cook County, Illinois, wherein INDYMAC
11    BANK, F.S.B., a Federal Saving Bank, is the
12    Plaintiff, and GANESAN VISVABHARATHY, an individual
13    and HAWTHORNE ORLANDO CORPORATION, a Florida
14    corporation, are the Defendants.
15       I further certify that the said witness was
16    first duly sworn to testify the truth, the whole
17    truth and nothing but the truth in the cause
18    aforesaid; that the testimony then given by said
19    witness was reported stenographically by me in the
20    presence of the said witness, and afterwards
21    reduced to typewriting by Computer-Aided
22    Transcription, and the foregoing is a true and
23    correct transcript of the testimony so given by
24    said witness as aforesaid.
```

Page 155

```
 1       I further certify that the taking of this
 2    deposition was pursuant to Notice, and that there
 3    were present at the deposition the attorneys
 4    hereinbefore mentioned.
 5       I further certify that I am not counsel for nor
 6    in any way related to the parties to this suit, nor
 7    am I in any way interested in the outcome thereof.
 8       IN TESTIMONY WHEREOF: I have hereunto set my
 9    hand and affixed my notarial seal this 11th day of
10    April, 2008.
11
12
13
14
15       _____
         CSR, NOTARY PUBLIC, WILL COUNTY, ILLINOIS
16
17
18
19
20
21
22
23
24
```

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

38e566c3-0ac8-44ff-9d60-3c3bcd24be9b