IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| INDYMAC BANK, F.S.B., | ) |
| a Federal Savings Bank, | ) |
| Plaintiff, | ) |
| vs. | )   No. 07 C 6224 |
| GANESAN VISVABHARATHY, | ) |
| an individual, | ) |
| Defendant. | ) |

The deposition of SURIYA SASTRI called for
examination pursuant to Notice and the Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken before
Jennifer A. Buckley, a notary public within and for the
County of Cook and State of Illinois, at 55 West Monroe
Street, Suite 3200, Chicago, Illinois, on the 8th day of
April 2008, at the hour of 10:20 a.m.

Reported By:  Jennifer A. Buckley, CSR
License No. 084-003632

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 2

1   APPEARANCES:
2      LEVENFELD PEARLSTEIN, LLC, by
3      MR. GARY I. BLACKMAN and
4      MR. JAMES G. MARTIGNON,
5      2 North LaSalle Street, Suite 1300
6      Chicago, Illinois 60602
7      (312) 476-7536
8          Representing the Plaintiff,
9
10     SPERLING & SLATER, by
11     MR. DANIEL A. SHMIKLER,
12     55 West Monroe Street, Suite 3200
13     Chicago, Illinois 60603
14     (312) 641-3200
15         Representing the Defendant,
16
17     BOLLINGER, RUBERRY & GARVEY, by
18     MR. MITCHELL D. ROSE,
19     500 West Madison Street, Suite 2300
20     Chicago, Illinois 60661
21     (312) 466-8000
22         Representing the deponent, Suriya Sastri.
23
24

Page 3

1           INDEX
2   WITNESS                EXAMINATION
3   SURIYA SASTRI
4   By Mr. Shmikler              9
5
6          EXHIBITS
7   NUMBER                 MARKED FOR ID
8        Sastri Deposition Exhibit
9   Exhibit 1              22
10  Exhibit 2              39
11  Exhibit 3              113
12  Exhibit 4              115
13  Exhibit 5              120
14  Exhibit 6              122
15  Exhibit 7              128
16
17
18
19
20
21
22
23
24

Page 4

1      MR. ROSE:  Mitchell Rose appearing for Dr. Sastri.
2      MR. SHMIKLER:  Dan Shmikler for the
3   defendant -- I'm sorry -- for defendant Visvabharathy,
4   Dr. Visvabharathy.
5      MR. BLACKMAN:  Gary Blackman for the plaintiff.
6      MR. MARTIGNON:  And Jim Martignon here for the
7   plaintiff.
8      MR. BLACKMAN:  For the record, we want to raise an
9   objection to the way in which these depositions in
10  particular counsel's what he calls Rule 32 deposition
11  has proceeded.  There is an evidentiary hearing next
12  week.  We did not obtain prior to Sunday any date on
13  which the doctor would be produced for deposition.  We
14  served her with a subpoena.  Counsel for the defendant
15  acknowledged in an e-mail to me yesterday that he was
16  not representing her but thought that the subpoena was
17  invalid.  Nobody had come in to quash the subpoena or
18  seek a protective order.
19     At 4:39 we received an e-mail from counsel
20  advising that the deponent would not be appearing at our
21  office, 4:39 yesterday, would not be appearing in our
22  office because he thought the subpoena was invalid but I
23  was welcome to come to a deposition at 10:00 a.m. today,
24  which happens to be the same time as the subpoenaed

Page 5

1   deposition to participate in his deposition.
2      The first notice of deposition from counsel
3   for today was received last night, though there was an
4   e-mail about it yesterday.  I spoke with the doctor on
5   the telephone yesterday who confirmed, whether she does
6   now or not I don't know, but confirmed that when she was
7   speaking with counsel last week, it was not scheduled
8   for downtown.  So what it appears is that -- and
9   everybody's refused to come to our office for the
10  subpoena.  So what it appears is that a subpoena was
11  issued.  And then subsequent to that, a decision was
12  made to more or less hijack this witness and take over
13  these proceedings and take counsel's own deposition at
14  the same time at the same date as the subpoena.
15     So the witness has retained a lawyer last
16  night who's here, and we're happy to see that.  We are
17  objecting to counsel beginning with his Rule 32
18  deposition.  But we have no control over the order that
19  the witness's lawyer wishes to present the witness.  And
20  after counsel's done with his questioning, by agreement
21  of the parties, by agreement of counsel without waiving
22  whatever objections he might have, we're going to begin
23  with our subpoenaed deposition of the witness.
24     MR. SHMIKLER:  I'd like to -- we'll put a

2  (Pages 2 to 5)

Page 6

1  more -- at the time that they begin their purported
2  subpoena examination, we'll make our objection in full.
3  But I'd note that, first of all, by agreement of the
4  parties is not correct if he means the defendant. We
5  absolutely do not agree that their subpoena is valid.
6  It's clearly barred by federal rule. They have not
7  sought -- it appears to be in the nature of a discovery
8  deposition which makes sense because they never
9  identified Dr. Sastri as a witness in this matter they
10  wish to call. There's been no discovery authorized in
11  this matter at this point which would be required by
12  federal rule. They were advised months ago that if they
13  wish to have discovery in this case, they needed to seek
14  Court leave and they never did so. And, in fact, the
15  description of how this deposition came to be scheduled
16  is inaccurate. In truth they were notified last week
17  that we were seeking to take Dr. Sastri's deposition.
18  We were working with her schedule in order to determine
19  when she would be available. She and I spoke last
20  Friday afternoon at which point she thought that she
21  would be available this morning but was confirming that.
22  While we waited confirmation, they served a subpoena
23  that is not valid.
24        Monday morning contrary to his representation

Page 7

1  we informed them that their subpoena was not valid but
2  that the witness was, in fact, available and was now
3  willing to come downtown and so that we would proceed
4  with our deposition to preserve her testimony for the
5  hearing this morning. In subsequent e-mails they
6  refused to agree to that and insisted that their
7  subpoena was valid and then claimed that because they
8  had not received a, quote unquote, formal notice, that
9  somehow it impaired our ability to take her deposition
10  at which point we sent them the notice that they had
11  requested. I note that specifically the proceeding that
12  we're going forward today with to preserve testimony was
13  expressly approved by Court, and once again they have
14  not received any Court permission to proceed with their
15  subpoena. So with that said, I think we would like to
16  go ahead and proceed. Swear the witness.
17        MR. BLACKMAN: I'd like to make a very brief
18  response, and I don't want to spend a lot more time on
19  this. We don't agree that we don't have the right to
20  seek a subpoena on an F find that you submit as part of
21  your motion to quash. Rule 26 does not apply to these
22  proceedings. We haven't even begun the case because
23  you're challenging jurisdiction. These are your
24  witnesses for your motion. So we don't agree that Rule

Page 8

1  26 requires us to seek permission to take the deposition
2  of a witness that you will be producing whether in
3  person or in a deposition to support your motion.
4        And, second, and this is just an observation,
5  if counsel had, in fact, been speaking with the witness
6  about producing her this morning and those discussions
7  happened before Monday, we surely were not advised of
8  that and no one asked our availability for a deposition
9  on Tuesday morning. So it is I think a little
10  disingenuous to say that this was a date that you were
11  looking toward when you hadn't even checked with our
12  office as to whether we were available to meet with the
13  doctor this morning here or somewhere else. So we're
14  ready to start.
15        MR. SHMIKLER: Do you have anything?
16        MR. ROSE: At this point I don't have anything else
17  to add to that discussion.
18        MR. SHMIKLER: Will you swear the witness, please.
19              (Witness sworn.)
20              SURIYA SASTRI
21  called as a witness herein, having been first duly
22  sworn, was examined and testified as follows:
23
24

Page 9

1              EXAMINATION
2  BY MR. SHMIKLER:
3    Q    Good morning. Could you state your name for
4  the record, please.
5    A    Suriya V. Sastri, M.D.
6    Q    You're a medical doctor I take it?
7    A    Yes.
8    Q    What kind of doctor are you?
9    A    I'm a gastroenterologist.
10    Q    Are you currently employed?
11    A    Yes.
12    Q    Where do you work?
13    A    I work with Well Group Health Partners,
14  Chicago Heights, Illinois.
15        MR. MARTIGNON: I'm sorry. Can you speak up just a
16  little bit? I'm having a little trouble hearing you.
17        THE WITNESS: Well Group.
18  BY MR. SHMIKLER:
19    Q    Okay. What's your current home address?
20    A    7529 Ridgewood Lane, Burr Ridge, Illinois
21  60527.
22    Q    Okay. How long have you lived there?
23    A    Since end of December 2004.
24    Q    Dr. Sastri, are you married?

3  (Pages 6 to 9)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 10

1    A    I guess but I'm separated.
2    Q    Okay. And what's your husband's name?
3    A    Ganesan Visvabharathy.
4    Q    And does your husband live with you?
5    A    No.
6    Q    I take it you're legally separated?
7    A    I don't know what legally means. I know I'm
8    separated.
9    Q    You're physically separated for sure?
10   A    Yes.
11   Q    I take it do you have divorce proceedings
12   pending?
13   A    Yes.
14   Q    And how long have those been pending?
15   A    I filed it in February 2006.
16   Q    Okay. When did your husband move out of the
17   house?
18   A    Probably summer 2006. And for a brief period
19   of time when I happened to go to India for a service
20   project, he was there between like the end of December
21   to January until I came back. He was watching the
22   children. That was 2007, January 2007 or the first week
23   February of 2007 he moved out. He left.
24   Q    So he came in in December of '06 and out in

Page 11

1    about February of '07?
2    MR. BLACKMAN: Objection as to form and leading.
3    This is your witness. You have to ask direct questions.
4    BY MR. SHMIKLER:
5    Q    Dr. Sastri, just to clarify what you just
6    said, what year was it? You said he moved in in
7    December. What year did you say it was?
8    MR. BLACKMAN: Same objection.
9    BY MR. SHMIKLER:
10   Q    What year did you say that was?
11   MR. ROSE: You can go ahead and answer the
12   question. Do you understand the question?
13   THE WITNESS: What is the question?
14   BY MR. SHMIKLER:
15   Q    The question is, I just want to clarify the
16   dates that you just gave us when your husband was living
17   back in the house while you were away. That was you
18   said it was from December through February, correct?
19   A    Not through February. It was just the end of
20   January he left.
21   Q    And was that December 2006 through January --
22   A    Through the end of January 2007.
23   Q    So, yes, that's right, December 2006?
24   MR. BLACKMAN: Objection, asked and answered.

Page 12

1    MR. SHMIKLER: I just want to be clear. I'm not
2    sure the record was clear with your answer.
3    MR. BLACKMAN: Regardless of why you want to be
4    clear or not, the objection is it's asked and answered.
5    MR. ROSE: You can answer.
6    THE WITNESS: I'm really confused about this
7    objection thing. So anyway --
8    MR. ROSE: Just hold on one second. If there's an
9    objection that's raised, then I'll take care of the
10   objection. I'll deal with the objection. And if I tell
11   you to go ahead and answer the question, just go ahead
12   and answer the question. You don't need to pay
13   attention to the objections themselves. Okay?
14   BY MR. SHMIKLER:
15   Q    Do you remember the question?
16   A    Yes. I mentioned that he was there for about
17   a three- to four-week period when I happened to go to
18   India. So he watched the children when I was not there.
19   So that was approximately between the end of December to
20   the end of January.
21   Q    I just want to make sure the years are clear.
22   A    And once I came back he left.
23   Q    I just want to make sure the years are clear.
24   Which years was that?

Page 13

1    A    December 2006 until January of 2007.
2    Q    Thank you.
3    When your husband moved out, did he move out
4    to live somewhere else?
5    A    I guess.
6    Q    Do you know where he went to live?
7    A    No. At that time, no.
8    Q    You learned some time later?
9    MR. BLACKMAN: Objection, leading and objection as
10   to form and foundation.
11   BY MR. SHMIKLER:
12   Q    Did you learn some time later where your
13   husband went to live?
14   A    Later on I learned that he probably was
15   staying somewhere one of the buildings he owned. I
16   didn't know exactly where he was. But then later we
17   learned that there was an apartment that he had in
18   LaGrange, and our children could go there and visit with
19   him. That was 400 South Catherine. So exactly like
20   when that happened, I'm not exactly sure. Only I
21   learned later on.
22   Q    Did you ever go to that apartment in
23   connection with the children?
24   A    No. They just went -- he would come pick

4 (Pages 10 to 13)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

## Page 14

1  them up and they would go meet with him a couple times a
2  week or on weekends, stuff like that.
3    Q   Other than the one instance that you already
4  described, did your husband ever come back to live with
5  you again in your house?
6    A   No.
7    MR. BLACKMAN: At what point in time?
8  BY MR. SHMIKLER:
9    Q   Now, has anyone ever come --
10   MR. BLACKMAN: Excuse me, Counsel. At what point
11 in time?
12   MR. SHMIKLER: Do you have an objection or what?
13   MR. BLACKMAN: Yeah. Objection. What point in
14 time?
15   MR. SHMIKLER: That's not an objection.
16   MR. BLACKMAN: Counsel, are you refusing to clarify
17 that?
18   MR. SHMIKLER: The witness understood the question.
19 If you want to follow-up on cross, follow-up on cross.
20   MR. BLACKMAN: Just answer my question. Are you
21 refusing to clarify what the witness at what point in
22 time that answer responded to? Just say yes or no.
23   MR. SHMIKLER: I think the answer was clear, and
24 I'm not following up on that. If you want to follow-up,

## Page 15

1  that's why you're here for.
2  BY MR. SHMIKLER:
3    Q   Has anyone ever come to your home looking for
4  your husband to serve him with legal papers?
5    A   Yes.
6    Q   Okay. When did that happen?
7    A   Approximately November 2007.
8    Q   Okay. What happened?
9    A   One evening I was coming back from where I
10 was in the evening around dusk time and this car was on
11 my driveway and this man approached me and he said that
12 he was serving some papers for my husband. And I said
13 he doesn't live here. He said where he would be, and I
14 said I don't know. And he was kind of threatening and
15 menacing with different questions, and then I actually
16 didn't want to chat with him on the driveway so I asked
17 him to come into the garage. And then I was talking
18 with him there, and he said then I will have the sheriff
19 come and knock at your door at midnight. And I said
20 feel free to do anything. He will not be there and I
21 don't mind being disturbed at any time of the day. I'm
22 a doctor after all is what I said.
23   Q   Did he say anything else to you?
24   A   He said that don't let me go through the

## Page 16

1  children to get to whatever I have to do. I mean I'm
2  not saying exact words, but this is what he said. Don't
3  allow me to go through them. I said don't bother with
4  them. That's what I said. And he left.
5    Q   Okay. Did he say anything else to you or you
6  to him?
7    A   I said what I said.
8    Q   Okay. Was that the last -- was that the only
9  time that a process server came to your home?
10   A   No. I think in the first week of December he
11 came back on a Saturday morning. He just knocked and
12 then he said he had his papers and he said the Court
13 hired asked them to be delivered at the house and I said
14 that he doesn't live here. He said these are the papers
15 for him. I said he didn't live here. And he said that
16 these were by court order and that his name is on the
17 utility bills and other things so he has -- they have to
18 deliver the papers. Why is that so? I mean I've been
19 paying for all the bills and everything. I haven't had
20 the time to change his name on the utility bills. I
21 wasn't even paying attention, but he hasn't lived here
22 in a long time since the previous summer basically. He
23 said that I'm going to drop them off here. And he
24 dropped them off at the front door. And I said, you

## Page 17

1  know, that -- he had said the mail is being delivered.
2  There are different mail with his name that are being
3  delivered to the home. I said, yeah, the mail just
4  stays here. And whenever their office or something like
5  that they have, they take it. So he just dropped it off
6  in the front door, and he left.
7    Q   Did you or he say anything else at that time
8  to each other?
9    A   No.
10   MR. SHMIKLER: Okay. That's all I have.
11   MR. BLACKMAN: Okay. I'd like to begin the
12 subpoenaed deposition of the witness.
13   MR. SHMIKLER: At this time again we object that
14 there's no authority for subpoena. We agree that they
15 have the right to cross-examine based on the examination
16 of the testimony that we've taken. But the subpoena is
17 not valid, is unauthorized. So to the extent that the
18 examination purports to be in the nature of discovery or
19 pursuant to their subpoena or exceeds the scope of the
20 direct examination, we object and reserve all objections
21 to that.
22   MR. ROSE: We also join in the objection as to the
23 propriety of the deposition to the extent that it's not
24 valid under the federal rules. Also, just to make a

5  (Pages 14 to 17)

Page 18

1    statement for the record, I spoke with Mr. Blackman
2    earlier this morning and indicated that I did not
3    believe that we had any documents that were responsive
4    to the documents that had been requested in the rider.
5    This morning, though, my client did provide me with some
6    documentation and I have copies here. I'm now producing
7    the documents to both counsel here. And for the record,
8    although I have not counted the number of pages, there's
9    I'd say roughly 20 or so pages of documents. And based
10   upon my review of the documents, you're obviously
11   welcome to make your own independent review, they appear
12   to be documents that are relating to the ownership of
13   the home at 7529 Ridgewood Lane in Burr Ridge. And just
14   to generally describe them, they appear to consist
15   mostly of a title insurance policy, the policy --
16       MR. BLACKMAN: I can go through it with her.
17       MR. ROSE: -- conditions. Just so I have for the
18   record what it is that we're producing. I understand
19   there are additional documents we are continuing to
20   investigate and look for responsive documents. And
21   we'll respond once we've had an opportunity to go ahead
22   and complete our initial investigation as to responsive
23   documents.
24       MR. BLACKMAN: Well, today is the subpoena. So

Page 19

1    next week -- this testimony is intended to preserve her
2    testimony so she does not have to appear at trial. And
3    so to the extent there are any documents that we
4    requested that support her affidavit that have not been
5    produced, then either we will have to bring her back for
6    another deposition or she'll have to appear at trial.
7    This is not a discovery deposition. This is a
8    deposition in lieu of testimony.
9        MR. ROSE: Right. Just are you done?
10       MR. BLACKMAN: Yeah, I'm done.
11       MR. ROSE: So based upon the investigation that
12   I've conducted to date and an interview of the client
13   and without waiving any obviously attorney-client
14   communications, our position at the present based upon
15   the investigation to date that in response to the first
16   paragraph rider number 1 paragraph number 1, that there
17   are not documents, additional documents that are
18   responsive to that paragraph. Number two, we have
19   produced some documentation today. I anticipate there's
20   probably some additional documentation we'll continue to
21   investigate.
22       Similarly with regard to paragraph 3, the
23   refinance of the home, we are investigating and can
24   produce some additional documentation. And then with

Page 20

1    regard to any mail, it's my understanding that there
2    have been some documents. She doesn't have any of those
3    documents with her today. And we'll obviously continue
4    to investigate.
5        MR. BLACKMAN: All right. You're not really
6    understanding my point. You can continue to
7    investigate, but the purpose of today's deposition is to
8    preserve her testimony for trial. So there is no other
9    date on which she's scheduled to appear. And to the
10   extent, you know, that there are additional documents
11   that are produced, then she will need to either reappear
12   for deposition or come into the trial to testify. So
13   this is not the point in time where the parties can be
14   investigating whether there's any additional documents.
15   We can -- Dan and I can fight about that in court, but I
16   just want to be clear with you that this is not a
17   deposition in the middle of a case that there'll be some
18   supplemental production. Now, if she wants to turn this
19   into something else and then you produce something and
20   then appear at trial, that's fine. But what she has
21   today is all that she has, and that's all we're going to
22   be able to question her on.
23       MR. ROSE: Okay.
24       MR. BLACKMAN: Why don't we get started.

Page 21

1        MR. ROSE: I just want to respond to that just so
2    we're clear. I don't agree or disagree with your
3    assertions. If you want to go ahead and renotice her or
4    notice her for trial or whatever, do whatever you're
5    going to do. We will respond. And if we believe
6    there's an appropriate objection to continue this
7    deposition beyond today, we will evaluate and assert
8    whatever objection you believe is appropriate at that
9    time.
10       MR. BLACKMAN: Can we get started now?
11       MR. SHMIKLER: One thing I want to point out, I
12   think counsel just said that their subpoena is not in
13   the nature of discovery, which I think puts a rest to
14   the issue about the documents because the request for
15   documents is clearly discovery. The witness -- we're
16   not putting in any documents with regard to this
17   witness. As far as I know, they're not putting any
18   documents with regard to this witness. So the only
19   issue there -- if they're also here just preserving
20   trial testimony, then there's no issue with regard to
21   documents.
22       MR. BLACKMAN: That's your opinion. We'll fight
23   about that later.
24       MR. ROSE: Obviously there's issues surrounding the

6 (Pages 18 to 21)

Page 22

1  reasonableness of the amount of time that's passed in
2  order to be able to assemble the --
3      MR. BLACKMAN: Guys, can we get started?
4      MR. ROSE: I think so. Are you ready?
5          (Sastri Deposition Exhibit
6          No. 1 was marked for
7          identification.)
8  BY MR. BLACKMAN:
9      Q    I'd like to show you what is marked as
10 Exhibit 1, notice of subpoena with an attached subpoena
11 for your testimony at my office today at 10:00 a.m.
12 Have you seen that before? Ma'am, have you seen that
13 before?
14     A    I had this.
15     Q    Can I see that?
16     A    I did not have this.
17     MR. ROSE: For the record just the witness --
18     THE WITNESS: That's why I was looking at this.
19     MR. ROSE: -- is indicating that she does not --
20     THE WITNESS: There was a check attached to this
21 and this. That's what was given to me by my daughter.
22 BY MR. BLACKMAN:
23     Q    You're referring to the subpoena that is on
24 the third page of the notice that I just handed to you;

Page 23

1  is that right?
2      A    That is what was given.
3      Q    So you received the subpoena, but you didn't
4  get the notice that was attached on top that went to
5  your husband's counsel? I just want to confirm that you
6  got the subpoena. Correct?
7      A    Yes.
8      MR. ROSE: The subpoena Exhibit A is a five-page
9  document. The first two pages consist of the notice of
10 subpoena and the certificate of service, and then the
11 remainder three pages consist of the actual subpoena and
12 a rider to subpoena. He's asking you --
13     THE WITNESS: I did not receive the later. The two
14 pages in between with a check was what I ... I did
15 get it like this.
16 BY MR. BLACKMAN:
17     Q    So is it your testimony that you never
18 received --
19     A    I think.
20     Q    Is it your testimony that you received the
21 check, you received the subpoena, but that the rider was
22 not attached? Are you stating that under oath, ma'am?
23     A    You know, this is what I remember. And if
24 there were some other papers that are mixed up

Page 24

1  somewhere, I don't know. This is what I remember.
2      Q    Ma'am, I want you to listen to my question.
3  Is it your testimony under oath that you received the
4  subpoena, that you received the check, but that you did
5  not receive a rider?
6      MR. SHMIKLER: Objection, asked and answered.
7      THE WITNESS: I earlier mentioned that I don't
8  remember seeing this page at all.
9      MR. ROSE: By this page she's referring to the
10 rider.
11     THE WITNESS: The rider to subpoena and then this
12 other thing.
13 BY MR. BLACKMAN:
14     Q    So you don't remember seeing it, but you may
15 have gotten it with the subpoena? It may have been
16 attached?
17     MR. SHMIKLER: Objection, asked and answered.
18     THE WITNESS: I answered what I remember.
19 BY MR. BLACKMAN:
20     Q    Well, I'm asking you a different question.
21 It may have been attached, correct?
22     MR. SHMIKLER: Objection, asked, answered, and
23 foundation.
24     THE WITNESS: I'm sorry. Anything is possible, but

Page 25

1  this is what I remember. And I'm thinking this is what
2  I saw.
3  BY MR. BLACKMAN:
4      Q    So when you got the subpoena, what did you
5  do?
6      A    Just looked at it.
7      Q    Did you call anybody?
8      A    It was in the evening 7:00 o'clock, so I
9  didn't call anybody. I just talked to my daughter and
10 asked her what happened. And she told me that somebody
11 knocked on the door or bell or something and she opened
12 the door and this person just thrust this into her hand.
13 And she said, what is this? And that person said it's a
14 subpoena for me. And she said my mother is not home so
15 take it back.
16     Q    Ma'am --
17     MR. SHMIKLER: I think the witness is allowed to
18 complete her answers.
19     MR. BLACKMAN: Not if she's not answering the
20 question responsively.
21     MR. SHMIKLER: You can always follow-up.
22     MR. BLACKMAN: You can make your objection. You're
23 not her lawyer. You can't interrupt.
24     MR. SHMIKLER: As a party to these proceedings, we

7  (Pages 22 to 25)

Page 26

1    are entitled to request that all witnesses be allowed to
2    complete their responses.
3        MR. BLACKMAN: You can request that.
4    BY MR. BLACKMAN:
5        Q    Did you contact any lawyer -- I'm not talking
6    about your family members. Did you contact anybody
7    outside of your family once you got served with the
8    subpoena to tell them I got served with the subpoena?
9    Did you call Mr. Shmikler?
10       MR. SHMIKLER: Objection, compound.
11       THE WITNESS: No. It was Sunday evening.
12   BY MR. BLACKMAN:
13       Q    Did you call him the next day?
14       A    I did not yet. I was at work. And he called
15   me to follow-up on our earlier arrangement of the
16   meeting to verify where it was going to be and whatnot,
17   and that is when I said I have been served with
18   subpoena.
19       Q    And what date? Was that on Monday,
20   yesterday?
21       A    Monday.
22       Q    Okay. Do you know what time?
23       A    About the morning time like after 9:00, 9:30,
24   between 9:30, 10:00 o'clock, something like that.

Page 27

1        Q    Prior to your conversation with counsel
2    yesterday, had you agreed on coming downtown for your
3    deposition?
4        A    We were still deciding on where we were going
5    to meet.
6        Q    Okay. Did you agree on what day?
7        A    We did not have any agreement as such, but we
8    had -- he had asked me for a tentative time, and I said
9    I may be available on Tuesday mornings. I have to clear
10   my schedule.
11       Q    And when did you tell him that?
12       A    Later part of last week.
13       Q    Do you know whether he ever checked with our
14   office to see whether we were available on Tuesday
15   mornings?
16       MR. SHMIKLER: Objection to foundation.
17       THE WITNESS: He was still waiting for my time.
18   And whether he did or not, you can't ask me whether he
19   did. You have to ask him.
20   BY MR. BLACKMAN:
21       Q    So as of yesterday when you spoke with him,
22   you hadn't scheduled today's deposition with him yet.
23   That was scheduled yesterday?
24       A    We were scheduling it.

Page 28

1        Q    Right. Listen to my question.
2        MR. SHMIKLER: I object to the relevance of any of
3    these questions.
4        THE WITNESS: We scheduled the time already. I had
5    told him preferably 10:00 o'clock would be suitable to
6    me, and I had said that on Friday or Thursday or
7    whenever.
8        MR. SHMIKLER: Let me interpose an objection to
9    this line of questioning as being completely irrelevant
10   to any matter that's at issue at the hearing.
11   BY MR. BLACKMAN:
12       Q    So is it your testimony, ma'am, that on
13   Friday you agreed that you would be deposed at 10:00
14   a.m. today downtown? That's not what you said a couple
15   minutes ago.
16       MR. SHMIKLER: Objection to form.
17       THE WITNESS: What did I say a couple minutes ago?
18   BY MR. BLACKMAN:
19       Q    That you were trying to schedule a time. But
20   as of yesterday morning, you hadn't scheduled a firm
21   deposition date for 10:00 a.m. downtown today.
22       MR. ROSE: Objection to the extent it
23   mischaracterizes her prior testimony.
24       THE WITNESS: I did already said I had scheduled

Page 29

1    this meeting. We were only going to confirm that so
2    that he can finalize on that.
3    BY MR. BLACKMAN:
4        Q    So you scheduled -- when you say meeting, you
5    scheduled the deposition with counsel. You scheduled
6    that and confirmed that when?
7        A    We were still confirming until this morning
8    for that purpose. The thing is that there are so many
9    things that are in play here. For you to -- the thing
10   is that we had an originally prearranged deposition that
11   we had discussed about, and I was willing to cooperate
12   for the deposition. So that is how it was. So it
13   was --
14       Q    All I'm asking, ma'am, all I want to know is
15   at what point did you agree to produce yourself for
16   deposition at this office this morning? Was that
17   something that you agreed with counsel on yesterday or
18   Friday or Thursday? I just want to know when the
19   deposition that counsel has scheduled for today that he
20   just took, when you agreed to do that.
21       A    Pretty much last week, the early part of last
22   week. I had -- it's not even towards the end. The
23   deposition was something that we agreed upon, and he was
24   arranging it. So I said okay.

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 30

1    Q    Now, do you have the rider in front of you?
2    A    Yes.
3    Q    Now, your counsel has produced some documents
4    in response to this that pertain to the ownership of the
5    home, correct?
6    A    Yeah.
7    Q    Okay. And when did you give these to your
8    counsel?
9    A    This morning.
10   Q    Okay. And when did you retain -- I don't
11   want to know what you talked about with your lawyer, but
12   when did you retain him?
13   A    Yesterday.
14   Q    Last night after you and I spoke on the
15   phone?
16   A    Of course.
17   Q    So it was around 10:00 o'clock, 11:00
18   o'clock?
19   A    Why would that be . . .
20   MR. ROSE: Just answer his question. Do you
21   remember what time it was you retained me to represent
22   you?
23   THE WITNESS: It was late in the evening. I don't
24   know exact time.

Page 31

1    MR. ROSE: His question is do you remember the
2    time? Either you remember or you don't remember.
3    MR. BLACKMAN: It doesn't matter. Let me withdraw
4    it.
5    THE WITNESS: I don't remember the exact time,
6    between 9:00 and 10:00 or 9:30.
7    MR. BLACKMAN: It doesn't matter. I'll withdraw
8    that. It's not important.
9    BY MR. BLACKMAN:
10   Q    How did you know to call Mr. Rose is it?
11   MR. ROSE: Yes.
12   BY MR. BLACKMAN:
13   Q    How did you know to call Mr. Rose?
14   MR. ROSE: Wait a second. Go ahead.
15   THE WITNESS: I had called another friend of mine
16   and found out if he had any attorney. I had no idea who
17   to call. So another attorney I had tried to reach, and
18   he wouldn't be able to be reached until this morning.
19   And then I talked to Dan Shmikler and asked him to refer
20   me to somebody who can represent me on such a short
21   notice, and he was kind enough to find somebody
22   yesterday who could even talk to me yesterday. So
23   between the two options, then I called another friend
24   and said somebody is able to talk to me yesterday. So I

Page 32

1    would rather use this person, so that I let go of the
2    other one.
3    BY MR. BLACKMAN:
4    Q    So Mr. Rose was recommended to you by
5    Mr. Shmikler?
6    A    Yes.
7    Q    And then when you spoke with -- and
8    Mr. Shmikler is not your lawyer, is he?
9    A    He's not.
10   Q    And he's never represented you personally?
11   A    That's correct.
12   Q    Okay. When you spoke with Mr. Rose last
13   night on the phone, was Mr. Shmikler on the phone?
14   A    No.
15   Q    Have you ever had any conversations since
16   last night with Mr. Rose and Mr. Shmikler?
17   A    Together?
18   Q    Uh-huh, in the same room the three of you.
19   A    Just before now we met.
20   Q    Can you tell me what you talked about?
21   A    Just introducing each and we just talked
22   about the deposition and the . . .
23   Q    Instead of telling me generally, tell me what
24   you recall was actually said between the three of you.

Page 33

1    A    We were just going through like actually the
2    time, I mean generally just tell whatever is the detail
3    of the what shall I say? Be truthful and
4    straightforward answers to questions.
5    Q    You said he was going through the time. Were
6    you about to say going through the time line of what
7    happened and when? Was that something you discussed?
8    A    Not really. We just were there for a short
9    time. I was answering my phones and other things there.
10   Mainly like when, you know, whether I had a doubt as to
11   the exact dates of the filing of the divorce and
12   everything so I was talking to him and then --
13   Q    Him being Dan?
14   A    And we were able to look at the divorce
15   petition filed, the date. I wanted to get the date.
16   MR. ROSE: I'm just going to interject for the
17   record. There were two meetings that we had. One was
18   with my client alone. And since the two meetings took
19   place one obviously right after the other, there was an
20   initial very short meeting where the three of us were in
21   the room together, and I was actually being cautious to
22   see if she was going to confuse the two. But there was
23   really nothing of substance discussed in the first
24   meeting with the three of us there obviously being

9  (Pages 30 to 33)

Page 34

1    sensitive to issues of attorney-client privilege. And
2    the only things it was just very general things about
3    the proceeding itself and the deposition and the
4    subpoena. I did mention to Mr. Shmikler that I did have
5    documents that I was going to make available to
6    everybody and then Mr. Shmikler left the room and then I
7    proceeded to meet with my client without him being
8    present. So there was really nothing of any substance.
9        MR. BLACKMAN: Okay. I appreciate that. Thank
10   you.
11   BY MR. BLACKMAN:
12       Q    When you brought in the documents with
13   respect to the home ownership this morning that you gave
14   to us, how did you know to bring this in?
15       A    I'm thinking it might be this. It might have
16   been there maybe.
17       Q    When you say there, ma'am, you're pointing to
18   the rider?
19       A    Rider, rider to the subpoena because --
20       Q    As your counsel stated before you began
21   testifying, this document which we'll mark in a minute
22   which is pertaining to home purchase documents, I
23   believe counsel stated that that was responsive to the
24   rider request number 2 where it says the ownership of

Page 35

1    your home located at 7529 Ridgewood Lane. That's what
2    the documents that counsel referenced this morning are
3    being produced in response to? Is that accurate?
4        MR. ROSE: Did you hear his question?
5    BY MR. BLACKMAN:
6        Q    Ma'am, you need to pay attention to me when
7    I'm asking questions. Now, you've brought in some
8    documents this morning with respect to ownership,
9    correct? You have to answer out loud.
10       A    Yes.
11       Q    Okay. And the rider that your counsel was
12   discussing before you began testifying asks for
13   ownership documents in number 2. Do you have that in
14   front of you?
15       A    Uh-huh.
16       Q    Okay. And your counsel said that these
17   documents that you brought in this morning were
18   responsive to request number 2?
19       A    Yes.
20       Q    Okay. Is that your understanding that these
21   documents you're producing are in response to the
22   request for ownership documents number 2?
23       A    Yes.
24       Q    Okay. So then how did you know that this

Page 36

1    request was made?
2        MR. ROSE: Objection to the extent that it requires
3    disclosure of an attorney-client communication. Let's
4    take a minute to step out for one second. Off the
5    record.
6            (A short break was taken.)
7        MR. ROSE: We're back on the record just to say
8    that you're free to examine her further about this.
9        MR. BLACKMAN: Unless you want to explain it to us
10   and save us some time. I'm happy to listen to you.
11       MR. ROSE: The truth is actually that she's not
12   sure and I'm not sure exactly whether she knows about
13   the documents that were requested based upon
14   communications that she and I had or whether she did
15   actually see the rider. She's not 100 percent sure
16   about that. And so to the extent there's any disclosure
17   of attorney-client communications there, it's without
18   waiver. But there was, you know, some -- she may have
19   learned -- it's possible she may have learned about the
20   nature of the documents, the fact that documents were
21   requested based upon communications with counsel or it
22   may have been that she saw it. She's not sure.
23       THE WITNESS: It's possible that --
24       MR. BLACKMAN: Wait a second, ma'am. There's not a

Page 37

1    question pending.
2        All I want to clarify to cut to the chase here
3    is that at some point prior to walking in this morning
4    with these documents, with these ownership documents,
5    she was aware either through you or being handed the
6    subpoena or through counsel, I don't care, that these
7    were the four categories because she obviously walked in
8    with documents responsive to one of them. Now, she may
9    have learned about it through getting the rider and
10   having it in her hand. You may have asked her this is
11   what they're asking for. Go look through it. That's
12   all I want to clarify, that she's producing documents
13   responsive as you said to one of the categories and that
14   whether she has them or not is a different issue. She
15   was aware of these other three categories before she
16   walked in today.
17       MR. ROSE: She was aware of all four categories
18   prior to us beginning this morning.
19       MR. BLACKMAN: Okay. That's all I want to know.
20       MR. ROSE: That's fine.
21   BY MR. BLACKMAN:
22       Q    Ma'am, I'd ask you to take a look at request
23   number 1 on the rider. Do you have it in front of you?
24       A    Yes.

10  (Pages 34 to 37)

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 38

1    Q    And it asks for any documents that support
2    what you've put forth in an affidavit that you've
3    submitted in this case. Do you remember reading that or
4    being told about that?
5    A    I read it.
6    Q    Okay. Now, did you bring with you
7    today -- Strike that.
8        Do you understand when it references an
9    affidavit what we are referring to?
10    A    Yes.
11    Q    You understand that in this case in support
12    of a pleading or a document filed by your husband, that
13    you have submitted to the Court and to us an affidavit?
14    You're aware of that, are you not?
15    A    Yes, I do.
16    MR. ROSE: Do you understand his question?
17    THE WITNESS: Yes.
18    MR. BLACKMAN: Now, I want to mark the affidavit as
19    Exhibit 2. I have copies if anybody needs them.
20    MR. SHMIKLER: Are you just going to show it to
21    her, or are you going to ask her questions about it?
22    MR. BLACKMAN: I'm going to ask her questions about
23    it.
24    MR. SHMIKLER: Then I need a copy.

Page 39

1    BY MR. BLACKMAN:
2    Q    We'll come back to this in a minute but the
3    affidavit --
4    MR. SHMIKLER: Wait. I think the reporter needs to
5    mark it.
6        (Sastri Deposition Exhibit
7        No. 2 was marked for
8        identification.)
9    BY MR. BLACKMAN:
10    Q    So when we're referring, ma'am, to your
11    affidavit, that's what we've marked as Exhibit 2 and
12    that's the documents that you signed on February 13,
13    2008?
14    A    Uh-huh.
15    Q    You have to answer --
16    A    Yes. I'm sorry.
17    Q    She can only take down a yes or a no.
18    A    Sorry.
19    Q    Going back to Exhibit 1, which is the rider
20    to the subpoena, have you brought in any documents that
21    support any of the statements made in your affidavit
22    other than the documents with respect to ownership that
23    your counsel gave this morning?
24    MR. ROSE: Objection to form. Did you understand

Page 40

1    the question?
2    THE WITNESS: No.
3    BY MR. BLACKMAN:
4    Q    Okay. Thank you for telling me that. I'll
5    rephrase it.
6        You understand that you have given us an
7    affidavit, right? That's in front of you?
8    A    Yes.
9    Q    You've made certain statements in that
10    affidavit that you're testifying under oath are true?
11    A    Yes.
12    Q    Okay. The rider to the subpoena, which is
13    right in front of you, request number 1 asks for any
14    documents or papers or records that support any of the
15    statements made by you in the affidavit. Do you
16    understand what that means?
17    A    Yes.
18    Q    Okay. And have you brought any?
19    A    It is my understanding that I am not here as
20    such for the subpoena because I don't have all these
21    documents. So I was not preparing all these documents.
22    MR. ROSE: Just answer his question.
23    THE WITNESS: I don't have --
24    MR. ROSE: Stop, stop. Just answer his question.

Page 41

1    He asked you did you bring in any documents. Just
2    answer his question. Did you bring in any documents
3    that relate to number 1 on the rider?
4    THE WITNESS: I didn't bring any documents.
5    BY MR. BLACKMAN:
6    Q    Okay. Now, did you before coming in this
7    morning undertake a search for any documents at your
8    house that would support any of the statements that
9    you've said in your affidavit?
10    A    No.
11    Q    Okay. Why not?
12    A    Because I wasn't sure if there's anything
13    that I can produce as documentation for any of these
14    things. I wasn't aware.
15    Q    You weren't aware of what?
16    A    What documentation that I'm requested to
17    produce.
18    Q    Well, you were aware that you -- you knew
19    what to produce with respect to number 2, right, because
20    you brought in documents with respect to the ownership
21    of the house?
22    A    That's because it said ownership of the
23    house. It's number 2.
24    Q    All right. Did you ever --

11 (Pages 38 to 41)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 42

1    MR. ROSE: I just want to assert an objection here
2  based upon the opportunity of the witness to confer with
3  counsel regarding a legal document served upon her and
4  what are the appropriate steps to take in response to
5  the subpoena, that the objection is that she has not had
6  a meaningful and adequate amount of time to consult with
7  an attorney regarding the details of what, in fact, is
8  required for her to produce. But under the
9  circumstances we have made as best efforts as are
10  possible under the circumstances to provide you with the
11  material that's readily available.
12    MR. BLACKMAN: To be clear because this will be a
13  matter that will be before the judge very shortly, she
14  is here so she does not have to testify at the
15  evidentiary hearing. When she got served with the
16  subpoena if someone wanted to say I need a couple more
17  days to retain counsel, I don't want to go ahead on
18  Tuesday because I need time to produce documents, I'm
19  not prepared to go this morning, any one of you could
20  have said that. But the deposition, you know, was
21  purportedly scheduled by Mr. Shmikler. And in our
22  conversation this morning, you know, we confirmed that
23  we had a valid subpoena. Now, there's nothing that
24  prevents anybody from us not going ahead because you

Page 43

1  need more time to consult with her or because the
2  witness needs more time to produce documents. So the
3  idea that there's going to be some further discovery or
4  investigation in response to our questions doesn't
5  really work in that situation where she's not coming in
6  to testify.
7    MR. ROSE: For the record, I did have a
8  conversation this morning with Mr. Blackman prior to his
9  deciding to come over here to participate in these
10  proceedings. And in those conversations I made it clear
11  that, in fact, I did not have -- I did not believe I had
12  any documentation and that if he wished to proceed under
13  those conditions that that was his choice. As it turns
14  out, my representation that I did not have any documents
15  was not entirely accurate as I later learned that there
16  were some materials that the witness was able to recover
17  after making a limited search based upon the amount of
18  time that she and I had had an opportunity to confer
19  about this and we did produce those here this morning.
20  So we have made it clear all along what the conditions
21  are about proceeding this morning, and you've decided to
22  proceed under those conditions.
23    MR. BLACKMAN: No, I have not agreed to proceed
24  under those conditions. The only reason that we were

Page 44

1  here is because we were told a deposition was going
2  ahead at 10:00 a.m. this morning by opposing counsel and
3  that we were welcome to proceed and this was the time
4  that he was going to be asking the witness questions
5  about what would be her testimony if she testified. So
6  that's why we're here. We're not forcing this. You are
7  her counsel, and you had every opportunity to say to
8  both of us we're not prepared to produce this witness to
9  either of you because I was just retained and she
10  doesn't have time to look for documents.
11    So, again, I appreciate your getting involved.
12  I appreciate what you're saying. I understand that you
13  are in a delicate position. But the fact of the matter
14  is that the only reason we're taking her deposition is
15  because the defendant's counsel asked for permission to
16  do that in lieu of presenting her at trial. Now, we
17  will obviously after the deposition do whatever we need
18  to do to clarify it, but let's just move on.
19    MR. ROSE: I just want to make it clear that I
20  obviously do not have the larger context here, nor do I
21  know exactly how these documents necessarily fit into
22  whatever theories of the case counsel has. The only
23  thing I can do is simply be upfront, which I have
24  definitely been in terms of saying, look, here's what

Page 45

1  we're prepared to do. We're prepared to present her if
2  you want to proceed and question her. And I was very
3  upfront about the documentation that I did or didn't
4  have. And then as soon as I learned there were
5  documents, I obviously made it clear so.
6    MR. SHMIKLER: Just very briefly, I don't know how
7  productive all this is but just to make it clear for a
8  couple things for the record. Number one is that if
9  we're talking about time lines, the only reason that
10  they subpoenaed her was to make sure that her testimony
11  was taken in preparation for the hearing. Well,
12  obviously that took place. But, in fact, there's this
13  additional issue where they want discovery of certain
14  documents, and it is discovery and that could have been
15  requested long ago. They should have sought leave to
16  get that long ago, and they didn't do that. Instead
17  they served Sunday night a subpoena for her to produce
18  documents on a Tuesday morning, and then they were told
19  prior to coming over here that those documents were not
20  forthcoming and they proceeded. All of this, of course,
21  on a subpoena that we assert was invalid. Under those
22  circumstances I think the notion that they can come back
23  and get more bites of this apple is quite unfounded.
24    MR. ROSE: Let's proceed because her time is

12 (Pages 42 to 45)

Page 46

1  limited.
2     MR. BLACKMAN: We'll accept that as a continuing
3  objection all the way through. You don't need to say it
4  each time.
5  BY MR. BLACKMAN:
6     Q  Ma'am, all I want to know is with respect to
7  the rider in front of you, you brought in some documents
8  with respect to the ownership in number 2, correct?
9     A  Yes.
10    Q  Okay. Now, did you undertake a review or an
11 investigation to see whether you have any documents that
12 support anything that you're saying in your affidavit?
13    MR. SHMIKLER: Objection, asked and answered.
14    MR. ROSE: Join in the objection.
15    THE WITNESS: Can you be more clear about your
16 question as to what documents you're talking about so I
17 can answer better?
18 BY MR. BLACKMAN:
19    Q  Okay. Did you look for any documents other
20 than the documents that reflect ownership?
21    MR. SHMIKLER: Objection, asked and answered.
22    THE WITNESS: I looked for the refi, but there's
23 nothing there in the refinance of the home. It's all
24 nowadays done through the Internet, and I left a message

Page 47

1  with the banker to get me those documents. The file
2  that I had only had the application. Nowadays they
3  don't even send anything in paper.
4  BY MR. BLACKMAN:
5     Q  All right. Let me try to make this --
6     A  So I asked her to send to me.
7     Q  With respect to any allegations or any
8  documents that support your allegations, and this is
9  regardless of whether they're attached to the rider or
10 not, you've stated in paragraph 2 that your husband has
11 not lived at the home since 2006. Do you see where I'm
12 saying?
13    A  Yes.
14    Q  Do you have anything to prove that? Do you
15 have any documents that support that that you've brought
16 with you today?
17    A  I'm not sure how I can prove that.
18    Q  Well, do you have any bills that shows that
19 you were the only person on the utility bills?
20    A  I answered earlier that -- I mean I was just
21 saying earlier I didn't change the utility name at all
22 up until, you know, I was told that it wasn't changed.
23 I didn't pay attention to it. I didn't change any name
24 on any of the bills.

Page 48

1     Q  So the bills that come to the house for
2  utilities and that would be heat, electric, and cable,
3  Internet, are those still in both yours and your
4  husband's name?
5     MR. ROSE: Objection, compound question, object to
6  form.
7  BY MR. BLACKMAN:
8     Q  Go ahead.
9     A  Some are in my name even from before. Some
10 are in joint name. Some are in his name. Whatever name
11 that was originally set up remained the same.
12    Q  So the bills that were originally in both of
13 your names, yours and your husband's, those are still in
14 both of your names?
15    A  Yeah.
16    MR. ROSE: Object to form.
17    THE WITNESS: It's possible. Yeah, I didn't change
18 anything except like recently one of the utility bills I
19 put my name on.
20 BY MR. BLACKMAN:
21    Q  Up until recently was how long ago?
22    A  Just last month.
23    Q  Prior to that one bill that you're referring
24 to, is it to the best of your knowledge because you

Page 49

1  haven't brought in any documents, is it your
2  understanding that the bills that were in both your name
3  and your husband's name remain in both your name and
4  your husband's name?
5     MR. SHMIKLER: Objection, asked and answered.
6     THE WITNESS: Yes.
7  BY MR. BLACKMAN:
8     Q  Okay. And with respect to your statement
9  that he has not lived at the home since 2006, is there
10 anything that you can produce to us in terms of
11 documents that supports what you've said there?
12    MR. SHMIKLER: Objection, asked and answered.
13    THE WITNESS: In what way do you think?
14 BY MR. BLACKMAN:
15    Q  It's your statement, ma'am. I mean you've
16 signed an affidavit that says he moved out in the summer
17 of 2006. All I'm asking is whether or not you have any
18 documents that would establish that that's true.
19    MR. SHMIKLER: Same objection.
20    THE WITNESS: He moved out. That's all. I don't
21 have anything --
22 BY MR. BLACKMAN:
23    Q  Listen to my question. I understand that
24 you're saying that today. I understand that you're

13  (Pages 46 to 49)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 50

1   saying that in an affidavit. What I'm asking you is, do
2   you have any documentation, any documents, any papers
3   that support what you're saying there?
4       A   I'm not sure.
5       Q   Okay. Well, did you undertake an
6   investigation for any documents that support that
7   statement?
8       A   I did not have time for looking into that.
9   That is the reason why I did not come here for a
10  subpoena as such to your place.
11      Q   Are you aware of any documents as you sit
12  here today that prove that what you're saying here is
13  true?
14      A   I--
15      MR. ROSE: I object to form. Wait. When I object,
16  let me object. Object to form.
17      MR. BLACKMAN: Let me rephrase that because prove
18  is a bad word.
19  BY MR. BLACKMAN:
20      Q   Are you aware of any documents as you sit
21  here today that support the statement that you have made
22  in your affidavit that your husband moved out in the
23  summer of 2006?
24      MR. ROSE: Just answer his question as best as you

Page 51

1   can yes or no.
2       THE WITNESS: It might be possible, but I right now
3   don't have them. I don't know if they exist.
4   BY MR. BLACKMAN:
5       Q   Okay. I'd ask you to look at the next line
6   in paragraph 2 of your affidavit that says prior to the
7   summer of 2006 your husband did reside with you but
8   permanently moved out as part of your separation. Do
9   you have any documents that support your statement that
10  he permanently moved out?
11      A   Much of what happened was all verbal between
12  me and my husband. So documentation is something that
13  I'm not sure they exist. They were communications that
14  we had. Whether it was written communication or verbal,
15  I don't know. He moved out. The thing is like
16  physically he took his stuff, his belongings and
17  everything. And his car is not there. So those are the
18  things are physical.
19      MR. ROSE: Can we go off the record, and maybe this
20  will move things.
21          (A short break was taken.)
22      MR. BLACKMAN: I don't remember if there was a
23  question pending, but I'll try again.
24      MR. ROSE: Go ahead.

Page 52

1   BY MR. BLACKMAN:
2       Q   Are you aware of any documents that exist
3   that support the statement in your affidavit that your
4   husband permanently moved out of the Ridgewood residence
5   in 2006?
6       A   I am not aware.
7       Q   Okay. Now, with respect to paragraph 3 of
8   your affidavit, you state, quote, it is my understanding
9   that when he moved out, Dr. Vish, can I call him that?
10  Is that okay?
11      A   Uh-huh, yes.
12      Q   Is that what you call him? Dr. Vish
13  established his own separate abode. Now, what do you
14  mean by that when you say it's my understanding.
15      A   Exactly what it means. It's my
16  understanding.
17      Q   How did you come to that understanding?
18      A   Like I mentioned earlier, that we learned
19  that he has an apartment in LaGrange.
20      Q   When did you learn that?
21      A   Some time in 2006 school year and when my
22  daughters could go there and she could park and go,
23  whatnot.
24      Q   And do you know for how long your husband had

Page 53

1   that apartment?
2       A   I had no connection with any of those things,
3   so I wouldn't know.
4       Q   Well, you say no connection. You're his
5   wife, are you not?
6       A   Yeah.
7       Q   The divorce is not final?
8       A   Yeah, but he doesn't tell me everything.
9       Q   Please, just listen to my questions.
10      A   Sorry.
11      Q   There's a parenting agreement in place that
12  allows each parent to see the children?
13      A   Yes.
14      Q   So when your husband moved out in the summer
15  of 2006, it's your testimony that he moved into an
16  apartment in LaGrange, that you learned that then?
17      Q   What time period did you say, 2006?
18      A   Summer of 2006.
19      Q   Summer, yeah.
20      Q   And for how long did he live there?
21      A   See, I don't know when he moved out from
22  there. That's the reason why I don't know how long he
23  lived there.
24      Q   So do you know if he was living in that

14 (Pages 50 to 53)

Page 54

1   apartment in November of 2007?
2       A    I don't know that.
3       Q    Do you know if he was living in December of
4   2007?
5       A    I don't know when he moved out.
6       Q    And you've never been to the apartment?
7       A    I don't remember. I know where it is.
8       Q    Did you ever go in?
9       A    I may have gone in one time.
10      Q    Do you remember when that was?
11      A    No.
12      Q    How old are your children?
13      A    They are now 18 and 15.
14      Q    When would have been the earliest that you
15  remember him living in LaGrange?
16      A    Probably in 2006 around late spring,
17  summertime, something like that.
18      Q    Okay. Now, who prepared this affidavit for
19  you to sign, Exhibit 2?
20      A    I don't know that.
21      Q    It wasn't you, was it?
22      A    I did not.
23      Q    And was it Mr. Shmikler?
24      A    It's possible. I don't know. Mr. Shmikler

Page 55

1   was arranging these things, and he asked me. Exactly
2   who did, I don't know. And I was talking with
3   Mr. Shmikler.
4       Q    Okay. And when was it that you first spoke
5   with Mr. Shmikler about this case?
6       A    I don't recall exactly when.
7       Q    Generally?
8       A    Not too long ago. Within the last year,
9   February or something.
10      Q    Did he call you, or did you call him?
11      A    I don't remember.
12      Q    And did you meet with him in person before --
13      A    This is the first time I met him.
14      Q    So that would be a no, right?
15      A    Yes.
16      Q    Okay. Did you spend time on the phone
17  talking about your affidavit?
18      A    Yes.
19      Q    And what did Mr. Shmikler tell you when you
20  spoke to him on the phone about your affidavit?
21      A    No. He asked me questions, and I told him
22  what happened. So he was drafting it on the other line
23  as to what the affidavit was.
24      Q    Okay. Did you take any notes when you were

Page 56

1   talking to him?
2       A    No, I don't think so.
3       Q    Did Mr. Shmikler ask you for any documents
4   that might support what was being said in the affidavit?
5       A    No.
6       Q    Did he ask you who was on the utility bills?
7       A    No.
8       Q    Did he ask you who owned the property?
9       A    No.
10      Q    Now going back to the rider, with respect to
11  number 3, there's a request related to the refinance of
12  the home in May of 2007. Do you see that?
13      A    Yes.
14      Q    Okay. Did you bring in any documents
15  responsive to that?
16      A    No.
17      Q    And do you recall that in May of 2007 the
18  home was refinanced?
19      A    I don't remember the exact date whether it
20  was May or whenever. We did do the refinancing, yes.
21      Q    Okay. And you said we did the refinancing.
22  Who are you speaking about?
23      A    Refinancing was done because the house is in
24  both our names, it was by both of us, myself and

Page 57

1   Visvabharathy.
2       Q    And that was a refinance with Private Bank?
3       A    No.
4       Q    MB Financial?
5       A    MB.
6       Q    Right. And did you have to fill out an
7   application?
8       A    Yes.
9       Q    And did you list on your application that you
10  were married?
11      A    I don't know. I'd have to look through. I
12  am married.
13      Q    Do you have a copy of the application?
14      A    I should have a copy of that application.
15      Q    Is there a reason why you didn't bring it in
16  this morning?
17      A    Because it said refinance of the home and
18  then I was looking for the actual refinancing documents.
19  I only had the application. I recall that I never
20  received anything. It was all only on the E files. And
21  so they never sent me anything.
22      Q    But you filled out an application for a loan?
23      A    Just on my own.
24      Q    Well, the refinance was in both your names,

Page 58

1  was it not?
2      A    They gave -- the refinancing was -- the
3  application was just my own. I have to find out exactly
4  what it is. But he needed to be signing off under or
5  something that he needed a signature because his name
6  was on the application. But the bank gave the
7  refinancing based on whatever my credentials were.
8      Q    And those documents can be produced after
9  today's deposition?
10     A    Of course. Whatever I have I will be happy
11 to provide.
12     Q    Now, number 4 says any and all mail received
13 by your husband at the home. Do you understand what
14 that means?
15     A    No. I had a question.
16     Q    When you had these questions, did you ask
17 your lawyer?
18     A    There is really no time.
19     MR. ROSE: Objection as to attorney-client
20 privilege.
21     MR. BLACKMAN: That privilege doesn't cover a
22 question asked by her of you. The privilege covers the
23 response by you to her.
24     MR. ROSE: It's attorney-client privilege.

Page 59

1      MR. BLACKMAN: Are you instructing her not to
2  answer on that basis, or do you want to hear what she
3  wants to say first?
4      MR. ROSE: Can I have the question read back,
5  please.
6          (Whereupon, the record was read
7           as requested.)
8      MR. ROSE: It's attorney-client privilege. I
9  instruct you not to answer. Just wait. There's no
10 question.
11 BY MR. BLACKMAN:
12     Q    Ma'am, are you not answering the question
13 based upon the advice of your counsel?
14     A    Of course.
15     Q    Okay. Now, your husband's mail has never
16 been forwarded to any other address. Isn't that true?
17     MR. SHMIKLER: Objection to foundation.
18     THE WITNESS: He doesn't live there so there is no
19 need to be -- he did not forward from our home.
20     MR. BLACKMAN: Right.
21     THE WITNESS: Whenever any mail that he has his own
22 address and so he would need to forward his mail from
23 his address. This is not the address he lives, so he
24 didn't have to forward anything.

Page 60

1  BY MR. BLACKMAN:
2      Q    Are you aware of anything filed by your
3  husband with the post office so that any mail that would
4  come to your home on Ridgewood would be forwarded to his
5  new address?
6      MR. SHMIKLER: Objection to foundation.
7      MR. BLACKMAN: That's why I asked are you aware.
8      THE WITNESS: I don't know what exactly he would
9  have done. I can't answer that question. But what in
10 practicality that would work very well for us was most
11 of the mail during this time period anything that is of
12 importance that he really should have was given to his
13 office which was very close to our home that was 101
14 Burr Ridge but now they moved to Pearson 333 so.
15     MR. ROSE: Just answer his question. His question
16 was, are you aware of anything that he would have done
17 to forward mail? Are you aware that he had a forwarding
18 notice? Did you get something from the post office
19 saying that mail is being forwarded? Are aware of it?
20 That's his question. Just answer his question yes or
21 no.
22     THE WITNESS: Say that again whether something was
23 being forwarded from our home to --
24     MR. ROSE: Are you aware that he was forwarding

Page 61

1  mail, yes or no?
2      THE WITNESS: Yes, he was.
3  BY MR. BLACKMAN:
4      Q    And how would he do that?
5      MR. ROSE: Objection to foundation.
6      MR. BLACKMAN: She just answered she was aware. So
7  she's already said in answer to your question, Counsel,
8  that she was aware. So we don't have to worry about
9  foundation.
10     MR. SHMIKLER: We still have to worry about
11 foundation. I join in the objection.
12 BY MR. BLACKMAN:
13     Q    What do you mean when you say that you were
14 aware he was forwarding mail?
15     A    Because the number of mail that was coming to
16 our home significantly lessened. We were not getting
17 much mail at all.
18     Q    Did you get any mail of his?
19     A    Occasionally some mail would come. Nowadays
20 mostly junk.
21     Q    Well, in the fall of 2000 and before -- I'm
22 sorry. The fall of 2007 and before were you getting
23 mail that would then be picked up from someone from his
24 office?

16   (Pages 58 to 61)

Page 62

1    A    Yes.
2    Q    Okay. Do you know why the mail was still
3  coming to your house at all?
4    A    Sometimes it's just those people who are
5  sending didn't have his forwarding address.
6    Q    And then what would you do with the mail when
7  it would come in addressed to him?
8    A    They will be saved and if they have any of
9  their office people --
10   Q    Who's they?
11   A    Occasionally the mail for me that goes to
12  them would be given to me by somebody from the office
13  would bring it. So then I would just give his mail to
14  that office person.
15   Q    Okay. So when you say the office person, are
16  you talking about someone that works in your husband's
17  business office?
18   A    Yes.
19   Q    Okay. Do you know which office that was?
20   A    He has only one office.
21   Q    And where is that at?
22   A    They now recently moved to Pearson, 333
23  Pearson.
24   Q    Which company is that?

Page 63

1    A    Hawthorne Development Corporation.
2    Q    So somebody from Hawthorne Development
3  Corporation would come to the home and pick up any mail
4  that was sent there that was addressed to your husband?
5    A    Sometimes that would happen occasionally.
6    Q    Okay.
7    A    Some I would put it in the mail and send it
8  to their office.
9    Q    So you would put it in the mail and send it
10  to their office because that's where he could pick it
11  up?
12   A    Hopefully. That's the only address I knew so
13  that's why I would send.
14   Q    Ma'am, you said you knew he was living in
15  LaGrange as early as 2006. Why didn't you send the mail
16  there?
17   A    I'm talking about recently. I'm not talking
18  about that.
19   Q    So were you originally sending mail to
20  LaGrange?
21   A    No.
22   Q    Okay. Why not?
23   A    Because Vish would be coming to pick up our
24  children so I will give it to him directly.

Page 64

1    Q    For some period of time he would come and
2  pick up his mail at the house?
3    A    He would come to pick up the children so I
4  will give the mail to him, whichever way you want to put
5  it.
6    Q    Okay. And for how long did he come to pick
7  up his mail at the house?
8    MR. SHMIKLER: Objection, mischaracterizes prior
9  testimony.
10   THE WITNESS: He didn't come to pick up the mail.
11  He came to see the children.
12  BY MR. BLACKMAN:
13   Q    Okay. For how long did it occur that when he
14  was there picking up the children he would also pick up
15  his mail? How long did that happen for?
16   A    2007, the end of 2007.
17   Q    And was it after that that whatever mail was
18  sent to your house addressed to him would be picked up
19  by the people from his office?
20   A    Lately, no. If I happened -- most of the
21  time they are pretty much, you know, I will just wait
22  until occasionally, yeah, maybe office or I would just
23  forward it, forward it by mail.
24   Q    Okay. Do you have any recollection of ever

Page 65

1  taking his mail on a regular basis and mailing it to
2  someplace other than your house between the summer of
3  2006 and today?
4    A    Can you please repeat the question.
5    MR. BLACKMAN: Can you read it back, please.
6         (Whereupon, the record was read
7          as requested.)
8    THE WITNESS: No.
9  BY MR. BLACKMAN:
10   Q    Now, you said that your husband would when he
11  would come and see the children pick up whatever mail
12  was there I think you said through the end of 2007?
13   A    Not through the end of 2007.
14   Q    November?
15   A    I can't say exactly when the last time it
16  was, maybe October or maybe before. I don't know
17  exactly when he came to see the children last.
18   Q    Okay. Now, when you were served with the
19  summons and the complaint, the papers, and that
20  was . . .
21   A    November or December.
22   Q    What did you do with them?
23   A    It stayed there.
24   Q    Okay. Did you call your husband and tell him

17  (Pages 62 to 65)

Page 66

1    that you had been served with these papers?
2    A    I didn't, I didn't have any contact with him
3    at that time.
4    MR. ROSE: Objection to the form of the question.
5    BY MR. BLACKMAN:
6    Q    Okay. So is it your testimony that you
7    haven't had any contact with your husband at all since
8    November of 2007?
9    A    Please repeat the question.
10    Q    Is it your testimony that you haven't had any
11    contact at all with your husband since December or
12    November of 2007?
13    A    It is not my testimony that I did not have
14    any contact with my husband since November 2007.
15    Q    So after you were served with the papers in
16    this case, did you tell him that you had been served
17    with the summons and the complaint?
18    A    Please repeat the question.
19    Q    After you were served with the papers, the
20    summons and the complaint in late November or early
21    December 2007, did you ever tell your husband that you
22    had been served with these papers?
23    MR. ROSE: Objection to form. You can go ahead and
24    answer.

Page 67

1    THE WITNESS: I may have.
2    BY MR. BLACKMAN:
3    Q    And when might you have done that?
4    A    Pardon me?
5    Q    When might you have done that?
6    A    Maybe in December 2007.
7    Q    Okay. And was this on a phone conversation?
8    A    Yes.
9    Q    And do you recall what he said to you and
10    what you said to him?
11    MR. ROSE: Objection. I'm sorry. Can you read the
12    question back.
13    (Whereupon, the record was read
14    as requested.)
15    THE WITNESS: I think --
16    MR. ROSE: Hang on. I'm going to object based upon
17    privilege between husband and wife.
18    MR. BLACKMAN: There's no privilege between husband
19    and wife in a civil action when she is representing that
20    she's estranged and she doesn't live there on a motion
21    to quash. You know, this is not a criminal matter. Do
22    you really want to make that objection? Because she
23    will be back here tomorrow or whenever the judge asks us
24    to. They've put her affidavit in to support their

Page 68

1    position that he does not live there and that the
2    service was improper. So do you really want to have her
3    not answer these questions?
4    MR. SHMIKLER: That question is not on the issue of
5    whether he lives there or not or doesn't live there.
6    MR. BLACKMAN: Okay. Well, you can make relevance
7    objections, which is fine and the judge may end up
8    throwing out half of this stuff. But do you want to
9    claim a privilege and instruct her not to answer these
10    questions with respect to conversations about the
11    service of these papers? I mean I'm not playing hard
12    ball. I'm just honestly trying to avoid having her come
13    back downtown. And if you want a minute to think about
14    it, that's fine.
15    MR. ROSE: Let me confer with my client.
16    (A short break was taken.)
17    MR. ROSE: All right. So I've had an opportunity
18    to confer with my client. We do continue to believe
19    that there is a husband-wife privilege, that it applies
20    in the context of this case. Despite the application of
21    the privilege after conferring, I'm going to permit my
22    client to -- she's agreed to waive the privilege. She's
23    agreed to waive the privilege and to testify only in the
24    very limited respect as to issues pertaining to the

Page 69

1    service of a subpoena as it relates to the complaint.
2    MR. SHMIKLER: Service of process.
3    MR. ROSE: Service of process matters as it relates
4    to the complaint that you guys have filed.
5    MR. BLACKMAN: Okay. Well, I'm not agreeing to the
6    limitation but we'll go as far as we can.
7    BY MR. BLACKMAN:
8    Q    After you were served with the summons and
9    the complaint --
10    MR. ROSE: Object to form. Just so we're not
11    playing games, what I wasn't sure about and I think I
12    have some clarification but since I'm new to this case,
13    you'll correct me if my understanding of what's going on
14    here is not correct. You were saying before that you
15    were serving her with the summons and complaint, and I
16    was objecting to form because it's my understanding that
17    she was not served with the summons and complaint. So
18    just maybe if we can be clear about the nomenclature.
19    MR. BLACKMAN: The issue is not whether or not she
20    received the papers, which would technically be a
21    different dispute. The issue is whether or not
22    she -- whether or not this is a proper service to serve
23    her on a case where her husband is a defendant. So I'm
24    using the term service so that she understands that I'm

18 (Pages 66 to 69)

Page 70

1  talking about when she was given the papers. If it
2  makes you feel better, I can say when you were given the
3  papers instead of serving the papers.
4      MR. ROSE: You don't need to make me feel better.
5  I just want the record to be clear.
6      MR. BLACKMAN: I understand.
7  BY MR. BLACKMAN:
8      Q    When you received the summons and complaint,
9  it was your testimony before you broke to speak with
10 your counsel that you did have a conversation with your
11 husband about what you were given?
12     MR. ROSE: I think there was a question pending I
13 think.
14     MR. BLACKMAN: The question pending was what did
15 you say to him and what did he say to you, and I'm happy
16 to start with that.
17     MR. ROSE: Did you recall a conversation but go
18 ahead. Objection to form.
19     THE WITNESS: Papers were dropped off. That was
20 just information. That's it.
21     MR. ROSE: Do you recall having a conversation with
22 your husband pertaining to the documents, the papers
23 that were dropped off at the home?
24     THE WITNESS: It was just an information. There

Page 71

1  were papers dropped off.
2  BY MR. BLACKMAN:
3      Q    And did you call him, or was it on a call
4  where he had called you?
5      A    I don't remember.
6      Q    And did you tell him what the papers were?
7      A    That these were papers dropped off for him.
8      Q    Did you tell him what they were? Did you
9  tell him what they were called, or did you just call
10 them papers?
11     A    I don't know, whatever the papers are called.
12 Because I don't have them in front of me, so I don't
13 want to tell you something else. But these are some
14 court papers that were dropped off for him.
15     Q    You told him that they were court papers?
16     A    I don't know. See, I can't tell you
17 something that I would have called them but anyway some
18 kind of legal documents.
19     Q    And then did he ask you what kind of legal
20 documents they were?
21     A    You know, I don't know, whatever. The sense
22 of it was that there is some kind of lawsuit by the bank
23 and he's being served these papers.
24     Q    Right. I understand.

Page 72

1      A    That's all.
2      Q    And then did he tell you what to do with
3  them?
4      A    He didn't tell me what to do with them.
5      Q    Did you ask him what should I do with these?
6      A    Yes.
7      Q    What did he say?
8      A    He asked me to just inform Mr. Collins, so I
9  just sent it to him.
10     Q    Mr. Collins is Michael Collins?
11     A    Michael.
12     Q    Who is one of his lawyers?
13     A    Yeah.
14     Q    And Michael Collins is a lawyer in Chicago?
15     A    Uh-huh, yes.
16     Q    You have to answer out loud. So that when
17 you were advised to send the papers to Michael Collins,
18 did you do that?
19     A    Yes.
20     Q    How did you know where to send it to?
21     Q    Why not?
22     Q    How did you know -- do you know who Michael
23 Collins is?
24     A    Yes.

Page 73

1      Q    How do you know him?
2      A    He and me -- they are our estate lawyers.
3  They did our estate planning and other things. I've
4  known him for a long time.
5      Q    So Mr. Collins has both represented both you
6  and your husband personally?
7      A    Harold Collins is his father, so he was the
8  estate lawyer. And through him we knew Mike Collins.
9      Q    Okay. However you got to know him, Michael
10 Collins is your -- has been your personal lawyer?
11     A    No.
12     Q    Okay. Somebody else at Michael Collins's
13 firm is your personal lawyer?
14     MR. SHMIKLER: Object to relevance.
15     THE WITNESS: The estate lawyer. I don't know what
16 you call personal lawyer. They did my estate planning I
17 said.
18 BY MR. BLACKMAN:
19     Q    So somebody else at Mr. Collins' office has
20 represented you and your husband on your estate
21 planning?
22     MR. ROSE: Objection to form.
23     MR. SHMIKLER: I object to relevance.
24

19  (Pages 70 to 73)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 74

1  BY MR. BLACKMAN:
2     Q    Go ahead.
3     A    Yes.
4     Q    Okay.  And so when you sent the papers to
5  Mr. Collins, did you do that by mail or did you do that
6  by messenger?
7     MR. ROSE:  Object to the form.
8     THE WITNESS:  I don't exactly remember which one I
9  did.
10  BY MR. BLACKMAN:
11    Q    Is it possible that you might have driven the
12  papers and dropped them off personally?
13    A    No.  That I know I didn't.
14    Q    All right.  That you know.  Is it possible
15  that someone from Mr. Collins' office came to your house
16  and picked up the papers?
17    A    No.  I'm not sure how I -- I remember talking
18  to Mike about it.  So after that I don't remember.
19    Q    Okay.  And Mr. Collins, he is the lawyer for
20  your husband's businesses?
21    A    Yes.
22    MR. ROSE:  Objection to form.  There's two
23  Mr. Collins I heard.
24

Page 75

1  BY MR. BLACKMAN:
2     Q    Michael Collins is the lawyer for your
3  husband's businesses?
4     A    Mike actually has done our partnership.  Mike
5  Collins and I as a family, he's our partnership lawyer
6  also.
7     Q    You're talking about your family trusts and
8  your family partnerships?
9     A    Yes.
10    Q    And when you dropped off the documents -- or
11  strike that.
12       However they got to Mr. Collins, you might
13  have mailed them, you might have messengered them, did
14  you put a note with that?
15    A    No.
16    Q    You just put it in an envelope, and there was
17  nothing else in there?
18    A    That's correct.
19    Q    And then did you have a conversation with
20  Mr. Collins about what you were sending him?
21    A    You know, this whole thing I don't exactly
22  recall what happened; but I remember talking with him
23  about these papers.
24    Q    And what was it that you said to him, and

Page 76

1  what did he say to you?
2     MR. ROSE:  Objection to attorney-client privilege.
3     MR. BLACKMAN:  I think it's her privilege to claim,
4  not yours but I don't think it's clear that that
5  conversation with respect to the papers constitutes,
6  Counsel, that we can't get into when she's put an
7  affidavit in.  So that's not to say you can't assert it
8  and tell her not to answer, but I think we can get into
9  it.  I think it's very relevant.
10    MR. ROSE:  Can I have the question read back,
11  please.
12           (Whereupon, the record was read
13             as requested.)
14    MR. ROSE:  You can go ahead and answer it.
15  BY MR. BLACKMAN:
16    Q    Go ahead.
17    MR. ROSE:  Do you remember the question that he
18  last asked you?
19    THE WITNESS:  Could you please repeat the question.
20    MR. ROSE:  What did you say to him?
21  BY MR. BLACKMAN:
22    Q    I'll say it again.  What did you say to
23  Mr. Collins, and what did he say to you?
24    A    Oh, I said to Mr. Collins that there was some

Page 77

1  court papers that were dropped off and I would like to
2  forward them to him.  I don't exactly recall how the
3  conversation went, but he said that -- I was asking him
4  should I just fax it to him but then it was pretty
5  voluminous.  So I don't know if I sent everything or
6  just some things were like really jargon there so I may
7  have sent just a couple of pages that were relevant.  I
8  don't know exactly how I sent, mail or fax or something
9  that I did.
10    Q    Do you recall anything else that you said to
11  him or he said to you?
12    A    No.
13    Q    Did you tell Mr. Collins, Michael Collins,
14  that your husband had asked that these be sent to him?
15    A    I might have said that.  I don't know.
16    Q    Now, going back to Exhibit 1, which is the
17  rider and finish that off, it requests on number 4 any
18  and all mail received by your husband at the home.  Have
19  you brought in any mail that's addressed to him that is
20  at your home?
21    A    No.
22    Q    Is there any mail there now?
23    A    Yes.
24    Q    Okay.  Why didn't you bring it in?

20  (Pages 74 to 77)

Page 78

1      A    I was not coming here prepared for the
2  subpoena. That is why I did not bring this in because
3  that was a question about the validity of the subpoena,
4  whatnot that was going on. And I did not have enough
5  time for all the documents.
6      Q    Well, you brought in some documents with
7  respect to number 2, right?
8      A    Yes.
9      MR. SHMIKLER: Objection, asked and answered many
10  times.
11  BY MR. BLACKMAN:
12     Q    And did your lawyer tell you not to bring in
13  any more documents?
14     MR. ROSE: Objection, objection as to
15  attorney-client privilege. You're instructed not to
16  answer.
17     MR. SHMIKLER: I'd also like to interpose in
18  addition to our many objections to the subpoena, I think
19  that there's some issues with regard to the mail whether
20  or not those should be turned over to the other side by
21  this procedure if it's mail that's Dr. Vish's mail.
22  That's an issue for another day.
23     THE WITNESS: That is the question that I had that
24  I raised here earlier. How can I give his mail to you?

Page 79

1  This mail is addressed to him. There are checks and
2  other things and I would just send it to -- sometimes
3  it's just the investment checks and I don't want to give
4  the check to you. That's the reason why -- I didn't
5  even think of it anyway, but that was a relevant
6  question I had in my mind.
7  BY MR. BLACKMAN:
8      Q    Well, did you when you had that question in
9  your mind, did you -- and I don't want to know the
10  content of what you said, but did you talk to anybody
11  about that?
12     A    No.
13     Q    Now, you mentioned checks and things like
14  that. These are things that are I assume not junk mail.
15  There are things of a personal nature?
16     A    Yes.
17     Q    And do you know why those are still coming to
18  your house?
19     MR. SHMIKLER: Objection to foundation.
20     THE WITNESS: No, I don't know why. I usually
21  write send the correct forwarding address.
22  BY MR. BLACKMAN:
23     Q    And you write that to who?
24     A    To his secretary who usually will take care

Page 80

1  of it. That's how most of the mail --
2      Q    You don't know whether that was ever done, do
3  you?
4      A    Yeah. They have been done. That's the
5  reason I'm not getting all the mail.
6      Q    How do you know that?
7      A    Because I will write to her, Jenny, forward
8  these mails and she will take care of it.
9      Q    Listen to my question. How do you know that
10  your husband took steps to forward his mail from the
11  home to some other address?
12     MR. SHMIKLER: Objection, asked and answered.
13     THE WITNESS: I know how he does this because he'll
14  say he will tell me like ask my secretary to have these
15  forwarded. If I say why you should have these forwarded
16  and say you will just send to my secretary, which is
17  what I did.
18  BY MR. BLACKMAN:
19     Q    But when your husband is saying, and maybe
20  you're not understanding my question, when he's saying
21  to tell my secretary to forward these on to him, what
22  I'm asking is a little different. What I'm asking is,
23  do you know whether your husband ever filed anything
24  with the post office telling the post office that he was

Page 81

1  no longer living at your home and that his mail should
2  be going to someplace else? Do you know whether he ever
3  did that?
4      MR. SHMIKLER: Objection, asked and answered.
5      THE WITNESS: I wouldn't know that. I know usually
6  it is the secretary who will take care of these sort of
7  things for him. And when mail comes here, I will give
8  it back to her.
9  BY MR. BLACKMAN:
10     Q    Ma'am, all I want to know is do you know
11  whether he did that or not?
12     MR. SHMIKLER: Objection, asked and answered.
13     THE WITNESS: No, sir.
14  BY MR. BLACKMAN:
15     Q    You said that he moved out and he took all
16  his stuff in the summer of 2006. That was your earlier
17  testimony?
18     A    Most of the things.
19     MR. ROSE: Objection to the extent it
20  mischaracterizes her prior testimony, but go ahead.
21  BY MR. BLACKMAN:
22     Q    Well, did I just mischaracterize your
23  testimony?
24     A    What did you say?

21  (Pages 78 to 81)

Page 82

1    Q    I said it was your testimony that in the
2  summer of 2006 your husband moved out and took all of
3  his stuff. Am I saying something wrong, or is that
4  accurate?
5    A    He did take many things.
6    Q    Okay. Did he leave some things?
7    A    Some of his personal things are still there.
8    Q    Like what? Give me an example.
9    A    Some clothes he never wears and stuff like
10  that.
11    Q    Anything else that you recall?
12    A    That's all.
13    Q    So the only thing that you know of as you sit
14  here today that's in the house that belongs to your
15  husband is his clothes. There's nothing else there that
16  belongs to him?
17    MR. SHMIKLER: Objection, asked and answered.
18    THE WITNESS: I can't say that. There are many
19  things that are his.
20  BY MR. BLACKMAN:
21    Q    Can you give me some other examples of things
22  that are his in addition to his clothes?
23    A    Lots of books and things like that, magazines
24  and all kinds of things. Anything that's important that

Page 83

1  he has already taken whatever that he would use.
2    Q    Can you give me some more examples in
3  addition to some books and magazines and some clothing?
4    A    We have not really divided which is his,
5  which is ours. So pretty much everything that's in the
6  house I think many things we bought together and
7  everything is there the way they are. He only took
8  whatever his immediate necessities and he left. So I
9  can't say it's mine or it's his. It's both. The
10  furniture and that, I mean furniture and all that kind
11  of silly things, anything that he may later claim as
12  his. He usually doesn't do those things.
13    Q    So would it be fair to say that the majority
14  of the items in the home belong to both of you?
15    MR. ROSE: Objection.
16    THE WITNESS: I --
17    MR. ROSE: Hang on. Hang on. Hang on. Objection
18  to the . . .
19    MR. BLACKMAN: I'll withdraw it. I'll withdraw it.
20  BY MR. BLACKMAN:
21    Q    Some of the items in there are his personal
22  items?
23    MR. SHMIKLER: Objection, asked and answered.
24

Page 84

1  BY MR. BLACKMAN:
2    Q    Correct?
3    A    His personal items he has already taken. I
4  already mentioned whatever that's left were it could be
5  his personal but he never uses any of those. These are
6  all old magazines and books and stuff like that and
7  extra clothing that he's not really using.
8    Q    Is there a reason you haven't thrown out the
9  clothing if he moved out almost two years ago?
10    A    We're just getting on with whatever we have
11  to do. That's one less thing. I may do it one of these
12  days.
13    Q    Is it your testimony that the other items in
14  the house belong to the both of you?
15    MR. ROSE: Objection to the extent that it calls
16  for a legal conclusion.
17  BY MR. BLACKMAN:
18    Q    Go ahead. The stuff in the house belongs to
19  both of you?
20    A    Yes. The stuff in the house belongs to both
21  of us everything he can say. But it's mostly children's
22  furniture, my furniture and his furniture. Those things
23  are just material. It doesn't matter to me.
24    Q    I'm not asking whether it matters to you.

Page 85

1  I'm asking --
2    A    It belongs to both.
3    Q    Okay. Now, is there a reason why -- Strike
4  that.
5        The divorce is still ongoing; is that correct?
6    A    Yes.
7    Q    Do you know why the divorce has not been
8  ended or resolved or finalized?
9    MR. SHMIKLER: Object to the extent it calls for a
10  legal conclusion.
11    THE WITNESS: I don't know.
12    MR. SHMIKLER: Also object to foundation.
13  BY MR. BLACKMAN:
14    Q    You don't know? Do you know what's left to
15  do in your divorce proceeding?
16    MR. SHMIKLER: Same objections.
17    THE WITNESS: Whoever knows. This is too long a
18  process. I hate it.
19  BY MR. BLACKMAN:
20    Q    I understand that. My question is not about
21  that. My question is, do you know what is left to do to
22  finalize your divorce?
23    MR. SHMIKLER: Same objections.
24    THE WITNESS: We both have to agree.

22 (Pages 82 to 85)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 86

BY MR. BLACKMAN:

1  BY MR. BLACKMAN:
2  Q    What is it that you have to agree on?
3  A    We have to agree to divorce each other.
4  Q    But are you not in agreement to do that? Are
5  you challenging the divorce?
6  MR. SHMIKLER: I object. This is far beyond the
7  bounds of relevance in this case.
8  MR. BLACKMAN: I disagree. I think it's extremely
9  relevant. I think it's very relevant to the issue of
10  whether or not that is his home and his relationship
11  with somebody who is still his wife. You can make those
12  objections, you know, when we submit our papers. But I
13  think it's very relevant.
14  MR. SHMIKLER: I can make those objections right
15  now, and I'm making them.
16  MR. BLACKMAN: All right. They're noted.
17  THE WITNESS: Say that again, please.
18  BY MR. BLACKMAN:
19  Q    The divorce that's been filed, did you file
20  that or did he file that?
21  A    I filed it.
22  Q    So you want the divorce?
23  A    Yes.
24  Q    Does he want the divorce?

Page 87

1  MR. ROSE: Hang on one second.
2  MR. SHMIKLER: In addition to whatever objections
3  counsel has, I'm going to have an objection to relevance
4  and foundation.
5  THE WITNESS: He --
6  MR. ROSE: Wait, wait. It's a husband-wife
7  communication. It's privileged. It does not as I can
8  see -- I'm going to instruct the witness not to answer.
9  MR. BLACKMAN: Just to be clear, I'm not asking
10  about a communication from him to her. I don't agree
11  that there's a privilege there anyways. But what I'm
12  asking is whether or not she believes he wants a divorce
13  which could be very relevant to whether or not he
14  considers this his home and wants to hang on to it as
15  his home. And that's why maybe he's keeping all his
16  stuff there, and maybe that's why he hasn't made a
17  permanent move. These things are all very relevant.
18  Now, I don't think there's an objection -- you can
19  laugh, Counsel, all you want.
20  MR. SHMIKLER: I can laugh at the notion that you
21  say that he keeps all the stuff there, which is contrary
22  to the testimony, that he hasn't permanently moved out,
23  which is contrary to the testimony. These things are
24  laughable.

Page 88

1  MR. ROSE: Do you believe --
2  MR. BLACKMAN: Hang on, Counsel. I would ask for a
3  little bit of professionalism. Okay. Don't laugh in
4  public. If you have an objection, you can make it.
5  This is not a silly proceeding.
6  MR. SHMIKLER: I don't think the proceeding is
7  silly, but I think that when you throw around
8  misrepresentations like that, that's problematic.
9  MR. BLACKMAN: She is represented by counsel. He
10  is I'm sure very capable and able to make an objection
11  if he thinks it's irrelevant. I would just appreciate
12  you not laughing during a deposition.
13  MR. SHMIKLER: I'm sorry. It was a gut reaction to
14  a blatant misrepresentation, and I can't promise it
15  won't happen again. I'll try.
16  BY MR. BLACKMAN:
17  Q    Go ahead, ma'am.
18  MR. ROSE: Do you believe -- the question is, do
19  you believe that your husband wants to divorce. Is that
20  accurate?
21  MR. BLACKMAN: Uh-huh.
22  MR. SHMIKLER: And our objections are to relevance
23  and to foundation.
24  THE WITNESS: That's not the question he asked. I

Page 89

1  would like you to ask first and then I will answer the
2  question and then I will answer your question, if I may.
3  MR. SHMIKLER: It's only his questions that you're
4  answering.
5  BY MR. BLACKMAN:
6  Q    Let me try to simplify it. Do you believe
7  that your husband -- Strike that.
8  Do you know whether your husband has agreed to
9  the divorce?
10  MR. SHMIKLER: Objection to the extent it calls for
11  a legal conclusion.
12  THE WITNESS: Obviously --
13  MR. ROSE: Hang on. Before you're asking about her
14  belief, which that's fine. Do you know whether she has
15  agreed, the only way that she could know whether there's
16  an agreement is based upon a communication whether oral
17  or written in which case it would bring it within the
18  context of a communication. If you want to ask about
19  her beliefs, you are free to ask her about her beliefs.
20  If you're going to ask about communications where we're
21  at right now, I'm going to direct her not to answer the
22  question.
23  MR. BLACKMAN: What's your basis for that?
24  MR. ROSE: Husband and wife privilege. It applies

23   (Pages 86 to 89)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 90

1   in both civil -- in civil proceedings even where the
2   parties have separated but there's no divorce that's
3   final, the privilege still attaches. It's statutory.
4        MR. BLACKMAN: Is it your position then that any
5   conversation between them with respect to any matter is
6   privileged? What are the boundaries for that privilege?
7        MR. ROSE: Right. I believe that, you know, first
8   of all, whether I'm able to articulate --
9        MR. BLACKMAN: You made the objection so I'm just
10  asking. You're saying it's clearly privileged. I'm
11  asking you what is it about this request that is
12  privileged and what are the boundaries of that.
13       MR. ROSE: According to 735 ILCS 54/8-801, neither
14  may testify to any communication or admission made by
15  either of them to the other or as to any conversation
16  between them during marriage. That is I believe a
17  parcel recitation of the statutory provision.
18       MR. BLACKMAN: So it's your position that that's
19  with respect to any matter?
20       MR. ROSE: As you have seen, I mean there's
21  flexibility and we did permit you to inquire as to
22  certain things that would otherwise be privileged and
23  we'll take it up on a case-by-case basis. If you want
24  to ask about her beliefs --

Page 91

1   BY MR. BLACKMAN:
2        Q   Okay. Let me first ask whether your husband
3   has agreed to a divorce that you initiated.
4        A   He's cooperating.
5        MR. SHMIKLER: That's the same question that he had
6   asked just before that you objected to.
7        THE WITNESS: He's cooperating with the divorce
8   proceedings. And divorce proceedings as you know take
9   forever in this country, and it is extremely slow and
10  impossible on many occasions. And this is one of those
11  when there are so many complicated business
12  relationships that are ongoing. But personally we are
13  separated and he has his own house and we are trying to
14  parent as best as possible. And there we go.
15  BY MR. BLACKMAN:
16       Q   When you say he has his own house?
17       A   He had his own house. I'm sorry. He had.
18       Q   The one in LaGrange?
19       A   Yeah.
20       Q   But you don't know how long he lived there
21  for?
22       A   He lived --
23       MR. SHMIKLER: Objection, asked and answered.
24

Page 92

1   BY MR. BLACKMAN:
2        Q   Your testimony earlier was that you did not
3   know for how long.
4        MR. SHMIKLER: Objection, asked and answered.
5        THE WITNESS: I told you that I did not know
6   exactly when he moved out, but I know how long he was
7   there through 2006 and 2007.
8   BY MR. BLACKMAN:
9        Q   Okay. We can go back. That wasn't your
10  testimony earlier. When I asked you whether or not you
11  knew whether he was living there in November and
12  December of 2007, you stated that you did not know.
13       A   That's correct.
14       Q   Okay. So where is he living now?
15       A   But in October, September my children went
16  and visited with him there. So I know when he lived
17  there. Exactly when he moved out is when I don't know.
18  And in November and December pertaining to my statement,
19  he did not live in my house. That's what was my
20  testimony. I didn't talk about when he was living.
21       Q   All right. So at some point he moved from
22  LaGrange. Is that your testimony?
23       A   Yes.
24       Q   Where did he move to?

Page 93

1        A   I don't know.
2        Q   Do you know where he's living now?
3        A   No.
4        Q   Do you know what country he's living in?
5        A   He's probably in India.
6        Q   Now, is it your testimony then that -- Strike
7   that.
8            Have you had any contact with him since
9   November or December of 2007?
10       MR. ROSE: Objection, compound. You can answer.
11       THE WITNESS: Yes.
12  BY MR. BLACKMAN:
13       Q   Okay. Was that on the phone?
14       A   Yeah.
15       Q   Was it -- how many times have you spoken with
16  him since November of 2007?
17       A   I don't know. Infrequently.
18       Q   Once a week?
19       A   No.
20       Q   Less than that?
21       A   Yes.
22       Q   When you've spoken with him, where was he
23  calling from?
24       A   Don't know.

24  (Pages 90 to 93)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 94

1    Q    Now, did you ever ask him where he was
2  living?
3    A    No. I might have, but I don't know where he
4  is. He never told me where he is.
5    Q    I understand that he never told you. But is
6  it your testimony that you never asked him where he
7  lives since he moved out in whenever the fall of 2007
8  whenever he moved out from where he was at? Is that
9  your testimony, ma'am?
10   A    I probably asked him where he lived, but I
11 don't know where he lives. He didn't tell me.
12   Q    Okay. And is it your belief or understanding
13 that he has moved to India permanently?
14   A    No.
15   MR. SHMIKLER: By the way, I object to foundation
16 to the last question.
17   BY MR. BLACKMAN:
18   Q    So you don't know whether he has moved
19 permanently or not?
20   A    I don't think he's moved permanently.
21   Q    And that's because --
22   MR. SHMIKLER: Same objection.
23   THE WITNESS: Pardon me?
24

Page 95

1  BY MR. BLACKMAN:
2    Q    And why don't you think he has moved
3  permanently to India?
4    A    He has many unfinished business here so he's
5  coming back.
6    Q    What kind of unfinished business?
7    A    So many things he has ongoing. He has his
8  business, and he has so many things here.
9    Q    Can you give me some examples, please?
10   A    For example, his children are here.
11   Q    So the parenting agreement that specifically
12 sets forth when your husband would be able to spend time
13 with the children, and it's very detailed and I read it,
14 that is still in effect to the best of your knowledge?
15   MR. SHMIKLER: Objection to the extent it calls for
16 a legal conclusion.
17   THE WITNESS: Of course it's in effect.
18   BY MR. BLACKMAN:
19   Q    Okay. And the businesses that you are
20 referring to, can you tell me what those pertain to?
21   MR. SHMIKLER: Objection to foundation.
22   THE WITNESS: He has an ongoing project here at
23 Pearson.
24

Page 96

1  BY MR. BLACKMAN:
2    Q    That's at 222 East Pearson?
3    A    Yes.
4    Q    What's your husband's involvement with that
5  project?
6    A    I have no clue.
7    Q    Well, what do you know about that? Why would
8  you think that's one of his businesses?
9    MR. SHMIKLER: Object to relevance.
10   THE WITNESS: It is.
11   BY MR. BLACKMAN:
12   Q    Is he the developer?
13   A    Yes.
14   Q    You have to speak up, ma'am.
15   A    Yes.
16   MR. SHMIKLER: I object to foundation and
17 relevance.
18   BY MR. BLACKMAN:
19   Q    And do you know -- Strike that.
20        If India is not his permanent residence, do
21 you know where he's residing in the United States?
22   MR. SHMIKLER: Objection to foundation.
23   THE WITNESS: I don't know.
24

Page 97

1  BY MR. BLACKMAN:
2    Q    Do you know where he -- Strike that.
3        Do you know whether your husband has been back
4  to the United States since November of 2007?
5    MR. SHMIKLER: Objection to foundation and to
6  relevance.
7    THE WITNESS: Could have. I don't know.
8  BY MR. BLACKMAN:
9    Q    Could have?
10   A    Yeah.
11   Q    What makes you think that he could have?
12   A    He goes back and forth. He has businesses.
13   MR. SHMIKLER: Same objections to that last
14 question by the way.
15   MR. BLACKMAN: You want to make a continuing?
16   MR. SHMIKLER: Well, I don't know. Some of the
17 questions are foundation problems, and some there
18 aren't.
19   MR. BLACKMAN: I'm not hearing any objection from
20 her counsel, so I don't know whether he's joining in or
21 not.
22   BY MR. BLACKMAN:
23   Q    How do you know he was going back and forth?
24 You said he was going back and forth. How do you know

25  (Pages 94 to 97)

Page 98

1 that?
2 A    He would come back.  He says he's coming
3 back.  So I'm thinking that he will be coming back.
4 Q    So he's told you that he's coming back?
5 A    Yes.
6 Q    When did he tell you that?
7 A    Some conversation that he will come back.  I
8 think that's my understanding.
9 Q    And have you seen your husband in person
10 since November of 2007?
11 MR. SHMIKLER:  Objection to relevance.
12 THE WITNESS:  I think yeah.  He was here once.  My
13 mother had passed away.  So he met me to offer
14 condolences.
15 BY MR. BLACKMAN:
16 Q    I'm sorry to hear that.  When was that?
17 A    She passed away in January.
18 Q    And was there a funeral?
19 A    Yes.
20 Q    Did he come to the funeral?
21 A    He was not here.  He didn't come to the
22 funeral, so he came afterwards.
23 Q    So after the funeral you saw him?
24 A    Yes.

Page 99

1 Q    You have to answer out loud.
2 A    Yes.
3 MR. SHMIKLER:  Object to relevance to this line.
4 BY MR. BLACKMAN:
5 Q    And do you know when he came in for the
6 funeral where he stayed?
7 MR. ROSE:  Objection to form and to the extent it
8 misstates her prior testimony.
9 THE WITNESS:  No.
10 BY MR. BLACKMAN:
11 Q    It doesn't matter whether it's in for a
12 funeral or in after a funeral.  But when you saw him in
13 January when he came in after your mother died, do you
14 know where he stayed?
15 MR. SHMIKLER:  Objection to relevance.
16 THE WITNESS:  No.
17 BY MR. BLACKMAN:
18 Q    Do you know how long he was in for?
19 A    Not long.  I don't know.  I just saw him
20 briefly.  He just came and offered condolences, and he
21 left.  It was barely a few minutes.
22 Q    And when he came, did he come to the house?
23 A    Yes, he did.
24 Q    Did he see the children?

Page 100

1 A    One of the children was there, so he saw her.
2 Q    Did he pick up his mail?
3 A    That was not the situation we were talking
4 about mail.
5 Q    I understand that wasn't why he was there,
6 but did he pick up his mail when he came in?
7 A    No.
8 Q    Do you know whether he conducted any business
9 when he was in?
10 A    I have no clue.
11 MR. SHMIKLER:  Objection, foundation.
12 BY MR. BLACKMAN:
13 Q    Is that the only time that you've seen him
14 since November of 2007?
15 A    Yes.
16 Q    And do you know whether he maintains a
17 residence or other place to live or sleep in the United
18 States right now?
19 A    No.
20 Q    And have you discussed with your husband how
21 it is he can continue to see the children under the
22 parenting agreement if he's living in India?
23 MR. ROSE:  Can I have that back, please.
24 (Whereupon, the record was read

Page 101

1 as requested.)
2 MR. ROSE:  Objection to privilege.  I direct the
3 witness not to answer.
4 BY MR. BLACKMAN:
5 Q    When you bought the house in 2004, who paid
6 for it?
7 A    We both.
8 MR. SHMIKLER:  Object to relevance.
9 BY MR. BLACKMAN:
10 Q    And how much do you recall was the cost?
11 MR. SHMIKLER:  Object to relevance.
12 THE WITNESS:  Exact amount I don't know.
13 BY MR. BLACKMAN:
14 Q    Approximately?
15 A    It was like 650 or something around that.
16 Maybe we had a down payment on top of it.  I don't
17 exactly know total amount of the purchase price.
18 Q    And did your husband pay for a portion of
19 that?
20 MR. SHMIKLER:  Object to relevance.
21 THE WITNESS:  Yes.
22 BY MR. BLACKMAN:
23 Q    Do you know what percentage?
24 MR. SHMIKLER:  Same objection.

26  (Pages 98 to 101)

Page 102

1     THE WITNESS: I don't know the percentage.
2   BY MR. BLACKMAN:
3     Q   Did he pay for most of it, or did you pay for
4   most of it?
5     MR. SHMIKLER: Same objection.
6     MR. BLACKMAN: I think you have a continuing
7   objection while I go through this whole line.
8     MR. SHMIKLER: Yeah. Objection to the purchase of
9   the house, ownership of the house is not relevant to
10  whether or not he lived there at the time that he was
11  purportedly served there.
12  BY MR. BLACKMAN:
13    Q   Do you recall whether you paid for most of
14  the house or he paid for most of the house?
15    A   We pretty much were almost equal or whatever.
16  I don't exactly remember, but substantial amounts we
17  both shared.
18    Q   And I think you've testified that you both
19  own the house currently?
20    A   Yes.
21    Q   And has your husband paid for any of the
22  utilities since he moved out in the summer of 2006?
23    A   No. He had to -- I'm sorry. He did have to
24  pay some amount per court order the amounts. So he paid

Page 103

1   through 2006, shared in the expenses in 2006. And I
2   don't know exactly how much he paid in 2007. I have to
3   look through.
4     Q   Do you know whether -- Strike that.
5     Does your husband get any phone calls at the
6   house?
7     MR. SHMIKLER: Objection to relevance.
8     THE WITNESS: Rarely.
9   BY MR. BLACKMAN:
10    Q   Now, how many rooms are there?
11    MR. SHMIKLER: Object to relevance.
12    THE WITNESS: We have four bedrooms and then the
13  other living room, kitchen, dining, family room and
14  study and basement.
15  BY MR. BLACKMAN:
16    Q   Are each of the bedrooms being used?
17    MR. SHMIKLER: Object to relevance.
18    THE WITNESS: Yes.
19  BY MR. BLACKMAN:
20    Q   And that's for you and your two children or
21  three children?
22    A   We have three children but one is like a
23  guest room.
24    Q   Okay. Have you ever advised anyone in your

Page 104

1   divorce proceeding that your husband moved to India?
2     A   I'm not exactly sure what you're asking.
3     Q   Have you ever advised anybody in connection
4   with your divorce proceeding that your husband moved to
5   India?
6     A   Do you mean if I advised my divorce lawyers?
7     Q   Anybody connected, either the lawyers or the
8   judge.
9     A   He didn't move to India, no, because he
10  didn't move to India.
11    Q   So if he didn't move to India, do you know
12  where he's living now?
13    A   I think he's staying in India conducting
14  whatever business that he has.
15    Q   Now, when you refinanced the house in May of
16  2007.
17    A   Yes.
18    Q   That was something that you were required to
19  do by court order because his lawyer said come into
20  court asking for permission to refinance. Is that
21  accurate? Do you remember that?
22    A   There was no court order to refinance.
23    Q   You don't recall any proceedings within your
24  divorce where your husband's lawyers came in and asked

Page 105

1   you to cooperate in the refinance of any properties?
2     A   That is not for refinancing of the house. It
3   is refinancing for Pearson project.
4     Q   So he wanted to refinance that, and he needed
5   your permission to do that?
6     A   My cooperation.
7     MR. SHMIKLER: Objection to relevance.
8   BY MR. BLACKMAN:
9     Q   And his lawyers came into court and asked
10  that you be required to cooperate?
11    A   Yes.
12    MR. SHMIKLER: Same objection.
13  BY MR. BLACKMAN:
14    Q   And with respect to the home refinance, do
15  you know whether any moneys were taken out of the
16  refinance?
17    A   Yes.
18    MR. SHMIKLER: Objection to relevance.
19  BY MR. BLACKMAN:
20    Q   And where did those go?
21    MR. SHMIKLER: Same objection.
22    THE WITNESS: I had to refinance my -- there was
23  some Private Bank loans that were coming to mature, so I
24  needed extra moneys to pay down or pay off that loan.

27 (Pages 102 to 105)

Page 106

1  BY MR. BLACKMAN:
2    Q   This was a loan that both you and your
3  husband were on at Private Bank?
4    A   Yes.
5    MR. SHMIKLER: Same objection.
6  BY MR. BLACKMAN:
7    Q   And was that loan paid off then?
8    A   Yes.
9    MR. SHMIKLER: Same objection.
10   MR. BLACKMAN: Do you have a continuing objection?
11  It's easier just to say that.
12   MR. SHMIKLER: You switched subject matters and I
13  want to make sure it's clear when I've got it.
14  BY MR. BLACKMAN:
15   Q   And this was a loan that both you and your
16  husband were personally responsible for?
17   MR. SHMIKLER: Objection to relevance.
18   THE WITNESS: Yes.
19  BY MR. BLACKMAN:
20   Q   Do you remember how much was used from the
21  house to pay down the loan?
22   MR. SHMIKLER: I object to relevance.
23   THE WITNESS: Uh-huh, yes.
24

Page 107

1  BY MR. BLACKMAN:
2    Q   How much?
3    MR. SHMIKLER: Same.
4    THE WITNESS: I think exact amount I can't say, but
5  probably I think it's 288,000.
6  BY MR. BLACKMAN:
7    Q   And that went to Private Bank?
8    MR. SHMIKLER: Same objection.
9    THE WITNESS: Approximately, yes.
10  BY MR. BLACKMAN:
11   Q   Now, going back to your affidavit, which is
12  Exhibit 2, paragraph 3 says again it is my understanding
13  that when he moved out, Dr. Vish established his own
14  separate abode.
15   A   Yes.
16   Q   That's your understanding as you sit here
17  today, or was that your understanding when you signed
18  this in February of '08?
19   MR. SHMIKLER: I object, asked and answered.
20   THE WITNESS: Obviously it was executed on February
21  13, 2008.
22  BY MR. BLACKMAN:
23   Q   But is that your understanding as you sit
24  here today that your husband has, in fact, established

Page 108

1  his own residence somewhere or his own abode which is
2  what this says?
3    MR. SHMIKLER: Object to form. That actually does
4  mischaracterize what it says.
5  BY MR. BLACKMAN:
6    Q   Fine. I'll go with counsel's objection.
7  I'll quote it. Quote, it is my understanding that when
8  he moved out, Dr. Vish established his own separate
9  abode, unquote.
10   A   Yes.
11   Q   And is it your testimony that that was when
12  he moved out of your house in 2006? Is that what that
13  paragraph pertains to?
14   A   It really pertains to Dr. Visvabharathy
15  having a place to stay. Whether it is 2006 or 7 or 8 he
16  obviously stays somewhere. He's not living with me, so
17  he's living somewhere else. I knew 2006 to 2007 he had
18  an address that I knew that my children were going to,
19  but now he's staying somewhere that I don't know. I
20  know he's in India. But when he comes here, he has
21  another abode, you know. I mean that's what it means.
22  He's in his own house.
23   Q   But you don't know whether he was in that
24  house in November and December of 2007?

Page 109

1    MR. SHMIKLER: Objection, asked and answered.
2    MR. ROSE: Object to form.
3  BY MR. BLACKMAN:
4    Q   Go ahead.
5    A   No.
6    Q   And have you reviewed any affidavits signed
7  by Dr. Vish?
8    A   No.
9    Q   Now, one of the things that Dr. Vish states
10  is, quote, I have been traveling abroad for the past
11  several months beginning in about October 2007.
12   A   Lately, yes.
13   Q   To the best of your knowledge, if you know,
14  is that a true and accurate statement?
15   A   Yes.
16   MR. SHMIKLER: Objection to foundation.
17  BY MR. BLACKMAN:
18   Q   So it's your understanding that beginning in
19  2007, October 2007 your husband was traveling abroad for
20  many months?
21   MR. SHMIKLER: Objection to foundation, asked and
22  answered.
23  BY MR. BLACKMAN:
24   Q   It's your understanding?

28  (Pages 106 to 109)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 110

1    MR. SHMIKLER: Again, you're asking her the same
2  question twice in a row. It's asked and answered, and
3  there's still no foundation.
4  BY MR. BLACKMAN:
5    Q   Go ahead. You can answer.
6    A   Yes.
7    Q   Now, do you know where he was?
8    A   No.
9    Q   Do you know whether when he began traveling
10 abroad in October of 2007 whether he had a home
11 anywhere?
12   MR. SHMIKLER: Object to foundation.
13   THE WITNESS: No.
14 BY MR. BLACKMAN:
15   Q   Now, on your --
16   A   If you don't mind, I have to answer some
17 pages because I'll be getting in big trouble if I don't
18 answer.
19   Q   We can take a break. I have one more
20 question. Then we can take a break if you want.
21       On paragraph 6 of your affidavit, do you have
22 it in front of you? Do you see where I'm referring,
23 ma'am?
24   A   Yes.

Page 111

1    Q   It says, quote, I have not given Dr. Vish any
2  of the papers left by the process server. Now, is it
3  still your testimony that you have not given him any
4  papers?
5    A   Yes.
6    Q   But you have given them to your lawyer?
7    MR. ROSE: Objection to the extent it
8  mischaracterizes prior testimony.
9    MR. SHMIKLER: I join in the objection.
10 BY MR. BLACKMAN:
11   Q   Am I wrong? Did you not give the papers to
12 Mr. Collins?
13   A   I may have sent a portion of some of the
14 front pages or something because I remember talking with
15 him about faxing some of it. And then I said, okay, now
16 there's like so many pages. I won't be able to send you
17 all of that. So I don't know exactly what I sent to him
18 what I can tell you.
19   Q   But you sent some portion of the papers that
20 you're referring to in paragraph 6 to your husband's
21 lawyer?
22   A   Michael Collins, yes.
23   MR. BLACKMAN: Okay. How long do you want to break
24 for, 15 minutes?

Page 112

1    THE WITNESS: No. A couple of minutes. I just
2  want to answer these phones, and I'll be right back
3  because I have to go. I have to make rounds. I have
4  patients scheduled.
5    MR. BLACKMAN: Ma'am, you signed an affidavit. I'm
6  sorry if it's inconvenient for you.
7    MR. ROSE: Gary, what's your best estimate as to
8  how much more?
9    MR. BLACKMAN: I think it'll be no more than an
10 hour.
11   THE WITNESS: See the thing is I'm so sorry. It's
12 not a subpoena that I am prepared for this. I had
13 really --
14   MR. BLACKMAN: You can talk to your lawyer about
15 that. It's between you and your lawyer.
16       (A short break was taken.)
17   MR. ROSE: She's indicated that she has a patient
18 who is currently in the ICU and she's been paged
19 regarding that. So if we can try to keep it within the
20 hour time frame so she can attend to her professional
21 duties, that would be appreciated.
22   MR. BLACKMAN: I will do my best. Just mark the
23 documents you produced before the deposition as Exhibit
24 3. Did you have copies of that for the court reporter?

Page 113

1    MR. ROSE: I have three copies. We can use this
2  copy. The witness copy will be the exhibit.
3       (Sastri Deposition Exhibit
4        No. 3 was marked for
5        identification.)
6    MR. ROSE: Go ahead.
7  BY MR. BLACKMAN:
8    Q   We've marked as Exhibit 3 the documents you
9  brought in. I'm not really going to spend any time on
10 these other than just to confirm that this is documents
11 that reflect that both you and your husband are
12 currently the owners of the property where you're
13 currently residing?
14   MR. ROSE: Objection to the extent that it, number
15 one, mischaracterizes the documents and, number two, it
16 requires a legal interpretation of them. The best
17 evidence of the documents is the documents themselves.
18 BY MR. BLACKMAN:
19   Q   Okay. You can answer.
20   THE WITNESS: Can you repeat the question, please.
21   MR. BLACKMAN: Can you read it back, please.
22       (Whereupon, the record was read
23        as requested.)
24   THE WITNESS: Yes.

29  (Pages 110 to 113)

Page 114

1  BY MR. BLACKMAN:
2     Q    And if you can look to the second to the last
3  page.
4     MR. ROSE: Schedule A of the Alta owner's policy?
5     MR. BLACKMAN: Correct.
6  BY MR. BLACKMAN:
7     Q    It says Ganesan Visvabharathy and Suriya
8  Visvabharathy Sastri, husband and wife, not as joint
9  tenants or as tenants in common but as tenants by the
10 entirety. Do you see where I'm referring?
11    A    Okay.
12    Q    And is it your understanding that that is an
13 accurate statement?
14    A    Yes.
15    MR. SHMIKLER: I object to the extent it calls for
16 a legal conclusion.
17 BY MR. BLACKMAN:
18    Q    Did you say yes, ma'am?
19    A    That's what it says.
20    MR. ROSE: Same objection.
21 BY MR. BLACKMAN:
22    Q    You are husband and wife?
23    MR. SHMIKLER: Objection, asked and answered.
24    THE WITNESS: Yeah, but we are separated.

Page 115

1     MR. BLACKMAN: I understand.
2              (Sastri Deposition Exhibit
3              No. 4 was marked for
4              identification.)
5  BY MR. BLACKMAN:
6     Q    I'll show you, ma'am, what we'll mark as
7  Exhibit 4.
8     MR. ROSE: One second to review it.
9     MR. BLACKMAN: Sure.
10    MR. SHMIKLER: I'd just say in addition to and
11 without waiving any of our other objections to this
12 portion of the proceeding, we additionally object in
13 that the plaintiff was supposed to provide any documents
14 that they were going to use for here in testimony
15 promptly and certainly in advance of that testimony and
16 they did not do so and this is the first time that we've
17 received this document from them.
18    MR. BLACKMAN: For the record, this is her own
19 divorce file and these are documents that you have
20 referenced in her affidavit when she states that there
21 are divorce proceedings ongoing. We also received I
22 think your documents yesterday, and then we received
23 some new documents from the witness this morning.
24    MR. SHMIKLER: The latter is between you and the

Page 116

1  witness, and the pro former you received documents
2  yesterday as soon as we got them for a testimony that is
3  to be taken several days in advance. So we were careful
4  to do that. We believe that that was in accordance with
5  what the Court wanted the parties to do as opposed to
6  what's been done here.
7     MR. BLACKMAN: I disagree.
8  BY MR. BLACKMAN:
9     Q    Are you ready, ma'am?
10    MR. ROSE: No. Give us a second, please.
11    We're ready.
12 BY MR. BLACKMAN:
13    Q    Okay. I will represent that this is an
14 agreed order that was entered in your divorce proceeding
15 that we obtained from the court file. And I'd ask you
16 to look to paragraph 1, and I'm going to read the first
17 part of paragraph 1. Quote, this order is entered
18 without prejudice to either party's right to an
19 evidentiary hearing on the issues addressed herein and
20 with the parties' acknowledgment that they are both
21 residing in the marital residence located at 7529
22 Ridgewood Lane, Burr Ridge, Illinois, with their minor
23 children Sowmya, S-o-w-m-y-a, and Vidya, V-i-d-y-a. Do
24 you see where I'm referring?

Page 117

1     A    Yes.
2     Q    Was that an accurate statement at the time?
3     A    At that time, yes.
4     Q    So June 29 of '06 you and your husband were
5  still residing at the Ridgewood Lane home; is that
6  correct?
7     MR. SHMIKLER: Objection, asked and answered.
8     THE WITNESS: It's possible, yes.
9  BY MR. BLACKMAN:
10    Q    Well, I'm not asking if it's possible. It
11 says here in a court order and is it your
12 testimony that that was accurate at the time?
13    MR. ROSE: Objection to foundation.
14    MR. SHMIKLER: Objection, asked and answered.
15    THE WITNESS: Yes.
16 BY MR. BLACKMAN:
17    Q    Okay. Now, it goes on to say that based on
18 the above, which is the portion I just read, commencing
19 on June 1 Vish would pay the following and then there's
20 a list, real estate taxes, homeowner's insurance, gas,
21 electricity, telephone bills that's in subparagraph A.
22 And then there's other issues pertaining to the children
23 in B and C and D. Do you see where I'm referring?
24    A    Yeah.

30 (Pages 114 to 117)

Page 118

```
 1     Q    Now, did your husband pay those expenses
 2   pursuant to this order after June 29, 2006?
 3     A    As I mentioned earlier, he paid through 2006.
 4   But he was paying everything to the bank afterwards. It
 5   was really very hard times. So I paid everything. I
 6   have -- whenever he could pay, he paid. When he
 7   couldn't pay, it doesn't matter. I took care of
 8   everything. So to the end of 2006 sporadically he
 9   supported. But in 2007 maybe once in a while but after
10   that no.
11     Q    So is it your testimony that he stopped
12   paying because he didn't have the money to pay?
13     A    I wouldn't say that. The thing is in reality
14   in 2007 I know that there were some financial hardships
15   and things like that. So if he didn't pay, I didn't
16   bother.
17     Q    Okay.
18     A    I took care of the expenses.
19     Q    My question is, with respect to this order,
20   is it your understanding that after June 29, 2006, based
21   on this order your husband was required to make the
22   payments that are set forth in the order? Is that your
23   understanding?
24     A    Yes.
```

Page 119

```
 1     Q    Now, did either you or him ever go back to
 2   the divorce court and change this order to tell the
 3   Court that he should not have to pay these?
 4     MR. ROSE: Objection to foundation.
 5     THE WITNESS: No, we did not. We didn't change
 6   this, but there were subsequent court orders.
 7   BY MR. BLACKMAN:
 8     Q    There were many court orders.
 9     A    Yes.
10     Q    Right. But with respect to this order which
11   states that the parties --
12     MR. SHMIKLER: I think you should let her finish
13   her answer. I think she was still going.
14     MR. BLACKMAN: Is that an objection?
15     MR. SHMIKLER: Yeah. It's an objection that you
16   cut off the witness and not let her be able to finish.
17     MR. BLACKMAN: You're lucky. You have two
18   attorneys today.
19   BY MR. BLACKMAN:
20     Q    Were you finished, ma'am?
21     A    No. I'm just actually looking through here.
22   Because it is a divorce proceeding that were evolving
23   through our individual personal and financial
24   situations, that what was entered was only applied as we
```

Page 120

```
 1   evolved in our separation process. So whatever was
 2   pertinent we enforced. Whatever was not we didn't. I
 3   suppose I have to look through the subsequent orders to
 4   see whether these have subsequently been already
 5   addressed because I remember sometimes we already have
 6   entered how much he needed to pay for the children and
 7   other things, and we already entered subsequently like
 8   he needed to pay lump sums of money. So because that
 9   was done, this didn't become relevant.
10     Q    Well, that's not my question. All right.
11   I'll ask it again. Are you aware of any order that
12   specifically revises this order wherein the Court is
13   told that the parties are no longer living in the same
14   house?
15     A    We did not inform the Court specifically that
16   we are not living together anymore, but he did move out.
17     Q    I understand that from your prior testimony.
18           Now, I'm going to show you what we'll mark as
19   Exhibit 5.
20           (Sastri Deposition Exhibit
21           No. 5 was marked for
22           identification.)
23     MR. BLACKMAN: Can we go off the record for one
24   second.
```

Page 121

```
 1           (Discussion off the record.)
 2     MR. SHMIKLER: I can't remember. Did I tell you we
 3   have the same objections to the document as to Exhibit
 4   4.
 5     MR. ROSE: Okay. You may proceed.
 6     MR. BLACKMAN: Thank you, sir. Thank you, good
 7   sir.
 8   BY MR. BLACKMAN:
 9     Q    Ma'am, this was an order I'll represent that
10   was entered in your divorce proceeding and I think we've
11   got some agreement that this was entered in November of
12   2006. And it requires your husband in number 1 to pay
13   you $12,000 a month without prejudice for the months of
14   November and December 2006. Do you see where I'm
15   referring?
16     MR. ROSE: By way of objection, I don't know
17   there's any agreement. I would say we've made our best
18   efforts to try to ascertain the date of the document and
19   that it is what it is but I don't know that we've agreed
20   or that we could agree that it's such a date.
21     MR. BLACKMAN: You probably could, but that's okay.
22   BY MR. BLACKMAN:
23     Q    The order that you're looking at required in
24   paragraph 1 your husband to pay you $12,000 in November
```

31 (Pages 118 to 121)

Page 122

1  and December 2006 for his contribution to household
2  expenses. Do you see where I'm referring?
3      A   Yes.
4      Q   Okay. And did he, in fact, pay his
5  contribution to household expenses?
6      A   Yes.
7      Q   And the household expenses would include
8  things like household bills, utilities?
9      A   Sure.
10     Q   Real estate taxes?
11     A   Yeah. The real estate taxes for 2007 were
12  paid by me individually, and he did not pay --
13     Q   Ma'am, there is no question pending. Your
14  lawyer can ask you whatever he wants.
15     A   Since you mentioned real estate taxes, I
16  clarified.
17     Q   Ma'am, there's no --
18     A   I'm continuing on the answer. I'm sorry.
19     MR. BLACKMAN: I just want to show you what we'll
20  mark as Exhibit 6.
21             (Sastri Deposition Exhibit
22             No. 6 was marked for
23             identification.)
24     MR. SHMIKLER: We have the same objection to

Page 123

1  Exhibit 6 as to the previous two exhibits.
2      MR. BLACKMAN: Just tell me when you're ready.
3      MR. ROSE: Are you ready?
4      THE WITNESS: Yeah.
5  BY MR. BLACKMAN:
6      Q   Now, this is an agreed order dated March 7,
7  2007, that precludes Dr. Vish from pledging or otherwise
8  disposing of various assets. Is that your
9  understanding?
10     A   Yes.
11     Q   Okay. And then this order was entered
12  because you had gone into the bankruptcy court and asked
13  for that?
14     A   Bankruptcy?
15     Q   Not bankruptcy court. The divorce court and
16  asked for that?
17     MR. SHMIKLER: I object to relevance.
18     THE WITNESS: It seems like that.
19  BY MR. BLACKMAN:
20     Q   It says that this is coming to be heard on
21  your emergency petition for temporary restraining order.
22  Were you concerned that your husband was going to be
23  transferring assets away from you?
24     MR. SHMIKLER: Objection to relevance.

Page 124

1      MR. ROSE: Objection to foundation.
2      THE WITNESS: Repeat the question, please.
3  BY MR. BLACKMAN:
4      Q   Were you concerned that your husband was
5  going to be transferring assets away from you?
6      MR. SHMIKLER: Same objection.
7      THE WITNESS: I don't know. It's one of those
8  things that the divorce proceedings take a course of
9  their own and I suppose I was advised to do it and so I
10  have done this to protect the assets.
11  BY MR. BLACKMAN:
12     Q   Do you know why it was required or
13  needed -- Strike that.
14         Do you know why your lawyers sought to get an
15  order protecting the assets?
16     A   Because they are joint assets.
17     Q   And was there a concern, if you know, as to
18  whether your husband would be transferring or somehow
19  disposing of assets that belonged in part to you?
20     MR. SHMIKLER: Continuing objection to relevance.
21     MR. ROSE: Yeah, object to foundation.
22     THE WITNESS: I did not say he shouldn't -- written
23  agreement of the parties. So it is basically asking
24  that I will be involved in this decision. I'm not

Page 125

1  precluding him from anything. I'm saying that together
2  we will make a decision since they are joint properties,
3  so that's what was done.
4  BY MR. BLACKMAN:
5      Q   Well, the first paragraph of the agreed order
6  states that this matter was coming to be heard on your
7  emergency petition for a restraining order and that out
8  of that came this agreement. And maybe you don't know
9  the answer to this because it's a question that's better
10  suited for your lawyers. But my question is whether or
11  not you know why it was necessary for you to go into
12  court on an emergency petition for a temporary
13  restraining order with respect to these assets.
14     MR. SHMIKLER: Objection, asked and answered.
15     MR. ROSE: Just answer his question. Do you know
16  why?
17     THE WITNESS: It's a question better suited for my
18  lawyers.
19  BY MR. BLACKMAN:
20     Q   Okay. Let me show you Exhibit 7. Let me go
21  back to Exhibit 6, I'm sorry, for a moment. These four
22  properties that are listed here, the 8999 South County
23  Line Road, the Ridgewood Lane, the property held in the
24  VCM Trust, do you know what that stands for, VCM?

32  (Pages 122 to 125)

Page 126

```
 1     A    Visvabharathy, V-i-s-v-a-b-h-a-r-a-t-h-y,
 2   Children's Minors' Trust.
 3     Q    And then the property held in the Suriya
 4   Sastri Trust?
 5     A    Yes.
 6     Q    Those assets are all owned jointly with you
 7   and your husband?
 8     MR. SHMIKLER:  Object to relevance.
 9     THE WITNESS:  No.
10   BY MR. BLACKMAN:
11     Q    No.  Okay.  Because I thought you had
12   testified a few minutes ago that these were assets that
13   belonged to both of you which is why they're in this
14   order.  Am I wrong about that?
15     A    No.  In the divorce proceedings everything is
16   a marital estate.  So that is in that context that we
17   wanted to have whatever that is pertinent to be
18   protected.  And whatever decision that is being taken
19   involves my approval.
20     Q    And is it your understanding that those
21   assets still exist?
22     A    Yes.
23     MR. SHMIKLER:  I'm going to object on relevance
24   here.  It's clear at this point the notion that this is
```

Page 127

```
 1   not a discovery deposition has been pretty well shot
 2   down.  They're going well on to the issue of the
 3   substance of what assets might be out there, and it's
 4   completely improper.
 5     THE WITNESS:  It is.
 6     MR. BLACKMAN:  Ma'am, you've got lawyers who can
 7   speak for you.  The reason why -- is everybody done?
 8   Let me just finish this objection.  The reason why it's
 9   relevant is when you're seeking to establish whether or
10   not he has a residence here, whether he has an abode
11   here, the witness has testified that she thinks that he
12   has not permanently moved because he has businesses and
13   assets here.  It's very relevant to whether or not his
14   move to India is permanent or not.  So, again, I don't
15   want to debate it with you.  I just want to put it on
16   the record.  Judge Guzman will go through this and I'm
17   sure he'll tell us very quickly what is and what is not
18   relevant.
19     MR. SHMIKLER:  For the record, I own assets in
20   Romania and I don't live there.
21     MR. BLACKMAN:  But you're not making a
22   representation in court under oath that you do not have
23   a residence in the United States.  So that's the
24   difference.
```

Page 128

```
 1     MR. SHMIKLER:  The question is still the same where
 2   you live, but go ahead.
 3                    (Sastri Deposition Exhibit
 4                     No. 7 was marked for
 5                     identification.)
 6   BY MR. BLACKMAN:
 7     Q    I'm going to show you Exhibit 7.  Do you
 8   recognize this as the joint parenting agreement that is
 9   in effect between yourself and your husband that was
10   file stamped September 7, 2007?
11     A    Yes.
12     MR. SHMIKLER:  We have the same objection to this
13   document as to the last three exhibits.
14   BY MR. BLACKMAN:
15     Q    And is it your testimony that this is the
16   most recent -- Strike that.
17     Are you aware of any other joint parenting
18   agreement that came after this one?
19     A    No.
20     Q    And is this the agreement that both you and
21   your husband are currently bound to?
22     A    Yes.
23     MR. ROSE:  Just note for the record that the
24   document itself seems to indicate that there's
```

Page 129

```
 1   pages -- there's 24 pages.  The document that I have in
 2   front of me as Exhibit 7 appears to have 23 pages.
 3     MR. BLACKMAN:  As does mine.  Yeah.  Page 23 looks
 4   like the signature page.  I don't know if there is a
 5   24th page.
 6     We're going to adjourn and we'll reserve the
 7   right to redepose her or call her to testify at the
 8   trial or at the evidentiary hearing depending upon what
 9   transpires after today in terms of documents or other
10   issues between the lawyers.  We'd rather not.  It's not
11   our hope to do that.  But, again, issues arose this
12   morning that required me to say that.  And I'll speak
13   with you, Counsel, after the deposition.
14     Ma'am, thank you very much for coming down.  I
15   know that it's someplace you don't want to be, and I
16   appreciate your time.
17     THE WITNESS:  You're welcome.
18     MR. BLACKMAN:  Are you waiving signature?  Oh, you
19   don't need to.  We're in federal court so.
20     MR. ROSE:  And for the record, the official copies
21   that the court reporter marked I'm going to tender back
22   to the court reporter to have her keep together with the
23   transcript.
24     MR. SHMIKLER:  And obviously in addition to
```

33  (Pages 126 to 129)

e0e747cc-eb0d-42f9-a074-0f84ae8e847a

Page 130

1 objections we have to the proceeding today, we would
2 reserve all objections to any attempt to continue with
3 the proceeding.
4     MR. ROSE: We will similarly evaluate any
5 subsequent requests to have this witness reappear and
6 assert whatever objections are appropriate at that time.
7     MR. BLACKMAN: No objection go unstated, so all
8 right. Thank you.
9     MR. ROSE: Did you have any other follow-up
10 questions you wanted to ask, Mr. Shmikler?
11     MR. SHMIKLER: No. We're done.
12     MR. ROSE: Thank you. We're off the record.
13           (Further deponent saith
14           naught.)
15
16
17
18
19
20
21
22
23
24

Page 131

1 STATE OF ILLINOIS )
2              ) SS:
3 COUNTY OF C O O K )
4     I, JENNIFER A. BUCKLEY, a notary public within and
5 for the County of Cook and State of Illinois, do hereby
6 certify that heretofore, to-wit, on the 8th day of April
7 2008, personally appeared before me, at 55 West Monroe
8 Street, Suite 3200, Chicago, Illinois, SURIYA SASTRI, in
9 a cause now pending and undetermined in the United
10 States District Court, wherein INDYMAC BANK, F.S.B. is
11 the Plaintiff, and GANESAN VISVABHARATHY is the
12 Defendant.
13     I further certify that the said witness was first
14 duly sworn to testify the truth, the whole truth and
15 nothing but the truth in the cause aforesaid; that the
16 testimony then given by said witness was reported
17 stenographically by me in the presence of the said
18 witness, and afterwards reduced to typewriting by
19 Computer-Aided Transcription, and the foregoing is a
20 true and correct transcript of the testimony so given by
21 said witness as aforesaid.
22     I further certify that the taking of this
23 deposition was pursuant to Notice, and that there were
24 present at the deposition the attorneys hereinbefore

Page 132

1 mentioned.
2     I further certify that I am not counsel for nor in
3 any way related to the parties to this suit, nor am I in
4 any way interested in the outcome thereof.
5     IN TESTIMONY WHEREOF: I have hereunto set my hand
6 and affixed my notarial seal this _____ day of
7 _____ 2008.
8
9
10
11     _____
12     NOTARY PUBLIC, COOK COUNTY, ILLINOIS
13
14
15
16
17
18
19
20
21
22
23
24

34 (Pages 130 to 132)